No. 19-2265

# In the United States Court of Appeals for the Fourth Circuit

---

**PUBLIC INTEREST LEGAL FOUNDATION**,

*Plaintiff-Appellant*,

v.

**NORTH CAROLINA STATE BOARD OF ELECTIONS**
and **KAREN BRINSON BELL**, in her official capacity as Executive Director of the North Carolina State Board of Elections

*Defendants-Appellees*,

---

On Appeal from the United States District Court for the Eastern District of North Carolina, in Case No. 5:19-cv-00248 (Hon. Terrence W. Boyle)

---

## JOINT APPENDIX

---

Noel H. Johnson (WI Bar No. 1068004)
Kaylan L. Phillips (IN Bar No. 30405-84)
PUBLIC INTEREST LEGAL FOUNDATION
32 East Washington Street, Suite 1675
Indianapolis, IN 46204
Tel: 317-203-5599
Fax: 888-815-5641
njohnson@publicinterestlegal.org
kphillips@publicinterestlegal.org

*Counsel for Appellant Public Interest Legal Foundation*

# **TABLE OF CONTENTS**

Docket Sheet ................................................................ 1

First Amended Complaint ............................................. 4

Exhibits to First Amended Complaint

    A. Post-Election Audit (2016) ................................. 25

    B. County Record Requests ................................... 59

    C. County NVRA Violation Notices ....................... 68

    D. Email Chain with Patrick Gannon .................... 74

    E. State Board NVRA Violation Notice ................. 78

    F. Email to Executive Director Attaching Violation Notice ............ 81

    G. Letter from Josh Lawson ................................. 82

    H. Foundation's Response to Josh Lawson ............ 85

    I.  Email Chain with Paul Cox .............................. 89

    J.  Foundation's Inspection Visit Letter ................ 95

    K. Letter from Paul Cox ....................................... 96

Defendant's Motion to Seal Ex Parte Motion to Stay .................... 98

Exhibits to Defendants' Motion to Dismiss

    1.  Complaint, League of United Latin American Citizens v. Public Interest Legal Foundation ............... 100

    2.  May 3 Correspondence from State Board with Attachments .... 187

    3.  Memorandum Opinion & Order, League of United Latin American Citizens v. Public Interest Legal Foundation ............ 245

    4.  Stipulation and Order of Dismissal with Prejudice, League of United Latin American Citizens v. Public Interest Legal Foundation ... 251

Exhibits to Plaintiff's Opposition to Motion to Dismiss

    A. Order, Public Interest Legal Foundation v. Reed ........................ 254

B.  Records Request to Wake County Board of Elections................ 256

Exhibits to Defendant's Reply in Support of Motion to Dismiss

1.  Declaration of Cleminshaw and Exhibits, League of United Latin American Citizens v. Public Interest Legal Foundation ............. 261

2.  Motion to Dismiss and Memorandum, Public Interest Legal Foundation v. Reed.................................................................... 284

Order Granting Defendant's Motion to Dismiss......................................... 294

Judgement ................................................................................... 303

Notice of Appeal ......................................................................... 304

APPEAL,CLOSED,MEDIATION,USMJ Gates

## U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CIVIL DOCKET FOR CASE #: 5:19–cv–00248–BO

Public Interest Legal Foundation, Inc. v. North Carolina State
Board of Elections
Assigned to: Chief Judge Terrence W. Boyle
Case in other court:  4CCA, 19–02265
Cause: Civil Miscellaneous Case

Date Filed: 06/17/2019
Date Terminated: 10/17/2019
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 06/17/2019 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0417–4986593.), filed by Public Interest Legal Foundation, Inc.. (Attachments: # 1 Exhibit A– Post Election Audit Report, # 2 Exhibit B– NVRA public disclosure report, # 3 Exhibit C– NVRA Violation Report, # 4 Exhibit D– Emails, # 5 Exhibit E– Notice of NVRA Violation, # 6 Exhibit F– Email, # 7 Exhibit G– Letter dated 5/3/19, # 8 Exhibit H– NVRA Violation and Inspection Visit # 9 Exhibit I– Emails, # 10 Exhibit J– NVRA Violation and Inspection Visit) (Sawrey, Benton) Modified on 6/19/2019 to describe exhibits. (Rudd, D.) (Entered: 06/17/2019) |
| 06/17/2019 | 2 | Notice filed by Public Interest Legal Foundation, Inc. . (Sawrey, Benton) (Entered: 06/17/2019) |
| 06/17/2019 | 3 | Financial Disclosure Statement by Public Interest Legal Foundation, Inc. (Sawrey, Benton) (Entered: 06/17/2019) |
| 06/17/2019 | 4 | Notice filed by Public Interest Legal Foundation, Inc. . (Sawrey, Benton) (Entered: 06/17/2019) |
| 06/17/2019 | 5 | Notice of Appearance filed by Benton G. Sawrey on behalf of Public Interest Legal Foundation, Inc.. (Sawrey, Benton) (Entered: 06/17/2019) |
| 06/17/2019 | 6 | Notice filed by Public Interest Legal Foundation, Inc. regarding 1 Complaint, *Exhibit K– Letter to Noel Johnson dated May 22, 2019.* (Sawrey, Benton) Modified on 6/19/2019 to describe exhibit. (Rudd, D.) (Entered: 06/18/2019) |
| 06/18/2019 | 7 | Notice of Special Appearance for non–district by Noel H. Johnson on behalf of Public Interest Legal Foundation, Inc.. (Johnson, Noel) (Entered: 06/18/2019) |
| 06/19/2019 |  | Notice to Counsel – Counsel did not properly identify exhibits pursuant to Section V.E. of the CM/ECF Policies and Procedures Manual. (i.e., "Exhibit A" is not a sufficient description). Additionally, when filing a document with more than five exhibits, the first attached exhibit must be an index of all the subsequent attachments. (Rudd, D.) (Entered: 06/19/2019) |
| 06/19/2019 |  | Notice to Counsel regarding: 2 Notice – other, 4 Notice – other. When filing a stand alone document using the event "Notice–other". Counsel should describe the filing in the space indicated (i.e. *Proposed Summons, Civil Cover Sheet*). No action needed at this time. (Rudd, D.) (Entered: 06/19/2019) |
| 06/19/2019 | 8 | Summons Issued as to North Carolina State Board of Elections. *(\*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.\*)* (Rudd, D.) (Entered: 06/19/2019) |
| 06/26/2019 |  | Case Selected for Mediation – A printable list of certified mediators for the Eastern District of North Carolina is available on the court's Website, http://www.nced.uscourts.gov/attorney/mediators.aspx. Please serve this list on all parties. (Stouch, L.) (Entered: 06/26/2019) |
| 07/03/2019 | 9 | Affidavit of Service for Complaint for Declaratory and Injunctive Relief filed by Public Interest Legal Foundation, Inc. served on Katelyn Love on 06/24/2019. (Johnson, Noel) (Entered: 07/03/2019) |

| 07/12/2019 | 10 | Notice of Appearance filed by Paul M. Cox on behalf of North Carolina State Board of Elections. (Cox, Paul) (Entered: 07/12/2019) |
|---|---|---|
| 07/15/2019 | 11 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by North Carolina State Board of Elections. (Attachments: # 1 Exhibit 1 LULAC v. PILF Complaint, # 2 Exhibit 2 May 3, 2019 Correspondence with PILF, # 3 Exhibit 3 LULAC v. PILF Memorandum Opinion & Order) (Cox, Paul) (Entered: 07/15/2019) |
| 07/15/2019 | 12 | Memorandum in Support regarding 11 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by North Carolina State Board of Elections. (Cox, Paul) (Entered: 07/15/2019) |
| 07/19/2019 | 14 | Ex Parte Motion to Seal 13 PROPOSED SEALED EX PARTE MOTION by Defendant North Carolina State Board of Elections . (Attachments: # 1 Text of Proposed Order) (Cox, Paul) (Entered: 07/19/2019) |
| 07/31/2019 | 15 | SEALED Ex Parte ORDER. Signed by Chief Judge Terrence W. Boyle on 7/30/2019. (Stouch, L.) (Entered: 07/31/2019) |
| 08/02/2019 | 17 | **AMENDED COMPLAINT** against North Carolina State Board of Elections, Karen Brinson Bell, filed by Public Interest Legal Foundation, Inc.. (Attachments: # 1 Index Index of Exhibits, # 2 Exhibit Exhibit A – Post Election Audit Report (2016), # 3 Exhibit Exhibit B – County Record Requests, # 4 Exhibit Exhibit C – County Violation Notices, # 5 Exhibit Exhibit D – Email Chain with Patrick Gannon, # 6 Exhibit Exhibit E – NCSBE Violation Notice, # 7 Exhibit Exhibit F – Email to Executive Director, # 8 Exhibit Exhibit G – Letter from Josh Lawson, # 9 Exhibit Exhibit H – Plaintiff's Response to Josh Lawson, # 10 Exhibit Exhibit I – Email Chain with Paul Cox, # 11 Exhibit Exhibit J – Plaintiff's Inspection Visit Letter, # 12 Exhibit Exhibit K – Letter from Paul Cox) (Johnson, Noel) (Entered: 08/02/2019) |
| 08/02/2019 | 18 | Notice filed by Public Interest Legal Foundation, Inc. regarding 17 Amended Complaint,,, *Proposed Summons.* (Johnson, Noel) (Entered: 08/02/2019) |
| 08/05/2019 | 19 | Summons Issued as to Karen Brinson Bell. *(*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.*)* (Stouch, L.) (Entered: 08/05/2019) |
| 08/05/2019 | 20 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *First Amended Complaint* filed by North Carolina State Board of Elections. (Attachments: # 1 Exhibit 1 Complaint, LULAC v. PILF, # 2 Exhibit 2 May 3, 2019 Correspondence with PILF, # 3 Exhibit 3 LULAC v. PILF Memorandum Opinion & Order, # 4 Exhibit 4 Stipulated Dismissal Order, LULAC v. PILF) (Cox, Paul) (Entered: 08/05/2019) |
| 08/05/2019 | 21 | Memorandum in Support regarding 20 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *First Amended Complaint* filed by North Carolina State Board of Elections. (Cox, Paul) (Entered: 08/05/2019) |
| 08/07/2019 | 22 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *the First Amended Complaint, joining the motion and brief filed by the North Carolina State Board of Elections (DE 20, 21),* filed by Karen Brinson Bell. (Cox, Paul) (Entered: 08/07/2019) |
| 08/07/2019 | 23 | Notice of Special Appearance for non–district by Kaylan L. Phillips on behalf of Public Interest Legal Foundation, Inc.. (Phillips, Kaylan) (Entered: 08/07/2019) |
| 08/09/2019 | 24 | Affidavit of Service for Amended Summons in a Civil Action and Complaint for Declaratory and Injunctive Relief filed by Public Interest Legal Foundation, Inc. served on Katelyn Love on 08/06/2019. (Johnson, Noel) (Entered: 08/09/2019) |
| 08/26/2019 | 26 | RESPONSE in Opposition regarding 20 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *First Amended Complaint*, 22 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *the First Amended Complaint, joining the motion and brief filed by the North Carolina State Board of Elections (DE 20, 21),* filed by Public Interest Legal Foundation, Inc.. (Attachments: # 1 Exhibit PILF v. Reed Order, # 2 Exhibit VIP–NC Records Request Letter) (Johnson, Noel) (Entered: 08/26/2019) |
| 09/09/2019 | 27 | REPLY to Response to Motion regarding 20 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *First Amended Complaint*, 22 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *the First Amended Complaint, joining the motion and brief filed by the North Carolina State Board of Elections (DE 20, 21),* filed by |

|  |  |  |
|---|---|---|
|  |  | Karen Brinson Bell, North Carolina State Board of Elections. (Attachments: # <u>1</u> Exhibit Exhibit 1 Exhibits from LULAC Case, # <u>2</u> Exhibit Exhibit 2 PILF v Reed, Motion to Dismiss) (Cox, Paul) (Entered: 09/09/2019) |
| 09/10/2019 |  | Motions Submitted to Chief Judge Terrence W. Boyle regarding <u>22</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *the First Amended Complaint, joining the motion and brief filed by the North Carolina State Board of Elections (DE 20, 21),* <u>20</u> MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *First Amended Complaint.* (Stouch, L.) (Entered: 09/10/2019) |
| 09/13/2019 | <u>28</u> | Notice filed by Karen Brinson Bell, North Carolina State Board of Elections regarding <u>27</u> Reply to Response to Motion,, *clarifying a passage in the Reply.* (Cox, Paul) (Entered: 09/13/2019) |
| 10/17/2019 | <u>29</u> | ORDER granting <u>20</u> Motion to Dismiss for Failure to State a Claim and <u>22</u> Motion to Dismiss for Failure to State a Claim and denying as moot <u>11</u> Motion to Dismiss for Failure to State a Claim. Signed by Chief Judge Terrence W. Boyle on 10/16/2019. (Stouch, L.) (Entered: 10/17/2019) |
| 10/17/2019 | <u>30</u> | SEALED Ex Parte ORDER. Signed by Chief Judge Terrence W. Boyle on 10/16/2019. (Stouch, L.) (Entered: 10/17/2019) |
| 10/17/2019 | <u>31</u> | JUDGMENT – IT IS ORDERED, ADJUDGED AND DECREED that defendants' motions to dismiss [DE 20 & 22] are GRANTED. The pending motion to dismiss the original complaint [DE 11] is DENIED AS MOOT. This case is closed. Signed by deputy clerk for Peter A. Moore, Jr., Clerk of Court on 10/17/2019. (Stouch, L.) (Entered: 10/17/2019) |
| 11/07/2019 | <u>32</u> | Notice of Appeal filed by Public Interest Legal Foundation, Inc. as to <u>31</u> Judgment, <u>30</u> SEALED Order, <u>15</u> SEALED Order, <u>29</u> Order on Motion to Dismiss for Failure to State a Claim,,,,,. Filing fee, receipt number 0417–5176305. (Johnson, Noel) (Entered: 11/07/2019) |
| 11/08/2019 | <u>33</u> | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding <u>32</u> Notice of Appeal. (Rudd, D.) (Entered: 11/08/2019) |
| 11/13/2019 | <u>34</u> | US Court of Appeals Case Number 19–2265 (Richard Sewell, Case Manager) as to <u>32</u> Notice of Appeal, filed by Public Interest Legal Foundation, Inc.. (Foell, S.) (Entered: 11/13/2019) |

<u>JA-3</u>

**United States District Court**
**Eastern District of North Carolina**
**Western Division**

| | |
|---|---|
| The **PUBLIC INTEREST LEGAL FOUNDATION**, <br><br> *Plaintiff*, <br><br> *v.* <br><br> **KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections, and NORTH CAROLINA STATE BOARD OF ELECTIONS**, <br><br> *Defendants*. | No. 5:19-cv-00248-BO |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Public Interest Legal Foundation (the "Foundation"), by its attorneys, brings this action for violations of Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States. This Court also has jurisdiction under 52 U.S.C. § 20510(b), as the action seeks injunctive and declaratory relief under the NVRA.

2. Venue in this Court is proper under 28 U.S.C. § 1391(b)(1), because the Defendants reside in this district, and under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

### PARTIES

3. The Public Interest Legal Foundation, Inc., (the "Foundation") is a non-partisan, public interest organization incorporated and based in Indianapolis, Indiana. The Foundation seeks to promote the integrity of elections nationwide through research, education, remedial

programs, and litigation. The Foundation regularly utilizes the NVRA's Public Disclosure

Provision and state and federal open records laws that require government records be made

available to the public. Using records and data compiled through these open records laws, the

Foundation produces and disseminates reports, articles, blog and social media posts, and

newsletters in order to advance the public education aspect of its organizational mission.

4.      Defendant Karen Brinson Bell is the Executive Director of the State Board of

Elections. Defendant Brinson Bell is the Chief State Elections Official of North Carolina for

purposes of the NVRA and is responsible for administration of North Carolina's election laws

and coordination of State responsibilities under the NVRA. N.C. Gen. Stat. § 163-27; N.C. Gen.

Stat. § 163-82.2. *See also*, 52 U.S.C. § 20509. Defendant Brinson Bell is responsible for

compliance with the NVRA, including the Public Disclosure Provision, 52 U.S.C. § 20507(i).

5.      Defendant North Carolina State Board of Elections is the state agency responsible

for the administration of North Carolina's election laws. *See, e.g.*. N.C. Gen. Stat. § 163-22. The

North Carolina State Board of Elections is responsible for overseeing elections and supervising

and maintaining voter registration and election records. Defendant North Carolina State Board of

Elections is responsible for compliance with the NVRA, including the Public Disclosure

Provision, 52 U.S.C. § 20507(i).

6.      Defendants are collectively referred to as "State BOE" throughout this Amended

Complaint. Unless otherwise specified, all allegations in this Amended Complaint are made

against all Defendants.

7.      Under 52 U.S.C. § 20507(i), the State BOE is required to maintain all records

related to registration list maintenance activities for at least two years and must permit public

inspection of all such records.

8.     The State BOE is a custodian of the requested records.

## BACKGROUND

9.     This is a public records case. More than nine months ago, the Foundation requested access to records that federal law entitles the Foundation to inspect and photocopy. Defendants are admittedly denying the Foundation access to the requested records. The Foundation now has no recourse but to seek relief from this Court.

10.     The governing statute is more than just a federal freedom of information law. Rather, upon request, election administration officials must "make available for *public inspection* . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1) (emphasis added) (hereafter, the "Public Disclosure Provision").

11.     The Public Disclosure Provision confers on the Foundation and every individual "a public right to information." *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 703 (E.D. Va. 2010). "[A] statutory right to information is substantive" in kind, *Landrum v. Blackbird Enters.*, LLC, 214 F. Supp. 3d 566, 571 (S.D. Tex. 2016), and thus a violation of that right creates an informational injury sufficient to establish Article III standing, *FEC v. Akins*, 524 U.S. 11, 21 (1998) ("[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute").

12.     The Fourth Circuit Court of Appeals instructs that the Public Disclosure Provision is to be interpreted broadly, explaining that the NVRA's "use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012). The Public Disclosure Provision's "language embodies Congress's conviction that Americans who are eligible under law to vote

3

have every right to exercise their franchise, a right that must not be sacrificed to administrative

chicanery, oversights, or inefficiencies." *Id*. at 334-35. Accordingly, "the NVRA requires

disclosure of all materials described in Section 8(i)(1), including voter registration records." *Id*.

at 337 (emphasis added).

13.     As recently articulated by the Southern District of Florida, Congress intended that

the NVRA's inspection rights would allow the public to monitor the activities of government as

they concern the right to vote:

> [The NVRA's Public Disclosure Provision is] available to any member of the
> public … and convey[s] Congress's intention that the public should be monitoring
> the state of the voter rolls and the adequacy of election officials' list maintenance
> programs. [52 U.S.C. § 20507(i)]. Accordingly, election officials must provide full
> public access to all records related to their list maintenance activities, including
> their voter rolls. *Id*. This mandatory public inspection right is designed to preserve
> the right to vote and ensure that election officials are complying with the NVRA.
> *Project Vote v. Long*, 682 F.3d. 331, 335 (4th Cir. 2012).

*Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *8 (S.D. Fla. Mar.
30, 2018).

14.     According to this Court, "to the extent [Defendant] maintains records concerning

implementation of its list maintenance activities . . . [it] is required to make such records

available for public inspection." *Voter Integrity Project NC, Inc. v. Wake Cty. Bd. of Elections*,

301 F. Supp. 3d 612, 618 n.5 (E.D.N.C. 2017).

15.     The State BOE, who is charged with the administration of the voter registration

and elections process, is not complying with the NVRA's Public Disclosure Provision. By

denying the Foundation access to the requested records, the State BOE is causing a concrete

injury to the Foundation in violation of the Foundation's right to information conferred by the

NVRA and is frustrating the Foundation's organizational mission. To remedy its ongoing injury,

the Foundation seeks declaratory and injunctive relief from this Court. Specifically, the

4

Foundation seeks a declaration that the requested records are subject to public inspection under the NVRA. The Foundation also seeks an order compelling the State BOE to comply with the NVRA's Public Disclosure Provision through an order commanding the State BOE to permit inspection and duplication of all requested records in its actual and constructive possession.

16.  The NVRA's Public Disclosure Provision provides:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1); *see also Project Vote v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) ("First, the statute clearly states that '*all* records' falling under Section 8(i)(1) must be publicly disclosed, not just those explicitly listed in Section 8(i)(2)") (emphasis in original).

17.    The only records exempted from the NVRA's Public Disclosure Provision are "records relate[d] to a declination to register to vote or the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).

18.    The NVRA's civil enforcement provision allows for a private right of action by any person "aggrieved by a violation," after providing, if necessary, "written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b).

> If the violation is not corrected within 90 days after receipt of a notice . . . or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

52 U.S.C. § 20510(b)(2).

5

19.     However, "[i]f the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2)." 52 U.S.C. § 20510(b)(3).

20.     A person is "aggrieved" by a violation of the Public Disclosure Provision if the person is denied access to records to which he is entitled under the NVRA.

**Programs and Activities Conducted to Ensure Accuracy of the Voter Rolls**

21.     In North Carolina, list maintenance records are maintained by state and county officials using a statewide computerized voter registration system, which facilitates voter registration and provides a central database containing voter registration information for each county. N.C. Gen. Stat. § 163-82.11.

22.     The State BOE is required to "adopt a uniform program that makes a diligent effort not less than twice each year . . . [t]o remove the names of ineligible voters from the official lists of eligible voters." N.C. Gen. Stat. § 163-82.14(a).

23.     The State BOE "has the authority to perform list maintenance…with the same authority as a county board." N.C. Gen. Stat. § 163.82-14(e).

24.     The State BOE coordinates with the North Carolina Division of Motor Vehicles ("DMV") to identify registered voters who have indicated to DMV that they do not satisfy the citizenship qualification to register and vote. *See* Exhibit A (report of audit conducted after 2016 General Election).[1] Each such registrant is sent a notice asking for confirmation of his or her

---

[1] *See also, e.g.*, Letter from State BOE Executive Director Gary Bartlett to North Carolina House Elections Committee, Attachment B at 6, March 11, 2013, available at, https://www.ncleg.gov/documentsites/committees/JointAppropriationsGeneralGovernment/2013%20Session/03-07-13%20Meeting/sbe_GA_response_with_attachments.pdf (last accessed Aug. 2, 2019) (describing DMV audit to identify and remove noncitizens who are registered to vote).

citizenship status. Registrants who fail to respond to the inquiry are removed from the lists of registrants who are eligible to vote. Records related to those activities are responsive to the Foundation's request and must be made available under the Public Disclosure Provision.

25.    The State BOE coordinates with the U.S. Department of Homeland Security and the U.S. Citizenship and Immigration Service to identify registrants who do not satisfy the citizenship qualification to register and vote. Exhibit G at 2-3. Records related to those activities are responsive to the Foundation's request and must be made available under the Public Disclosure Provision.

26.    On information and belief, the State BOE has engaged and is engaging in other programs and activities conducted to identify and remove ineligible registrants from the registration rolls, including registrants who do not satisfy the necessary citizenship requirements. Records related to those activities are responsive to the Foundation's request and must be made available under the Public Disclosure Provision.

**Instances of Registration and Voting by Noncitizens in North Carolina**

27.    United States citizenship is a requirement to register and to vote in North Carolina. N.C. Gen. Stat. §§ 163-55(a); 163-54.

28.    In 2014, the State BOE reported that it "completed an audit of more than 10,000 registered voters with questionable citizenship status. The Agency analyzed data provided by the N.C. Division of Motor Vehicles and the U.S. Department of Homeland Security to flag 1,425 currently registered voters who are likely non-citizens."[2]

---

[2] Press Release, North Carolina State Board of Elections, *Board of Elections finalizes citizenship audit*, Oct. 24, 2014, https://www.ncsbe.gov/press-releases?udt_2226_param_detail=15.

7

29.      In April 2017, the State BOE issued the Post-Election Audit Report for General

Election 2016. Exhibit A. The audit's Summary provides:

> **41 non-citizens with legal status (green card, etc.) cast ballots.** The State
> Constitution only permits U.S. citizens to register and to vote. The audit pairing
> state and federal databases identified an additional 34 voters who provided
> documents showing they are U.S. citizens. Investigators continue to review 61
> additional records.

Exhibit A at 3 (bolded language in original).

30.      In August 2018, federal prosecutors charged 19 foreign nationals with registering

to vote and voting illegally in North Carolina in the 2016 presidential election.[3]

**The Foundation Sought and was Denied Access to Records Concerning Noncitizen
Registrants and Voters**

31.      On September 10, 2018, the Foundation sent letters via email to the county boards

of elections for the counties of Durham, Guilford, and Forsyth. Copies of these letters are

attached as Exhibit B.

32.      Citing the NVRA's Public Disclosure Provision of the NVRA, 52 U.S.C. §

20507(i), the Foundation's letters sought the opportunity to inspect the following three broad

categories of records concerning each county board's programs and activities related to the

registration and removal of suspected and actual non-U.S. citizens since 2006:

> 1. Documents regarding all registrants who were identified as potentially not
> satisfying the citizenship requirements for registration from any official
> information source, including information obtained from the various agencies
> within the U.S. Department of Homeland Security, North Carolina Department of
> Motor Vehicles, and from the North Carolina State Board of Elections since
> January 1, 2006. This request extends to all documents that provide the name of the
> registrant, the voting history of such registrant, the nature and content of any notice
> sent to the registrant, including the date of the notice, the response (if any) of the

---

[3] Press Release, U.S. Attorney's Office, Eastern District of North Carolina, *Nineteen Foreign
Nationals Charged for Voting in 2016 Election*, Aug. 24, 2018, https://www.justice.gov/usao-
ednc/pr/nineteen-foreign-nationals-charged-voting-2016-election.

8

registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.

2. All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection officials—state and federal--since January 1, 2006 referencing individuals who claimed to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

33.    The request also provided specific examples of responsive documents, including the "completed voter application form" for each registrant and "[a]ny documents sent by your office to the voter to require that an affirmation of citizenship or noncitizenship be given in writing with responses included, where applicable." The full scope of records sought is available at Exhibit B.

34.    When the Foundation received no response to the requests, the Foundation notified each county board on October 1, 2018 that it was in violation of the NVRA, copying the State BOE on the correspondence. Exhibit C.

35.    On October 1, 2018, Patrick Gannon, Public Information Officer for the State BOE, contacted the Foundation via email, stating,

We at the State Board of Elections & Ethics Enforcement hope to help facilitate a response to your recent records request to some of North Carolina's county boards of elections, as our agency likely houses some of the data responsive to your request.

We are aware of requests to two counties – Durham and Forsyth. Were additional requests made to other counties?

Exhibit D at 4.

36.     On October 1, 2018, the Foundation made the State BOE aware of the third pending records request—to Guilford County—and, on October 9, 2018, the Foundation asked the State BOE to collect and provide "identical information" from the counties of Mecklenburg and Buncombe. Exhibit D at 3-4. The requests for records of the county boards in Durham, Forsyth, Guilford, Mecklenburg, and Buncombe are hereafter referred to collectively as the "County Records Requests."

37.     When no further correspondence was received from the State BOE, the Foundation wrote to the State BOE via email on October 29, 2018, asking for an update on the progress of the County Records Requests. Exhibit D at 3.

38.     Later that day, the State BOE responded via email, assuring the Foundation that the State BOE was "working on them" and "would hope to have a response to [the Foundation] some time in November." Exhibit D at 2.

39.     The State BOE did not produce any records or further communicate with the Foundation in November 2018.

40.     Cognizant that the State BOE was facing uncertainty regarding the legality of its composition[4], the Foundation remained patient, and agreed to travel to State BOE offices to conduct an in-person inspection of the requested records on January 11, 2019. On December 13, 2018, the Foundation informed the State BOE via email of its plans to visit the State BOE for an inspection. Exhibit D at 2.

41.     On or around January 9, 2019, the State BOE contacted the Foundation via telephone to communicate that the scheduled in-person visit was not necessary because the State

---

[4] Horsch, The News & Observer, The clock is ticking for elections board ruled unconstitutional, but there's a reprieve, Nov. 30, 2018, https://www.newsobserver.com/news/politics-government/article222432185.html.

10

BOE would begin production of records by the end of January—as agreed to by both parties at the time. On January 9, 2019, the phone call was memorialized in an email, in which the State BOE stated, "Working on the citizenship request now, per our discussion. I will send records for your additional request on a rolling basis as they are reviewed and redacted." Exhibit D at 2. Based on those representations, the Foundation cancelled its representative's flight to State BOE offices. However, the State BOE did not produce any records or further communicate with the Foundation by the end of January 2019.

42.     More than two months later, on April 10, 2019, the Foundation again wrote to the State BOE via email to request an update on the progress of the County Records Requests, stating, "We're well-past the agreed time and are simply running out of runway. Please advise asap." Exhibit D at 1.

43.     Later than day, the State BOE responded via email, assuring the Foundation that an "update" and records were imminently forthcoming, stating, "I will give you a full update and hopefully start providing responsive documents tomorrow or Friday." Exhibit D at 1. The State BOE did not produce any "update" or any records by Friday, April 12, 2019.

44.     The Foundation waited for a response for nearly three additional weeks before again contacting the State BOE.

45.     On April 30, 2019, the Foundation contacted Kim Westbrook Strach, then-Executive Director of the State BOE and North Carolina's Chief Election Official, by letter via email and through the United States Postal Service. A copy of the letter, hereafter referred to as the "NVRA Violation Notice" is attached as Exhibit E. A copy of the email sent to then-Executive Director Strach (and the general contact email for the State BOE—Elections.SBOE@ncsbe.gov) attaching the NVRA Notice Letter is attached as Exhibit F.

11

46.    Then-State BOE Chairman Robert Cordle received a copy of the NVRA Violation Notice via the United States Postal Service. Exhibit E at 3.

47.    The NVRA Violation Notice notified then-Executive Director Strach that the Foundation has not received any responsive records from her office, despite repeated assurances that production of records was imminently forthcoming. Exhibit E at 1.

48.    The NVRA Violation Notice also notified then-Executive Director Strach that the requested records are subject to disclosure under to the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i). Exhibit E at 1.

49.    The NVRA Violation Notice also notified then-Executive Director Strach that the State BOE is in violation of the NVRA for failure to permit inspection and photocopying of the requested records, as required by 52 U.S.C. § 20507(i). Exhibit E at 1.

50.    A primary election for federal office in North Carolina was scheduled for and did occur on May 14, 2019.[5]

51.    The NVRA violation described in this Complaint occurred and was ongoing within 30 days of the federal election scheduled for May 14, 2019.

52.    For NVRA violations occurring within 30 days of an election for federal office, there is no curative period. "The aggrieved person need not provide notice to the chief election official of the State . . . before bringing a civil action . . . ." 52 U.S.C. § 20510(b)(3).

53.    Although not required by the NVRA, the Foundation nevertheless provided pre-litigation notice to then-Executive Director Strach—the Chief Election Official of North Carolina, N.C. Gen. Stat. § 163-82.2—in an effort to resolve this dispute without court intervention.

---

[5] https://s3.amazonaws.com/dl.ncsbe.gov/Elections/2019/District9Candidates.pdf.

54.     The NVRA Notice Letter informed then-Executive Director Strach and the State BOE that "[i]f the NVRA violation described herein is not corrected immediately, the Foundation will pursue federal litigation to enforce its rights." Exhibit E at 3.

55.     On May 3, 2019, the Foundation received a letter and documents via email from Josh Lawson, then-General Counsel for the State BOE. A copy of the letter is attached as Exhibit G.

56.     The State BOE's May 3 letter describes programs and activities conducted by the State BOE to perform registration list maintenance with respect to suspected or actual noncitizen registrants and acknowledged that records of those programs and activities are responsive to the Foundation's requests. Exhibit G at 2-3.

57.     The May 3 letter further explained that the State BOE will not permit the Foundation to inspect those records. Exhibit G at 2-3.

58.     The State BOE attached to its May 3 letter a small number of records it claimed were responsive to the Foundation's request.

59.     The attached records included the State BOE's Post-Election Audit Report for General Election 2016 (the "2016 Audit"). Exhibit A.

60.     The 2016 Audit describes programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters with respect to suspected and actual noncitizens. Exhibit A at 3, 5-6, 9-10.

61.     The 2016 Audit refers to "[i]nformation obtained from those who are not citizens," Exhibit A at 6, and includes documents entitled "Sample Letter to Possible Non-U.S. Citizen Voters," Exhibit A at 29-30, and "Admission or Denial of Non-U.S. Citizen Return Form," Exhibit A at 31.

13

62.     The 2016 Audit also includes a document that indicates how many registered noncitizens were identified in each North Carolina county. Exhibit A at 22-23. Each of the counties from which records were requested had at least one noncitizen whose registration was canceled in connection with the 2016 Audit. *Id*.

63.     Records relating to the 2016 Audit were requested, are responsive to the County Records Request, and must be made available for inspection under the NVRA's Public Disclosure Provision.

64.     Although the Foundation had already done so, the May 3 letter asked the Foundation to "please indicate what records it now seeks." Exhibit G at 3.

65.     On May 9, 2019, the Foundation responded to the State BOE via letter, which explained why the State BOE's decision to withhold the requested records is without justification and explained that the State BOE "remains in violation of the NVRA." Exhibit H at 2.

66.     The May 9 letter further explained that the Foundation continues to seek all records responsive to its request and repeated the examples of such records, Exhibit H at 2, specifically referencing the records described in the 2016 Audit (Exhibit A).

67.     The Foundation informed the State BOE that its representative planned to visit the State BOE's offices a week later, on May 16, 2019, to inspect and retrieve copies of the requested records. Exhibit H at 2.

68.     On May 13, 2019, the Foundation received an email from Paul Cox, an attorney in the North Carolina Attorney General's Office, who claimed to represent the State BOE. Exhibit I at 4-5. The State BOE stated it would not accommodate the Foundation's planned inspection due to the need to prepare for two upcoming special elections. *Id*. at 5. Counsel for the

14

State BOE proposed a phone call to discuss the Foundation's records request and provided the days and times he would be available the following week. *Id.* at 5.

69. The Foundation was forced to rearrange its travel plans to accommodate the schedule of the State BOE and its counsel.

70. In a letter dated May 14, 2019, the Foundation informed the State BOE that its representative now planned to visit the State BOE's offices the week following the special election and on a day when Mr. Cox stated he was available—May 23, 2019. Exhibit J.

71. A week later, and two days before the Foundation's scheduled travel to State BOE offices, counsel for the State BOE stated in an email that the State BOE would mail responsive records to the Foundation on a hard drive. Exhibit I at 3-4. Counsel did not describe the records or state whether the State BOE was continuing to withhold responsive records as described in its May 3 letter.

72. The next day, May 22, 2019, the Foundation responded via email, stating,

> I cannot presently assess whether the records satisfy the request in full. Because my travel is already booked, I believe the best way to proceed is to retrieve the records in person, as planned. That way I can review what was compiled and resolve any outstanding issues in person. Hopefully, that will allow us to conclude this matter as quickly as possible.
>
> My plan is to arrive at the offices of the State Board at 10:00 am. If you prefer to be present and if another meeting location is preferable, please let me know as soon as possible.

Exhibit I at 3.

73. Counsel for the State BOE did not respond to the Foundation's May 22, 2019 email.

74. On May 22, 2019, the Foundation's representative traveled from Indianapolis, Indiana to Raleigh, North Carolina, and the following day, visited the State BOE's offices, as planned and as was communicated to the State BOE on May 14, 2019.

75.     When the Foundation's representative arrived, an administrative assistant gave him an envelope containing a cover letter, dated May 22, 2019, and a hard drive.

76.     The Foundation's representative asked to speak with then-General Counsel Josh Lawson, who informed the Foundation that he could not discuss the Foundation's records request further and referred the Foundation's representative to the State BOE counsel, Paul Cox.

77.     The hard drive provided to the Foundation on May 23, 2019 did not contain the requested records. With limited exception, the hard drive contained the same incomplete set of records provided via email on May 3, 2019.

78.     The May 22 cover letter that accompanied the hard drive explained, "For further background, I refer you to the May 3, 2019 letter from Board of Elections General Counsel Josh Lawson that was addressed to you." Exhibit K.

79.     While still in Raleigh, North Carolina, the Foundation's representative contacted the State BOE's counsel via email and asked to meet in person to discuss the Foundation's request for records. Exhibit I at 3.

80.     The State BOE's counsel responded that he could not meet due to deadlines and child care. Exhibit I at 2.

81.     On May 29, 2019, the Foundation spoke via telephone with the State BOE's counsel. During that call, the Foundation asked whether the State BOE is continuing to withhold records under the position stated in the May 3, 2019 letter from then-General Counsel Josh Lawson (Exhibit G), or whether the State BOE will permit inspection of the records as requested. State BOE counsel stated that he needed additional time to confirm his client's position. Exhibit I at 1 (email memorializing telephone call).

82.     On June 7, 2019, counsel for the State BOE left a voicemail for the Foundation, in which he indicated that the State BOE is standing by its previously-stated position—that taken in its May 3 letter (Exhibit G)—that the Foundation is not entitled to inspect the requested records.

83.     It has now been **326 days** since the Foundation first requested access to public voter list maintenance records in the possession of North Carolina election officials.

84.     The Foundation has spent considerable time and financial resources in an effort to obtain the requested records without the need for judicial intervention.

85.     Despite those efforts, the State BOE is denying the Foundation's request for inspection of records pursuant to the NVRA's Public Disclosure Provision.

**The State BOE is Violating the NVRA by Refusing to Provide Inspection of the Requested Records**

86.     The records requested from the State BOE are records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. . . ." 52 U.S.C. § 20507(i)(1).

87.     Under the NVRA, the State BOE is obligated to make the requested records available for public inspection and photocopying. *Id.*

88.     The State BOE has not done so and is therefore in violation of law. 52 U.S.C. § 20510.

89.     The State BOE's violation of the NVRA occurred within 30 days of an election for federal office and the violation is ongoing. Therefore, there is no pre-litigation notice requirement. 52 U.S.C. § 20510(b)(3).

90.     However, North Carolina's Chief Election Official was sent and received notice on April 30, 2019 that the State BOE was violating the NVRA. Exhibits E and F. Even if the 20-day curative period provided by 52 U.S.C. § 20510(b)(2) applied, the notice requirement has

17

been satisfied. *See Voter Integrity Project NC, Inc. v. Wake Cty. Bd. of Elections*, 301 F. Supp. 3d 612, 617 n.4 (E.D.N.C. 2017).

**The State BOE's Violation of the NVRA is Harming the Foundation and the Public**

91.    "[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). The Foundation is suffering a clear informational injury as a direct result of the State BOE's violations of the NVRA because the State BOE has denied the Foundation access to the records to which it is entitled under the law. This injury is ongoing.

92.    The State BOE's actions have also frustrated and harmed the Foundation's organizational mission.

93.    As an integral part of its public interest mission, the Foundation gathers and disseminates information about compliance by state and local officials with federal election statutes, including election integrity statutes.

94.    Using records and data compiled through use of the NVRA's Public Disclosure Provision, the Foundation has produced written reports concerning the registration and voting activity of noncitizens. The Foundation publishes and disseminates these reports as part of its mission.

95.    The Foundation publicizes its work through media and press sources. Representatives of the Foundation appear on national television programs and in widely circulated newspapers of record to discuss the inadequacies of state election systems in preventing noncitizens from registering and voting. The Foundation believes that keeping voter rolls free of ineligible registrants requires full transparency of government agencies. By denying

18

the Foundation access to the requested records the State BOE has impaired and will impair the Foundation from carrying out its mission.

96.     A central activity of the Foundation is to promote election integrity and compliance with federal and state statutes that are designed to improve the accuracy of voter rolls across the country. The State BOE's violations of NVRA have impaired and will impair the Foundation from carrying out this its mission.

97.     The failure of the State BOE to comply with its obligations under the NVRA has also undermined the confidence of North Carolina's properly registered voters in the integrity of the voter registration rolls, and, accordingly, has undermined the integrity of elections held across the State of North Carolina.

98.     The State BOE has not cured its violation of the NVRA.

99.     The State BOE's failure to permit inspection and duplication of the requested records pursuant to the NVRA is causing the Foundation to suffer an informational injury and has further frustrated, impeded and harmed the efforts of the Foundation.

## COUNT I

**Violation of the NVRA**
**Failure to Permit Inspection and Duplication of List Maintenance Records**

100.     Plaintiff realleges paragraphs 1 through 99 as if fully stated herein.

101.     Defendants have failed to permit inspection and duplication of records concerning Defendants' implementation of programs and activities conducted to ensure the accuracy and currency of the official lists of eligible registrants, in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(i). *See Project Vote v. Long*, 682 F.3d 331, 334-335 (4th Cir. 2012) (The NVRA requires election officials to provide such records to the public).

102.     Defendants have not cured their violation of law.

19

103.    Plaintiff is suffering an ongoing informational injury as a direct result of Defendants' violations of Section 8 of the NVRA because the Plaintiff does not have the data and records requested. The NVRA confers upon Plaintiff a right to information, and by denying that information to the Plaintiff, the Defendants have caused a concrete injury to the Plaintiff.

104.    Plaintiff will continue to be injured by the Defendants' violations of Section 8 of the NVRA unless and until the Defendants are enjoined from continuing to violate the law.

105.    Plaintiff has no adequate remedy at law.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiff prays for a judgment:

1.    Declaring that Defendants are in violation of Section 8 of the NVRA;

2.    Ordering the Defendants to provide to the Plaintiff the records concerning their implementation of programs and activities to ensure the accuracy and currency of voter registration lists;

3.    Ordering the Defendants to pay Plaintiff's reasonable attorney's fees, including litigation expenses and costs, pursuant to 52 U.S.C. § 20510(c); and

4.    Granting Plaintiff further relief that this Court deems just and proper.


Dated: August 2, 2019.

Respectfully submitted,

For the Plaintiff Public Interest Legal Foundation:


/s/ Benton G. Sawrey
Benton G. Sawrey (N.C. Bar #46379)
Narron Wenzel, P.A.
102 S. Third Street

<div align="center">

20

</div>

PO Box 1567
Smithfield, N.C. 27577
T: (919) 934-0049
F: (919) 934-6280
bsawrey@narronwenzel.com
Local Civil Rule 83.1(d) Counsel

/s/ J. Christian Adams
J. Christian Adams* (Virginia Bar #42543)
Public Interest Legal Foundation, Inc.
1555 King St., Ste. 200
Alexandria, VA 22314
Tel: (317) 203-5599
Fax: (888) 815-5641
adams@PublicInterestLegal.org

/s/ Noel H. Johnson
Noel H. Johnson** (Wisconsin Bar #1068004)
Public Interest Legal Foundation, Inc.
32 E. Washington St., Ste. 1675
Indianapolis, IN 46204
Tel: (317) 203-5599
Fax: (888) 815-5641
njohnson@PublicInterestLegal.org
*Special Appearance to be filed*
**Special Appearance filed*

Attorneys for Plaintiff Public Interest Legal Foundation

# Post-Election Audit Report

April 21, 2017

## General Election 2016



NORTH CAROLINA
State Board *of* Elections

**BACKGROUND**     The N.C. State Board of Elections (NCSBE) is an independent and bipartisan agency charged with oversight of elections in North Carolina. Advances in database technology and data quality and the formation of an in-house investigative team now allow the agency to develop audits that flag irregularities for review by investigators. These "post-election integrity audits" compare voter and election records with various government databases to identify potentially ineligible voters and irregularities, ranging from unintentional violations to intentional voter fraud and elections tampering. [**Appendix 1: Audit Descriptions**]

Conducting integrity audits requires NCSBE to walk an extremely tight line: Preserving processes that ensure broad access to the polls while preventing unlawful participation. Data cannot tell the whole story and audit results must be analyzed carefully by those who know the limitations of individual data sources. Data analysts work alongside trained investigators with prior experience in state and federal law enforcement to review cases before drawing conclusions or involving prosecutors.

State law requires our agency to investigate "frauds and irregularities in elections" and to report violations to the attorney general or district attorneys. [**Appendix 2: G.S. § 163-22(d)**]

NCSBE takes seriously its uniquely independent position to address allegations of fraud in the state through responsible, data-driven investigations. In 2015, this agency created a formal Investigations Division — one of a few of its kind in the nation — to review allegations related to elections and refer them to prosecutors when warranted by evidence.

State and federal elected officials, journalists and everyday citizens have requested information regarding cases of fraud or investigations following the 2016 elections. [**Appendix 3: Congressional Letter**]

Rather than providing information on a one-off basis, NCSBE staff prepared this report, which is intended to provide an overview of audits, findings and investigations related to the 2016 general election in North Carolina, while offering context necessary to avoid misinterpretation. Where possible, this report also provides numbers of voters who investigators are reviewing or who investigators have concluded were not eligible to participate.

Irregularities occur in small percentages in nearly every election, and North Carolina is not immune to this. Administrative error and misunderstanding should be distinguished from systemic manipulation or intentional fraud. However, NCSBE understands that whether an irregularity is administrative, unintentional or intentional, the end result is an ineligible vote that dilutes votes lawfully cast by eligible voters. ***Even assuming all ineligible ballots identified in this report were cast for the prevailing candidate, no races -- statewide or local -- would have had a different outcome than the one already certified by the state.***

## SUMMARY

Nearly 4.8 million N.C. voters participated in the 2016 general election, the largest number in state history. It is important to recognize that suspected cases of ineligible voters casting ballots and/or committing fraud represent a tiny fraction of that number.

The following data points summarize the results of post-election audits from the 2016 general election:

- **441 open cases of voting by suspected active felons.** The State Constitution disqualifies current felons from voting until their sentence is completed, including probation or parole. Investigators were able to rule out more than 100 voters initially flagged as ineligible through the audit, further supporting the need for investigative review of data audits. These new processes are being implemented to ensure those serving felony sentences do not remain on the voter rolls and that all registrants are checked against the current felons' database at the time of registration. New processes fill gaps in the list maintenance process outlined in G.S. § 163-82.14(c).
- **41 non-citizens with legal status (green card, etc.) cast ballots.** The State Constitution only permits U.S. citizens to register and to vote. The audit pairing state and federal databases identified an additional 34 voters who provided documents showing they *are* U.S. citizens. Investigators continue to review 61 additional records.
- **24 substantiated cases of double-voting initiated through tips and data audits.** An initial audit identified a few dozen additional voter records that remain under review, though administrative errors by poll workers can lead to voter history being assigned to the wrong people; this may lead to false positives in audits that can only be detected by more detailed review.
- **Two cases of voter impersonation referred to prosecutors.** NCSBE is conducting additional review using death data and double-voting audits to identify whether additional cases should be investigated. Of the two cases referred, one involves voting by mail, and the other involves voting in person. Both involve family members voting in the place of a recently deceased loved one, forgery of the deceased voter's signature, and subsequent admissions to investigators. **[Appendix 4: Admission Letters]**
- **Irregularities affecting absentee by-mail voting in Bladen County.** The State Board voted unanimously late last year to refer an investigation into suspected criminal activity to federal prosecutors.
- **No evidence of ballot stuffing or equipment tampering.** NCSBE was among the first states to partner with the U.S. Department of Homeland Security in an effort last year to prevent cyber hacking. A separate audit of voting systems logs presented no evidence of administrative fraud, including in Durham County (where an investigation in the March primary was referred to local prosecutors).

**[Appendix 5: Breakdown of Voting Irregularities by Type, Party Affiliation of Voters]**

All numbers above are subject to change based on ultimate investigative findings.

**A provisional ballot audit resulted in 428 ballots of eligible voters being counted that would not otherwise have counted.** The audit was performed to ensure uniformity and compliance with election laws among the 100 county boards of election. **[Appendix 1: Audit Descriptions]**

## FELONS

Under G.S. § 163-275(5), it is a Class I felony "for any person convicted of a crime which excludes the person from the right of suffrage, to vote . . . without having been restored to the right of citizenship."

NCSBE initiates investigations into possible cases of felons voting through a system of data audits followed by investigator review, referrals from county boards of elections and tips from the public.

In late January 2017, NCSBE sent letters to suspected felon voters identified through data audits, notifying recipients that they may have illegally voted and that their registrations would be canceled in 30 days unless they objected in writing and presented evidence that they are not active felons. *See* G.S. §§ 163-82.14(c)(3) and 163-82.14(c) **[Appendix 6: Sample Letter to Suspected Felon Voters]**

Some suspected felons provided information showing they were not active felons (they had completed their sentences, been convicted of a misdemeanor or received a deferred prosecution, for example), and were eligible to vote. Others told investigators that they did not know they had lost their voting rights upon conviction.

Currently, 441 files of suspected felon voters remain open after an initial screening and contacts or attempted contacts with the voters.

Investigators have begun referring investigation reports regarding felons to local prosecutors. To date, 16 substantiated cases from the 2016 general election have been referred to district attorneys. The remaining 425 are expected to be referred when investigations are complete. Under state law, felon voting is a strict liability offense, and thus a felon may be convicted of a crime even if he or she does not know that voting while serving an active sentence is wrongful.

Updated voter lists help prevent individuals from unintentional violations. An individual may, for instance, legally register to vote before becoming a felon and then appear at the polls while on probation. Such a person may not understand they are ineligible. NCSBE has reexamined its registration and list maintenance processes and is taking significant steps to discourage unlawful participation by current felons. NCSBE's efforts include:

- **Working with public safety officials and the court system to ensure that convicted felons are expressly notified that they lose their voting rights upon conviction**, and regain them only after completing their sentence, including probation and parole. Certain suspects claimed they were never informed of the restriction. An initial review of associated plea agreements and contact with probation personnel indicate there is room to improve education around voting rights. **[Appendix 7: Letter to DPS/AOC on Felons]**
- **Increasing data-sharing between local election officials to ensure a felon removed in one county does not re-register in another county, unless his or her sentence is complete.** Though the past system followed the requirements of G.S. § 163-82.14(c), a gap in the legacy voting data system may have allowed some active felons to register or to re-register without being detected. **Additional felons who did not vote in the general election were recently removed from the voter rolls, closing that gap.** These removals followed the notice sent to felons by mail and waiting period required under state law. Fixing the gap and educating affected voters will reduce the opportunity for unintentional violations. It also will improve the likelihood of successful prosecutions against willful offenders.
- **Updating elections software to check felon status at the time of registration.** The improved system is being coded and will roll out statewide this summer, substantially improving the maintenance efforts through current technologies and new data-sharing relationships.
- **Adding checkboxes to voter forms to ensure participants are aware of voter qualifications**, including the restriction on current felons. **[Appendix 8: New Voter Forms]**
- **Educating the public about voting requirements** through NCSBE website, outreach events, news releases, social media and other means.

---

## NON-CITIZENS

The N.C. Constitution allows only U.S.-born and naturalized citizens to register and vote. It is unlawful for a non-citizen to register or vote in a state or federal election.

A separate post-election audit and post-audit investigation using state and federal databases identified non-U.S. citizens suspected of casting ballots in the general election. Upon receipt of a letter from NCSBE, 41 of these individuals acknowledged they were not U.S. citizens. **[Appendix 9: Sample Letter to Possible Non-U.S. Citizen Voters].** The investigation into these cases, including interviewing voters, is ongoing.

All cases involve documented non-citizens who were admitted into the country lawfully. All individuals subject to this audit were matched to the Department of Homeland Security's database using information obtained from the N.C. Division of Motor Vehicles (DMV).

NCSBE research shows the 41 non-citizen voters originally came from 28 different countries. **[Appendix 10: Breakdown of Non-U.S. Citizen Voters by Country of Origin]**

This audit, detailed in Appendix 1, identified 61 additional voters who did not respond to the letter, and investigations into those cases continue as well. And 34 voters, tagged by the same audit, subsequently provided proof of citizenship, highlighting the fact that data matches alone are not sufficient to verify citizenship or to take action against the voters without follow-up investigations.

Information obtained from those who are not citizens illustrates the complexity of this work. A number of non-citizens said they were not aware that they were prohibited from voting. Interviews and evidence show that some non-citizens were misinformed about the law by individuals conducting voter registration drives or, in at least one documented case, by a local precinct official. One registrant in her 70s has lived in the United States for more than 50 years and believed that she was a citizen because she had been married to a U.S. citizen.

Investigations on non-citizen cases also have revealed the complexities of immigration law and citizenship status. For instance, some individuals achieve citizenship as a matter of law through "derived citizenship" as the child of a naturalized citizen, though paperwork showing that changed status is only available if requested and official databases may not reflect the correct status. An Application for Certificate of Citizenship costs $1,170. Individual contact with affected registrants has also illustrated the limitations of the data. Even where data from the Division of Motor Vehicles, the U.S. Department of Homeland Security and the voter rolls matched exactly, a high proportion of flagged individuals were citizens. **[Appendix 1: Audit Descriptions].** For this reason, it is important to take a case-by-case approach to these matters.

As with felons, education and understanding of state law appear to be the primary problem. Consequently, warnings on voter registration forms and voting documents are being reviewed to improve their effectiveness. **[Appendix 8: Revised Voter Forms]**. NCSBE is working with the Division of Motor Vehicles to more clearly indicate that registrants must be U.S. citizens. Additionally, NCSBE is developing additional poll worker training to address the nuances with terms like "permanent resident" and "green card" so that poll workers are better equipped to assist voters who are uncertain about their eligibility.

## DOUBLE VOTERS & IMPERSONATION

So-called double voters violate state and federal law by voting more than one time in a single election. A suspect may do so by voting multiple times within the same jurisdiction or in different jurisdictions. NCSBE is currently investigating 24 substantiated cases of double-voting from the 2016 general election.

North Carolina maintains a strong system that checks for this behavior throughout voting, whether through the mail, at early voting locations, or in the precinct on Election Day. However, variations in voter information or human error can allow a double voter to go undetected until more nuanced investigation is performed. Some violators appear to be "testers" trying to find holes in the system. Others claim their property ownership in multiple jurisdictions should allow them to vote in each, and others brush past the law to support their candidate by any means necessary. Additionally, a case that initially appears to be a double voter — an individual who votes twice — may actually be a case of voter impersonation — an individual who casts a ballot using the identity of another person.

Detecting double voting and voter impersonation is a time-intensive process. Database matching is not enough, as administrative errors can lead to voter history being assigned to the wrong person — such as when a poll worker checks off the wrong name on the poll book. Instead, data is only the starting point for cases that ultimately involve live interviews and signature analyses. NCSBE has begun that process on possible in-state double voting cases in 2016. This initial review of NC voter registration records indicates that there are a few dozen possible additional cases of double voting; however, this process is still in its preliminary stages and staff have not yet completed review of voter documents to determine whether the match was due to administrative error rather than illegal voting.

NCSBE rarely encounters verified cases of voter impersonation, though two cases are being referred to prosecutors from the election last fall. In one instance, a widow voted by mail after allegedly forging her husband's signature in the presence of relatives. In the second instance, a daughter allegedly presented in person to vote in the name of her deceased mother. The suspects in each case indicated that they were motivated out of a desire to carry out their loved one's voting wishes. **[Appendix 4: Admission Letters]**. NCSBE is conducting additional audits using state and federal death databases and screening algorithms to review 19 cases in which records indicate a date of death earlier than the date on which records indicate that person voted. An initial review of the voter registration documents indicates that a number of these are likely cases of mistaken identity rather than voter fraud where, for example, the death record was for a "John Smith Sr." and the voter record was for a "John Smith Jr."

While no audit exists to catch all possible cases of voter impersonation, double voter and deceased voter audits may detect such cases. State law puts additional deterrents in place. They include requiring identification documents from (1) voters whose information cannot be verified or who wish to register and vote on the same day during the early voting period, (2) requiring voters to state their name and address, and (3) requiring

two witness signatures or a notarial certificate on absentee return envelopes.[1]

Also, since 2014, NCSBE has used data from the Interstate Crosscheck Program as a tool to help identify voters who vote in more than one state in the same election. Administered by the Kansas Secretary of State's office, the program identifies possible duplicate registrations among states and provides evidence of possible double voting. NCSBE recently received the program's data for 2016 and will examine it in the coming months.

## NEXT STEPS

NCSBE continues to investigate voting irregularities from the 2016 general election and will refer cases to prosecutors where appropriate. Findings from post-election audits and subsequent investigations allow NCSBE to pinpoint which policies are best suited to improving electoral integrity in the state. For example, because this agency knows that many irregularities occurred because of a lack of information and education, we know to direct our efforts to better educating registrants and those who help citizens register to vote. This agency stands ready to help policymakers, advocacy organizations, media representatives, and the general public understand the topic of voting irregularities and provide information that will help them draw accurate and appropriate conclusions.

This agency strongly cautions readers not to refer to each of these cases as "voter fraud." As stated earlier, "ineligible voters casting ballots" may be the result of unintentional or intentional conduct. Fraud, in most cases, is an intent crime that requires prosecutors to show that the voter knowingly committed a crime.

***The evidence suggests that participation by ineligible voters is neither rampant nor non-existent in North Carolina. Our audits suggest that in the 2016 general election, approximately 0.01% of ballots were cast by ineligible voters. Most incidents are isolated and uncoordinated, and detecting technical violations does not always prove purposefully unlawful conduct. Our work indicates that ineligible voters are not isolated to one political party or any geographical region of the state.***

When people do vote unlawfully, either out of ignorance or to perpetrate a fraud, NCSBE now has procedures in place to detect and investigate those incidents and refer potential criminal cases to prosecutors where warranted. North Carolina has made tremendous advances in data analysis and investigation tactics, and NCSBE remains committed to improving elections administration responsibly by integrating new data streams into its processes, where appropriate. The report reflects our agency's commitment to public transparency, the rule of law, and our mission to promote access to the polls and the vigilance necessary to preserve the credibility of electoral outcomes.

---

[1] A federal court enjoined additional identification and registration requirements under S.L. 2013-381 on July 29, 2016.



# APPENDIX 1

## Audit Descriptions

### Overview

The following audits are designed to ensure election integrity by maintaining accurate voter rolls and proper oversight of election processes. Audits take various forms and are crafted to identify data anomalies that could indicate potential issues or problems, while supporting the N.C. State Board of Elections' goal of uniformity and compliance across 100 counties.

The audits have detected instances in which ineligible voters are suspected of casting ballots in the 2016 general election. NCSBE has developed a thorough process to investigate these cases and, when warranted, refer them to prosecutors across the state to consider criminal charges. NCSBE understands that some of these cases will be prosecuted and others will not, based on the unique circumstances of each case.

It is important to note that data used to identify suspected ineligible voters, like all data, is not perfect and matches require further analysis and investigation. This agency has taken great care to ensure that no one is publicly accused of any crime or referred to prosecutors without evidence that a crime was committed and that referral for prosecution is warranted.

### Felon Audit

Under state law, it is a Class I felony "for any person convicted of a crime which excludes the person from the right of suffrage, to vote . . . without having been restored to the right of citizenship."

After an election, the N.C. State Board of Elections checks the state's voter registration database against a list of current felons from the N.C. Department of Public Safety. This analysis cross-checks dates of birth and driver's license numbers between the two databases. When a match occurs, NCSBE reviews voting history to determine whether the individual may have cast a vote while serving a felony sentence.

If an active felon appears to have voted, NCSBE investigators then refer to an additional criminal records database, the Criminal Justice Law Enforcement Automated Data Services (CJLEADS), for further verification. The resulting matches from this second check may then be followed up with interviews, mailings and other traditional investigative methods.

If a current felon appears to be improperly registered, county boards of elections may proceed to remove the registration following notice and hearing, if requested, as required by state law.

### Non-U.S. Citizen Audit

The N.C. Constitution allows only U.S.-born and naturalized citizens to register and vote, and it is unlawful for a non-citizen to vote in a state or federal election. To identify non-U.S. citizens who may have cast ballots, NCSBE first checks voter records against N.C. Division of Motor Vehicles (DMV) data, which indicates whether a customer's driver's license contains a restriction code related to their non-citizen status. Other DMV tables are then cross referenced to determine if evidence of citizenship was provided in a subsequent visit to the DMV.



Post-Election Audit Report
N●RTH CAROLINA
State Board of Elections

The resulting matches are run through the U.S. Department of Homeland Security's Systematic Alien Verification for Entitlements Program (SAVE) database, an information service for agencies to verify an individual's immigration status.

NCSBE has determined based on past experience that a match with the SAVE database is not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE.

Also, due to timing issues and the fact that DMV data is generally updated only when licenses are issued, DMV data alone is not reliable for this purpose either. **In fact, voters who appear to be non-citizens based on DMV data were confirmed to be U.S. citizens in the SAVE database 97.6 percent of the time.**

If SAVE indicates a voter is a non-citizen, NCSBE opens a case file and attempts to contact the voter to determine citizenship status through mailings and interviews. Because of the unreliability of citizenship data, voters who appear to be non-citizens — where both data sources indicate non-citizenship status — are not removed from the rolls, absent independent confirmation that they are not citizens. In fact, approximately three-quarters of those who subsequently provide proof of U.S. citizenship continued to appear as non-citizens in the SAVE database.

**Manual Entry Audit**

County election officials occasionally must enter election results by hand directly into the vote tabulation software. This may occur, for example, due to a media card failure. This audit can catch inadvertent mistakes in transcribing numbers, as well as purposeful manipulation of data. After the 2016 election, the NCSBE identified all manual entries that occurred in November across the state. Data analysts then reached out to the counties to identify the reasons for the manual entries. NCSBE determined all manually entries were done for valid purposes. In the future, manual entry audits will include an automated process able to detect transcription errors in real time as results are entered by hand. This change, still under development, will help ensure the accuracy of manual entries made in future elections.

**Voter History Audit**

When voters check in at polling places, they fill out authorization to vote (ATV) forms or one-stop applications during early voting. This results in a voter history record for each individual. When ballots are run through tabulators, tabulation software provides election return data that identifies the number of ballots cast. This audit compares the number of ATV forms and one-stop applications with the number of physical ballots cast. Those two numbers should generally match, but may be *slightly* off for valid reasons, such as if a voter checks in and then decides not to vote.

This audit is designed to identify certain problems or fraud, such as ballot stuffing, fraudulent manual entries, tampering with media cards or certain ballot coding issues.

**Provisional Ballot Audit**

Voters cast provisional ballots when questions arise about their qualifications or eligibility to vote in certain contests. Those ballots are held aside pending research by county boards of elections as to whether they should be counted.

Appendix Page 2



This audit is aimed at ensuring all 100 counties make uniform decisions that comply with election laws when counting provisional ballots. It compares provisional voter data to several data sources, including the DMV database, an incomplete queue that catalogs registration attempts that were deemed incomplete and the current registration database as of Election Day. Data analysts execute matching algorithms to determine whether provisional voters were eligible vote in the counties where they presented to vote. Additionally, two web services are used to geocode the voters' addresses to confirm that they resided in the county at the time they voted. Audit results are sent to county boards of elections, which analyze them and, where appropriate, amend their canvasses to reflect any changes.

For the 2016 general election, this audit resulted in 428 voters statewide whose provisional ballots were counted in accordance with current election law. Those ballots wouldn't have been counted otherwise.



# APPENDIX 2

## G.S. § 163-22(d)

**G.S. § 163-22.  Powers and duties of State Board of Elections.**

. . . .

(d)    The State Board of Elections shall investigate when necessary or advisable, the administration of election laws, frauds and irregularities in elections in any county and municipality and special district, and shall report violations of the election laws to the Attorney General or district attorney or prosecutor of the district for further investigation and prosecution.



# APPENDIX 3

## Congressional Letter

### Congress of the United States
#### Washington, DC 20515

January 25, 2017

The Honorable Kim Westbrook Strach
Executive Director
State Board of Elections
P.O. Box 27255
Raleigh, NC 27611

The Honorable Josh Stein
North Carolina Attorney General
Attorney General's Office
9001 Mail Service Center
Raleigh, NC 27699-9001

Dear Executive Director Strach and Attorney General Stein:

Thank you for your service in the critical work of helping ensure that elections across the country are free, fair, and administered in a way that upholds the fundamental tenets of the United States Constitution. We are writing given recent claims of voter fraud and its potential impact on our nation's elections. To investigate these claims, we are seeking information regarding confirmed incidents of voter fraud.

To assist in our inquiry, we request that you provide a list of all specific cases in which either of your offices has determined that an individual who cast a vote in the federal elections held in November 2016 was legally prohibited from doing so. For each specific case, please include the following information:

1) the identity of the individual who cast the prohibited vote;
2) the date on which the prohibited vote took place;
3) the polling place where the prohibited vote occurred;
4) the specific legal reason the individual's vote was prohibited; and
5) the result of the individual's prosecution, if any.

Please include in this list all cases in which the state has determined that a prohibited vote was cast, regardless of whether a prosecution was initiated or concluded. Please feel free to provide joint or separate responses.

We request this information by February 22, 2017. Please contact Karen Kudelko of Ranking Member Cummings' staff at (202) 225-5051, Khalil Abboud with Ranking Member Brady's staff at (202) 225-2061, or Amy Miller Pfeiffer with Assistant Democratic Leader Clyburn's staff at (202) 226-3210 with any questions.

PRINTED ON RECYCLED PAPER



The Honorable Kim Westbrook Strach
The Honorable Josh Stein
Page 2

Sincerely,

Elijah E. Cummings
Ranking Member
Committee on Oversight and
Government Reform

Robert A. Brady
Ranking Member
Committee on House
Administration

James E. Clyburn
Assistant Democratic
Leader

cc:     The Honorable Jason Chaffetz
        Chairman, House Committee on Oversight and Government Reform

        The Honorable Gregg Harper
        Chairman, Committee on House Administration

Appendix Page 6



Post-Election Audit Report
N●RTH CAROLINA
State Board of Elections

# APPENDIX 4.1

## Admission Letter (Case 1)

From: ███████████████
Sent:        Friday, February 03, 2017 10:11 AM
To: ███████████
Subject: ███████████

I, ███████████ personally completed both ballots.

From: ███████████████ ████@ncsbe.gov>
To: ███
Sent: Friday, February 3, 2017 10:02 AM
Subject: RE: ███████████

Both Ballots

From: ███████████████
Sent: Friday, February 03, 2017 10:01 AM
To: ███████████ ████@ncsbe.gov>
Subject: Re: ███████████

I, ███████████ wife of ███████████, marked the ballot.

From: ███████████████ ████@ncsbe.gov>
To: ███
Sent: Friday, February 3, 2017 9:48 AM
Subject: RE: ███████████

███████.

On the first ballot that was done at the hospital who marked the ballot?
On the second ballot that was retrieve from the trash who marked that ballot?

███████

From: ███████████████
Sent: Thursday, February 02, 2017 9:10 PM
To: ███████████████ ████@ncsbe.gov>
Subject: Re: ███████████

Entered  your email address incorrectly!

From: ███████████████
To: ███      ████@nbsbe.gov      ████@nbsbe.gov>
Sent: ████████████ary 2, 2017 12:15 PM
Subject: ███████████

1

Thank you for this opportunity to clarify the absentee ballot of my late husband, ▉▉▉▉▉ I apologize for my misunderstanding of the process.

My husband was hospitalized Sept 11, 2015. Because of the seriousness of his condition, my brother, ▉▉▉▉▉▉▉▉ suggested we apply for absentee ballots, just in case he wasn't home in time to vote. We had always voted in person and were not even aware this was a possibility. Since I was basically living in ▉▉▉ hospital room at ▉▉▉, I asked ▉▉▉ to request the absentee ballots for us. By the time the ballots arrived, my husband's condition had further deteriorated, but his desire to vote had not diminished. With family at his bedside, we witnessed his nod to vote (Republican) and signed to that effect. It was my misunderstanding of the written directions that left his signature line blank. I did not make a copy of our ballots, so I cannot look back to see what I misunderstood, but we left it unsigned on purpose, thinking our witness of his will and intent was sufficient. I took our ballots to the post office to be sure the proper postage was affixed, and the ballots were mailed.

After my husband died, another ballot arrived at our home, which I thought strange, but just a mistake, since our ballots had already been mailed. I discarded the ballot to the recycling bin. Then I received several reminders to be sure to complete and return the ballot. When I mentioned this to my brother, he advised me to call the Board of Elections in ▉▉▉▉ County. I was told that my ballot had been received, but that my husband's ballot was unsigned and another had been sent for his signature. Using a flashlight, my brother and I retrieved the discarded ballot out of the recycling bin on the curb. The next day, I completed the ballot on my husband's behalf, according to his wishes, and signed his name. I thought that was what I was supposed to do. I was not trying to be deceitful or fraudulent, as I thought I had authority to sign his signature as his wife, and as executor of his estate. I even drove to the Board of Elections and delivered it in person, explaining that it was to clarify the first ballot.

I am glad to know that voter fraud is being diligently investigated. I am very distressed that my ignorance, but good intentions, have caused such a problem. Maybe in less stressful circumstances I would not have made this mistake. I respectfully request that you consider these facts, and our history as reputable, law-abiding citizens.

▉▉▉▉▉▉▉▉▉▉

2



**From:**
**Sent:** Wednesday, February 08, 2017 11:00 AM
**To:**
**Subject:**

Hi Mr. ████, good morning. Thank you for your call and condolences today regarding my blood sister ████ and her late husband (my brother-in-law) ████. When ████ was first hospitalized at ███ and ████ was staying with him full-time, I suggested they apply for absentee ballots. Several times in the past while my children were off at college I had requested absentee ballots to be sent to my two sons and daughter to be sure they had the opportunity to vote. ████ called and asked me to request both ballots for them because she was at the hospital ████ and did not have her computer nor a convenient way to request the ballots. Both expected to be back home in time to vote on election day but to be sure they wanted to get their absentee ballot submitted in case they were unable to be home. I spoke (by phone and visits) numerous times with ████ about politics and he was very excited about the upcoming election. Unfortunately, while be treated and making progress in his recovery, he suddenly suffered some critical setbacks and unexpectedly passed away. With best regards, ████

1



Post-Election Audit Report
N●RTH CAROLINA
State Board *of* Elections

# APPENDIX 4.2

## Admission Letter (Case 2)

**From:**
**Sent:** Friday, February 03, 2017 3:26 PM
**To:**
**Subject:** Re: NCSBE Case #

My phone number is

Sent from my iPhone

On Feb 3, 2017, at 1:47 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ @ncsbe.gov> wrote:

> I am very sorry for your loss.
> Thank you for your cooperation in this matter.
> Please forward a telephone number if we have to contact you.
> If you have any additional question please feel free to contact me.
> Thank you
>
> ▮▮▮▮▮▮/Investigator
> North Carolina State Board of Elections
> 441 N. Harrington Street
> Post Office Box 27255
> Raleigh, NC 27611
> ▮▮▮▮▮ office | 919.715.0135 fax
> www.ncsbe.gov
>
> <image002.png>

**From:**
**Sent:** Friday, February 03, 2017 11:16 AM
**To:** ▮▮▮▮▮▮▮ @ncsbe.gov>
**Subject:** NCSBE Case #

My mother ▮▮▮▮▮▮▮▮▮ at 89 was a tremendous Donald Trump fan. She donated to his campaign, watched all his debates and news involving his campaign on Fox news. She was so excited about voting for him and at every opportunity told everyone else to vote for him to save our country.

1



My mother had AFIB which would cause her heart rate and blood pressure to rise to dangerous levels with the risk of stroke. I had printed out a State Absentee Ballot Request Form on Saturday, October 22, 2016 and told her to fill it out and mail it in so that she could vote in the event she was unable to go and cast her vote. She said, "ok and if anything happens you have my power of attorney and you be sure to vote for Donald Trump for me". The following day she had a massive stroke and passed away on October 26. 2016.

This was devastating to me because my dad, brother and sister were deceased and I was the only one left in my family. As election day approached, all I could hear were her words "if anything happens you have my power of attorney and you be sure to vote for Donald Trump for me"! On November 3rd I took a copy of the power of attorney, which no one asked for, and honored her request and voted on her behalf. It was the last thing I could do for her and I felt excited to do that for her.

My mother was alive during the absentee period and if she had received the ballot in time she would have been able to vote. Please understand that my actions were in no way intended to be fraudulent but were done during my grief and an effort to honor my mothers last request and I knew that one vote from this 89 year old lady would not affect the outcome of the election anyway.

2



**RECEIVED**

MAR 27 2017

STATE BOARD OF ELECTIONS

DAVID LEARNER
DISTRICT ATTORNEY

State of North Carolina
General Court of Justice
Twenty-Fifth Prosecutorial District

CATAWBA COUNTY JUSTICE CENTER
P.O. BOX 566
NEWTON, NC 28658
(828) 695-6110
(828-695-6111 FAX

Investigator ▮▮▮▮▮▮▮
NC State Board of Elections
PO Box 27255
Raleigh, NC 27611-7255

Re:    NCSBE Case number: 2016-165

Dear Investigator ▮▮▮▮,

The 25th Prosecutorial District will decline to prosecute the above referenced case, taking all facts and evidence into consideration along with the lack of criminal history for Ms. ▮▮▮▮.

Ms. ▮▮▮ voted for her mother believing that her power of attorney and honoring her mother's dying wish was not a fraudulent act. Her mother was alive during the absentee period and if she had received the ballot in time she would have been able to legitimately cast her vote. Ms. ▮▮▮ actions were done during a time of grief and mourning and in an effort to honor her mother's dying wish.

The 25th Prosecutorial District believes it to be in the best interest of justice to decline prosecution of NCSBE Case Number 2016-165. If you have any questions or need additional information, please don't hesitate to contact me.

Sincerely,

Stacey London, MPA
Administrative Assistant
25th Prosecutorial District
828-695-6196



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

# APPENDIX 5

## Breakdown of Voting Irregularities by Type, Party Affiliation of Voter

| Party Affiliation | Double Voter | % | Felons | % | NonCitizens | % | Voter Impersonation | % | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Democrat | 14 | 58% | 292 | 66% | 20 | 49% | | 0% | 326 | 54% |
| Libertarian | | 0% | 4 | 1% | | 0% | | 0% | 4 | 1% |
| Republican | 5 | 21% | 73 | 17% | 11 | 27% | 2 | 100% | 91 | 15% |
| Unafiliated | 5 | 21% | 72 | 16% | 10 | 24% | | 0% | 87 | 14% |
| **Total** | **24** | **100%** | **441** | **100%** | **41** | **100%** | **2** | **100%** | **508** | **100%** |

\*    The above reflects affiliation as of Election Day 2016
\*\*  On Election Day 2016, statewide registration by party as follows:
     Democrat (39.5%), Republican (30.2%), Libertarian (0.4%), and Unaffiliated (29.9%)



| County | Double Voter* | Felons | Non-Citizens | Voter Impersonation | Total |
|--------|--------------|--------|--------------|---------------------|-------|
| ALAMANCE | 2 | 13 | | | 15 |
| ALLEGHANY | | | 1 | | 1 |
| ANSON | | 2 | | | 2 |
| ASHE | | 1 | | | 1 |
| BEAUFORT | | 7 | 1 | | 8 |
| BERTIE | | 1 | | | 1 |
| BLADEN | | 1 | | | 1 |
| BRUNSWICK | | 3 | | | 3 |
| BUNCOMBE | | 7 | 1 | | 8 |
| CABARRUS | | 6 | 2 | | 8 |
| CALDWELL | 1 | 6 | | | 7 |
| CARTERET | | 5 | | 1 | 6 |
| CASWELL | | 2 | | | 2 |
| CATAWBA | 1 | 4 | | 1 | 6 |
| CHATHAM | | 2 | | | 2 |
| CHEROKEE | | 1 | | | 1 |
| CLAY | 2 | 1 | | | 3 |
| CLEVELAND | | 5 | | | 5 |
| COLUMBUS | | 2 | 1 | | 3 |
| CRAVEN | 1 | 10 | 1 | | 12 |
| CUMBERLAND | 1 | 20 | 3 | | 24 |
| CURRITUCK | 1 | 1 | | | 2 |
| DAVIDSON | | 4 | 1 | | 5 |
| DAVIE | | 1 | | | 1 |
| DUPLIN | | 3 | | | 3 |
| DURHAM | 1 | 30 | 3 | | 34 |
| EDGECOMBE | | 8 | | | 8 |
| FORSYTH | | 20 | 2 | | 22 |
| FRANKLIN | | 2 | | | 2 |
| GASTON | | 11 | 1 | | 12 |
| GATES | | 1 | | | 1 |
| GRANVILLE | | 2 | | | 2 |
| GREENE | | 1 | | | 1 |
| GUILFORD | 6 | 49 | 8 | | 63 |
| HALIFAX | | 9 | | | 9 |
| HARNETT | | 4 | | | 4 |
| HAYWOOD | | 2 | | | 2 |
| HENDERSON | 1 | | | | 1 |
| HERTFORD | | 3 | | | 3 |
| HOKE | | 5 | 2 | | 7 |
| JOHNSTON | | 8 | 1 | | 9 |
| JONES | | 3 | | | 3 |
| LENOIR | | 2 | | | 2 |
| LINCOLN | | 1 | | | 1 |



| | | | | | |
|---|---|---|---|---|---|
| MCDOWELL | | 1 | | | 1 |
| MECKLENBURG | | 14 | 1 | | 15 |
| MONTGOMERY | | 3 | | | 3 |
| MOORE | 1 | 5 | | | 6 |
| NASH | | 4 | 1 | | 5 |
| NEW HANOVER | | 16 | 1 | | 17 |
| ONSLOW | | 1 | | | 1 |
| ORANGE | 1 | 1 | | | 2 |
| PAMLICO | | 5 | | | 5 |
| PASQUOTANK | | 2 | | | 2 |
| PENDER | | 6 | 1 | | 7 |
| PERSON | | 3 | | | 3 |
| PITT | | 13 | | | 13 |
| POLK | | 1 | | | 1 |
| RANDOLPH | | 6 | 1 | | 7 |
| RICHMOND | 1 | | | | 1 |
| ROBESON | | 5 | | | 5 |
| ROCKINGHAM | | 6 | | | 6 |
| ROWAN | | 3 | | | 3 |
| RUTHERFORD | | 2 | | | 2 |
| SAMPSON | | 3 | | | 3 |
| SCOTLAND | | 5 | | | 5 |
| STANLY | | 2 | | | 2 |
| STOKES | | 2 | | | 2 |
| SURRY | | 3 | 1 | | 4 |
| UNION | | 7 | 2 | | 9 |
| VANCE | | 2 | | | 2 |
| WAKE | 1 | 32 | 3 | | 36 |
| WARREN | 1 | 3 | | | 4 |
| WAYNE | 3 | 12 | | | 15 |
| WILKES | 1 | | | | 1 |
| WILSON | | 4 | 2 | | 6 |
| **Grand Total** | **26 records (24 voters)** | **441** | **41** | **2** | **510 records (508 voters)** |

\* Two suspected double voters are assigned to two different registration
records, each from a different county.


# APPENDIX 6

## Letter to Suspected Felon Voters


**NORTH CAROLINA**
State Board *of* Elections

*Mailing Address:*
P.O. Box 27255
Raleigh, NC 27611-7255

Phone: (919) 733-7173
Fax: (919) 715-0135

**KIM WESTBROOK STRACH**
*Executive Director*

[Date]

**TO:**    [Voter Name]
        [Mailing Address]
        [Mailing City, State, ZIP]

**RE:**    **NOTICE OF REMOVAL DUE TO FELONY CONVICTION;**

This office has received felony conviction records indicating that you are currently an active felon and that as such, you may have illegally voted in [County] in the November 8, 2016 General Election.

Persons who are currently serving a sentence for a felony conviction are not qualified to vote in North Carolina. Active felons include persons serving prison time or those on probation or parole for a felony conviction and who have not completed all aspects of their sentence, <u>including completion of any period of parole or probation.</u> It is a felony to vote if you are not qualified to do so. By this letter, please be notified that: **If not already cancelled, as a convicted felon, your current voter registration in [County] will be cancelled in 30 days.**

If you disagree with the finding that you are an active felon and you object to the removal of your name from the list of registered voters, you must **object in writing within 30 days of this notice.** If you object, the chairman of the County Board of Elections will enter a challenge to your voter registration. You will then be notified to appear at a challenge hearing. The above referenced notice and other relevant records received by our office of your felony conviction will be introduced as evidence at the hearing.

If you are in a *deferred prosecution* status for a felony, please contact our office immediately and provide us with these details, including the name and telephone number of your current probation officer and the attorney who represented you. Persons who are on *deferred prosecution* may not be subject to removal and may avoid removal from the voter registration rolls.

As a convicted felon, your rights of citizenship are restored automatically under the provisions of North Carolina General Statute § 13-1 <u>only</u> upon discharge from your felony sentence, including periods of probation or parole, or a full pardon. At that time, provided that you are under no other active felony convictions, you will be qualified to vote. Upon completion of your sentence, you must submit a **new voter registration form** to the County Board of Elections office where you reside.

Again, if you believe that the information contained in this letter concerning your voter eligibility and/or voting activity is incorrect, you must object in writing to this office **within 30 days of this notice.** Please mail your written objection and any documentation to the attention of NCSBE Investigator Matthew Martucci at P.O. Box 27255, Raleigh, NC 27611-7255. It is also recommended that you contact Investigator Martucci at (919) 715-1827.

Thank you for your prompt attention to this matter.

*6400 Mail Service Center ▪ Raleigh, NC 27699-6400*
*441 N. Harrington Street ▪ Raleigh, NC 27611-7255*



# APPENDIX 7

### Letter to DPS/AOC on Felons



NORTH CAROLINA
State Board *of* Elections

*Mailing Address:*
P.O. Box 27255
Raleigh, NC 27611-7255

Phone: (919) 733-7173
Fax: (919) 715-0135

March 3, 2017

*VIA E-MAIL*

The Honorable Erik A. Hooks
Secretary, Department of Public Safety
erik.hooks@nccrimecontrol.org

The Honorable Marion R. Warren
Director, Administrative Office of the Courts
marion.r.warren@nccourts.org

Re:  Uniform notice to felons regarding voting rights in North Carolina.

Dear Secretary Hooks and Judge Warren:

As you are each aware, the State Board of Elections maintains a statewide voter registration system used by election officials across North Carolina. In recent years, data-sharing relationships among states and with federal agencies have enhanced our efforts to ensure the integrity of the voter rolls, including the removal of voters who have become ineligible due to felony conviction. We are presently engaged in a comprehensive audit of the agency's list maintenance process surrounding felons on the rolls, and I am encouraged by the plan set in motion two weeks ago by technical staff from our three agencies and the Government Data Analytics Center. Thank you for sharing in our mission to ensure the integrity of elections.

Beyond the promising future in our data-sharing relationship, I want to make you aware that the State Board's in-house investigations staff have become aware that the information provided to felons serving active sentences does not appear to be standard and often excludes references to the loss of voting rights. This issue arises at the referral phase of our investigations, when some district attorneys express understandable concern that a felon who has voted may not have been aware of the unlawfulness of his actions. Although individuals are required to affirm that they are not serving an active felony sentence both when registering and presenting to vote, we have received feedback that not all voters read this language prior to signing. Establishing that the subject of an investigation may have knowingly and willfully violated N.C. election laws prohibiting felons from voting will support successful prosecutions.

We are in the process of finalizing an investigation into a number of felons suspected of voting unlawfully in the 2016 general election, and it is my hope that we can take proactive steps to ensure notice is provided to felons that they are not eligible to vote in North Carolina until they have completed their sentences, including probation. Educating active felons about the law could help reduce the volume of infractions, while making prosecution of willful offenders easier for our state's dedicated district attorneys. It would also align with G.S. § 163-82.20A, which requires

*441 N. Harrington Street ▪ Raleigh, NC 27601-7255*



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

that our agencies create programs and procedures to inform felons about the restoration of their voting rights. Among other suggestions, we are seeking improvements and additions to passive methods of informing felons of their voting ineligibility, such as the use of informational pamphlets and verbal warnings, to more active written warnings that are presented to felons orally and in writing and which are then signed by the felon acknowledging their understanding.

If you are willing, I would like to arrange a conference call between appropriate personnel at our agencies for the week of March 20th. Thank you for your consideration, and I look forward to our continued coordination on behalf of the voters of this State.

Sincerely,

Kim Westbrook Strach
Executive Director, State Board of Elections

Appendix Page 18



Post-Election Audit Report
NORTH CAROLINA
State Board *of* Elections

# APPENDIX 8

## Revised Voter Forms

---

### AUTHORIZATION TO VOTE FORM
**North Carolina**

ATV #  _____

VR PARTY _____     PRIMARY PARTY _____

**FRAUDULENTLY OR FALSELY COMPLETING THIS FORM IS A CLASS I FELONY UNDER CHAPTER 163 OF THE NC GENERAL STATUTES.**

**A  Voter's Certification of Voting Qualifications**

If ID required, check the type of current ID shown:

AGE

☐ Photo ID          ☐ Government Check
☐ Bank Statement    ☐ Paycheck               VIN
☐ Utility Bill      ☐ Other Government Doc

Registration Date:

ELECTION
PCT:
VTD

I, **[INSERT VOTER NAME]**, certify that:

☐ I am a registered voter in this county and I shall have resided at the address noted above for **30 days** immediately prior to this election.
☐ I am a United States Citizen.
☐ I am at least 18 years of age, or will be by the date of the general election.
☐ *For partisan primary elections ONLY:* I am registered **[PARTY NAME]** and I will receive a **[PRIMARY PARTY]** ballot.
☐ I understand that it is a felony to vote more than one time in an election.
☐ I have not been convicted of a felony, or if I have been convicted of a felony, I have completed my sentence, including any probation or parole.

**X** _____          _____
SIGNATURE OF VOTER                              OFFICIAL'S INITIALS

**B  Election Day Transfer** (Use this section to send a voter from their old polling place to their new polling place after moving.)
This person is hereby authorized to vote in his/her precinct after executing this form.

Old Precinct # _____     Name of New Polling Place: _____

New Precinct # _____     Address of New Polling Place _____

Party Affiliation On Record _____     **X** _____
                                                SIGNATURE OF PRECINCT OFFICIAL

**C  Curbside Affidavit** (Affidavit of person voting outside voting place or enclosure.)
STATE OF NORTH CAROLINA, COUNTY OF _____

I do solemnly swear (or affirm) that I am a registered voter in _____ precinct. That because of age or physical disability, I am unable to enter the voting place to vote in person without physical assistance. That I desire to vote outside the voting place or enclosure. **I understand that a false statement as to my condition will be in violation of North Carolina law.**

_____     VOTER ADDRESS
DATE            **X** _____     **X** _____
                SIGNATURE OF VOTER                SIGNATURE OF PRECINCT OFFICIAL

| OFFICIAL USE ONLY | Station | | Voting Method | | Voting Date/Time | | V2017.04 |
|---|---|---|---|---|---|---|---|
| | Site | | Transaction | | Operator Name | | |

---

Appendix Page 19



## ONE STOP APPLICATION
**NORTH CAROLINA**
**COUNTY OF**

_____

_____

**FRAUDULENTLY OR FALSELY COMPLETING THIS FORM IS A CLASS I FELONY UNDER CHAPTER 163 OF THE NC GENERAL STATUTES.**

**A**   **Voter's Certification of Voting Qualifications**

VRN:

REG:
PARTY:
REG DATE:

PCT:

PRIMARY
BALLOT:
AGE:

VTD:

*Mailing Address*

---

I, **[INSERT VOTER NAME]**, certify that:

☐ I am a registered voter in this county and I shall have resided at the address noted above for 30 days immediately prior to this election.

☐ I am a United States Citizen.

☐ I am at least 18 years of age, or will be by the date of the general election.

☐ *For partisan primary elections ONLY:* I am registered **[PARTY NAME]** and I will receive a **[PRIMARY PARTY]** ballot.

☐ I understand that it is a felony to vote more than one time in an election.

☐ I have not been convicted of a felony, or if I have been convicted of a felony, I have completed my sentence, including any probation or parole.

**X** _____    _____
SIGNATURE OF VOTER        OFFICIAL'S INITIALS

**B**   **Change or Verification of Name and Address** (Use this section to verify or change a voter's name or address in the registration records.)

New Name: _____    Former Name: _____

New Address: _____    Former Address: _____

New Mailing Address: _____    Former Mailing Address: _____

Have you lived here for 30 days or more? ☐ Yes ☐ No     I certify that I moved at least 30 days before this election to the new address.

If no, date moved? _____ / _____ / _____    DAYTIME PHONE NO

**X** _____
SIGNATURE OF PRECINCT OFFICIAL

**C**   **Curbside Affidavit** (Affidavit of person voting outside voting place or enclosure.)

STATE OF NORTH CAROLINA, COUNTY OF _____

I do solemnly swear (or affirm) that I am a registered voter in _____ precinct. That because of age or physical disability, I am unable to enter the voting place to vote in person without personal assistance. That I desire to vote outside the voting place or enclosure. **I understand that a false statement as to my condition will be in violation of North Carolina law.**

_____    VOTER ADDRESS
DATE

**X** _____    **X** _____
SIGNATURE OF VOTER       SIGNATURE OF PRECINCT OFFICIAL

| OFFICIAL USE ONLY | Board Approval Date: | | Board Signature: | | | V2017.04 |
|---|---|---|---|---|---|---|
| | Station | | Voting Method | | Voting Date/Time | |
| | Site | | Transaction | | Operator Name | |



Post-Election Audit Report
N◉RTH CAROLINA
State Board *of* Elections

# APPENDIX 9

## Sample Letter to Possible Non-U.S. Citizen Voters



N◉RTH CAROLINA
State Board *of* Elections

*Mailing Address:*
P.O. **Box** 27255
Raleigh, NC 27611-7255

Phone: (919) 733-7173
Fax: (919) 715-0135

February 16, 2017



RE:    <u>Your voter registration in North Carolina.</u>

Dear Mr./Ms. _____:

The State Board of Elections conducts routine audits following an election. During one of these audits, N.C. Division of Motor Vehicles (DMV) data indicated that you were not a citizen of the United States when you applied for or renewed your driver's license or state identification card. Information from the U.S. Department of Homeland Security (DHS) also indicated that you may not be a citizen of the United States. We understand these databases may not be current, and you may be a citizen of the United States.

In North Carolina only citizens of the United States may register to vote or to vote.[1] It is a crime for a non-citizen to vote in a state or federal election.[2]

**Please complete and return the enclosed *Admission or Denial of Non-U.S. Citizen Return Form* within (30) days of receiving this letter.** If you are a citizen of the United States, include a copy of an official document confirming your citizenship status. If your name has changed, be sure to provide documentation of that name change. You may mail, fax, e-mail or deliver the *Admission or Denial of Non-U.S. Citizen Return Form.*

Documents that may prove your citizenship within the United States include the following:

- **U.S. Birth Certificate.** If you cannot find your birth certificate, please contact the vital statistics office in the state or U.S. territory that originally issued your certificate.

- **U.S. Passport (booklet or card).** If you cannot find your U.S. Passport, please contact the U.S. Department of State at 1-877-487-2778 (TTY 1-888-874-7793) or visit the website at: http://travel.state.gov/passport/lost/lost_848.html

---

[1] *See* North Carolina General Statute § 163-55 and Article VI, Section 1 of the North Carolina Constitution.
[2] North Carolina General Statue § 163-275 and United States Code Title 18, Section 611.

*441 N. Harrington Street ▪ Raleigh, NC 27611-7255*



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

- **Consular Report of Birth Abroad.** If you cannot find your U.S. Consular Certificate of Birth, please contact the U.S. Department of State at 1-877-487-2778 (TTY 1-888-874-7793) or visit the website at: https://travel.state.gov/content/passports/en/abroad/events-and-records/birth/replace-or-amend-consular-report-of-birth-abroad.html

- **Certificate of Naturalization or Certificate of Citizenship.** If you cannot find your Certificate of Naturalization or Certificate of Citizenship, or believe that there is some problem with your records that needs to be corrected by the United States Citizenship and Immigration Services (USCIS), please refer to the enclosed *Information for Registrants: Verification of Citizenship Status and How to Obtain Your Document or Correct Your Record with USCIS*. You can make a copy of your naturalization or citizenship certificate and send it to this agency.

If you return the *Admission or Denial of Non-U.S. Citizen Return Form* stating that you are <u>not</u> a citizen of the United States, you will be removed from the voter registration rolls.

If you believe an error has occurred regarding your identity or citizenship status, you have the right to ask for a hearing. The citizenship requirements, however, cannot be waived or ignored by those at a hearing. Remember, it is a crime for a non-citizen to vote in an election in North Carolina.

If you do not respond to this letter and return the *Admission or Denial of Non-U.S. Citizen Return Form* within thirty (30) days of receipt, your case may be referred to your local county board of elections, which may enter a challenge to your voter registration. If the challenge is successful, your voter registration will be cancelled.

For information regarding this matter or to submit your completed *Admission or Denial of Non-U.S. Citizen Return Form*, you may contact our agency at the following:

| **Mailing Address:** | **Street Address:** | **Phone:** | (919) 733-7173* |
|---|---|---|---|
| N.C. State Board of Elections | 441 N. Harrington St. | **Fax:** | (919) 715-0135 |
| Attn: Joan Flemming | Raleigh, NC 27603 | **E-mail:** | joan.fleming@ncsbe.gov |
| P.O. Box 27555 | | | |
| Raleigh, NC 27611-7255 | | *Please ask for the undersigned | |

Thank you for your cooperation in this matter.

Sincerely,


Joan Fleming
Chief Investigator, North Carolina State Board of Elections

Enclosures:   *Admission or Denial of Non-U.S. Citizen Form* & self-addressed return envelope
*Information for Registrants: Verification of Citizenship Status and How to Obtain Your Document or Correct Your Record with USCIS*



# ADMISSION OR DENIAL OF
# NON-U.S. CITIZEN RETURN FORM

*Please complete and return this form no later than thirty (30) days of receiving the notice of potential ineligibility. If you do not respond within that timeframe, we may refer your case to the local county board of elections, which may enter a challenge against your voter registration.*

Under penalties of perjury, I swear or affirm that (check applicable statements):

☐ I am the person referred to in the letter I received from you and that I am **not** a U.S. citizen.

☐ I am the person referred to in the letter I received from you but I **am** a U.S. citizen. Check one:

_____ I am enclosing a copy of proof of U.S. citizenship; or

_____ I am currently seeking a records review or correction, or replacement copy of the documentation or record in support of my U.S. citizenship from_____.
<span style="font-size:small">[Insert the name of the government agency]</span>

☐ I am not the person referred to in the letter I received from you and am enclosing a copy of proof of my identity and/or U.S. citizenship.

| Voter's Name | | | |
|---|---|---|---|
| | Last Name | First | Middle |
| Date of Birth | | | |
| | Month   (MM) | Day (DD) | Year (YYYY) |

North Carolina Driver's License Number OR North Carolina ID Card Number OR Last 4 of Social Security Number

| Contact Information (mailing address, phone number, or e-mail) | |
|---|---|

**SIGNATURE OF VOTER:**_____  **DATE:** _____

*(WARNING: If you sign this form and know it to be false, you can be convicted of a Class I felony)*

**RETURN FORM TO:**
North Carolina State Board of Elections
Attn: Joan Fleming (Investigations)
P.O. Box 27555
Raleigh, N.C. 27611-7255

*North Carolina driver's license number/North Carolina identification card number, Social Security numbers and date of birth are exempt from public disclosure under Public Records Law. The signature can be viewed but not copied.*

[REFERENCE:  ]



**U.S. Department of Homeland Security**
*U.S. Citizenship and Immigration Services*
*Verification Division*
*Washington, DC 20024*



**U.S. Citizenship
and Immigration
Services**

# Fact Sheet

**Information for Registrants: Verification of Citizenship Status and
How to Obtain Your Document or Correct Your Record with USCIS**

Many federal, state and local agencies verify the immigration or citizenship status of benefit applicants to ensure that only qualified aliens or naturalized and derived citizens receive benefits. These agencies verify immigration or citizenship status by using the Systematic Alien Verification for Entitlements (SAVE) Program of the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS).

The voter registration agency in your state has submitted information to the SAVE Program for verification of your citizenship. Because the SAVE Program cannot confirm your citizenship status based upon information provided by the agency, you must be given an opportunity by the voter registration agency to provide the correct documentation or correct your records with USCIS and/or appeal the denial of your voter registration. Please note that there are a number of reasons why the SAVE Program may not be able to verify your citizenship, e.g., the SAVE Program can only verify naturalized or derived citizens, to the extent that a derived citizen received an official determination on citizenship by USCIS. The inability of the SAVE Program to verify your citizenship does not necessarily mean that you are not a citizen of the United States and are ineligible to vote.

If you need a replacement of your Naturalization Certificate or Certificate of Citizenship or believe that the SAVE Program response to the voter registration agency did not provide accurate information about your citizenship status and you need to make corrections to your citizenship record, please contact USCIS by using one of the following methods:

**1. File a Form N-565 to obtain a replacement of your Naturalization Certificate or Certificate of Citizenship.** The Form N-565 and instructions for filing can be found at: http://www.uscis.gov/files/form/n-565.pdf and http://www.uscis.gov/files/form/n-565instr.pdf

**2. Schedule an appointment for an in-person interview at a local USCIS office to correct your record.** You may schedule an appointment at a local USCIS office at the InfoPass website, http://infopass.uscis.gov, or by calling the National Customer Service Center, **1-800-375-5283**. Scheduling an appointment is the fastest way to correct your records. We recommend that you bring to your appointment this Fact Sheet, documentation evidencing your citizenship status, and any information provided by the voter registration agency concerning why your citizenship status could not be verified.

**3. Submit a request in writing to correct your record.** If you know the information that needs

Rev. Ver. August 14, 2012



to be corrected in your record, you may submit a request to <u>correct</u> your records to the Freedom of Information Act/Privacy Act (FOIA/PA) Office at the following address:

Privacy Act Amendment
U.S. Citizenship and Immigration Services National Records Center
FOIA/PA Office
P.O. Box 648010
Lee's Summit, MO 64064-8010

**We recommend that you include the following information in your submission, if available:**

- State that you are being denied voter benefits
- Information that is inaccurate
- Proposed change(s) to the record
- Date and place of birth
- A return address
- Copies of your immigration or DHS citizenship documents
- Reason it is inaccurate
- A-File number and/or the full name
- Notarized signature of the registrant
- Other information to assist locating the record

If you do not know the information you need to correct, you may submit a written request to <u>obtain</u> your records by submitting Form G-639, *FOIA/PA Request.* This form is available from the nearest USCIS office or online at <u>http://www.uscis.gov/files/form/g-639.pdf</u>. You should use the address specified above, but mark the envelope *"Privacy Act Request" rather than "Privacy Act Amendment."*

Rev. Ver. August 14, 2012



Post-Election Audit Report
NORTH CAROLINA
State Board *of* Elections

# APPENDIX 10

## Breakdown of Non-U.S. Citizen Voters by Country of Origin

| Country of Origin | Count |
|---|---|
| Canada | 2 |
| China, Peoples Republic | 1 |
| Costa Rica | 2 |
| Dominican Republic | 1 |
| El Salvador | 1 |
| Germany | 2 |
| Guyana | 1 |
| Haiti | 2 |
| Honduras | 1 |
| Israel | 1 |
| Italy | 2 |
| Jamaica | 1 |
| Korea | 1 |
| Liberia | 2 |
| Malaysia | 1 |
| Mexico | 4 |
| Netherlands | 1 |
| Nicaragua | 2 |
| Nigeria | 2 |
| Panama | 1 |
| Philippines | 1 |
| Poland | 1 |
| Australia | 1 |
| Senegal | 1 |
| Sierra Leone | 1 |
| United Kingdom | 1 |
| Ukraine | 1 |
| Vietnam | 1 |
| UNKNOWN | 2 |
| **Grand Total** | **41** |

Appendix Page 26

# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

September 10, 2018

Derek L. Bowens
Director
Durham County Board of Elections
PO Box 868
Durham, NC 27702
Email: elections@dconc.gov

**RE: NVRA public disclosure request**

Dear Disclosure Officer(s):

I am writing to request inspection or copies of records related to your office's voter list
maintenance obligations under the National Voter Registration Act of 1993 (NVRA).

The National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq.*, requires your office to
make available for public inspection "all records concerning the implementation of programs and
activities conducted for the purpose of ensuring the accuracy and currency of official lists of
eligible voters." 52 U.S.C. § 20507(i).

Pursuant to Section 20507(i) of NVRA, I request that your office reproduce or provide the
opportunity to inspect the following:

1. Documents regarding all registrants who were identified as potentially not satisfying the
   citizenship requirements for registration from any official information source, including
   information obtained from the various agencies within the U.S. Department of Homeland
   Security, North Carolina Department of Motor Vehicles, and from the North Carolina
   State Board of Elections since January 1, 2006. This request extends to all documents that
   provide the name of the registrant, the voting history of such registrant, the nature and
   content of any notice sent to the registrant, including the date of the notice, the response
   (if any) of the registrant, and actions taken regarding the registrant's registration (if any)
   and the date of the action. This request extends to electronic records capable of
   compilation.

2. All documents and records of communication received by your office from registered
   voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a
   removal or cancellation from the voter roll for any reason related to non-U.S. citizenship.
   Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection
   officials—state and federal--since January 1, 2006 referencing individuals who claimed

to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

Understanding that federal file retention laws may impact some disclosures, an optimal grouping of documents presented per registered voter disclosed would contain the following:

- The completed voter application form (redacted where necessary to prevent disclosures of claimed Social Security number and signature);

- Referral documents/transmissions for new or updated voter registration applications provided by state agencies charged with National Voter Registration Act (Motor Voter) duties;

- Records indicating the "voter profile" or "voter view" or similar feature provided within the North Carolina State Elections Information Management System (SEIMS) which details all information kept per voter, to include but is not limited to:
    - Full name on file (including previous names)
    - Date of birth
    - Voter ID number
    - Voter registration date (including previous dates of registration)
    - Date of last maintenance/update action
    - Reason code(s) for previous maintenance action(s)
    - County of registration
    - Detailed address information history (residential and mailing)
    - Political party designation history (if claimed/recorded)
    - Registration method history (e.g. self, NVRA agency transaction, third-party, etc.)
    - Assigned voting districts history
    - Election participation history in full
    - All internal memoranda stored within each "profile"

- All letters, postcards, and other mailings sent from your office to the voter in question with notations for types of postage or method of delivery indicated where possible;

- All letters, emails, logged phone calls, documents, and other communications from the voter in question to your office—including those communications from legal counsel or claimed relatives on their behalf—that is either affirmatively sent by the voter or in response to a mailing received by your office or other official entity;

- All documents your office may receive from federal entities to include but are not limited to the U.S. Department of Homeland Security/USCIS detailing inquiries regarding registered voters in your county and your responses given;

- All documents your office may generate upon request to the voter or federal agency concerned with immigration matters for the purpose of detailing a registration status

history and voting history;

- All documents and communications between your office and the registered voter in question with respect to pending immigration matters; and

- Any documents sent by your office to the voter to require that an affirmation of citizenship or noncitizenship be given in writing with responses included, where applicable.

If you wish to dispense with a public inspection and provide copies of these records instead, please send them to following address:

> 32 E. Washington Street
> Suite 1675
> Indianapolis, IN 46204

Should you need to contact me regarding this request, please contact me via email at lchurchwell@publicinterestlegal.org.

Thank you for your service on this matter.


Sincerely,

Logan Churchwell
Communications & Research Director
Public Interest Legal Foundation
lchurchwell@publicinterestlegal.org

# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

September 10, 2018

Tim Tsujii
Director
Forsyth County Board of Elections
201 N. Chestnut Street
Winston Salem, NC 27101
Email: FORSYTH.boe@ncsbe.gov

**RE: NVRA public disclosure request**

Dear Disclosure Officer(s):

I am writing to request inspection or copies of records related to your office's voter list maintenance obligations under the National Voter Registration Act of 1993 (NVRA).

The National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq.*, requires your office to make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i).

Pursuant to Section 20507(i) of NVRA, I request that your office reproduce or provide the opportunity to inspect the following:

1. Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles, and from the North Carolina State Board of Elections since January 1, 2006. This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.

2. All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection officials—state and federal--since January 1, 2006 referencing individuals who claimed

32 E. Washington Street, Suite 1675, Indianapolis, Indiana 46204
Telephone: 317.203.5599  Fax: 888.815.5641  PublicInterestLegal.org

JA-62    Case 5:19-cv-00248-BO   Document 17-3   Filed 08/02/19   Page 4 of 9   Exhibit B, Page 4

to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

Understanding that federal file retention laws may impact some disclosures, an optimal grouping of documents presented per registered voter disclosed would contain the following:

- The completed voter application form (redacted where necessary to prevent disclosures of claimed Social Security number and signature);

- Referral documents/transmissions for new or updated voter registration applications provided by state agencies charged with National Voter Registration Act (Motor Voter) duties;

- Records indicating the "voter profile" or "voter view" or similar feature provided within the North Carolina State Elections Information Management System (SEIMS) which details all information kept per voter, to include but is not limited to:
    o Full name on file (including previous names)
    o Date of birth
    o Voter ID number
    o Voter registration date (including previous dates of registration)
    o Date of last maintenance/update action
    o Reason code(s) for previous maintenance action(s)
    o County of registration
    o Detailed address information history (residential and mailing)
    o Political party designation history (if claimed/recorded)
    o Registration method history (e.g. self, NVRA agency transaction, third-party, etc.)
    o Assigned voting districts history
    o Election participation history in full
    o All internal memoranda stored within each "profile"

- All letters, postcards, and other mailings sent from your office to the voter in question with notations for types of postage or method of delivery indicated where possible;

- All letters, emails, logged phone calls, documents, and other communications from the voter in question to your office—including those communications from legal counsel or claimed relatives on their behalf—that is either affirmatively sent by the voter or in response to a mailing received by your office or other official entity;

- All documents your office may receive from federal entities to include but are not limited to the U.S. Department of Homeland Security/USCIS detailing inquiries regarding registered voters in your county and your responses given;

- All documents your office may generate upon request to the voter or federal agency concerned with immigration matters for the purpose of detailing a registration status

history and voting history;

- All documents and communications between your office and the registered voter in
  question with respect to pending immigration matters; and

- Any documents sent by your office to the voter to require that an affirmation of
  citizenship or noncitizenship be given in writing with responses included, where
  applicable.

If you wish to dispense with a public inspection and provide copies of these records instead,
please send them to following address:

> 32 E. Washington Street
> Suite 1675
> Indianapolis, IN 46204

Should you need to contact me regarding this request, please contact me via email at
lchurchwell@publicinterestlegal.org.

Thank you for your service on this matter.


Sincerely,

Logan Churchwell
Communications & Research Director
Public Interest Legal Foundation
lchurchwell@publicinterestlegal.org

# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

September 10, 2018

Charlie Collicutt
Director
Guilford County Board of Elections
PO Box 3427
Greensboro, NC 27240
Email: GUILFORD.boe@ncsbe.gov

**RE: NVRA public disclosure request**

Dear Disclosure Officer(s):

I am writing to request inspection or copies of records related to your office's voter list maintenance obligations under the National Voter Registration Act of 1993 (NVRA).

The National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq.*, requires your office to make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i).

Pursuant to Section 20507(i) of NVRA, I request that your office reproduce or provide the opportunity to inspect the following:

1. Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles, and from the North Carolina State Board of Elections since January 1, 2006. This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.

2. All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection officials—state and federal--since January 1, 2006 referencing individuals who claimed

to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

Understanding that federal file retention laws may impact some disclosures, an optimal grouping of documents presented per registered voter disclosed would contain the following:

- The completed voter application form (redacted where necessary to prevent disclosures of claimed Social Security number and signature);

- Referral documents/transmissions for new or updated voter registration applications provided by state agencies charged with National Voter Registration Act (Motor Voter) duties;

- Records indicating the "voter profile" or "voter view" or similar feature provided within the North Carolina State Elections Information Management System (SEIMS) which details all information kept per voter, to include but is not limited to:
  o Full name on file (including previous names)
  o Date of birth
  o Voter ID number
  o Voter registration date (including previous dates of registration)
  o Date of last maintenance/update action
  o Reason code(s) for previous maintenance action(s)
  o County of registration
  o Detailed address information history (residential and mailing)
  o Political party designation history (if claimed/recorded)
  o Registration method history (e.g. self, NVRA agency transaction, third-party, etc.)
  o Assigned voting districts history
  o Election participation history in full
  o All internal memoranda stored within each "profile"

- All letters, postcards, and other mailings sent from your office to the voter in question with notations for types of postage or method of delivery indicated where possible;

- All letters, emails, logged phone calls, documents, and other communications from the voter in question to your office—including those communications from legal counsel or claimed relatives on their behalf—that is either affirmatively sent by the voter or in response to a mailing received by your office or other official entity;

- All documents your office may receive from federal entities to include but are not limited to the U.S. Department of Homeland Security/USCIS detailing inquiries regarding registered voters in your county and your responses given;

- All documents your office may generate upon request to the voter or federal agency concerned with immigration matters for the purpose of detailing a registration status

history and voting history;

- All documents and communications between your office and the registered voter in question with respect to pending immigration matters; and

- Any documents sent by your office to the voter to require that an affirmation of citizenship or noncitizenship be given in writing with responses included, where applicable.

If you wish to dispense with a public inspection and provide copies of these records instead, please send them to following address:

> 32 E. Washington Street
> Suite 1675
> Indianapolis, IN 46204

Should you need to contact me regarding this request, please contact me via email at lchurchwell@publicinterestlegal.org.

Thank you for your service on this matter.


Sincerely,

Logan Churchwell
Communications & Research Director
Public Interest Legal Foundation
lchurchwell@publicinterestlegal.org

# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

October 1, 2018

Derek L. Bowens
Director
Durham County Board of Elections
PO Box 868
Durham, NC 27702
Email: elections@dconc.gov

**RE: NVRA Violation Notice**

Dear Mr. Bowens:

This letter is in regard to our September 10, 2018 request pursuant to the public inspection provision of the National Voter Registration Act (NVRA), 52 U.S.C. § 20507(i), to inspect and duplicate voter list maintenance records maintained by your office.

On September 10, 2018, we wrote to your office seeking an opportunity to inspect and photocopying the following voter list maintenance records:

1. Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles, and from the North Carolina State Board of Elections since January 1, 2006. This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.

2. All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection officials—state and federal--since January 1, 2006 referencing individuals who claimed to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

**To date, no response or status update has been offered by your office.**

As we stated previously, our request to inspect and photocopy records is made pursuant to the National Voter Registration Act (NVRA), 52 U.S.C. § 20507(i). Any exemptions or restrictions found in North Carolina law are superseded by federal law and thus inapplicable to our request. Furthermore, the NVRA places no restrictions on the use of the list maintenance records we have requested.

By refusing to make the requested records available for public inspection, your office is in violation of the NVRA. This letter serves as final statutory notice required by 52 U.S.C. § 20510(b) prior to the commencement of any lawsuit in order to enforce provisions of Section 8 of the NVRA, 52 U.S.C. § 20507(i), for failure to grant inspection and duplication of the requested records.

**Durham County is hereby notified that it now faces federal litigation should it continue to deny access to requested records in its possession.**

It is our hope the County will work quickly to provide for inspection of all of the records previously requested. A lawsuit under the NVRA may be filed against you if the NVRA violation described herein is not fully remedied within 20 days of your receipt of this letter. 52 U.S.C. § 20510(b). For any lawsuits initiated by a private party, an award of attorney's fees, expenses, and costs incurred are available under 52 U.S.C. § 20510(c).

Thank you for your time and attention to this matter.


Sincerely,

Logan Churchwell
Communications & Research Director
Public Interest Legal Foundation
lchurchwell@publicinterestlegal.org


CC: Mr. Andy Penry
Chairman
North Carolina State Board of Elections
PO Box 27255
Raleigh, NC 27611-7255
Email: Elections.sboe@ncsbe.gov

# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

October 1, 2018

Tim Tsujii
Director
Forsyth County Board of Elections
201 N. Chestnut Street
Winston Salem, NC 27101
Email: forsyth.boe@ncsbe.gov

**RE: NVRA Violation Notice**

Dear Mr. Bowens:

This letter is in regard to our September 10, 2018 request pursuant to the public inspection provision of the National Voter Registration Act (NVRA), 52 U.S.C. § 20507(i), to inspect and duplicate voter list maintenance records maintained by your office.

On September 10, 2018, we wrote to your office seeking an opportunity to inspect and photocopying the following voter list maintenance records:

1. Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles, and from the North Carolina State Board of Elections since January 1, 2006. This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.

2. All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection officials—state and federal--since January 1, 2006 referencing individuals who claimed to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

**To date, no response or status update has been offered by your office.**

As we stated previously, our request to inspect and photocopy records is made pursuant to the National Voter Registration Act (NVRA), 52 U.S.C. § 20507(i). Any exemptions or restrictions found in North Carolina law are superseded by federal law and thus inapplicable to our request. Furthermore, the NVRA places no restrictions on the use of the list maintenance records we have requested.

By refusing to make the requested records available for public inspection, your office is in violation of the NVRA. This letter serves as final statutory notice required by 52 U.S.C. § 20510(b) prior to the commencement of any lawsuit in order to enforce provisions of Section 8 of the NVRA, 52 U.S.C. § 20507(i), for failure to grant inspection and duplication of the requested records.

**Forsyth County is hereby notified that it now faces federal litigation should it continue to deny access to requested records in its possession.**

It is our hope the County will work quickly to provide for inspection of all of the records previously requested. A lawsuit under the NVRA may be filed against you if the NVRA violation described herein is not fully remedied within 20 days of your receipt of this letter. 52 U.S.C. § 20510(b). For any lawsuits initiated by a private party, an award of attorney's fees, expenses, and costs incurred are available under 52 U.S.C. § 20510(c).

Thank you for your time and attention to this matter.


Sincerely,

Logan Churchwell
Communications & Research Director
Public Interest Legal Foundation
lchurchwell@publicinterestlegal.org


CC: Mr. Andy Penry
Chairman
North Carolina State Board of Elections
PO Box 27255
Raleigh, NC 27611-7255
Email: Elections.sboe@ncsbe.gov

# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

October 1, 2018

Charlie Collicutt
Director
Guilford County Board of Elections
PO Box 3427
Greensboro, NC 27402
Email: guilford.boe@ncsbe.gov

**RE: NVRA Violation Notice**

Dear Mr. Bowens:

This letter is in regard to our September 10, 2018 request pursuant to the public inspection provision of the National Voter Registration Act (NVRA), 52 U.S.C. § 20507(i), to inspect and duplicate voter list maintenance records maintained by your office.

On September 10, 2018, we wrote to your office seeking an opportunity to inspect and photocopying the following voter list maintenance records:

1. Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles, and from the North Carolina State Board of Elections since January 1, 2006. This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.

2. All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection officials—state and federal--since January 1, 2006 referencing individuals who claimed to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

**To date, no response or status update has been offered by your office.**

As we stated previously, our request to inspect and photocopy records is made pursuant to the National Voter Registration Act (NVRA), 52 U.S.C. § 20507(i). Any exemptions or restrictions found in North Carolina law are superseded by federal law and thus inapplicable to our request. Furthermore, the NVRA places no restrictions on the use of the list maintenance records we have requested.

By refusing to make the requested records available for public inspection, your office is in violation of the NVRA. This letter serves as final statutory notice required by 52 U.S.C. § 20510(b) prior to the commencement of any lawsuit in order to enforce provisions of Section 8 of the NVRA, 52 U.S.C. § 20507(i), for failure to grant inspection and duplication of the requested records.

**Guilford County is hereby notified that it now faces federal litigation should it continue to deny access to requested records in its possession.**

It is our hope the County will work quickly to provide for inspection of all of the records previously requested. A lawsuit under the NVRA may be filed against you if the NVRA violation described herein is not fully remedied within 20 days of your receipt of this letter. 52 U.S.C. § 20510(b). For any lawsuits initiated by a private party, an award of attorney's fees, expenses, and costs incurred are available under 52 U.S.C. § 20510(c).

Thank you for your time and attention to this matter.


Sincerely,

Logan Churchwell
Communications & Research Director
Public Interest Legal Foundation
lchurchwell@publicinterestlegal.org


CC: Mr. Andy Penry
Chairman
North Carolina State Board of Elections
PO Box 27255
Raleigh, NC 27611-7255
Email: Elections.sboe@ncsbe.gov

# RE: [External] Re: Your NVRA request

### Gannon, Patrick <Patrick.Gannon@ncsbe.gov>

Wed 4/10/2019 17:08

To Logan Churchwell <lchurchwell@PublicInterestLegal.org>;

Mr. Churchwell,

I will give you a full update and hopefully start providing responsive documents tomorrow or Friday. I'm sorry for the delay but we've been sidetracked by many unforeseen events here.

Thanks,

Pat


## Patrick Gannon
*PIO*
O: (919) 814-0765
M: (984) 204-0767



---

**From:** Logan Churchwell [mailto:lchurchwell@PublicInterestLegal.org]
**Sent:** Wednesday, April 10, 2019 4:21 PM
**To:** Gannon, Patrick <Patrick.Gannon@ncsbe.gov>
**Subject:** Re: [External] Re: Your NVRA request

> External email. Do not click links or open attachments unless you verify. Send all suspicious email as an attachment to report.spam@nc.gov

Patrick:


We're well-past the agreed time and are simply running out of runway. Please advise asap.

---

**From:** Gannon, Patrick <Patrick.Gannon@ncsbe.gov>
**Sent:** Wednesday, January 9, 2019 9:46:47 AM

**To:** Logan Churchwell
**Subject:** RE: [External] Re: Your NVRA request

Mr. Churchwell,

Thanks for taking the call, and we appreciate your patience on these records. Working on the citizenship request now, per our discussion. I will send records for your additional request on a rolling basis as they are reviewed and redacted.

Again, thanks,

Pat

Patrick Gannon | PIO
o: 919-814-0765 | c: 984-204-0767



---

**From:** Logan Churchwell [mailto:lchurchwell@PublicInterestLegal.org]
**Sent:** Thursday, December 13, 2018 4:15 PM
**To:** Gannon, Patrick <Patrick.Gannon@ncsbe.gov>
**Cc:** Tim Tsujii <tsujiidt@forsyth.cc>; SVC_SBOE.Elections <Elections.SBOE@ncsbe.gov>; Lawson, Joshua <joshua.lawson@ncsbe.gov>; Love, Katelyn <Katelyn.Love@ncsbe.gov>
**Subject:** Re: [External] Re: Your NVRA request

> External email. Do not click links or open attachments unless verified. Send all suspicious email as an attachment to Report Spam.

Mr. Gannon:

We're slated to be in Raleigh the afternoon of January 11 and plan to stop by your offices to review responsive documents by then. If you happen to have the records prepared prior to that date, please let me know.

**From:** Gannon, Patrick <Patrick.Gannon@ncsbe.gov>
**Sent:** Monday, October 29, 2018 10:30:32 AM
**To:** Logan Churchwell
**Cc:** Tim Tsujii; SVC_SBOE.Elections; Lawson, Joshua; Love, Katelyn
**Subject:** RE: [External] Re: Your NVRA request

Mr. Churchwell,

We are still working on them and would hope to have a response to you some time in November.

Thanks,

Pat

Patrick Gannon | PIO
o: 919-814-0765 | c: 984-204-0767



**From:** Logan Churchwell [mailto:lchurchwell@PublicInterestLegal.org]
**Sent:** Monday, October 29, 2018 10:18 AM
**To:** Gannon, Patrick <Patrick.Gannon@ncsbe.gov>
**Cc:** Tim Tsujii <tsujiidt@forsyth.cc>; SVC_SBOE.Elections <Elections.SBOE@ncsbe.gov>; Lawson, Joshua <joshua.lawson@ncsbe.gov>; Love, Katelyn <Katelyn.Love@ncsbe.gov>
**Subject:** [External] Re: Your NVRA request

---

External email. Do not click links or open attachments unless verified. Send all suspicious email as an attachment to Report Spam.

---

Patrick-

May we please have an update on these requests?

---

**From:** Logan Churchwell
**Sent:** Tuesday, October 9, 2018 11:45:32 AM
**To:** Gannon, Patrick
**Cc:** Tim Tsujii; SVC_SBOE.Elections; Lawson, Joshua; Love, Katelyn
**Subject:** Re: Your NVRA request

Patrick-

While this file is open, if you could help us collect identical information from Mecklenburg and Buncombe Counties as well--that would be most helpful.

Thank you.

---

**From:** Logan Churchwell
**Sent:** Monday, October 1, 2018 4:54:27 PM

**To:** Gannon, Patrick
**Cc:** Tim Tsujii; SVC_SBOE.Elections; Lawson, Joshua; Love, Katelyn
**Subject:** Re: Your NVRA request

Guilford County is the third with identical requests.

Logan C. Churchwell
432-935-3840
Sent from my iPhone

On Oct 1, 2018, at 16:50, Gannon, Patrick <Patrick.Gannon@ncsbe.gov> wrote:

> Mr. Churchwell,
>
> We at the State Board of Elections & Ethics Enforcement hope to help facilitate a response to your recent records request to some of North Carolina's county boards of elections, as our agency likely houses some of the data responsive to your request.
>
> We are aware of requests to two counties – Durham and Forsyth. Were additional requests made to other counties?
>
> We appreciate your patience during this busy time, but please let me know if you have questions.
>
> Thanks,
>
> Pat
>
>
>
> Patrick Gannon | PIO        <image001.png>
> o: 919-814-0765 | c: 984-204-0767

# PUBLIC INTEREST
## — LEGAL FOUNDATION —

VIA EMAIL

April 30, 2019

Kim Westbrook Strach
Executive Director
North Carolina State Board of Elections
P.O. Box 27255
Raleigh, NC 27611-7255
Email: Kim.Strach@ncsbe.gov, Elections.SBOE@ncsbe.gov

**RE: Notice of NVRA Violation**

Dear Ms. Strach:

It has been nearly seven months since the North Carolina State Board of Elections (NCSBE) promised to produce voter list maintenance records originally requested from certain North Carolina county boards of elections pursuant to the records inspection provision of the National Voter Registration Act of 1993 ("NVRA"). 52 U.S.C. 20507(i). The requested records concern the actions county election officials have taken to identify and cancel registrations belonging to individuals who do not satisfy the citizenship requirements for voting.

To date, <u>**we not have not received any responsive records from the NCSBE**</u>, despite repeated assurances that production of records was imminently forthcoming.

This letter serves to notify that the <u>**NCSBE is in violation of the NVRA for failure to permit inspection and photocopying of public records as required by 52 U.S.C. § 20507(i)**</u>. Because these violations are ongoing and occurring within 30 days of an election for federal office,[1] the NVRA authorizes us to pursue immediate federal litigation to enforce the inspection requirements of the law. *See* 52 U.S.C. § 20510(b)(3). However, we are providing this letter with the hope that you will immediately remedy these violations and make litigation unnecessary.

**Background**

On September 10, 2018, we requested the opportunity to inspect or receive certain voter list maintenance records from the county boards of elections in Guilford, Forsyth, and Durham pursuant to the records inspection provision of the NVRA, 52 U.S.C. § 20507(i). In part, the request sought "[d]ocuments regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration" and "actions taken regarding the registrant's registration." A copy of the letter served on the Durham County Board of Elections is attached this request, for reference.

---

[1] The primary election for North Carolina's 9th Congressional District is scheduled to occur on May 14, 2019.

When we received no response to our requests, we notified each county board on October 1, 2018 that it was in violation of the NVRA, copying the NCSBE on the correspondence. That same day, the NCSBE wrote to us via email, explaining that it would "help facilitate a response to [the] recent records request[s]" made to Guilford, Forsyth, and Durham because "our agency likely houses some of the data responsive to your request." On October 9, 2018, we asked the NCSBE to provide the same records for the counties of Mecklenburg and Buncombe as well.

When asked for an update on the progress of the request 20 days later, the NCSBE stated, "We are still working on them and would hope to have a response to you some time in November." The NCSBE did not produce any records in November.

Cognizant that the NCSBE was facing uncertainty regarding the legality of its composition, we remained patient, and agreed to travel to NCSBE offices to conduct an in-person inspection of the requested records on January 11, 2019.

On or around January 9, 2019, the NCSBE contacted us via telephone to indicate that the scheduled in-person visit was not necessary because the NCSBE would begin production of records by the end of January. On January 9, 2019, the phone call was memorialized in an email, in which the NCSBE stated, "Working on the citizenship request now, per our discussion. I will send records for your additional request on a rolling basis as they are reviewed and redacted." The NCSBE did not produce any records by the end of January.

More than two months later, on April 10, 2019, we again wrote to the NCSBE to request an update on the progress of the requests. Later than day, the NCSBE responded via email, stating, "I will give you a full update and hopefully start providing responsive documents tomorrow or Friday." The NCSBE did not produce any records—let alone an "update"—by Friday, April 12, as promised.

As of the date of this letter, the NCSBE has not provided a substantive update on its progress or produced any records responsive to the request. It has now been **232 days** since we first requested access to public voter list maintenance records in the possession of North Carolina election officials.

**Violation of the National Voter Registration Act**

As explained in the September 10, 2018 requests (attached), the NVRA requires election officials to make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). The requested records fall within the scope of this requirement.

Failure to permit public inspection or otherwise provide copies of these records is a violation of federal law for which the NVRA provides a private-right-of-action. 52 U.S.C. § 20510(b).

2

A primary election for federal office in North Carolina is scheduled for May 14, 2019.[2] For NVRA violations occurring within 30 days of an election for federal office, there is no curative period. 52 U.S.C. § 20510(b)(3). **If the NVRA violation described herein is not corrected immediately, the Foundation will pursue federal litigation to enforce its rights.** For any lawsuits initiated by a private party, an award of attorney's fees, expenses, and costs incurred are available under 52 U.S.C. § 20510(c).

As the state's chief election official for purposes of the NVRA, N.C. Gen. Stat. § 163A-6, the Executive Director of the NCSBE is copied on this correspondence. *See Voter Integrity Project NC, Inc. v. Wake Cty. Bd. of Elections*, 301 F. Supp. 3d 612, 617 n.4 (E.D.N.C. 2017).

Please direct all future correspondence to njohnson@publicinterestlegal.org.

Thank you for your service on this matter.

Sincerely,


Noel Johnson
Litigation Counsel
Public Interest Legal Foundation

CC:

Mr. Robert Cordle
Chairman
North Carolina State Board of Elections
P.O. Box 27255
Raleigh, NC 27611-7255

---

[2] https://s3.amazonaws.com/dl.ncsbe.gov/Elections/2019/District9Candidates.pdf.

| | |
|---|---|
| **From:** | Logan Churchwell |
| **To:** | kim.strach@ncsbe.gov; SVC_SBOE.Elections |
| **Cc:** | Noel Johnson |
| **Subject:** | NVRA violation notice - PILF |
| **Date:** | Tuesday, April 30, 2019 10:02:22 AM |
| **Attachments:** | 19.4.30 - NCSBE - NVRA Violation.pdf |
| | 2018.9.10 Durham County NVRA Request.pdf |

Dir. Westbrook Strach:

I'm emailing this document and related attachment on behalf of counsel, Noel Johnson.

**Logan Churchwell**

Communications & Research Director

**Public Interest Legal Foundation**

lchurchwell@PublicInterestLegal.org

432-935-3840



# NORTH CAROLINA
## STATE BOARD OF ELECTIONS

<u>VIA EMAIL</u>
Public Interest Legal Foundation
   c/o   Noel Johnson, Esq.


May 3, 2019


Re:   <u>Notice citing the National Voter Registration Act of 1993 (NVRA).</u>


Dear Ms. Johnson:

     This letter responds to the above-referenced Notice, *enclosed*, received by the N.C. State Board of Elections Office ("State Board Office") today by U.S. Mail. We are aware of communications between the Public Interest Legal Foundation (PILF) and certain staff at the State Board Office in recent months, and it appears a number of items may have been misunderstood.

     Records are maintained and freely available for list maintenance activities as to each registered voter, statewide, online: ncVoter_Statewide.zip (468.7 MB). It was our understanding that PILF was previously aware of that public file, which is updated weekly to reflect current registration and list maintenance activities. From the public file, PILF can identify each individual removed from the rolls, the reason for that removal, and the date of removal. Additional information is also available to you using that file. Our State has gone further and made freely available individual voter participation history for all voters, statewide, at no cost: nchist_Statewide.zip (264.4 MB).

     However, your Notice states that PILF's request is fundamentally for records affecting "registrations belonging to individuals who do not satisfy the citizenship requirements for voting," and your correspondence to various counties further clarifies that you seek "information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles" and this Agency.

<div align="center">1</div>

The State Board Office is unable to disclose the identity of particular individuals in the manner you request, although we wish to provide you an overview of the process and the reasons why individuals cannot be identified in the manner sought.

In 2013, the State Board Office sought to enhance its ability to identify non-citizen registrants by entering an agreement with the U.S. Department of Homeland Security (DHS) and the United States Citizenship and Immigration Service (USCIS) to access their Systematic Alien Verification for Entitlements (SAVE) Program, which allows state agencies to query certain information regarding particular individuals' citizenship status. Before the State Board was granted access to the SAVE Program, however, DHS and USCIS required the State Board to enter into a memorandum of agreement that outlined and restricted the State Board's use and reliance on data from the SAVE Program. Additionally, the State Board was required to submit both the proposed agreement and other documents to the United States Department of Justice for preclearance under Section 5 of the Voting Rights Act. The State Board entered into this agreement in September 2013 (the "MOA"), *enclosed*.

Use and disclosure of information obtained through SAVE is strictly limited by the terms of our Agency's MOA with DHS and USCIS. We are required, for instance, to "use any information provided by DHS-USCIS under this MOA solely for the purpose of determining the eligibility . . . and limit use of such information accordance with this and all other provisions of this MOA," which expressly requires that the Agency "protect its confidentiality, including ensuring that it is not disclosed to any unauthorized person(s) without the prior written consent of DHS-USCIS." MOA at Sections IV(B)(1)(g) and (i), *enclosed*.

The SAVE Program is most effectively queried using alien identification numbers, which the State Board Office sought from the Department of Motor Vehicles. We understand that information is subject to nondisclosure under the Driver's Privacy Protection Act (DPPA).

In addition to the above, the State Board Office and certain county boards of elections continue to provide records sought by federal law enforcement, as described in Numbered Memos 2018-09 and 2019-01, *enclosed*. We will not presently disclose the identity of any prior or current registrant that may be subject to review by federal law enforcement.

Our Agency conducts list maintenance activities in a transparent manner consistent with the NVRA, and it has detailed investigatory steps regarding the use of the SAVE Program data and DMV data. *See* Post-Election Audit Report (April 21, 2017), *enclosed*.  While the State Board Office cannot provide information and data otherwise restricted by agreement with federal agencies, the pendency of federal proceedings affecting that data, or other federal statutes, our Agency has provided broad access to list maintenance data for the entire state, supra.

Understanding the restrictions on the discrimination of particular data, we would ask that PILF please indicate what records it now seeks.  We look forward to providing all records to which you are entitled under the NVRA.

Sincerely,

Josh Lawson
General Counsel

Encl.:       Memorandum of Agreement (2013)
             Post-Election Audit Report (2016), with copies of
             requested correspondence
             Numbered Memo 2019-01
             Numbered Memo 2018-09
             Notice Letter

3

# PUBLIC INTEREST
## — LEGAL FOUNDATION —

VIA EMAIL

May 9, 2019

North Carolina State Board of Elections
c/o Josh Lawson, General Counsel
430 N. Salisbury St.
Raleigh, NC 27603-5918
Email: joshua.lawson@ncsbe.gov
cc: kim.strach@ncsbe.gov, Legal@ncsbe.gov, pcox@ncdoj.gov

**RE: NVRA Violation and Inspection Visit**

Dear Mr. Lawson:

We have received your response to our letter notifying the North Carolina State Board of
Elections ("NCSBE") that it is in violation of the National Voter Registration Act of 1993
("NVRA") for failure to permit inspection of voter list maintenance records. As explained more
fully below, your response is not sufficient to remedy the violations identified in our previous
letter and the NCSBE thus remains in violation of the NVRA. To attempt to resolve this matter
without court intervention, our representative will visit your office at 430 N. Salisbury St.,
Raleigh, NC 27603, on the **morning of Thursday, May 16, 2019,** to inspect and retrieve copies
of the requested records.

Your letter explains that the NCSBE will not make the requested records available for inspection
due to its belief that its agreement with DHS and USCIS regarding use of the SAVE Program
(the "MOA") and the Driver's Privacy Protection Act ("DPPA") prohibit disclosure of those
records. Those are not valid bases to deny access to public list maintenance records.

The MOA explicitly disavows all conflict with the NVRA. Paragraph (J) of Section VI of the
MOA states, "Nothing in this MOA is intended or should be construed to limit or affect the
duties, responsibilities, and rights of the User Agency under the National Voter Registration
Act." Even if this provision did not exist, it would make no difference. The government cannot
abrogate by contract the rights conferred upon the public by the NVRA.

The DPPA likewise does not conflict with or limit the NVRA's records inspection requirements.
In *Public Interest Legal Foundation v. Reed*, No. 16-cv-01375 (E.D. Va., filed Oct. 31, 2016),
the United States District Court for the Eastern District of Virginia confronted and rejected the
NCSBE's position that the DPPA overrides the records inspection rights of the NVRA with
respect to a request for nearly identical records. A copy of that order is attached to this letter.

The NVRA is known as "Motor Voter" because one of its primary purposes was to provide for
voter registration at motor vehicle agencies. In fact, the NVRA requires that an application for a
driver's license must "serve as an application for voter registration." 52 U.S.C. § 20504(a)(1). It

32 E. Washington Street, Suite 1675, Indianapolis, Indiana 46204
Telephone: 317.203.5599  Fax: 888.815.5641  PublicInterestLegal.org

JA-85     Case 5:19-cv-00248-BO   Document 17-9   Filed 08/02/19   Page 2 of 14     Exhibit H, Page 1

would plainly frustrates the intended transparency of the NVRA to interpret the DPPA to shield from disclosure all list maintenance records that can trace their heritage to any nexus with a state motor vehicle agency. The DPPA protects motor vehicle records, not the list maintenance records the Foundation has requested.

While we appreciate your directing us to the list maintenance and voter history files made available on the NCSBE's website, those records do not satisfy our request. Our request seeks *all* records concerning registrants who were identified as potentially not satisfying the citizenship requirements for registration since January 1, 2006. **We continue to seek all such records because the NVRA requires that they be made available for public inspection**. *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012).

As we explained in our original request, sent on September 10, 2018, such records would include, but not be limited to the following:

- records showing registered voters cancelled or flagged for investigation for reasons of non-U.S. citizenship, including records derived from use of the SAVE Program and DMV data;
- voter registration applications belonging to those registrants;
- notices, affirmations of citizenship, and other correspondence sent to and received from those registrants (*see, e.g.*, correspondence at pages 42-46 of your response);
- voting history for those registrants;
- correspondence sent to and received from registered voters, legal counsel, claimed relatives, or other agents requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship;
- records related to registered voters who indicated on juror forms that they were not U.S. citizens; and,
- responsive records maintained or created by the North Carolina State Elections Information Management System (SEIMS).

The Post-Election Audit Report for the 2016 General Election included in your response confirms or eludes to the existence of many records responsive to our request. *See, e.g.*, Post-Election Audit Report at 4-5. We seek access to those records and similar records for years other than 2016.

**The NCSBE remains in violation of the NVRA.** To attempt to resolve this matter without court intervention, our representative will visit your office at 430 N. Salisbury St., Raleigh, NC 27603, on the **morning of Thursday, May 16, 2019,** to inspect and retrieve copies of the requested records. We look forward to meeting with your staff.

Sincerely,

Noel Johnson
Litigation Counsel
Public Interest Legal Foundation

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

THE PUBLIC INTEREST LEGAL          )
FOUNDATION, INC.                   )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )    Case No. 1:16-cv-01375
                                   )
                                   )
SUSAN REED, in her official        )
capacity as General Registrar      )
for the City of Manassas,          )
                                   )
        Defendant.                 )

**ORDER**

THIS MATTER comes before the Court on Defendant Susan Reed's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 8.) Plaintiff, The Public Interest Legal Foundation, Inc., brought this suit under Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507, seeking declaratory and injunctive relief to order Defendant, in her official capacity as General Registrar for the City of Manassas, to allow Plaintiff to inspect voter records.

Defendant has moved to dismiss the Complaint on the grounds that the privacy provision of the Driver Privacy Protection Act of 1994 ("DPPA"), 18 U.S.C. §§ 2721-2725, overrides the public disclosure provision of the NVRA under the circumstances of this

case.  The Court finds that the DPPA does not apply to the disclosure of the voter information requested by Plaintiff. Because Plaintiff has stated a plausible claim for declaratory and injunctive relief, it is hereby

ORDERED that Defendant Susan Reed's Motion to Dismiss is DENIED.

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
January 27, 2016

2

| | |
|---|---|
| **From:** | Noel Johnson |
| **To:** | Cox, Paul |
| **Cc:** | Kaylan Phillips |
| **Subject:** | RE: Notice citing the National Voter Registration Act of 1993 (NVRA) |
| **Date:** | Wednesday, May 29, 2019 4:49:00 PM |
| **Attachments:** | image002.png |

Paul,

Thank you for speaking with me today about our NVRA request. As I mentioned on the phone, the question we need answered is whether the State Board is withholding records under the position stated in the May 3, 2019 letter from Josh Lawson or whether the State Board will produce the additional records described in the original requests (reiterated in my letter of May 9, 2019). As we further discussed, we need an answer by next week. Thank you again.

Noel

**From:** Noel Johnson
**Sent:** Tuesday, May 28, 2019 4:53 PM
**To:** Cox, Paul <pcox@ncdoj.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Paul,

I just left you a voicemail at 919-716-6900. I will be in the office until around 6:45. If I don't hear from you today, I will try again tomorrow morning. Thanks.

Noel

**From:** Cox, Paul <pcox@ncdoj.gov>
**Sent:** Tuesday, May 28, 2019 10:47 AM
**To:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

That's fine. I'm unsure if this deposition will be finished by then, anyway.

**From:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Sent:** Tuesday, May 28, 2019 10:46 AM
**To:** Cox, Paul <pcox@ncdoj.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Paul,

I overlooked an appointment at 1:40 today that will keep me from calling at 2:00. I will try you when I am back in the office in the late afternoon.

Noel

---

**From:** Cox, Paul <pcox@ncdoj.gov>
**Sent:** Thursday, May 23, 2019 3:21 PM
**To:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Sounds good.

---

**From:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Sent:** Thursday, May 23, 2019 3:18 PM
**To:** Cox, Paul <pcox@ncdoj.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

That works for me. I will plan on calling you at 2:00pm unless I hear your schedule has changed. Thank you.

---

**From:** Cox, Paul [mailto:pcox@ncdoj.gov]
**Sent:** Thursday, May 23, 2019 3:16 PM
**To:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

I could tentatively do a call next Tuesday afternoon after 2pm.  That's contingent on a deposition that is currently scheduled to start that morning but which I don't expect to last too long.

---

**From:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Sent:** Thursday, May 23, 2019 3:07 PM
**To:** Cox, Paul <pcox@ncdoj.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

What is your availability next week Tuesday or Wednesday for a phone call?

Noel

---

**From:** Cox, Paul [mailto:pcox@ncdoj.gov]
**Sent:** Thursday, May 23, 2019 12:30 PM
**To:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Hi Noel – unfortunately today won't work.  I'm tied up with some deadlines for the next couple hours, and then I'm on the hook for childcare for the rest of the day.

Paul

---

**From:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Sent:** Thursday, May 23, 2019 11:08 AM
**To:** Cox, Paul <pcox@ncdoj.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Mr. Cox,

I retrieved your letter and the hard drive this morning from the State Board of Elections office. I also spoke briefly with Josh Lawson, who instructed me to refer all further questions about our request to you. Consistent with his instructions and your letter, I am no longer including your client on my correspondence.

I am currently in Raleigh and, I believe, within walking distance of your office. Do you have time to meet today to answer a few questions about the State Board's response to our request? I do not fly out until 7:45 pm. Please let me know.

Noel

---

**From:** Noel Johnson
**Sent:** Wednesday, May 22, 2019 12:13 PM
**To:** Cox, Paul <pcox@ncdoj.gov>; Lawson, Joshua <joshua.lawson@ncsbe.gov>
**Cc:** Strach, Kim <kim.strach@ncsbe.gov>; SBOE_Grp - Legal <Legal@ncsbe.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Mr. Cox,

Thank you for the response. We appreciate the Board's effort compiling responsive records. Obviously, I cannot presently assess whether the records satisfy the request in full. Because my travel is already booked, I believe the best way to proceed is to retrieve the records in person, as planned. That way I can review what was compiled and resolve any outstanding issues in person. Hopefully, that will allow us to conclude this matter as quickly as possible.

My plan is to arrive at the offices of the State Board at 10:00 am. If you prefer to be present and if another meeting location is preferable, please let me know as soon as possible.

Thank you,

Noel

---

**From:** Cox, Paul <pcox@ncdoj.gov>
**Sent:** Tuesday, May 21, 2019 5:56 PM
**To:** Noel Johnson <njohnson@PublicInterestLegal.org>; Lawson, Joshua <joshua.lawson@ncsbe.gov>
**Cc:** Strach, Kim <kim.strach@ncsbe.gov>; SBOE_Grp - Legal <Legal@ncsbe.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Mr. Johnson,

The Board was able to put together materials responsive to your requests and consistent with the NVRA and other applicable law, and can send these materials to you on a hard drive. This would avoid a trip to the Board's office to pick up the same information on Thursday. This process is the Board's typical method of responding to public records requests. Please let me know what address to forward these materials to.

Best regards,



**Paul M. Cox**
Special Deputy Attorney General
Phone: (919)716-6932
pcox@ncdoj.gov
114 W. Edenton St., Raleigh, NC 27603

Please note messages to or from this address may be public records.

---

**From:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Sent:** Tuesday, May 14, 2019 3:58 PM
**To:** Cox, Paul <pcox@ncdoj.gov>; Lawson, Joshua <joshua.lawson@ncsbe.gov>
**Cc:** Strach, Kim <kim.strach@ncsbe.gov>; SBOE_Grp - Legal <Legal@ncsbe.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Mr. Cox,

Please see the attached correspondence regarding this matter.

Noel Johnson

---

**From:** Cox, Paul <pcox@ncdoj.gov>
**Sent:** Monday, May 13, 2019 8:44 PM
**To:** Noel Johnson <njohnson@PublicInterestLegal.org>; Lawson, Joshua <joshua.lawson@ncsbe.gov>
**Cc:** Strach, Kim <kim.strach@ncsbe.gov>; SBOE_Grp - Legal <Legal@ncsbe.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Mr. Johnson,

I hope this note finds you well.

I'm an attorney with the North Carolina Attorney General's Office and represent the State Board of Elections. I'd like to discuss your information requests, but your notice from last Thursday that you would be visiting the State Board's office this Thursday to ask to be shown various categories of records that you have previously requested in writing is not possible to accommodate on such short notice. The Board staff that would be involved with such a visit would have to be taken away from critical election-related duties in the midst of two special congressional elections—including one that has a primary election tomorrow. I trust that your visitation notice is not intended to hinder the Board's core election administration functions. The Board's legal staff is also in the middle of a staff transition, and I am in near-constant depositions for the remainder of the week.

In the interest of reasonable accommodation, I'd like to suggest that we set up a call sometime next week to discuss your information requests and your understanding of the records that are covered by the disclosure provisions of the NVRA, as well as our understanding of what the law permits and/or requires the Board to disclose. My hope is that we can reach an understanding of what the law requires. I am available most any day except Monday morning, Tuesday afternoon, and Friday morning.

I look forward to hearing from you and connecting soon.

Best regards,



**Paul M. Cox**
Special Deputy Attorney General
Phone: (919)716-6932
pcox@ncdoj.gov
114 W. Edenton St., Raleigh, NC 27603

Please note messages to or from this address may be public records.

---

**From:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Sent:** Thursday, May 9, 2019 11:44 AM
**To:** Lawson, Joshua <joshua.lawson@ncsbe.gov>
**Cc:** Strach, Kim <kim.strach@ncsbe.gov>; SBOE_Grp - Legal <Legal@ncsbe.gov>; Cox, Paul <pcox@ncdoj.gov>
**Subject:** RE: Notice citing the National Voter Registration Act of 1993 (NVRA)

Mr. Lawson,

Please see the attached correspondence regarding this matter.

Noel Johnson

---

**From:** Lawson, Joshua <joshua.lawson@ncsbe.gov>
**Sent:** Friday, May 03, 2019 4:13 PM
**To:** Noel Johnson <njohnson@PublicInterestLegal.org>
**Cc:** Strach, Kim <kim.strach@ncsbe.gov>; SBOE_Grp - Legal <Legal@ncsbe.gov>; Cox, Paul
<pcox@ncdoj.gov>
**Subject:** Re: Notice citing the National Voter Registration Act of 1993 (NVRA)

Good afternoon, Attorney Johnson.  Attached, please find correspondence regarding
your letter.

Very sincerely,

—
Josh Lawson  |  General Counsel
o: 919-814-0755  |  f: 919-715-0135



# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

May 14, 2019

North Carolina State Board of Elections
c/o Paul M. Cox, Special Deputy Attorney General
430 N. Salisbury St.
Raleigh, NC 27603-5918
Email: pcox@ncdoj.gov
cc: kim.strach@ncsbe.gov, Legal@ncsbe.gov, joshua.lawson@ncsbe.gov

**RE: NVRA Violation and Inspection Visit**

Dear Mr. Cox:

Thank you for your response. Let me assure you that our scheduled visit is not intended to disrupt the NCSBE's functions, nor will it have that effect. Our visit is necessary, however, because the NCSBE has not permitted inspection and photocopying of records that must be made public pursuant to federal law. The NCSBE promised to produce those records *more than seven months ago*. The notice you received last week is thus anything but "short."

To accommodate your schedule and that of the NCSBE, we have rearranged our travel plans to schedule our visit for **the morning of Thursday, May 23, 2019**. The Foundation's representative is willing to devote the entire day to this matter, if necessary, to accommodate the NCSBE's other functions. We are more than happy to discuss the Foundation's requests with you and NCSBE staff and we look forward to inspecting and photocopying responsive records.


Sincerely,


Noel Johnson
Litigation Counsel
Public Interest Legal Foundation

32 E. Washington Street, Suite 1675, Indianapolis, Indiana 46204
Telephone: 317.203.5599   Fax: 888.815.5641   PublicInterestLegal.org

JA-95     Case 5:19-cv-00248-BO   Document 17-11   Filed 08/02/19   Page 1 of 1   Exhibit J, Page 1



JOSH STEIN
ATTORNEY GENERAL

PAUL COX
SPECIAL DEPUTY ATTORNEY GENERAL
SPECIAL LITIGATION SECTION
T: 919.716.6900
F: 919.716.6763
PCOX@NCDOJ.GOV

May 22, 2019

Noel Johnson
Public Interest Legal Foundation
*[For in person receipt at the North Carolina State Board of Elections]*

Dear Mr. Johnson,

Please find enclosed with this letter a hard drive including materials that are responsive to your request for records, the provision of which is consistent with applicable law. For further background, I refer you to the May 3, 2019 letter from Board of Elections General Counsel Josh Lawson that was addressed to you.

If you wish to communicate further on your records request or the State Board's production, please be in touch at my contact info listed above. N.C. R. Prof'l Conduct 4.2.

With best regards,

/s/ Paul M. Cox
Paul M. Cox
Special Deputy Attorney General
Special Litigation Section
North Carolina Department of Justice

| Name | Date modified | Type | Size |
|---|---|---|---|
| Statewide Voter File | 5/23/2019 9:16 AM | File folder | |
| Statewide Voter History | 5/23/2019 9:29 AM | File folder | |
| Correspondence_2017-05 | 5/23/2019 9:36 AM | PDF File | 337 KB |
| Correspondence_2019-05-03(PILF) | 5/3/2019 4:12 PM | PDF File | 4,998 KB |
| Correspondence_2019-05-03 | 5/23/2019 9:26 AM | PDF File | 95 KB |
| Correspondence_2019-05-22 | 5/23/2019 9:37 AM | PDF File | 357 KB |
| Numbered Memo 2018-09 | 5/23/2019 9:25 AM | PDF File | 493 KB |
| Numbered Memo 2019-01 | 5/23/2019 9:25 AM | PDF File | 508 KB |
| Post-Election_Audit_Report | 5/23/2019 9:24 AM | PDF File | 2,856 KB |
| SBE_DHS_USCIS_Agreement | 5/23/2019 9:28 AM | PDF File | 865 KB |
| SBE_DMV_Agreement | 5/23/2019 9:26 AM | PDF File | 376 KB |

| Name | Date modified | Type | Size |
|---|---|---|---|
| ncvoter_Statewide | 5/18/2019 6:41 AM | Text Document | 3,482,490 KB |

| Name | Date modified | Type | Size |
|---|---|---|---|
| ncvhis_ncvoter_data_format | 5/23/2019 9:17 AM | Text Document | 7 KB |
| ncvhis_Statewide | 5/18/2019 6:47 AM | Text Document | 4,709,477 KB |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

No. 5:19-cv-00248-BO

| | |
|---|---|
| PUBLIC INTEREST LEGAL FOUNDATION,<br>*Plaintiff*<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS,<br>*Defendant.* | MOTION TO SEAL<br>EX PARTE MOTION TO STAY AND SUPPORTING MEMORANDUM OF LAW<br><br>**Filed Under Seal** |

## MOTION TO SEAL

The North Carolina State Board of Elections, by Attorney General Joshua H. Stein, files this Motion to Seal the State Board's Ex Parte Motion to Stay the Case and supporting Memorandum of Law.

Although the case in which this motion is being filed is a public civil matter, the proposed ex parte motion and memorandum of law discuss matters that are before this Court in sealed proceedings relating to sealed criminal investigations and grand jury subpoenas issued pursuant to these investigations. The importance of maintaining the secrecy of the grand jury proceedings and ensuring that the State Board abides with the Court's orders in the sealed matter overcomes the common law and First Amendment presumption to access and justifies sealing until the grand jury matters and underlying criminal investigations are fully resolved.

THEREFORE, the State Board respectfully requests that its Ex Parte Motion to Stay and supporting Memorandum of Law be sealed, along with this Motion and Proposed Order.

This 19th day of July, 2019.

Respectfully submitted,

JOSHUA H. STEIN
ATTORNEY GENERAL

/s/ Paul M. Cox
Paul M. Cox
Special Deputy Attorney General
N.C. State Bar No. 49146
Email: pcox@ncdoj.gov

Benjamin O. Zellinger
Special Deputy Attorney General
N.C. State Bar No. 37149
Email: bzellinger@ncdoj.gov

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602-0629
Telephone: (919)716-6900

*Counsel for the North Carolina State Board of Elections*

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| League of United Latin American Citizens – Richmond Region Council 4614, Eliud Bonilla, Lucania Freeman, Abby Jo Gearhart, and Jeanne Rosen, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| PUBLIC INTEREST LEGAL FOUNDATION, an Indiana Corporation, and J. CHRISTIAN ADAMS | ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. __1:18cv423__   (LO/IDD)

**COMPLAINT**

**INTRODUCTION**

1.      In our democracy, all eligible Americans must be able to participate in elections,

free from unlawful interference or impediments.  For generations, this country has fought to

secure the right for all eligible Americans to vote in our elections free from intimidation or

threats.  Protecting these hard-won rights requires steady vigilance, as the techniques used to

intimidate or otherwise suppress the participation of voters evolves over time.  This case

concerns one modern form of voter intimidation: the groundless assertion that certain eligible

voters are committing voter fraud by participating in elections.  Such accusations are almost

1

invariably unfounded in fact; overwhelming evidence demonstrates that actual instances of voter fraud are vanishingly infrequent.[1]

2.    Spurious accusations of voter fraud cause real harm – both to the accused individuals and to our broader democracy.  Plaintiffs in this case include four Virginia voters accused by Defendants of committing state and federal felonies by participating in the electoral process.  These private citizens did not seek the public limelight or political power; they merely wished to exercise their fundamental right to participate in our elections.  The false accusations leveled against them – now archived on the internet for the general public to see and further disseminate – give rise to a variety of harms to these individuals that have the effect of intimidating them from voting or registering to vote.

3.    This is the kind of insidious modern technique of voter intimidation that civil rights laws are intended to eradicate.  These false accusations are also the sort of assaults on Plaintiffs' reputations that the law has long recognized as defamation.  Likewise, this form of voter intimidation affects the work of the organizational Plaintiff in this case, League of United Latin American Citizens – Richmond Region Council 4614, and the voting behavior of its members and the Latino community it serves.

4.    The Defendants are the Public Interest Legal Foundation and J. Christian Adams.  Together, Defendants and others conspired to release two so-called "bombshell" exposés— which were publicized to media across the country, published on the internet, shared on

---

[1] *See, e.g.*, Justin Levitt, *A Comprehensive Investigation of Voter Investigation of Voter Impersonation Finds 31 Credible Incidents Out of One Billion Ballots Cast*, WASHINGTON POST (Aug. 6, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/08/06/a-comprehensive-investigation-of-voter-impersonation-finds-31-credible-incidents-out-of-one-billion-ballots-cast/?tid=a_inl&utm_term=.72b02eea461a.

social media, and subsequently submitted to the Presidential Advisory Commission on

Election Integrity ("Presidential Commission")—that alleged that specific, named Virginians

committed felony voter fraud and should be prosecuted.

5.      Defendants gave their first supposed "exposé" the provocative and threatening

title of "*Alien Invasion in Virginia*" ("*Alien Invasion I*").  The report stated that over a

thousand individuals had "***registered to vote illegally***" in Virginia.  Ex. A, at 2 (italics and

bold in original)[2].  The report then went on to list many of those purported felons' names and

home addresses, and, in some cases, even their *home phone numbers*, in the report's exhibits

(see Exhibits 1 and 7 to the report).  This report and associated voter information is still

available online.

6.      The next supposed "exposé" kept the threatening moniker—this time dubbed

*Alien Invasion II*—and expanded Defendants' false assertions that certain Virginians were

committing specific instances of felony voter fraud.  *See* Ex. B ("*Alien Invasion II*").  For

example, *Alien Invasion II* accused hundreds of named residents of Prince William County of

committing felony voter fraud, suggesting that the United States Department of Justice "**has

done nothing about the felonies *committed* by 433 suspected aliens registered in Prince

William County alone.**"  Ex. B, at 6 (italics added, bold in original).  The report accuses

1,852 Virginia voters of being "**illegal registrants**" who cast nearly 7,500 ballots by voting

"**in elections dating back to 1988**" and thereby committing "felonies upon felonies."  Ex. B,

at 1, 3 (bold in original).  And, once again, Defendants published the names, home addresses,

---

[2] Names, except those of Plaintiffs, and personal information of individuals listed in the exhibits
to this complaint have been redacted.

telephone numbers, and, in some cases, social security numbers of these individuals. This

report and associated voter information is also still available online.

7.      Defendants' "exposés" are predicated on specific, harmful falsehoods about

numerous individuals made without due diligence to confirm the accuracy of the accusations.

Defendants base their allegations that certain individuals committed felony voter fraud on the

fact that those citizens were removed from the voting rolls for *potentially* being non-citizens.

But, as Virginia elections officials have repeatedly emphasized to the Defendants, U.S.

citizens can be removed from the voting rolls for various reasons—including routine

paperwork errors. Thus, Defendants' repeated allegations that certain Virginians were non-

citizens and repeat felons were based on a demonstrably false proposition—of which

Defendants were fully aware. Subsequent media investigations have conclusively

demonstrated that Defendants falsely implied that scores of constitutionally eligible

Virginians committed multiple voter fraud felonies.

8.      These reckless allegations risk serious harm to the reputations of innocent

Virginians. In the age of the internet, Google, and social media, where these reports remain

easily accessible, even being *accused* of a felony can have life-altering economic, emotional,

and social consequences.

9.      Defendants' ongoing defamation campaign is a modern, covert, and particularly

insidious method of voter intimidation. An objectively reasonable individual named in either

of the reports, or fearful of being wrongly named in future reports, would simply not register

or vote again because the benefit from doing so would not outweigh the significant potential

risk that the voter would be a continued target of Defendants' ongoing and intensifying

defamation campaign that could have devastating effects on their careers and personal lives,

or make them susceptible to harassment by "ballot security" activists[3] (who now have access to their contact information by virtue of these published reports).

10.    Defendants' conduct violates both federal and state law.  The reckless and false allegations that specific, named individuals committed felonies constitute textbook cases of per se defamation under Virginia law.  Defendants' defamation campaign also violates both the Voting Rights Act, *see* 52 U.S.C. § 10307, and the Ku Klux Klan Act, *see* 42 U.S.C. § 1985(3), because it intimidates constitutionally eligible voters, like Plaintiffs, into not exercising their right to vote.

11.    Plaintiffs have not sought notoriety or attention or high office or to wield public power.  They simply want the same unfettered right to participate in our democracy free from harassment or intimidation that our country guarantees to every eligible voter.  They bring this suit to redress the injuries they personally have suffered, to ask the court to stop Defendants' continuing violations of the law, and to deter Defendants and others from this insidious form of voter suppression in the future.

## PARTIES

12.    Plaintiff League of United Latin American Citizens – Richmond Region Council 4614 ("LULAC") is a membership-based organization that works to advance the economic condition, educational attainment, political influence, health, housing, and civil rights of the Latino population of the city of Richmond, Virginia, and the surrounding area, including

---

[3] These are individuals who engage in various activities, including challenging voters at polls, that in certain instances have been alleged to suppress or interfere with voting rights.  *See generally* Wendy Weiser and Vishal Agraharkar, *Ballot Security and Voter Suppression: What It Is and What the Law Says,* Brennan Center for Justice (Aug. 29, 2012), https://www.brennancenter.org/publication/ballot-security-and-voter-suppression.

Hannover, Henrico, and Chesterfield counties, as well as the Tri-Cities area, which is comprised of the cities of Colonial Heights, Petersburg, Chester and Hopewell.  As part of its mission, LULAC engages in a wide variety of political participation initiatives, including voter registration and voter outreach and education efforts.

13.    Plaintiff Eliud Bonilla is a current resident of the state of Maryland who resided and voted in Herndon, Virginia, from 1999 until 2013.  He is of Puerto Rican descent.  Mr. Bonilla is a citizen born in Brooklyn, New York and has been a regular voter his entire adult life.

14.    Plaintiff Luciania Freeman is a resident of Woodbridge, Virginia and a registered voter in Prince William County, Virginia.  She is African American.  Ms. Freeman is a citizen born in Fayetteville, North Carolina.  She first registered to vote when she was 18 years old.

15.    Plaintiff Abby Jo Gearhart is a resident of Barhamsville, Virginia, and a registered voter of New Kent County, Virginia.  Ms. Gearhart is a citizen; she was born in Newport News, Virginia, and has lived in Virginia her entire life.  She has been a regular voter in Virginia since she registered at age 18.

16.    Plaintiff Jeanne Rosen is a resident of Yorktown and a registered voter in York County, Virginia.  Ms. Rosen is a citizen born in Brooklyn, New York.  She first moved to Virginia and registered to vote in 2013 and remained in Virginia until moving to Kansas in 2014.  Ms. Rosen returned to the Commonwealth in 2016, and voted in the 2016 presidential election.

17.     Defendant Public Interest Legal Foundation ("PILF") is a 501(c)(3) organization incorporated in the state of Indiana and has its principal place of business in Indianapolis, Indiana.

18.     Defendant J. Christian Adams is President and General Counsel of PILF.  Mr. Adams also participated as a member of President Trump's recently disbanded Presidential Advisory Commission on Election Integrity.  That Commission has been described by noted election-law expert Professor Richard L. Hasen as a "rogue's gallery of the country's worst voter suppressors."[4]  Even after the Presidential Commission was disbanded amidst multiple federal lawsuits, Mr. Adams publicly indicated his intention to continue his work on defamatory and intimidating "exposés" such as those at issue here.[5]  Mr. Adams resides in Alexandria, Virginia.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  Plaintiffs' claims under 42 U.S.C. § 1985(3) and Section 11(b) of the Voting Rights Act (codified at 52 U.S.C. § 10307) arise out of federal law.

---

[4] Richard L. Hasen, *Beyond Words: J. Christian Adams Appointed to Pence-Kobach Commission*, Election Law Blog (July 10, 2017), http://electionlawblog.org/?p=93726 (explaining that "it is hard to imagine a list of people less credible on the issue of voter fraud in the United States").

[5] Hans von Spakovsky and J. Christian Adams, *The Obstruction of a Vital Election Integrity Commission*, WASH. EXAMINER (Jan. 9, 2018),  http://www.washingtonexaminer.com/the-obstruction-of-a-vital-election-integrity-commission/article/2645401 (continuing to tout the findings of the defamatory *Alien Invasion* reports and vowing that "we and others dedicated to protecting our democratic system will continue our work" performed as members of the commission).

20.     This Court has supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Defendant Adams as a resident of Virginia and over Defendant PILF under Virginia's long-arm statute, Va. Code § 80.1-328.1. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

22.     Defendants Adams and PILF conspired with each other and with non-party Virginia Voters Alliance ("VVA") to draft, publish and publicize *Alien Invasion I* and *Alien Invasion II*.  As set forth below, the publication and dissemination of those reports violated the civil rights of Plaintiffs and defamed them.

### Defendants Make Their Initial False Allegations in a Report Entitled "*Alien Invasion I*"

23.     *Alien Invasion I* was published in September 2016.[6]  Defendant PILF and non-party VVA were the named authors of the report.  On information and belief, Defendant Adams participated in the drafting of the report.  Defendant Adams participated in the publication and dissemination of the report through authoring articles and granting media interviews.[7]

---

[6] The report is available online at https://publicinterestlegal.org/files/Report_Alien-Invasion-in-Virginia.pdf (last accessed April 11, 2018).

[7] *See, e.g.,* J. Christian Adams, *Yes, Virginia, Aliens Are Registered or Voting … and in Pennsylvania, by the Thousands*, PJ MEDIA (Oct. 3, 2016), https://pjmedia.com/jchristianadams/2016/10/03/yes-virginia-aliens-are-registered-and-voting-and-in-pennsylvania-by-the-thousands/.

8

24.    Defendants publicized *Alien Invasion I* to national media via press releases and postings on Facebook and Twitter.  Media outlets further disseminated the report's assertions to a broad audience.[8]

25.    *Alien Invasion I* accuses the voters named in it of committing multiple, separate felonies, from illegally registering to vote to casting an ineligible ballot.

26.    The report characterizes the existing voter registration system as an "ineffective honor system under which the alien need merely lie to get on the voter rolls."  Ex. A, at 1. The report then asserts that Defendants and VVA had "***found 1046 aliens who registered to vote illegally***."  Ex. A, at 2 (emphasis in original).  The report explains that "[w]hen non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections."  Ex. A, at 3.

27.    *Alien Invasion I* purports to base its accusation that non-citizens have voted illegally on "**list**[s] **of registrants who had been purged from the voter rolls because they were determined to not be U.S. citizens**."  Ex. A, at 6 (emphasis in original); *see also* Ex. A, at 12 ("This data is but a minor snapshot. . . . It represents *non-citizen registrants*. . . and includes only those *non-citizens* that were *discovered to have been improperly registered*. . ." (emphasis added)).

28.    The report asserts the discovery of multiple lists of non-citizen felons in the following Virginia counties:

---

[8] *See, e.g.*, Neil W. McCabe, *Illegal Foreign Voting in Virginia Covered Up By Soros-Backed Democratic Officials, Says Report*, BREITBART NEWS (Oct. 2, 2016), http://www.breitbart.com/big-government/2016/10/02/virginia-illegal-voting-fraud-coverup/.

- Alexandria.  *See* Ex. A, at 6 (alleging that "**70 registrants . . . had been removed from Alexandria's registration lists after they were determined to not be U.S. citizens**" (bold in original)).

- Bedford.  *See* Ex. A, at 8 (stating county "provided a list of 35 non-citizens that had been removed from their voter rolls").

- Prince William.  *See* Ex. A, at 7 ("**Prince William County provided a list of *433 non-citizens* who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens.**" (bold and italics in original)).

- Roanoke.  *See* Ex. A, at 8 (claiming county "provid[ed] a list of **22 alien registrants**" (bold in original)).

29.     The report's exhibits then provide lists of the alleged felons by name.  Plaintiff Lucania Freeman was listed in *Alien Invasion I*, along with her contact information, including address and phone number.  *See* Ex. C (containing the page from the report's Exhibits 1 and 7 which lists Ms. Freeman).

30.     The clear implication of *Alien Invasion I* to an objectively reasonable reader is that Ms. Freeman, resident of Prince William County, and other listed individuals should not have registered or voted, and by doing so, committed felonies under state or federal law.  The report states clearly: "**The United States Attorney in Virginia has done nothing about the *felonies committed by 433 aliens* registering in Prince William County alone.**"  Ex. A, at 8 (italics added, bold in original)); *see also* Ex. A, at 2 (claiming the discovery of "*1046 aliens who registered to vote illegally*" (bold and italics in original)).

10

31.    Labeling the individuals named in the reports as non-citizens and therefore felons

with reckless disregard for the truth of those accusations acts to intimidate and threaten those

individuals and to deter them from voting or registering to vote.  Indeed, Defendant Adams

suggested to *Breitbart News* that these individuals should be prosecuted:

> "*When an alien registers to vote, it is a felony* . . . . When an alien votes, it is multiple
> felonies.  DOJ under Obama has stopped enforcing this law.  *We name the names of the
> registered voters removed from the rolls for citizenship problems.  Will DOJ prosecute
> any of them*?"[9]

32.    Defendants' felony accusations are false.  The county registrar information relied

on by Defendants and VVA does not establish that any particular voter is a not a citizen or

that their conduct is felonious.  The registrar lists simply establish that certain voters were

removed from the voting rolls, which Defendants know can occur for various reasons—

including accidental failures to respond to government inquiries or routine paperwork errors.

In fact, Plaintiff Freeman is a natural-born United States citizen and an eligible voter in the

state of Virginia where she is registered.  Hers was a case of paperwork error, in which a

government official mistakenly believed that she was a non-citizen based on a Department of

Motor Vehicles form.  In going beyond what the registrar's information actually establishes

and accusing people like Ms. Freeman of committing felonies, Defendants not only defame

these individuals, but also intentionally intimidate and threaten these individuals and other

potential voters to deter them from registering to vote and voting.

33.    On information and belief, before Defendants published *Alien Invasion I,* Virginia

elections officials informed Defendants that they were drawing false conclusions from the

---

[9] Neil W. McCabe, *Illegal Foreign Voting in Virginia Covered Up By Soros-Backed Democratic
Officials, Says Report*, BREITBART NEWS (Oct. 2, 2016) (emphasis added),
http://www.breitbart.com/big-government/2016/10/02/virginia-illegal-voting-fraud-coverup/.

registrar information and running the significant risk of wrongfully accusing constitutionally

eligible voters of committing felony voter fraud.  Despite these warnings, Defendants

intentionally accused people like Ms. Freeman and others of committing felonies by

registering to vote and voting.

34.     On information and belief, critical media reports made Defendants further aware

of the methodological shortcomings in *Alien Invasion I* after its release.[10]  Virginia election

officials also informed Defendants of the methodological deficiencies of *Alien Invasion I*

before *Alien Invasion II* was published.  *See* Ex. B, at 10.

**Despite Notice of the Flaws in their Approach, Defendants Continued Their Defamation**

**and Intimidation Campaign By Publishing *Alien Invasion II***

35.     Less than one year after publishing *Alien Invasion I*, Defendants continued their

campaign of defamation and intimidation with the publication of *Alien Invasion II* in May of

2017.[11]  As the name suggests, *Alien Invasion II* was intended to be a sequel to *Alien

Invasion I*.

36.     Again, Defendants worked to publicize *Alien Invasion II* to national media via

press releases and postings on Facebook and Twitter.  Media outlets again further

_____

[10] *See* Peter Galuszka, *An Alien Invasion in the Old Dominion*, WASHINGTON POST (Oct. 10, 2016), https://www.washingtonpost.com/blogs/all-opinions-are-local/wp/2016/10/06/an-alien-invasion-in-the-old-dominion/?utm_term=.9aa4b72108fa.

[11] The report is available online at https://publicinterestlegal.org/files/Alien-Invasion-II-FINAL.pdf (last accessed April 11, 2018).

disseminated the report's assertions to a broad audience.[12]

37.    PILF and VVA were the named authors of *Alien Invasion II*.  Defendants

conspired and worked in concert with each other and with VVA to develop and publish this

second defamatory report.  On information and belief, Defendant Adams participated in the

drafting of the report.  Defendant Adams again participated in the publication and

dissemination of the report.

38.    *Alien Invasion II* affirmatively reiterates the accusation in *Alien Invasion I* that

certain voters in a number of Virginia jurisdictions, including the Richmond area (where

Plaintiff LULAC operates), were guilty of committing one felony by registering to vote and

likely guilty of committing another felony by actually voting:

> Ex. B, at 6 ("**Among the records uncovered at Ms. Leider's office was a list of**
>
> **registrants who had been removed from the voter rolls because they were**
>
> **determined to not be U.S. citizens.**" (bold in original)); Ex. B, at 6 ("**Prince William**
>
> **County provided a list of 433 noncitizens who had registered to vote in the county,**
>
> **but were then removed after they were determined to not be U.S. citizens**. . . . **The**
>
> **Department of Justice so far has done nothing about the *felonies committed* by 433**
>
> **suspected aliens registered in Prince William County alone.**" (italics added, bold in
>
> original)); Ex. B, at 7 ("Bedford County provided a list of 35 non-citizens that had been
>
> removed from the voter rolls."); Ex. B, at 7 (noting the discovery of "**list of 22 alien**
>
> **registrants**" in Roanoke (bold in original)); *see also* Ex. B, at 1 ("[*Alien Invasion I*]

---

[12] *See, e.g.*, Brandon Darby, *Watchdog Claims 5K Noncitizens Registered to Vote in Virginia*, BREITBART NEWS (May 30, 2017), http://www.breitbart.com/texas/2017/05/30/5k-noncitizens-registered-vote-virginia-report-finds/.

revealed that in these eight Virginia localities more than 1,000 non-citizens had recently been removed from the voter rolls. In this small sample, nearly 200 verified ballots were cast prior to official removal. *Each one of them is likely a felony.*" (emphasis added)).

39.     *Alien Invasion II* was released in the wake of President Trump's unsupported allegations of massive voter fraud in the 2016 elections and the May 11, 2017, establishment of the Presidential Advisory Commission on Election Integrity—developments that Defendants might have expected to amplify the impact of their defamatory publication.

40.     *Alien Invasion II* alleges that 5,500 illegal registrations in Virginia resulted in 7,474 "Votes Cast By Non-Citizens" in recent Virginia elections. *See* Ex. B, at 2. The report imputes to each of those allegedly illegally registered individuals the commission of multiple felonies. Ex. B, at 3 ("When non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections."); Ex. B, at 12 ("Each time an alien registers a crime is committed."); Ex. B, at 15 ("**Over 1,100 non-citizens were discovered on the voter rolls in Fairfax County. These individuals cast over 1,000 ballots before they could be removed from the rolls**. . . . It makes no difference whether alien votes were cast as a result of confusion or on purpose. *Each is a felony . . .*" (italics added, bold in original)).

41.     *Alien Invasion II* was published along with a roughly eight-hundred-page appendix containing voter registration forms, which included the names, home addresses, and telephone numbers of the alleged felons. The published appendix originally included several voter registration forms with social security numbers before Defendants redacted that information.

14

42.     Plaintiffs' names, home addresses, and telephone numbers were included in the exhibits to *Alien Invasion II*.  *See* Ex. D (containing the pages from the report's Exhibit 1, which lists Luciania Freeman (at page 258) and Eliud Bonilla (at page 100), and from the report's Exhibit 12, which lists Jeanne Rosen (at page 48), Abby Jo Gearhart (at page 96-97[13]), Eliud Bonilla (at page 217), and Luciania Freeman (at page 831)).

43.     Subsequently, Defendants published a revised version of the appendix to *Alien Invasion II*, with a self-serving and dubious explanatory footnote stating that "Exhibit 12 was updated after the discovery that some records were erroneously disclosed by the Commonwealth of Virginia which reflected individuals incorrectly categorized in the official voter registration archive as being 'declared non-citizens'.  Those Records were removed." As a consequence, Plaintiffs Abby Jo Gearhart and Jeanne Rosen no longer appear as part of *Alien Invasion II* in the version of the report presently available on Defendant PILF's website.  However, Eliud Bonilla and Luciana Freeman continue to appear on pages 164 and 748 of the revised Exhibit 12, respectively, and continue to be defamed as non-citizens engaged in voter fraud.

44.     *Alien Invasion II* unequivocally accuses Plaintiffs of having committed a felony under federal and state law by improperly registering to vote and the clear implication of the report to an objectively reasonable reader is that Plaintiffs are also guilty of a second felony by actually voting.  In making such false accusations, Defendants have acted to intimidate or threaten Plaintiffs for registering to vote and voting.

_____

[13] Ms. Gearhart's registration uses her maiden name (Sharpe) and a name from a previous marriage (Focht).

45.     By labeling the individuals named in the report as non-citizens and felons with

reckless disregard for the truth of those accusations, Defendants act to intimidate and threaten

those individuals and to deter them from voting or registering to vote.  In a contemporaneous

article, Defendant Adams advocates prosecuting the individuals named in the report for voter

fraud:

> [The Public Interest Legal Foundation] obtained 700 pages of similar examples. . .
> All can be accessed by law enforcement personnel at this link. . . The [] report documents
> election *felonies piled on top of felonies*.
>
> Federal law 52 U.S.C. Section 20511 makes it a felony to submit a false voter
> registration form.  Federal law 18 U.S.C. Section 1015 makes it a crime to make a false
> statement to register to vote.  Federal law 18 U.S.C. Section 611 makes it illegal for
> foreigners to cast a ballot.  Virginia law also criminalizes the casting of an illegal ballot.
>
> So you may think there should have been hundreds, or even thousands, of voter
> fraud prosecutions in Virginia in the last few years.  Again, you'd be wrong.
>
> And it's not for a lack of information. . .
>
> . . .
>
> In another American age, when government records revealed that crimes were
> committed by the hundreds or thousands . . .everyone would have cared. . .
>
> Let's see what happens . . .
>
> Maybe, just maybe, those tasked with enforcing the law at the United States
> Department of Justice and county prosecutors will ignore the nonsense and click the
> links—where hundreds of pages of real evidence can be found.[14]

Plaintiffs' names and contact information were listed on those so-called "pages of real

evidence."

_____

[14] J. Christian Adams, *Alien Invasion: Thousands of Foreigners Registered to Vote (and Voting)
in Virginia*, PJ MEDIA (May 30, 2017) (emphasis added),
https://pjmedia.com/jchristianadams/2017/05/30/alien-invasion-thousands-of-foreigners-
registered-to-vote-and-voting-in-virginia/.

### Defendants' Felony Accusations Are False

46.    Defendants' felony accusations are false.  The lists provided by the county registrars do not establish that any particular voter is actually a non-citizen (and by implication guilty of committing a felony).  The lists simply establish that certain voters were removed from the voting rolls, which Defendants know can occur for various reasons—including accidental failures to respond to government inquiries or routine paperwork errors.  Subsequent media reports also noted that Virginia's election commissioner (as well as certain voters who themselves had been accused of felonies) vigorously disputed the accusations.  In response to a state legislator's inquiry about *Alien Invasion II*, Virginia Commissioner of Elections Edgardo Cortes stated that "[n]othing in this process necessarily confirms non-citizenship – only that inconsistent information has been provided," and that Adams and the Public Interest Legal Foundation "were uninterested in the context [and] had their own narrative they wanted to tell."[15]

47.    In fact, Plaintiffs are United States citizens.  They are therefore factually innocent of the false charges of felony voter fraud leveled by Defendants in the *Alien Invasion* reports.

### Defendants' False Accusations Have Imposed Substantial Harms on Plaintiffs and Interfered with Plaintiffs' Civil Rights

48.    Plaintiffs have suffered and continue to suffer various and extensive injuries because of Defendants' actions.  Each Plaintiff has been falsely accused of having committed one or more felonies by registering to vote and actually voting as alleged non-citizens.  Each

---

[15] *See* Jane C. Timm, *Vote Fraud Crusader J. Christian Adams Sparks Outrage,* NBC NEWS (Aug. 27, 2017), https://www.nbcnews.com/politics/donald-trump/vote-fraud-crusader-j-christian-adams-sparks-outrage-n796026.

Plaintiff has been subjected to adverse publicity on a national level; various media reported on the "*Alien Invasion*" reports and provided internet links to PILF's website and/or to the reports and their appendices, which contained sensitive contact information for Plaintiffs and are still largely accessible online.  This embarrassment and harm to their reputation—having been wrongly accused of committing felonies—was compounded when Defendant Adams ensured that the report and its appendices (including Plaintiffs' names) were made a part of the record of the Presidential Commission, which received extensive national press coverage.

49.     Plaintiffs have been and continue to be intimidated and threatened by Defendants' campaign of defamation.  In addition to the embarrassment and reputational harm that they have already suffered, Plaintiffs fear that the defamatory material will lead to a variety of adverse effects.  For example, Plaintiff Bonilla, who considered running for public office one day, fears and expects that the fact that his name is a part of a public record wrongly accusing him of being a non-citizen and having committed felonies, will subject him to "birther" conspiracies like the ones that plagued President Barack Obama.  He also worries about the potential impact the publication of this erroneous information could have on his family.  These accusations may deter him from exercising his right to run for public office. As a further example, Plaintiff Freeman fears for her physical safety because she has been accused of illegal voting and her name and contact information are publicly available.  She also fears that her current or future employer could take adverse action against her because she has been falsely accused of a crime.  She fears that, if someone could erroneously include her name and personal information in a report accusing her of committing crimes, then authorities relying on the same publication could arrest or prosecute her based on mistaken beliefs about her citizenship.  Plaintiff Rosen feared that her right to vote would be disputed

when she reported to vote in the 2017 general election as a result of being listed in Defendants' report and continues to fear that inclusion in the report will permanently affect her ability to vote and have her votes counted in the future.  Likewise, Plaintiff Gearhart has been intimidated by the false accusations in the report.  Specifically, Plaintiff Gearhart fears her ability to vote may be challenged in the future and fears that she will be the target of harassment or violence.  Given the inclusion of her personal information in the report, Gearhart has chosen not to remove a home security system and has decreased her involvement in political activities.

50.     Plaintiffs have a legitimate concern regarding harassment and physical safety.  The reports were picked up by a number of media outlets which wrote articles that linked to the reports or to the PILF website.  The comment sections to those articles contained numerous threatening statements concerning those who were alleged to have fraudulently registered to vote or voted, with commenters, for example, calling for people to be "shot," "executed," "deported," or "imprisoned." [16]



---

[16] Neil W. McCabe, *Illegal Foreign Voting in Virginia Covered Up By Soros-Backed Democratic Officials, Says Report*, BREITBART NEWS (Oct. 2, 2016), http://www.breitbart.com/big-government/2016/10/02/virginia-illegal-voting-fraud-coverup/.





51.     The *Alien Invasion* reports further incite the already-heated rhetoric and discrimination against Latino and immigrant communities.  Indeed, the comments to media articles on the *Alien Invasion* mix anti-immigration sentiments with views on the reports. Plaintiff LULAC has devoted and will continue to devote critical and limited organizational resources to ensuring that Latino voters are not deterred from participating in the electoral process.

## COUNT 1

### 42 U.S.C. § 1985(3)

52.      Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

herein.

53.      Plaintiffs bring a claim under the second clause of 42 U.S.C. § 1985(3), which

provides that:

> If two or more persons in any State or Territory conspire or go in disguise on the highway
> or on the premises of another, for the purpose of depriving, either directly or indirectly,
> any person or class of persons of the equal protection of the laws, or of equal privileges
> and immunities under the laws; or for the purpose of preventing or hindering the
> constituted authorities of any State or Territory from giving or securing to all persons
> within such State or Territory the equal protection of the laws; *if two or more persons*
> *conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled*
> *to vote, from giving his support or advocacy in a legal manner, toward or in favor of*
> *the election of any lawfully qualified person as an elector for President or Vice*
> *President, or as a Member of Congress of the United States; or to injure any citizen in*
> *person or property on account of such support or advocacy*; in any case of conspiracy
> set forth in this section, if one or more persons engaged therein do, or cause to be done,
> any act in furtherance of the object of such conspiracy, whereby another is injured in his
> person or property, or deprived of having and exercising any right or privilege of a citizen
> of the United States, *the party so injured or deprived may have an action for the*
> *recovery of damages occasioned by such injury or deprivation, against any one or more*
> *of the conspirators.* (emphases added)

54.      Defendants conspired with each other and with VVA to knowingly accuse

constitutionally eligible voters, including Plaintiffs, of having committed felony voter fraud

with the purpose of intimidating those and other voters in an effort to prevent them from

voting or registering to vote.

55.      Defendants' publication of the *Alien Invasion* reports constituted substantial steps

in furtherance of that conspiracy.

21

56.    Defendants either knew or should have known at the time they published and publicized the reports that they were accusing multiple United States citizens who were constitutionally eligible voters, including Plaintiffs, of committing felony voter fraud.

57.    By advocating for the prosecution of the ostensibly "non-citizen" voters published in the *Alien Invasion* reports and suggesting they could risk severe penalties, including significant jail time, if they voted, Defendants hoped to deter these constitutionally eligible voters from voting in upcoming elections.

58.    Additionally, by publishing the names and contact information of these constitutionally eligible voters in the *Alien Invasion* reports—thereby making them available to "ballot security" activists to "monitor" their voting—and by heavily publicizing the report on TV, radio, and online media using incendiary rhetoric (including lamenting the failure of law enforcement official to prosecute any of the published "non-citizen" voters), Defendants aimed to foment public outrage in an effort to intimidate these voters.

59.    Defendants' multiyear, ongoing defamation campaign did intimidate Plaintiffs and would intimidate an objectively reasonable individual named in either of the *Alien Invasion* reports, and thereby discourage or prevent the named individual from either registering or attempting to vote, for fear of the repercussions of being publicly accused of a felony.

60.    Defendants maliciously persist in their efforts to continue publicizing the names and contact information of Plaintiffs and other voters, even after knowing that they have accused innocent voters of having committed voter fraud.

61.    Plaintiffs Eliud Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen, each of whom was constitutionally eligible to vote in Virginia, were injured and continue to

be injured by being wrongly accused as having committed multiple felonies and having their

contact information (including home addresses, email addresses, and phone numbers)

published.

62.     Defendants' campaign of defamation is calculated to cause and has caused

Plaintiffs to fear that the publication of false accusations and personally identifying

information will subject them to harassment, malicious prosecution, physical harm, or other

repercussions from people believing they have committed voter fraud.  For some, their names

continue to be associated with those accusations, so the harms persist.  Defendants' conduct

is aimed at deterring Plaintiffs from exercising their voting rights.

63.     Plaintiff LULAC has been and continues to be injured by Defendants' publication

of these reports.  LULAC's members and the Latino community LULAC represents have

been and continue to be intimidated and threatened by Defendants asserting that registering

to vote and/or voting constitutes an unlawful "alien invasion" that should be prosecuted.  The

Latino community, including members of LULAC, will be discouraged from participating in

the electoral process as a direct result of Defendants' conduct.

64.     Plaintiff LULAC has been and continues to be injured by Defendants' publication

of these reports because it impedes one of LULAC's core goals, the promotion of political

participation.  Instead of engaging in its ordinary course initiatives, LULAC must devote

time and resources to combat the false narrative that Latinos who vote are doing so illegally.

Voters in Latino communities are already subject to scorn and discrimination because of

heated rhetoric directed against Latino and immigrant communities.  For example, in the

recent 2017 Virginia gubernatorial election, the rampant propagation of derogatory

information and generalizations associating Latinos with gangs such as MS-13 or painting

them as criminals caused much despair and despondence amongst the Latino community in the larger Richmond area.  Similarly, the *Alien Invasion* reports, which falsely accused many Latino voters as being noncitizens who were guilty of committing voter fraud, created an environment that deters constitutionally eligible Latino voters from exercising their fundamental right to vote.

65.      LULAC expended substantial time and effort combatting this heated rhetoric, and was required to divert significant resources to combatting and remedying those harms.  For example, LULAC was the recipient of a two-year grant to improve Latino graduation rates in the Richmond community.  They had planned to begin implementing this program in local middle schools and high schools with high Latino populations at the beginning of the 2017 school year.  However, because LULAC had to redirect its resources to combat the heated rhetoric against Latinos as non-citizens or worse and amplify their Latino voter mobilization efforts, LULAC had to delay the start of this program until after 2017 elections.  As a result of this delay, LULAC is further behind in achieving their intended goals for the education initiative and is still continuing to play catch-up.

66.      Unless enjoined by the Court, Defendants, and those acting in concert with them, will continue to violate Section 1985(3) by continuing to conspire to publish and publicize their *Alien Invasion* reports that intimidate and attempt to intimidate constitutionally eligible voters by subjecting them to false felony accusations on the internet and in national media, and/or risk harm and harassment by voter protection vigilantes.

## COUNT 2

### Section 11(b) of the Voting Rights Act

67.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

68.     Section 11(b) of the Voting Rights Act provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307.

69.     Defendants violated Section 11(b) of the Voting Rights Act by intentionally publishing and publicizing *Alien Invasion* and *Alien Invasion II* as part of a reckless, ongoing defamation campaign.

70.     The defamation campaign intimidated, threatened, or coerced, and/or attempted to intimidate, threaten, or coerce the constitutionally eligible voters recklessly and falsely accused of committing felony voter fraud in the *Alien Invasion I* and *Alien Invasion II* into refraining from engaging in future voting-related activities.  Defendants' accusations would intimidate an objectively reasonable individual named in either *Alien Invasion I* or *Alien Invasion II* and thereby discourage or prevent the named individual from either registering or attempting to vote regardless of whether that individual was constitutionally eligible to vote in Virginia.

71.     Through the continued publication of the defamatory reports, Defendants intimidate or attempt to intimidate Plaintiffs and others similarly situated from exercising

their constitutional right to register to vote and vote.  Defendants' conduct has instilled fear

in Plaintiffs that they will not be able to successfully exercise their right to vote in the future,

and/or that engaging in such voting activity will subject them to further false accusations,

false prosecution, harassment, threats to safety, or economic hardship.

72.      As detailed above, Plaintiff LULAC has been and continues to be injured, both as

an organization and as a representative of its membership and the Latino community in the

Richmond area.

73.      Unless enjoined by the Court, Defendants will continue to violate Section 11(b) of

the Voting Rights Act by continuing to publicize their *Alien Invasion* reports that intimidate

or attempt to intimidate Plaintiffs and potential voters by implying that as a consequence of

lawfully registering and/or voting, they will repeatedly face false felony accusations on the

internet and the national news.

## COUNT 3

### Defamation

[Plaintiffs Bonilla, Freeman, Gearhart, and Rosen, only]

74.      Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

herein.

75.      Defendants published the *Alien Invasion I* and *Alien Invasion II* reports.  Those

reports defame Plaintiffs by falsely asserting that Plaintiffs Eliud Bonilla, Luciania Freeman,

Abby Jo Gearhart, and Jeanne Rosen were non-citizens who committed felony voter fraud by

registering to vote and/or voting.  *See, e.g.*, Ex. B, at 13 & n.69 ("For the remaining 702 non-

citizen registrants, getting on the voter rolls was as easy as checking "yes" to the citizenship

question . . . . The voter registration applications are produced at Exhibit 12"); Ex. D

(containing the registration forms from *Alien Invasion II*'s Exhibit 12, which lists Jeanne

Rosen (at page 48 of Exhibit 12), Abby Jo Gearhart (at pages 96-97), Eliud Bonilla (at page

217), and Luciania Freeman  (at page 831); Ex. B, at 12 ("Non-citizen registration and voting

matters. Each time an alien registers a crime is committed.  **When an alien votes** . . .

**another crime** [is] **committed**." (bold in original)); Ex. B, at 2 ("Simply put, it is a felony

for a non-citizen to register and to cast a ballot.  Each time such a crime is perpetrated . . ."));

Ex. B, at 3 ("When non-citizens register or actually vote, they violate both state and federal

statutes . . ."); Ex. B, at 5 & n.5 ("**The numbers are alarming: 5,556 non-citizens have**

**been removed from the voter rolls for citizenship problems** . . . . The cancellation reports

for all 120 counties are available at Exhibit 1 at the link provided on page 1 of this report."

(bold in original));  Ex. D (containing the pages from the report's Exhibit 1, which lists

Luciania Freeman (at page 258) and Eliud Bonilla (at page 100)); Ex. B, at 1 ("It is not

unreasonable to conclude that the full, and unknown, extent of non-citizens registered to vote

far exceeds the 5,500-plus who were removed."); Ex. B, at 1 ("**Despite obstruction from**

**local and state officials, the Public Interest Legal Foundation (PILF) expanded the non-**

**citizen investigation to the entire Commonwealth.  As a result, the number of**

**registrants removed from voter rolls for citizenship problems during the last few**

**election cycles grew to over 5,500. Of these** *illegal registrants*, **1,852 cast nearly 7,500**

**ballots in elections dating back to 1988**." (italics added, bold in original)); Ex. B, at 15

("The accidental discovery of over 5,500 non-citizens . . . "); Ex. B, at 6 & n.32 ("**Prince**

**William County provided a list of 433 noncitizens who had registered to vote in the**

**county, but were then removed after they were determined to not be U.S. citizens** . . . .

An updated cancellation report subsequently received from the Department of Elections lists

the "Declared Non-Citizen Total" as 443.  See Exhibit 1." (bold in original)); Ex. B, at 6

("**The Department of Justice so far has done nothing about the felonies committed by**

**433 suspected aliens registered in Prince William County alone.**" (bold in original)); Ex.

B, at 13 ("The Fairfax County board had discovered 278 registered voters who had

represented to the DMV that they were not U.S. citizens.  **Almost half of them—117—had**

**not only registered to vote, they had in fact voted in state and federal elections**.  The

Department of Justice never followed up, leaving nearly 300 gift-wrapped cases of voter

fraud untouched." (bold in original)); Ex. B, at 15 ("**Over 1,100 non-citizens were**

**discovered on the voter rolls in Fairfax County.  These individuals cast over 1,000**

**ballots before they could be removed from the rolls**." (bold in original)); Ex. B, at 1 & n.1

("In October 2016, looking at data from only eight Virginia counties, we uncovered proof

that large numbers of ineligible aliens are registering to vote and casting ballots. Our

investigation revealed that in these eight Virginia localities more than 1,000 non-citizens had

recently been removed from the voter rolls.  In this small sample, nearly 200 verified ballots

were cast prior to official removal.  Each one of them is likely a felony. . . .

https://publicinterestlegal.org/blog/reportineligible-aliens-registering-vote-casting-ballots/.")

Ex. A, at 2 ("*[W]e found 1046 aliens who registered to vote illegally*." (emphasis in

original)); Ex. A, at 8 ("**The United States Attorney in Virginia has done nothing about**

**the felonies committed by 433 aliens registering in Prince William County alone**." (bold

in original)); Ex. C (containing the pages from the report's Exhibits 1 and 7 which lists Ms.

Freeman).

76.    Those reports are false statements of fact and are defamatory per se because they

falsely impute to Plaintiffs the commission of crimes of moral turpitude.  Plaintiffs Eliud

Bonilla, Lucinia Freeman, Abby Jo Gearhart, and Jeanne Rosen are United States citizens that are, or were, constitutionally eligible to vote in Virginia when they voted in Virginia.

77.    Plaintiffs Eliud Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen are private citizens and are not public figures or limited public figures.

78.    Defendants' libelous statements were false when made, were made without regard to their truth or falsity, and were made for the purpose of and with the intent of damaging the reputation of Plaintiffs or with reckless disregard of their effect on the reputation of Plaintiffs. Specifically, Defendants recklessly and maliciously failed to exercise due care and diligence before publishing the defamatory statements. A failure to respond to a government notice from the registrar of voters and/or removal from the voting rolls establishes neither that someone is a non-citizen nor that they committed voter fraud.

79.    Defendants published the defamatory statements with actual malice because they acted with reckless disregard for the truth of whether plaintiffs had illegally registered to vote and/or illegally voted.

80.    Defendants' false statements have impeached, injured, and damaged Plaintiffs.

81.    As an actual and proximate cause of Defendants' conduct in making such false statements, Plaintiffs have sustained harm, including damages in an amount to be determined at trial.

82.    Unless enjoined by the Court, Defendants, and those acting in concert with them, will continue to publish the defamatory statements.

## **PRAYER FOR RELIEF**

Plaintiffs pray for relief as follows:

1. That the Court determine that it has jurisdiction over this action.

2.  That the Court declare that Defendants have violated 42 U.S.C. §1985(3).

3.  That the Court declare that the Defendants have violated Section 11(b) of the Voting

    Rights Act.

4.  That the Court declare that the Defendants have defamed the Plaintiffs in violation of

    Virginia law.

5.  That the Court award compensatory and consequential damages in an amount to be

    determined at trial to compensate the Plaintiffs for the injuries that they have suffered as

    a result of Defendants' unlawful conduct.

6.  That the Court award punitive damages as provided by law and as proved at trial to

    punish Defendants for the publication of defamatory statements with actual malice.

7.  That the Court award attorneys' fees and litigation costs to Plaintiffs' attorneys.

8.  That the Court enjoin Defendants and anyone acting in privity with the Defendants from

    further violations of the law.

9.  That the Court grant all other and further relief as it may deem necessary and appropriate.

## **JURY DEMAND**

Plaintiffs demand a jury trial of all issues so triable.  *See* Fed. R. Civ. P. 38.

Dated this 12th Day of April 2018.

/s/ Anisa A. Somani
ANISA A. SOMANI (VSB No. 86103)
NICOLE M. CLEMINSHAW (VSB No. 92161)
GEOFFREY M. WYATT (*Pro hac vice* forthcoming)
SEAN M. TEPE (*Pro hac vice* forthcoming)
LAUREN A. EISENBERG (*Pro hac vice* forthcoming)
SAMUEL LEVOR (*Pro hac vice* forthcoming)
ANDREW HANSON (*Pro hac vice* forthcoming)
1440 New York Ave. NW
Washington, DC 20005
Telephone:     (202) 371-7000
Facsimile:     (202) 661-8209
Anisa.Somani@probonolaw.com
Nicole.Cleminshaw@probonolaw.com
Geoffrey.Wyatt@probonolaw.com
Sean.Tepe@probonolaw.com
Lauren.Eisenberg@probonolaw.com
Sam.Levor@probonolaw.com
Andrew.Hanson@probonolaw.com
Zachary.Martin@probonolaw.com


ALLISON RIGGS (*Pro hac vice* forthcoming)
JACLYN MAFFETORE (*Pro hac vice* forthcoming)
**SOUTHERN COALITION FOR SOCIAL JUSTICE**
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone:     (919) 323-3380
Facsimile:     (919) 323-3942
AllisonRiggs@southerncoalition.org
JaclynMaffetore@southerncoalition.org

CAMERON KISTLER (*Pro hac vice* forthcoming)
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave., NW # 163
Washington, DC 20006
Telephone:     (202) 599-0466
Facsimile:     (929) 777-9428
cameron.kistler@protectdemocracy.org

31

LARRY SCHWARTZTOL (*Pro hac vice* forthcoming)
**PROTECT DEMOCRACY PROJECT**
10 Ware St.
Cambridge, MA 02138
Telephone:    (202)-599-0466
Facsimile:    (929)-777-9428
larry.schwartztol@protectdemocracy.org


ANDREW G. CELLI, JR. (*Pro hac vice* forthcoming)
ALANNA KAUFMAN (*Pro hac vice* forthcoming)
**EMERY CELLI BRINCKERHOFF & ABADY LLP**
600 Fifth Avenue at Rockefeller Center
10th Floor
New York, New York 10020
Telephone:    (212) 763-5000
Facsimile:    (212) 763-5001
acelli@ecbalaw.com
akaufman@ecbalaw.com


*Attorneys for Plaintiffs League of United Latin American Citizens –
Richmond Region Council 4614, Eliud Bonilla, Luciania Freeman, Abby
Jo Gearhart, and Jeanne Rosen*

**Exhibit A**



# PUBLIC INTEREST

## — LEGAL FOUNDATION —

# ALIEN INVASION IN VIRGINIA

## The discovery and coverup of noncitizen registration and voting

**VIRGINIA VOTERS ALLIANCE**

## September 30, 2016

> *"'The recount is almost over, and in this contest for attorney general … it's become apparent that our campaign is going to come up a few votes short,' Obenshain said, noting that he'd already called Herring to offer his congratulations. 'It was a vigorous and hard-fought campaign, but it's over.' Obenshain's concession will end a recount process that began on Nov. 5, when the two candidates were separated by a razor-thin election night margin. **Herring defeated Obenshain by 165 votes out of more than 2.2 million votes cast**, according to results certified by the Virginia Virginia Department of Elections on Nov. 25."*

- *Politico*, December 18, 2013, covering Republican Mark Obenshain's whisker thin loss in the Virginia Attorney General's race.

## Only Americans Should Choose American Leaders

Citizenship is the most fundamental element of eligibility to vote in American elections. Every state requires voters to be U.S. citizens to vote in state elections.[1]  The Virginia Constitution, specifically, delineates that "[e]ach voter shall be a citizen of the United States."[2] Only Americans should choose American leaders. Federal law makes it a crime for an alien to register to vote or to vote in a federal election. Simply put, it is a felony for a non-citizen to register and to cast a ballot.[3] Each time such a crime is perpetrated, whether by accident or willfully, a citizen is effectively disenfranchised.

The right to vote free from dilution by aliens is safeguarded primarily in several places—all of them appear to be failing to prevent aliens from participating in American elections and in the Commonwealth of Virginia. On the front end, federal law requires election officials to use reasonable efforts to identify and remove ineligible registrants from the voter rolls. The Federal voter registration form purports to prevent aliens from registering to vote, but it is an ineffective honor system under which the alien need merely lie to get on the voter rolls. On the back end, federal and state law enforcement officials are entrusted with prosecuting non-citizens who register and vote as a means to deter others from doing the same. Here too, the system is failing because the Obama administration has ignored instance after instance of voter fraud.

---

[1] See U.S. Dept. of Just., Federal Prosecution of Election Offenses 66 (7th ed. 2007), *available at* https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf

[2] Va. Const., Art. II, Sec. 1.

[3] 18 U.S.C. § 1015(f). It is also a felony for an individual to simply "falsely and willfully represent[] himself to be a citizen of the United States." 18 U.S.C § 911.

1

In practice, none of these so-called safeguards is functioning correctly. Based on voting history records, large numbers of ineligible aliens are registering to vote and casting ballots.  They are canceling out the valid votes of American citizens. In some Virginia jurisdictions, the number of people registered to vote exceeds the number of citizens eligible to vote. When the Justice Department has been told of aliens registering to vote and committing federal felonies, nothing is done.

## *Summary of Findings*

An investigation in Virginia by the Public Interest Legal Foundation (PILF) and the Virginia Voter's Alliance (VVA) shows that the cause of this problem is something much worse than simple ineffective governance. Worse still, Virginia state election officials are obstructing access to public records that reveal the extent to which non-citizens are participating in our elections. These obstructionist tactics have led to PILF and VVA obtaining data from only a handful of Virginia counties so far. But the information from a few counties demonstrates a massive problem.

**In our small sample of just eight Virginia counties who responded to our public inspection requests,** *we found 1046 aliens who registered to vote illegally.*

The problem is most certainly exponentially worse because we have no data regarding aliens on the registration rolls for the other 125 Virginia localities. Even in this small sample, when the voting history of this small sample of alien registrants is examined, **nearly 200 verified ballots were cast before they were removed from the rolls. Each one of them is likely a felony.**

Again, this is from just a small sampling of Virginia counties. Each of the aliens we have discovered to have registered or voted has likely committed a felony. Will the Justice Department act now that their names, registration records and dates of voting are herein provided?

Ultimately, the number of illegal votes doesn't matter when the integrity of the process is at stake. Nobody should tolerate voter fraud, whether it comes in bunches as we describe here, happens occasionally, or decides the outcome of an election.  Lawlessness in elections is a precursor for lawlessness across our government and culture. The response of law enforcement officials to both single instances of voter fraud and the hundreds of examples documented in this report should be the same: swift, sure and unwavering. No excuses should be made for the lawless who taint the electoral process.

**The most alien votes were cast in 2012, followed by 2008, the year President Obama was elected to his first term.**

In Virginia, like most states, there is no formal program for identifying non-citizen registrants. The Commonwealth formerly arranged to use the Federal Systematic Alien Verification for Entitlements (SAVE) database to detect aliens, but vigorous

2

use seems to have ended during the administration of Governor Terry McAuliffe. Most discoveries of non-citizens on the registration rolls are accidental or chance. What this means is that the number of registered non-citizens thus far identified by this investigation is just the "tip of the iceberg." The true extent of the problem likely runs in the thousands, if not more. And it is not unique to Virginia.

There is plenty of blame to go around. One culprit, however, is glaringly obvious—federal and state voter registration forms, which ask registrants to affirm their citizenship with nothing more than the check of a box. No documentary proof of citizenship must be shown. It is nothing more than an honor system, one that is unquestionably failing to keep non-citizens from voting. States that have tried to remedy this problem by asking registrants to prove their citizenship with documentary proof have uniformly been stonewalled by litigation brought by our own Department of Justice and legions of attorneys working with left-leaning voter groups committed to keeping ineligible voters on the rolls.

This report demonstrates the serious problem that unelected election officials have refused to address and even conspired to hide. It is our hope that this report will result in swift change and restore confidence in our elections.

### *When an alien completes a voter registration form, they commit a felony.*

This report must begin with the relevant law. It is only with that in mind that the reader can comprehend the gravity of the problem Virginia and other states are facing when it comes to non-citizen participation in our elections. When non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections.

The offenses a fraudulent voter might commit when he registers and votes are numerous:

- Virginia Code § 24.2-1004: Criminalizes casting an illegal ballot.

- Title 18, United States Code § 611: Criminalizes voting by illegal aliens in federal elections.

- Title 18, United States Code § 911: Criminalizes representing oneself to be a citizen of the United States.

- Title 18, United States Code § 1015: Criminalizes false statements in order to register to vote or to vote in any Federal, State, or local election.

- Title 52, United States Code § 20511: Criminalizes the fraudulent submission of voter registration applications and the fraudulent casting of ballots.

The United State Attorney General and the law enforcement officers in the Commonwealth of Virginia are, respectively, authorized to prosecute violations of all of these statutes. Given that the integrity of an election is where the consent of the governed is obtained, you would think that federal and state elections officials would treat these crimes with appropriate seriousness. As will be discussed later in this report, that is, however, not the case.

3

### *The National Voter Registration Act and the Help America Vote Act*

The problems in Virginia and other states can be traced as far back as 1993. Within months of assuming the Presidency, Bill Clinton signed into law the National Voter Registration Act ("NVRA")[4], a sweeping piece of legislation that proponents claimed would increase the number of registered voters and participation in our elections. One thing is for sure— it has increased the number of ineligible voters on state voter rolls.

The NVRA, commonly known as "Motor Voter," requires each state to offer voter registration to any individual that applies for a driver's license.[5] This provision of the law requires the applicant to swear to his or her citizenship under penalty of perjury,[6] but does not permit nor deny the state's ability to verify citizenship through formal documentation. Instead, the law provides that the states "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."[7]

Attempts by various states to require registrants to provide documentary proof of citizenship during registration for federal elections have been thwarted by lawsuits brought by left-leaning voter groups and the Department of Justice. *Virginia therefore requires applicants to **merely check a box** in order to "prove" their citizenship status.*

The NVRA also allows individuals to register to vote through the mail using the federal voter registration form (the "Federal Form"), a document that is developed and maintained by a federal agency called the Election Assistance Commission. In 2002, the Help America Vote Act added a citizenship question to the Federal Form.[8] Like Virginia's state registration form, the Federal Form requires only that a registrant check a box to "prove" his or her citizenship. Under the NVRA, state are required to "accept and use" the Federal Form for purposes of registration,[9] but the law does not prevent states from applying their own eligibility requirements.



---

[4] 52 U.S.C. § 20501 *et seq.*

[5] *See* 52 U.S.C. § 20504(a)(1) and (c)(1).

[6] 52 U.S.C. § 20504(c)(2)(C).

[7] 52 U.S.C. § 20504(c)(2)(B)(ii).

[8] 52 U.S.C. § 21083(b)(4)(A)(i).

[9] 52 U.S.C. § 20505(A)(1).

4

**Voter Registration Application**

Before completing this form, review the General, Application, and State specific instructions.

| Are you a citizen of the United States of America? | ☐ Yes ☐ No | This space for office use only. |
|---|---|---|
| Will you be 18 years old on or before election day? | ☐ Yes ☐ No | |
| If you checked "No" in response to either of these questions, do not complete form. | | |
| (Please see state-specific instructions for rules regarding eligibility to register prior to age 18.) | | |

The NVRA also imposes voter list maintenance and record keeping obligations. The law does not contain of checklist of required actions, but rather states generally that election officials must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant or a change in the residence of the registrant."[10] What constitutes a "reasonable effort" is not provided by the statute, which has often made litigation necessary to enforce these list maintenance obligations.

Election officials must also "maintain for at least 2 years" and "make available for public inspection" "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."[11] Like the NVRA's list maintenance provision, the public inspection provision suffers from ambiguity, allowing election officials to deny access to records based on their unilateral determination that certain records are outside the scope of the statute. In one such example, the nonprofit organization Project Vote endured three years of litigation simply to obtain copies of completed voter registration applications requested from the General Registrar of Norfolk, Virginia—records which the Fourth Circuit Court of Appeals ruled were "unmistakably" within the scope of records that election officials must make publicly available for inspection.[12]

PILF has filed four separate lawsuits in 2016 alone to force election officials to allow inspection of their election records**. In Virginia, election officials have opposed transparency and many Virginia counties are not in compliance with federal law regarding our requests and may yet be sued in federal court to obtain requested records.**

The NVRA authorizes the federal Attorney General to enforce the NVRA's mandates, including the statute's list maintenance and public inspection provisions.[13] However, this grant of authority has been sparingly used during the Obama years because officials within the enforcing agency— the Department of Justice Civil Rights Division—are ideologically opposed to enforcing this federal law. Justice Department officials are aware of corrupted voter rolls, but their politics prevent them from doing the right thing.

---

[10] 52 U.S.C. § 20507(a)(4).

[11] 52 U.S.C. § 20507(i).

[12] *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012).

[13] 52 U.S.C. § 20510(a).

5

## *Obstruction Begins in Alexandria*

The effort to obscure the number of non-citizens who are registering and voting in Virginia began in the City of Alexandria.

In January 2016, the election integrity group Virginia Voter's Alliance (VVA) contacted Alexandria General Registrar Anna Leider, notifying her that based on implausible registration data, her office appeared to be in violation of the NVRA's mandate that she use reasonable efforts to remove ineligible registrants. **The letter additionally requested access to ten categories of records concerning Ms. Leider's list maintenance programs pursuant to the NVRA's public inspection provision.**

In April 2016, PILF, on behalf of VVA and David Norcross, a private Alexandria citizen, sued Ms. Leider under the NVRA's private right of action, alleging that her office violated the NVRA by refusing to provide inspection of election records and for failing to conduct reasonable list maintenance practices.

After a court hearing where Alexandria said it would make the requested records available, VVA then proceeded to visit Ms. Leider's office to inspect the city's records.

**Among the records uncovered at Ms. Leider's office was a list of registrants who had been purged from the voter rolls because they were determined to not be U.S. citizens.  The list includes hundreds of non-citizen registrants**, all of whom had likely committed felonies by registering to vote.

When VVA asked to photocopy the list, Ms. Leider refused, contradicting her statements made to the court. **Her refusal, however, was directed by state election officials. Ms. Leider's attorney later stated that she cannot provide the list because of "guidance" from the Virginia Department of Elections.** The excuse was that the reason for a registrant's cancellation—including by reason of non-citizen status—is confidential, and such information can neither be inspected nor duplicated.

A week later, and over eight months after the initial request was made, Ms. Leider finally capitulated. Her attorney provided VVA with a list, identifying **70 registrants who had been removed from Alexandria's registration lists after they were determined to not be U.S. citizens. These were just the aliens who were caught.**

Records showing the removal of ineligible non-citizen registrants are quintessentially records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,"[14] records that must be made available for public inspection under the NVRA. **Yet it took months of negotiations and a federal lawsuit to bring these records to the public's attention.**

---

[14] 52 U.S.C. § 20507(i).

6

Did any of the non-citizens removed from Alexandria's registration lists cast votes? Ms. Leider wouldn't tell PILF. According to her attorney, that information, too, is "confidential and available only for official use by the Department of Elections and general registrars." As discussed later in this report, some of these individuals have, in fact, participated in Virginia's elections.

## *The Virginia Alien Voter Cover-up Goes Statewide*

Alexandria is not the only jurisdiction that concealed the commission of felonies committed by non-citizen voters in Virginia. Upon the discovery of Alexandria's list of purged non-citizen registrants, **PILF utilized the NVRA's public inspection provision to request similar information from 19 Virginia counties and cities on August 8, 2016. Nearly all of the counties have failed to comply with their federal obligation to provide transparent list maintenance records to us.**

Requests for a list of non-citizens purged from the voter lists since 2011 were made to the following Virginia counties and cities:

- **Arlington**
- **Albemarle**
- **Bedford**
- **Chesterfield**
- **Fairfax City**
- **Fauquier**
- **Frederick**
- **Falls Church**
- **Loudon**
- **Hampton**
- **Hanover**
- **James City**
- **Lancaster**
- **Manassas**
- **Prince William**
- **Roanoke**
- **Stafford**
- **Rappahannock**
- **York**

The election officials in charge of these jurisdictions were sometimes responsive, at first. **Prince William County provided a list of *433 non-citizens* who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens.**[15]

---

[15] See Exhibit 1. PILF notes that, on page 1, one registrant appears to be listed twice. However, on page 29, Prince William County lists the "Declared Non-Citizen Total" at 433 individuals.

7

The only indication that any of these potential felons were brought to attention of law enforcement is one communication provided by the county, which indicates that the United States Citizenship and Immigration Services contacted the county's general registrar requesting the voter registration application of one individual— **REDACTED** [16] The discovery was accomplished by chance and not a result of the county's own list maintenance. An additional communication shows that registration material for **REDACTED** , and one other individual, were then forwarded to the attorney for Prince William County. The communication notes that both individuals voted in the November 2012 General Election.

**The United States Attorney in Virginia has done nothing about the felonies committed by 433 aliens registering in Prince William County alone.**

**Bedford County,** a relatively small rural county in Virginia with only about 60,000 individuals of voting age, also provided a list of 35 non-citizens that had been removed from their voter rolls. Bedford County also provided copies of notices sent to 54 individuals who indicated on their DMV applications that they were not citizens. Upon learning that these individuals were not citizens, the county did not cancel their registrations. Rather, the county sent each individual a Notice of Intent to Cancel,[17] which informed the applicant that although they indicated they were not a citizen on their DMV application, their registration would remain active if they simply signed the notice, affirming they were a citizen. Based on the fact that only 35 non-citizens were removed between 2011 and the present, we can conclude that 19 individuals who swore under penalty of perjury to the DMV that they were not U.S. citizens returned the notice, stating they are a U.S. citizen. Like the initial check box used to register, the affirmation notice is nothing more than an honor system that easily allows non-citizens to remain registered to vote.

One week after providing the list of purged non-citizens, Barbara Gunter, the general registrar for Bedford County, contacted PILF by phone. The Virginia Department of Elections had since contacted Ms. Gunter and told her that she should not have provided us with the list because doing so violates federal law—the Federal Drivers Privacy Protection Act. She asked that PILF delete the list. Obviously we did not delete the list, and as we shall see, providing the records to the public obviously does not violate the federal law the Virginia Department of Elections used to strong-arm local election officials into noncompliance.

| |
|---|
| **We received no records showing that election officials had referred any non-citizen voters for investigation or prosecution.** |

**Roanoke County** acted similarly. After providing a list of **22 alien registrants**, General Registrar Judith Stokes emailed PILF, asking that we "destroy" the list she had previously provided.[18] Like Bedford County, Ms. Stokes explained that her request originated with the Department of Elections.

---

[16] See Exhibit 2.

[17] An example of this notice is provided in Exhibit 3.

[18] The email is reproduced in its entirety at Exhibit 4 to this report.

8

This is where production of records required to be released effectively stopped. Over the course of August and September 2016, responses from election officials rolled in, *each one explaining that state election officials had instructed them not to provide lists of non-citizens* who had been removed from Virginia's voter rolls.

The responses were nearly identical and soon it became clear that they were orchestrated by Edgardo Cortes, the Commissioner of the Virginia Department of Elections, and an appointee of Governor McAuliffe. According to numerous county election officials, Commissioner Cortes had issued guidance to them, instructing them not to respond to our requests for records pertaining to non-citizen voters. Some election officials kindly provided us the original communications from Cortes.

The guidance from Commissioner Cortes included these instructions:[19]

> c. ELECT is working on creating a single cancellation report that does not include the reason for cancellation and only releasable information to facilitate your response to these types of requests. We will offer a statewide report to the requesting organization. While there is a VERIS report that provides a list of registrants canceled due to non-citizenship for your administrative use, **you may not provide the information regarding reason for cancellation for non-citizen status** as this information is received from DMV and is covered under the federal Driver's Privacy Protection Act (DPPA). The GR/EB Handbook already indicates that this information is not releasable. The DPPA prohibits the release of covered data. It is not sufficient to simply redact the reason code column from the current VERIS report since it contains only individuals identified by DMV as being potentially non-citizen and cancelled as a result.
>
> d. The Department will not provide voting history as this is not covered under NVRA. The Code of Virginia establishes who may obtain this information and how in 24.2-406. Only the Department of Elections may provide this information to authorized individuals and entities. We will notify the requestor of this fact and you should respond accordingly to this or any other request for voting history.

This is what a cover-up of alien voting looks like. State election officials are preventing public access not only to records showing the number of non-citizens who have successfully registered to vote, but also records showing how many of them voted prior to being removed from the registration rolls.

---

[19] The email is reproduced in its entirety at Exhibit 5 to this report.

Commissioner Cortes' guidance was distributed statewide on August 19, 2016. Yet not until September 16 did Commissioner Cortes contact PILF. In his correspondence, Commissioner Cortes offered to provide a "customized report" at a cost of $240,[20] a report that he claimed would satisfy our request concerning non-citizens. It wouldn't.

**Commission Cortes refused to provide a list of non-citizens who have been purged from the registration list in each jurisdiction.** He likewise refused to provide the voting history of purged non-citizens, reiterating his position that such information is not subject to release under the NVRA's public inspection provision, but is available only to "qualified entities" under limited circumstances.[21]

## *The Virginia State Board of Election's Excuses to Hide the Scope of Alien Registration*

### The Drivers Privacy Protect Act

According to the guidance issued to county election officials, Commissioner Cortes states that a list of registrants purged from Virginia's registration lists cannot be provided to the public because such information is protected from release by the federal Driver's Privacy Protection Act (DPPA). This is nonsense.

The DPPA makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted" by one of fourteen exceptions to the prohibition on disclosure.[22] According to Commissioner Cortes, neither general registrars nor the Department of Elections can disclose a list of registrations cancelled by election officials because, according to him, a registrant's citizenship status, as indicated on his driver's license application, is "personal information." Commissioner Cortes is plainly wrong for numerous reasons.

PILF seeks list maintenance records from election officials, not from any other state agency. The DPPA prohibits only the disclosure of "personal information" from a "motor vehicle record."[23] "Motor vehicle record" is defined by the law; it includes "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles."[24] Neither the registrant's citizenship status nor the reason for the registrant's cancelation is "personal information" under the DPPA.

---

[20] This cost was later waived after we informed Commissioner Cortes that the NVRA permits election officials to charge "reasonable costs" for "photocopying" only. 52 U.S.C. § 20507(i)(1). It does not permit election officials to impose costs for time spent producing records.

[21] The email is reproduced in its entirety at Exhibit 6 to this report.

[22] 18 U.S.C. § 2722(a).

[23] 18 U.S.C. § 2722(a).

[24] 18 U.S.C. § 2722(a).

10

The DPPA prohibits the disclosure of only "personal information" and highly restricted personal information."[25] "Personal information" is defined by the law; it includes "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information."[26] "Highly restricted personal information" is "an individual's photograph or image, social security number, medical or disability information."[27]

List maintenance records pertaining to the removal of aliens from the rolls has nothing to do with a motor vehicle record or any protected personal information or highly restricted personal information.

**Voter History**

Commission Cortes' guidance directed local election officials to conceal records showing the voting history of any individual whose registration was cancelled for reasons of citizenship. According to Commissioner Cortes, documents concerning voting activity are not covered under the NVRA's public inspection provision and can only be disclosed publicly as permitted by Commonwealth law, which permits disclosure, at a reasonable cost, only to a list of qualified entities.[28]

In the end, the State Board could not conceal the extent of alien voting because PILF and VVA worked with a third party with access to voter history to determine which of the aliens who registered to vote, actually voted. Not surprisingly, many ballots were cast by these aliens.

# The Extent of the Non-citizen Registration in Virginia

Despite the cover-up orchestrated by state election officials, PILF was successful in procuring additional data concerning non-citizen voter registration in Virginia. It was, however, not easy. Federal law says it should be easy, but Virginia has a great deal to hide when it comes to alien registration and voting.

By way of dozens of phone calls and in-person visits to election offices, we were able to extract additional information from local registrars concerning non-citizen participation in Virginia's elections. Some officials, however, stood firm, refusing to provide us with the requested information. The information we have been able to gather thus far demonstrates what many of us already knew: **non-citizens are registering and voting in our elections.** The obstructionist effort led by state election officials has prevented us from learning how much deeper the problem runs.

---

[25] 18 U.S.C. § 2722(a).

[26] 18 U.S.C. § 2725(3).

[27] 18 U.S.C. § 2725(4).

[28] Va. Code Ann. § 24.2-406.

11

Below is the number of registrants per jurisdiction that have been removed from the voter rolls since, at most, 2011.



This data is but a minor snapshot of the problem. It represents non-citizen registrants in only 8 of Virginia's 133 voting jurisdictions and includes only those non-citizens that were discovered to have been improperly registered. Because no formal programs exist in Virginia to identify non-citizen registrants, the discovery and removal of these non-citizens is either by accident or because the registrant later indicated to election officials that he or she was not a citizen. The total number of non-citizens that remain registered to vote therefore cannot be completely ascertained. It is, however, likely, that based on discoveries to date, thousands of non-citizens remain registered and eligible to vote throughout the Commonwealth.

At the instruction of Commissioner Cortes, local election officials refused to provide us with records showing the voting history of non-citizens removed from registration lists.

In the 8 jurisdictions that provided us with lists of aliens recently removed from their voter rolls, **we discovered that 31 non-citizens had cast a total of 186 votes between 2005 and 2015. The most alien votes were cast in 2012 followed by 2008, the year President Obama was elected to his first term.**

The bill would have required the clerk of court to "make such information available to local elections officials so that they could cancel the registration of those individuals deemed ineligible to vote. The bill's purpose was clear: prevent ineligible residents from registering and voting in Virginia's elections. **Governor McAuliffe gave essentially no justification for his veto of this commonsense law, stating only that the issue needed "addition study."[29]**

---

[29] http://leg1.state.va.us/cgi-bin/legp504.exe?151+amd+HB1315AG.

12

It may be no accident that Commissioner Cortes had not done all he could when it comes to transparency about aliens voting in Virginia elections. Before he was picked by Governor McAuliffe, he worked at the Advancement Project, an organization strongly opposed to using citizenship verification tools such as the federal SAVE database.

PILF's request to local election officials asked for *all communications with federal and state law enforcement officials pertaining to non-citizens who had either registered to vote or voted*. **However, we received no records showing that election officials had referred any non-citizen voters for investigation or prosecution.** In fact, some jurisdictions indicated that they do not even review voter history to identify fraudulent votes. Like our other requests, this absence of records is due in part to the obstructionist efforts by Commissioner Cortes, whose guidance to local election officials informed them that communications with law enforcement officials were not records covered by NVRA and therefore did not need to be provided to PILF.

### *Systems Failure*: The Tradition of Ignoring Alien Voter Fraud in Virginia

The lack of action by the Department of Justice and law enforcement officials in Virginia is nothing new. In 2011, members of the Fairfax County Electoral Board alerted the Office of the U.S. Attorney for the Eastern District of Virginia in Alexandria, as well as the Public Integrity Section of the Criminal Division of the Justice Department (which coordinates election crime prosecutions) in Washington, of possible voter fraud by non-citizens.



*1: Source Virginia State Board of Elections election results website.*

The Fairfax County board had discovered 278 registered voters who had represented to the DMV that they were not U.S. citizens. Almost half of them—117—had not only registered to vote, they had in fact voted in state and federal elections. The Department of Justice never followed up, leaving nearly 300 gift-wrapped cases of voter fraud untouched.

*Systems Failure*: **Voter registration forms easily permit non-citizens to register and participate in our elections.**

The lack of prosecution of election crimes provides a key deterrent to voter fraud, if it is used. But the existing registration process provides non-citizens with an easy path to the ballot box. As previously explained, the federal voter registration form and the registration forms used by the Commonwealth of Virginia rely on nothing more than an honor system to limit voter registration to citizens of this country. In all cases, these forms include a checkbox at the top of the form, which asks registrants to answer "yes" or "no" to the question "Are you a citizen of the United States?" The registrant must additionally sign the form, under penalty of perjury, attesting to the fact that his or her answer to that question is true and correct. There are no other "safeguards" in place to protect the integrity of the registration process.

As the data demonstrates, this honor system has undeniably failed to prevent non-citizens from registering and voting. PILF's investigation requested that county election officials provide us with copies of voter registration forms used by the non-citizens those election officials later removed from voter rolls.

Prince William County, which provided a list of 433 non-citizens removed from its voter rolls since 2011, **provided us with those registration forms for non-citizens removed since 2015. These forms highlight the failures of our current registration process.**

Prince William County removed a total of 84 non-citizens from its voter rolls in 2015 and 2016.[30] **Of these registrants, 77 checked "yes" on their registration form, attesting, under penalty of perjury, that they were U.S. citizens.** Without any other confirmation, these individuals were registered to vote because Virginia is not using the SAVE database to check all incoming registrations for citizenship status.

However, a "yes" answer is not necessary to secure registration. **Four individuals actually answered "no" to the citizenship question but were registered to vote.**



**One registrant checked neither "yes" nor "no" but was still registered to vote.** The citizen checkbox on federal voter registration forms is failing to keep aliens off American voter rolls.

---

[30] The completed registration applications provided to PILF are available at Exhibit 7. The applications for at least two registrants were not provided by Prince William County.

14



Only two other jurisdictions, Fairfax City and Hanover County, complied with PILF's request to inspect voter registration application forms of the aliens who were detected. In Fairfax City, 20 non-citizens were removed from the rolls since 2011. Of those individuals who were registered to vote, 15 answered "yes" to the citizenship question, **3 answered "no,"** and 2 answered neither "yes" nor "no." In Hanover, which also provide 20 applications of purged non-citizens, 17 answered "yes" to the citizenship question, **2 answered "no,"** and 1 answered neither "yes" nor no."

The answer to this problem seems simple: **require all applicants to provide documentary proof of citizenship at the time of their registration.**

This obviously solution has, however, faced severe opposition by well-funded organizations and our own Department of Justice. Several states, including Alabama, Kansas, and Georgia have tried to safeguard their residents' right to vote by requiring all individuals to prove their citizenship prior to registering to vote.

Virginia Governor Terry McAuliffe is also doing his part to make voting by non-citizens even easier. In April 2015, Governor McAuliffe vetoed legislation[31] that would have required jury commissioners to retain information from individuals not qualified to serve as jurors for reasons that would also disqualify them from voting, such as

- not being a citizen of the United States
- no longer being a resident of the Commonwealth
- being a resident of another county or city in the Commonwealth
- having been convicted of a felony and having not provided evidence that their right to vote has been restored, or
- having been adjudicated incapacitated.

The bill would have required the clerk of court to "make such information available to local elections officials so that they could cancel the registration of those individuals deemed ineligible to vote. The bill's purpose was clear: prevent ineligible residents from registering and voting in Virginia's elections. Governor McAuliffe gave essentially no justification for his veto of this commonsense law, stating only that the issue needed "addition study."[32]

---

[31] House Bill 1315, available at http://leg1.state.va.us/cgi-bin/legp504.exe?151+ful+HB1315ER+pdf.

[32] http://leg1.state.va.us/cgi-bin/legp504.exe?151+amd+HB1315AG.

15

It is unlikely that this report, or any amount of evidence demonstrating the rampant election fraud taking place in Virginia, will convince Governor McAuliffe that additional safeguards to needed to protect the voting rights of his constituents.

## *Systems Failure*: Inviting Aliens to Stay on the Rolls

In one astonishing example, **one non-citizen was invited to remain on the voter rolls even after he had informed election officials he was an alien.** When        REDACTED       registered to vote in 2007, he checked "yes" in response to the application's citizenship question. In 2010, REDACTED renewed his driver's license and on his application, he checked "no" to the citizenship question. The inconsistencies in   REDACTED  's answers alerted election officials that he might not be eligible to vote. His registration, however, was not canceled. Instead, REDACTED was mailed an "Affirmation of Citizenship," which asked REDACTED to affirm, subject to penalty of law, that he was a U.S. citizen. REDACTED signed the form and returned it. In May 2015,   REDACTED  's voter registration was cancelled after election officials determined that he was, in fact, not a U.S. citizen.[33]

*What can be done?*

There are several changes that states and the federal government can and should make to prevent non-citizens from registering and voting illegally in state and federal elections:

- The registration process must be changed. The check-box honor system is a failure and is facilitating voter fraud. All states should require anyone who registers to vote to provide documentary proof of U.S. citizenship. In the alternative, states should fully utilize the federal SAVE database which contains the names of aliens who have had contact with the immigration system.

- Congress and state legislatures should require all federal and state courts to notify local election officials when individuals summoned for jury duty from voter registration rolls are excused because they are not United States citizens.

- State legislatures or state elections officials should enact requirements that force local election officials to conduct a systematic review of the voter history of all registrants who were purged from the rolls due to not meeting the requirements of U.S. citizenship.

- The database, known as E-Verify, that is being used by U.S. employers to check the citizenship status of prospective employees should be made available to election officials and administrators of statewide registration databases so that election officials can easily identify registered voters who are not U.S. citizens.

- Law enforcement at both the federal and state level should exercise their authority to prosecute cases of voter fraud. Voter registration and voting history records such as those contained in this report makes prosecution an easy task. Armed with that information,

---

[33]  REDACTED  's registration applications are available at Exhibit 8.

16

prosecutors would simply have to verify whether or not the individual was a citizen at the time of registration or voting.

*Conclusion*

The problem is real and the solutions are simple. What is happening in Virginia is happening in every other state. Your vote is at risk and elected officials must act. You can help. Please contact your local election officials to ask what they are doing to ensure voter lists are accurate and free of ineligible voters.

17

**Exhibit B**



# Alien Invasion II

### The Sequel to the Discovery and Cover-up of Non-citizen Registration and Voting in Virginia

# Alien Invasion II

## THE SEQUEL TO THE DISCOVERY AND COVER-UP OF NON-CITIZEN REGISTRATION AND VOTING IN VIRGINIA

# PUBLIC INTEREST

### — LEGAL FOUNDATION —



May 2017

# Table of Contents

Introduction                                          01

The Stakes                                            02

Summary of Findings                                   02

Felonies upon Felonies                               03

Terry McAuliffe Is Working Against
Election Integrity                                   04

Sharing the Blame: Defects in the
National Voter Registration Act                      05

The Cover-up of Alien Registration
and Voting                                           06

    Alexandria                   06

    The Cover-up Goes Statewide   06

    The Excuses for Hiding Information on
    Non-citizens                  08

The Extent of Non-citizen Registration
in Virginia                                          09

    Alien Registration            09

    Alien Voting                  10

Can Non-citizens Affect Election
Outcomes? Yes.                                       12

    Senate District 6             12

    House District 87             12

    Other Close Races             12

Who Is to Blame for Non-citizen
Registration and Voting?                             13

Virginia's Future: Why Action Is
Needed Right Now                                     15

    Virginia's Next Governor      15

    House of Delegates            15

    United States Senate          15

    Local Elections               15

Recommendations and Solutions                        16

Conclusion                                           16

# Introduction

In October 2016, looking at data from only eight Virginia counties, we uncovered proof that large numbers of ineligible aliens are registering to vote and casting ballots. Our investigation[1] revealed that in these eight Virginia localities more than 1,000 non-citizens had recently been removed from the voter rolls. In this small sample, nearly 200 verified ballots were cast prior to official removal. Each one of them is likely a felony.



This report details the statewide problem of registered voters with citizenship problems in Virginia.

**Despite obstruction from local and state officials, the Public Interest Legal Foundation (PILF) expanded the non-citizen investigation to the entire Commonwealth. As a result, the number of registrants removed from voter rolls for citizenship problems during the last few election cycles grew to over 5,500. Of these illegal registrants, 1,852 cast nearly 7,500 ballots in elections dating back to 1988.**

This report details for policy makers, election officials and the general public the scope of the problem, the particular details for each county and the obstruction by government officials in obtaining this data.

Policy makers have a dual challenge—fixing the underlying problem of non-citizens easily registering to vote as well as the stubborn tendency of some election officials to hide and excuse this circumstance.

 Since our last investigation, the number of registrants removed from voter rolls for citizenship problems grew to over 5,500. Of these illegal registrants, 1,852 cast nearly 7,500 ballots in elections dating back to 1988.

Remember, the 5,500-plus registrants removed for citizenship problems are only those who were caught. They were caught by happenstance, usually by telling the motor vehicle agency they were not a citizen after previously telling the agency they were a citizen. It is not unreasonable to conclude that the full, and unknown, extent of non-citizens registered to vote far exceeds the 5,500-plus who were removed.

This is an especially sound conclusion when you consider that virtually nothing is being done to detect non-citizens on the voter rolls in Virginia. Worse, the Department of Elections and some local election officials did everything they could to hide the information, as we shall see below. Only after the Public Interest Legal Foundation filed multiple lawsuits in federal court, did state officials relent and provide the voter list maintenance records.

All of the raw data and records obtained in our research into alien registration and voting can be obtained at:

https://publicinterestlegal.org/alien-invasion-virginia/



# The Stakes

Citizenship is the most fundamental element of eligibility to vote in American elections. Every state requires voters to be U.S. citizens to vote in state elections.[2] The Virginia Constitution, specifically, delineates that "[e]ach voter shall be a citizen of the United States."[3]

The design is simple: **only Americans should choose American leaders.** Federal law makes it a crime for an alien to register to vote or to vote in a federal election. Simply put, it is a felony for a non-citizen to register and to cast a ballot.[4] Each time such a crime is perpetrated, by accident or willfully, a citizen is effectively disenfranchised.

The safeguards to prevent alien voter registration are failing. The Federal Voter Registration Form purports to prevent aliens from registering to vote. But it is an ineffective honor system under which the alien need merely lie to get on the voter rolls. Virginia's election officials could implement procedures to safeguard the system, but haven't for partisan reasons.

Even worse, federal and state law enforcement officials—who are entrusted with prosecuting non-citizens who register and vote as a means to deter others from doing the same—**have repeatedly done nothing when provided with solid evidence of non-citizen participation in the electoral system.**



Every state requires voters to be U.S. citizens to vote in state elections.

In practice, none of the so-called safeguards are functioning correctly. **Based on voting history records, large numbers of ineligible aliens are registering to vote and casting ballots, sometimes for decades, before they are removed from the registration rolls.** They are cancelling out the valid votes of American citizens. Faced with this stark reality, Governor Terry McAuliffe has not only failed to act, he has repeatedly blocked legislation designed to help fix these problems.

# Summary of Findings

Obstructionist tactics by local and state election officials limited the scope of the October 2016 Alien Invasion report to six counties and two cities. We had asked the Virginia Department of Elections for the full list of registrants removed for citizenship problems but we did not receive it until we brought federal lawsuits against two Virginia election officials.

**Now we have a better picture of the extent of alien registration. The numbers are alarming: 5,556 non-citizens have been removed from the voter rolls for citizenship problems in 120 of Virginia's 133 voting jurisdictions since 2011.[5] In 102 of these jurisdictions, 1,852 individuals cast 7,474 ballots before election officials cancelled their registrations. In the other 13 voting jurisdictions, election officials have not removed a single record from the voter rolls because of citizenship problems in over 6 years.**

Non-citizen Registrations

5,556 👤👤👤👤👤👤👤👤👤

Votes Cast by Non-Citizens

7,474 👤👤👤👤👤👤👤👤👤

In Virginia, like most states, there is no formal program for identifying non-citizen registrants. The Commonwealth formerly arranged to use the Federal Systematic Alien Verification for Entitlements (SAVE) database to detect aliens, but **vigorous use seems to have ended during the administration of Governor Terry McAuliffe.**

State election officials concede that most discoveries of non-citizens on the registration rolls are accidental or by chance. According to communications received from Edgardo Cortes, the Commissioner of the Virginia Department of Elections, the 5,556 non-citizens removed from the voter rolls in recent years were discovered only because they **"self-reported"** their status as a non-citizen to Commonwealth officials.[6]

# Felonies upon Felonies

In essence, the number of registered non-citizens in Virginia thus far identified by this investigation is just the "tip of the iceberg." According to 2016 United State Census estimates, there are approximately 474,000 voting age noncitizens in the Commonwealth.[7] Each of these individuals can make their way onto the voting rolls by simply checking the wrong box during a visit to the DMV. **The true extent of the problem likely runs in the tens of thousands, if not more.**

Ultimately, the number of illegal votes does not matter when the integrity of the process is at stake. No one should tolerate voter fraud, whether it comes in pockets as we describe here; happens occasionally; or decides the outcome of an election.

Lawlessness in elections is a precursor for the same across our government and culture. The response of law enforcement officials to both single instances of voter fraud and the hundreds of examples documented in this report should be the same: swift, sure and unwavering.



No one should tolerate voter fraud, whether it comes in pockets as we describe here; happens occasionally; or decides the outcome of an election.

There is plenty of blame to go around. One culprit, however, is glaringly obvious—federal and state voter registration forms, which ask registrants to affirm their citizenship with nothing more than the check of a box. **No documentary proof of citizenship must be shown.** This is nothing more than an honor system, one that is unquestionably failing to keep non-citizens from voting. Once the voter is registered, no additional checks are made about the citizenship status of the registrant. Easily obtained public information—such as jury recusal information showing persons who escape jury duty because they are not a citizen—is ignored.

This report demonstrates the serious problem that Governor McAuliffe and the Commonwealth's unelected officials have refused to address and even tried to hide. It is our hope that this report will result in swift changes that restore confidence in our elections.

When non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections.

The offenses a fraudulent voter might commit when he registers and votes are numerous:

### Virginia Code § 24.2-1004

Criminalizes casting an illegal ballot.

### Title 18, United States Code  § 611

Criminalizes voting by illegal aliens in federal elections.

### Title 18, United States Code  § 911

Criminalizes representing oneself to be a United States citizen.

### Title 18, United States Code  § 1015

Criminalizes false statements in order to register or vote in any Federal, State, or local election.

### Title 52, United States Code  § 20511

Criminalizes the fraudulent submission of voter registration applications and the fraudulent casting of ballots.

The United States Attorney General and the law enforcement officers in the Commonwealth of Virginia are, respectively, authorized to prosecute violations of all of these statutes. Given that the integrity of an election is where the consent of the governed is obtained, you would think that federal and state election officials would treat these crimes with appropriate seriousness. As will be discussed later in this report, that is not the case.

# Terry McAuliffe Is Working Against Election Integrity

If anything, Virginia Governor Terry McAuliffe is consistent. With respect to voter integrity, McAuliffe has repeatedly vetoed legislation designed to protect the right to vote in the Commonwealth. **Since 2015, McAuliffe, the former head of the Democratic National Committee, has vetoed a staggering eight bills passed by the Virginia legislature that would have strengthened election integrity.**

At least two of these bills were designed to remedy the issue of non-citizen registration and voting identified in this report.

In April 2015, McAuliffe vetoed House Bill 1315,[8] **which would have required jury commissioners to retain information from individuals not qualified to serve as jurors for reasons that would also disqualify them from voting, including status as a non-citizen or a felon. The bill required that this information be transmitted to election officials upon request.**

The purpose of this bill was simple: provide reliable information to local election officials to allow them to detect non-citizens on the rolls. McAuliffe vetoed the bill, citing nothing more than his belief that "additional study" was needed.[9]

Governor McAuliffe also vetoed Senate Bill 1105.[10] **It would have required local election officials to perform audits or investigations whenever voter rolls contain more registered voters than the number of individuals eligible to vote** or when the number of votes exceeds the number of registered voters.[11]

In other words, the bill would have required an investigation when the voter rolls contain an <u>impossible</u> number of registrants or when an <u>impossible</u> number of votes were cast.



Since 2015, Governor McAuliffe has vetoed a staggering eight bills passed by the Virginia legislature that would have strengthened election integrity.

Corrupted voter rolls are not an imaginary problem. In 2015, PILF identified 141 counties across the nation that had more registered voters than living residents eligible to vote.[12] In 2016, we identified 37 more counties whose voter rolls contain either more registered voters than citizens eligible to vote, or a number of registrants that is nearing 100 percent of its citizen voting-age population.[13] Five of those counties are in Virginia.



Photo credit: Wikipedia Commons

2017 has been a banner year so far for Governor McAuliffe. In just 4 months, he has sent six election integrity bills to the scrap heap. Each of these bills was meant to remedy a specific vulnerability in Virginia's voting apparatus.


Provides resources to local election officials to identify voters registered in other states.[14][15]


Requires voter ID for voters using absentee ballots.[16][17][18][19]


Requires electronic pollbooks to include photo of voter.[20][21]


Criminalizes paying people to register to vote.[22][23]


Requires election officials to verify voter registration data using federal and state databases.[24][25]

# Sharing the Blame: Defects in the National Voter Registration Act

The problems with the voter rolls in Virginia and other states can be traced back to 1993. Within months of assuming the Presidency, Bill Clinton signed into law the National Voter Registration Act ("NVRA"),[26] a sweeping piece of legislation that proponents claimed would increase the number of registered voters and participation in our elections. One thing is for sure—defects in the legislation also increased the number of ineligible voters on state voter rolls.

The NVRA, commonly known as "Motor Voter," requires each state to offer voter registration to any individual that applies for a driver's license.[27] This provision of the law requires the applicant to swear to his or her citizenship under penalty of perjury,[28] but does not permit (nor deny) the state's ability to verify citizenship through formal documentation. Instead, the law provides that the states "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."[29]



Photo credit: Wikipedia Commons

PILF filed lawsuits in four separate states in 2016 alone to force election officials to allow inspection of their election records. **When PILF set out to investigate non-citizen voting in Virginia, local and state election officials opposed transparency. Many Virginia county election officials denied or even ignored our requests under the NVRA forcing us to file <u>three</u> separate lawsuits in federal courts to obtain the requested records.**

 Virginia requires applicants to merely check a box in order to "prove" their citizenship status.

Attempts by various states to require registrants to provide documentary proof of citizenship during registration for federal elections have been thwarted by lawsuits brought by left-leaning groups. Virginia therefore requires applicants to <u>merely check a box</u> in order to "prove" their citizenship status. This has proven to be inadequate.

Election officials must also "maintain for at least 2 years" and "make available for public inspection" "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."[30]

**Virginia Voter Registration Application**

*Starred (\*) items are required.* *If you do not complete all of the items that are marked w*

1. ☐ YES ☐ NO    * Full social
   * I am a citizen of the      security
   United States of America.   number ☐ No SSN was ever issued.

Are you a citizen of the United States of America?   ☐ Yes   ☐ No
Will you be 18 years old on or before election day?   ☐ Yes   ☐ No
**If you checked "No" in response to either of these questions, do not complete form.**
(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.)

# The Cover-up of Alien Registration and Voting

## Alexandria

The effort to obscure the number of non-citizens who are registering and voting in Virginia began in the City of Alexandria.

In January 2016, the election integrity group Virginia Voter's Alliance (VVA) contacted Alexandria General Registrar Anna Leider, **and requested access to public records concerning Ms. Leider's list maintenance programs pursuant to the NVRA's public inspection provision.**

In April 2016, PILF, on behalf of VVA and David Norcross, a private Alexandria citizen, sued Ms. Leider under the NVRA's private right of action, alleging that her office violated the NVRA by refusing to allow inspection of election records.[31]

After a court hearing where Alexandria said it would make the requested records available, VVA then proceeded to visit Ms. Leider's office to inspect the city's records.

**Among the records uncovered at Ms. Leider's office was a list of registrants who had been removed from the voter rolls because they were determined to not be U.S. citizens.  The list included hundreds of non-citizen registrants,** all of whom had likely committed felonies by registering to vote.

When VVA asked to photocopy the list, Ms. Leider refused. **Her refusal was directed by state election officials.**

A week later, and over eight months after the initial request was made, Ms. Leider finally capitulated. Her attorney provided VVA with a list, identifying **70 registrants who had been removed from Alexandria's registration lists after they were determined to not be U.S. citizens. These were just the aliens who were caught.**

Did any of the non-citizens removed from Alexandria's registration lists cast votes? Ms. Leider wouldn't tell PILF. PILF was told that information is "confidential and available only for official use by the Department of Elections and general registrars." As discussed later in this report, some of these individuals have, in fact, participated in Virginia's elections.

## The Cover-up Goes Statewide

Alexandria is not the only jurisdiction that concealed the commission of felonies committed by non-citizen voters in Virginia. Upon the discovery of Alexandria's list of registrants removed for citizenship problems, **PILF utilized the NVRA's public inspection provision to request similar information from 19 Virginia counties and cities on August 8, 2016.** The request went to:

- Arlington
- Albemarle
- Bedford
- Chesterfield
- Fairfax City
- Fauquier
- Frederick
- Falls Church
- Loudon
- Hampton
- Hanover
- James City
- Lancaster
- Manassas
- Prince William
- Roanoke
- Stafford
- Rappahannock
- York

The election officials in charge of these jurisdictions were sometimes responsive, at first. **Prince William County provided a list of 433 non-citizens who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens.**[32]

The only indication that any of these potential felons were brought to attention of law enforcement is one communication provided by the county, which indicated that the United States Citizenship and Immigration Services contacted the county's general registrar requesting the voter registration application of one individual— REDACTED REDACTED .[33] The discovery of REDACTED was accomplished by chance and not a result of the county's own list maintenance efforts.

An additional communication shows that registration material for REDACTED , and one other individual, were then forwarded to the attorney for Prince William County. The communication notes that both individuals voted in the November 2012 General Election.

**The Department of Justice so far has done nothing about the felonies committed by 433 suspected aliens registered in Prince William County alone.**

**Bedford County** provided a list of 35 non-citizens that had been removed from the voter rolls. Bedford County also provided copies of notices sent to 54 individuals who indicated on their DMV applications that they were not citizens. The county sent each individual a Notice of Intent to Cancel,[34] which informed the applicant that although they indicated they were not a citizen on their DMV application, their registration would remain active if they simply signed the notice, affirming they were a citizen.

Of the 54 suspected non-citizens, only 35 were removed. The remaining 19 individuals who had previously sworn under penalty of perjury to the DMV that they were not U.S. citizens returned the notice, stating they were a U.S. citizen and therefore stayed on the registration rolls. The affirmation notice is nothing more than an honor system that easily allows non-citizens to remain registered to vote, just like the initial citizenship checkbox on the voter form.

One week after providing the list of registrants removed for citizenship problems, Barbara Gunter, the general registrar for Bedford County, contacted PILF by phone. The Virginia Department of Elections contacted Ms. Gunter and told her that she should not have provided us with the list of removed voters because doing so violates the Federal Drivers Privacy Protection Act. She asked that PILF delete the list of previously provided public information. As we shall see, a federal court found no merit in the attempt to hide election records based on a federal highway law.

**Roanoke County** acted similarly. **After providing a list of 22 alien registrants, General Registrar Judith Stokes emailed PILF, asking that we "destroy" the list of removed registrants she had previously provided.**[35] Like Bedford County, Ms. Stokes explained that her request to destroy public election information originated with the Virginia Department of Elections.

After the Virginia Department of Elections pushed the meritless claim that federal highway law prevented us from seeing the list of those removed from the voter rolls for citizenship problems, the production of records by local officials effectively stopped. Over the course of August and September 2016, responses from election officials rolled in, **each one explaining that state election officials had instructed them not to provide lists of non-citizens who had been removed from Virginia's voter rolls.**



Edgardo Cortes, Commissioner, Department of Elections
Photo credit: Commonwealth of Virginia

This state-engineered stonewalling occurred on the eve of a federal election where the role of foreigners in the United States was a central issue in the Presidential race. Covering up the role of foreigners registering to vote did a disservice to a full and transparent debate of the issues.

Edgardo Cortes, the Commissioner of the Virginia Department of Elections, and an appointee of Governor McAuliffe, instructed local election officials to stonewall our requests for public information about alien voting with a legally meritless excuse. Numerous county election officials confirmed to PILF that Commissioner Cortes had issued guidance to them, instructing them not to respond to our requests for records pertaining to non-citizen voters.  Some election officials kindly provided us the original communications from Cortes directing the stonewalling.

This is what a cover-up of alien voting looks like.

**State election officials prevented public access not only to records showing the number of non-citizens who have successfully registered to vote, but also records showing how many of them voted prior to being removed from the registration rolls.**



Commissioner Cortes' instructions to stonewall our requests for public election information was distributed statewide to local election officials on August 19, 2016.[36] Yet not until September 16 did Commissioner Cortes contact PILF. In his correspondence, Commissioner Cortes offered to provide a "customized report" at a cost of $240,[37] a report that he claimed would satisfy our request concerning non-citizens.  It didn't come close to responding to our requests detailing the names of aliens removed from the voter rolls for citizenship problems.

**Commission Cortes refused to provide a list of registered voters who have been removed from the registration rolls for citizenship problems in each jurisdiction.** He likewise refused to provide the voting history of registrants removed from the rolls for citizenship problems, reiterating his position that such information is not subject to release under the NVRA's public inspection provision, but is available only to "qualified entities" under limited circumstances.[38]

Cortes did not provide a list of registrants removed for citizenship problems across the Commonwealth until March 28, 2017, nearly eight months after PILF first made a broad request to counties on August 8, 2016. Cortes did this only after the United States District Court wholly rejected the flimsy excuse for failing to provide the data—that federal highway laws made it private.

## The Excuses for Hiding Information on Non-citizens

Commissioner Cortes told local election officials that a list of registrants removed from Virginia's registration lists for citizenship problems cannot be provided to the public because such information is protected from release by the federal Driver's Privacy Protection Act (DPPA). A federal court rejected this nonsensical excuse.

The DPPA makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted" by one of fourteen exceptions to the prohibition on disclosure.[39] The law has nothing to do with elections or election records. With no other recourse, PILF sued two defiant local election officials, Larry Haake, then-general registrar for Chesterfield County, and Susan Reed, general registrar for the City of Manassas.

Haake was unabashed about his non-compliance with PILF's request for registration records. During a public hearing before a joint session of the Privileges and Elections Committees of the Virginia General Assembly on October 13, 2016, at which PILF representatives were invited to speak, Haake testified that he deliberately did not provide PILF with the requested records. His defiance landed him in federal court.

Haake and Reed moved to dismiss PILF's lawsuits, arguing, at the behest of Commissioner Cortes, that the DPPA shielded their records from public disclosure. In a two-page decision, the federal court swiftly rejected this excuse, finding that "the DPPA does not apply to disclosure of the voter information requested by the Plaintiff."[40]

Haake did not take his defeat in stride. In an email written on the "official communication list for the General Registrars of the Commonwealth," Haake referred to Public Interest Legal Foundation attorneys as "lowlifes."[41] One month later, Haake announced he was retiring.[42]

With a court order in hand, PILF renewed its request to the State Department of Elections for non-citizen registration records for all 133 of Virginia's voting jurisdictions. A week later, Commissioner Cortes provided the data.

> In an email written on the "official communication list for the General Registrars of the Commonwealth," Haake referred to Public Interest Legal Foundation attorneys as "lowlifes."

Commissioner Cortes' guidance also directed local election officials to conceal records showing the voting history of any individual whose registration was cancelled for citizenship reasons. According to Commissioner Cortes, documents concerning voting activity are not covered under the NVRA's public inspection provision and can only be disclosed publicly as permitted by Commonwealth law, which permits disclosure, at a reasonable cost, only to a list of qualified entities.[43]

In the end, the state officials could not conceal the extent of alien voting because PILF and VVA worked with a third party with access to voter history to determine which of the aliens who registered to vote, actually voted.  Not surprisingly, many ballots were cast by these aliens.

# The Extent of Non-citizen Registration in Virginia

After eight months of phones calls, election office visits, and federal litigation, PILF has obtained records showing the currently-accounted-for extent of non-citizen registration and voting in Virginia. It was, not easy, despite the fact that federal law requires significant levels of transparency from election officials.

The information we have been able to gather demonstrates what many of us already knew: **non-citizens are registering and voting in our elections.** The obstructionist effort led by state election officials prevented PILF from obtaining this information prior to the 2016 election.

## Alien Registration

In total, 5,556 registrants were removed from the voter rolls for citizenship problems since 2011 in 120 voting jurisdictions. These were only the registrants with citizenship problems who were caught providing conflicting answers to state officials regarding their citizenship status. They swore they were citizens on voter registration forms, then later told the state they were not citizens, sometimes after many years of voting in elections.

Yet, in 13 jurisdictions, not a single non-citizen has been removed in over 6 years. Below are the totals for the top 20 offending jurisdictions. The data for the remaining jurisdictions is available at Exhibit 1 at the link provided on page 1 of this report.

This data is but a snapshot of the problem. **Because no formal programs exist in Virginia to identify non-citizen registrants, the discovery and removal of these non-citizens is either by accident or because the registrant later indicated to election officials that he or she was not a U.S. citizen.** The total number of non-citizens that remain registered to vote therefore cannot be completely ascertained. However, it is estimated that approximately 474,000 non-citizens of voting age reside in Virginia. It is highly likely, that based on discoveries to date, thousands of non-citizens remain registered and able to vote throughout the Commonwealth.

The institutions that should be asking the questions about the full extent of the problem—election officials, law enforcement, and the media—aren't even asking. More often, they are denying the problem exists.

Recall that in 2015, Governor McAuliffe vetoed legislation[44] that would have allowed local election officials to obtain information concerning individuals who recused themselves from jury duty due to their status as non-citizens. Such individuals are ineligible to vote and their registrations should be cancelled. Governor McAuliffe's veto prevented that from happening.



**Top 20 Jurisdictions for Non-citizen Registrants**

- Fairfax County (1104)
- Prince William County (475)
- Virginia Beach City (363)
- Chesterfield County (282)
- Loudoun County (247)
- Norfolk City (229)
- Newport News City (221)
- Richmond City (194)
- Chesapeake City (169)
- Arlington County (145)
- Hampton City (113)
- Stafford County (109)
- Roanoke City (99)
- Manassas City (83)
- Henrico County (80)
- Alexandria City (77)
- Spotsylvania County (74)
- Portsmouth City (74)
- Albemarle County (64)
- Suffolk City (56)

0    200    400    600    800    1000    1200

In one astonishing example of bureaucratic indifference—deliberate or otherwise—election officials registered an individual to vote who told election officials she resided at a foreign address.

According to records provided by state officials, **REDACTED** , whose Prince William County registration was cancelled in 2012 for citizenship problems, provided a Guatemalan address on her voter registration application.[45] **REDACTED** voted in 14 different elections—most recently in 2008—before her registration was canceled.

**REDACTED** .

**REDACTED**

Finally, communications by election officials demonstrated zeal to conceal defects in Virginia's list maintenance systems to an astonishing degree. Despite PILF never once mentioning the role of "illegal aliens" in list maintenance problems, Arlington County general registrar Linda Lindberg heard otherwise. In a January 31, 2017 email we obtained, Lindberg fretted about the ramifications of PILF's courtroom success in obtaining the data contained in this report:

"This group [PILF] has and will interpret the fact that there may be voting credit on the cancelled record as "illegal aliens" registering and voting, despite the voter having subsequently affirmed his citizenship. (Although how they know these non-citizens are illegals is another story.)"[46]

Another story indeed—for PILF has never drawn any distinction between aliens and illegal aliens. Neither is entitled to vote. Lindberg's email is important for a second reason. Lindberg writes off this whole mess as a scrivener's error, where registrants are removed from the rolls for not being citizens, but later put back on the rolls once they affirm their citizenship by merely signing a form. Neither circumstance is very attractive.

Lindberg's alternative explanation is itself a serious problem with list maintenance in the Commonwealth. Legitimate voters should not be removed from the rolls for not being citizens. If this is how Lindberg explains the 5,500-plus instances of removal for citizenship defects, then that circumstance is also appalling. Lindberg went further in her email, threatening to alter election records prior to providing them to PILF. Regarding some registrants removed from the rolls for citizenship problems, Lindberg suggested she might make those records vanish in the email:



Linda Lindberg, General Registrar, Arlington
Photo credit: County of Arlington

"I am going to delete or otherwise notate these names from my report, either by deleting the rows from the Excel version or marking them on the report."[47]

In other words, for removed registrants that Lindberg thought might actually be citizens, she might "delete" them from the removal report. Even accepting Lindberg's premise that the removed registrants were really citizens, this would mean the public information provided by Lindberg would gloss over their potentially invalid removal from the rolls.

Lindberg's premise also has another problem. It simply might not be accurate. According to the Commissioner of the State Department of Elections, Edgardo Cortes, if a registration is cancelled for citizenship reasons, but the registrant subsequently affirms his citizenship, they will not appear on the cancellation reports. In an email to PILF attorneys, Cortes explains,

"If an individual was previously cancelled and then subsequently affirmed citizenship and was re-registered, they would no longer appear on this report because they would now be on active status."[48]

If that is true, Lindberg's alteration of election records would be even more troubling.

PILF's priority is that every eligible citizen remain on the rolls and every ineligible alien be removed from the rolls. Potentially deleting and altering public election records would conceal from view examples to the contrary. **Election officials should be transparent, and in Virginia, transparency has been in short supply.**

10

# AlienVoting

In 102 jurisdictions, we discovered that 1,852 non-citizens had cast a total of 7,474 votes between 1988 and 2016. The most alien votes, 1,065, were cast in 2008, the year President Obama was elected to his first term.[49]

Before Commissioner Cortes was picked by Governor McAuliffe, he worked at the Advancement Project, an organization strongly opposed to using citizenship verification tools such as the federal SAVE database.

PILF's request to local election officials asked for all communications with federal and state law enforcement officials pertaining to non-citizens who had either registered to vote or voted. However, to date, we have received no records showing that election officials had referred any non-citizen voters for investigation or prosecution. In fact, some jurisdictions indicated that they do not even review voter history to identify fraudulent votes. Like our other requests, this absence of records is due in part to the obstructionist efforts of Commissioner Cortes, whose guidance to local election officials informed them that communications with law enforcement officials were not records covered by NVRA and therefore did not need to be provided to PILF.

These circumstances raise serious questions as to whether the efforts to obscure the extent of alien participation in our elections are deliberate. Do various interests want the rolls to be polluted?

Virginia's use of absentee voting by mail only aggravates preexisting problems with the rolls. The people receiving mail ballots undergo essentially no scrutiny before their ballots are counted. As more and more states push for vote-by-mail options, lawmakers must also expand their efforts to keep the rolls free from ineligible registrants.



## Top 20 Counties for Non-citizen Votes



# Can Non-citizens Affect Election Outcomes? Yes.

Non-citizen registration and voting matters. Each time an alien registers a crime is committed. **When an alien votes, not only is another crime committed, the vote of a U.S. citizen is effectively cancelled.** That alone should motivate elected officials to seek solutions to these problems.

The commission of felonies and disenfranchisement are not the only concerns. The number of non-citizens found on the voters rolls—a number that reflects only those non-citizens caught by chance—demonstrates that non-citizens can affect actual election outcomes, stripping Americans of their fundamental right to choose their own leaders.

Republican Mark Obenshain's razor-thin loss to Democrat Mark Herring in Virginia's 2013 Attorney General race is well known. At the time the election was certified, Herring defeated Obenshain by a mere 165 votes.[50] After a recount was conducted, Herring's margin of victory increased to 907 out of over 2.2 million votes cast.[51] With thousands of non-citizens registering to vote in Virginia, it is not unreasonable to consider that Herring's victory could very well have been aided by the votes of non-citizens.

Statewide races are not the only elections that matter. The lives of Virginians are greatly affected by the outcomes of a host of regional and local elections, ranging from House and Senate contests to elections for mayor, Commonwealth attorneys, and school board members.

A review of election results shows that a number of recent elections could have been swayed by non-citizen voters based on a comparison of the margin of victory to the number of non-citizens discovered on the rolls by chance.

## Senate District 6 (2014)

2014's Special Election for the Senate seat in District 6 was decided by just 9 votes out of over 20,000 votes cast.[52] Senate District 6 includes two jurisdictions with some of the largest instances of removals for citizenship problems in the Commonwealth. (Table, Top 20 Counties for Non-citizen Registrants, above). When the votes were tallied, Democrat Lynwood Wayne Lewis, Jr. defeated Republican Burwell Wayne Coleman.

## House District 87 (2011)

2011's House of Delegates election in District 87 was decided by 51 votes.[53] District 87 includes portions of Fairfax County, Loudoun County and Prince William County, jurisdictions that rank in the top 5 for number of non-citizens removed from the voter rolls since 2011.

## Other Close Races

Tight races are commonplace in the Commonwealth. The following are examples of recent elections where the margin of victory was small enough for non-citizen voters to potentially affect the outcome:

### 2011

School Board (Augusta - Beverly Manor) – 1 vote[54]
School Board (Rockingham - District 2) – 3 votes[55]
School Board (Spotsylvania - Livingston) – 21 votes[56]
School Board (Loudoun - Leesburg) – 85 votes[57]
Commonwealth Attorney (Richmond) – 53 votes[58]
Senate District 17 – 286 votes[59]

### 2012

Mayor – Herndon (Fairfax County) – 38 votes[60]

### 2013

House District 86 – 54 votes[61]
House District 87 – 187 votes[62]
House District 2 – 223 votes[63]
House District 31 – 228 votes[64]
House District 34 – 422 votes[65]

### 2015

Clerk of Court (Roanoke) – 37 votes[66]
House District 2 – 125 votes House[67]
District 87 – 320 votes[68]

# Who Is to Blame for Non-citizen Registration and Voting?

The evidence plainly demonstrates that Virginia's voter registration system is broken. But who is to blame? Well, there is plenty of blame to go around. The federal government, state election officials, and local general registrars all contribute to the problem and it is clear that real reform is needed at all levels to ensure voting in the Commonwealth is secure.

## ⇒ System Failure: The Tradition of Ignoring Alien Voter Fraud in Virginia

In addition to asking local registrars to turn over data on non-citizen registration, we asked some officials whether they had referred any non-citizen registrants to law enforcement for investigation or prosecution. **We did not receive any documents indicating that even a single referral had been made.**

The absence of data on criminal referrals in other voting jurisdictions is due to the obstructionist efforts of Commissioner Cortes, whose guidance to local election officials informed them that communications with law enforcement officials were not records covered by NVRA and therefore did not need to be provided to PILF.

The lack of action by the Obama Department of Justice and law enforcement officials in Virginia is nothing new. In 2011, members of the Fairfax County Electoral Board alerted the Office of the U.S. Attorney for the Eastern District of Virginia in Alexandria, as well as the Public Integrity Section of the Criminal Division of the Justice Department (which coordinates election crime prosecutions) in Washington, of possible voter fraud by non-citizens.



We did not receive any documents indicating that even a single referral to law enforcement had been made.

The Fairfax County board had discovered 278 registered voters who had represented to the DMV that they were not U.S. citizens. **Almost half of them—117—had not only registered to vote, they had in fact voted in state and federal elections.** The Department of Justice never followed up, leaving nearly 300 gift-wrapped cases of voter fraud untouched.

## ⇒ System Failure: Voter registration forms easily permit non-citizens to register and participate in our elections.

The lack of prosecution of election crimes provides a key deterrent to voter fraud, if it is used. But the existing registration process provides non-citizens with an easy path to the ballot box. As previously explained, the Federal Voter Registration Form and the registration forms used by the Commonwealth of Virginia rely on nothing more than an honor system to limit voter registration to citizens of this country.

In all cases, these forms include a checkbox at the top of the form, which asks registrants to answer "yes" or "no" to the question "Are you a citizen of the United States?" The registrant must additionally sign the form, under penalty of perjury, attesting to the fact that his or her answer to that question is true and correct. There are no other "safeguards" in place to protect the integrity of the registration process.

Our previous investigation demonstrated the undeniable failures of the current voter registration system. **In the three jurisdictions PILF was able to survey, it was revealed that election officials were registering non-citizens who left the check box blank or, even worse, answered "no" to the citizenship question.**

By way of repeated requests for documents, PILF obtained voter registration forms for 13 additional voting jurisdictions in Virginia. The results reveal that the check-box honor system is a failure across the board.

In the 16 jurisdictions surveyed, PILF reviewed 764 voter registration applications submitted by applicants who were later removed for lacking U.S. citizenship. **In this small sample, 43 non-citizens answered "no" to the citizenship question yet were registered to vote.** An additional 18 non-citizens left the citizenship question blank yet were registered to vote. One individual checked both boxes and was still registered to vote.

That means over 8 percent of the non-citizen registrations surveyed could have been caught at the time of registration if election officials simply paid closer attention.

For the remaining 702 non-citizen registrants, getting on the voter rolls was as easy as checking "yes" to the citizenship question.[69]

**"No"**

| 1 | *Are you a citizen of the United States of America? ☐YES ☒NO | *Will you be at least 18 years of age on or before the next General Election day? ☐YES ☒NO | If you checked "NO" in response to either of these questions, do not complete this form. |

| 2 | REDACTED ☒Male ☐Female | REDACTED | REDACTED |
| | *Social Security Number | *Gender  REDACTED  *Date of Birth  REDACTED | Daytime Telephone Number |
| | | ☐None | ☐None |

| 3 | *Last Name | *First Name | REDACTED  *Full Middle or Maiden Name | *Suffix (Jr., Sr., III, Etc.) |
| | *Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste  City/Town | Zip Code |

**Blank**

| 1 | *Are you a citizen of the United States of America? ☐YES ☐NO | *Will you be at least 18 years of age on or before the next General Election day? ☐YES ☐NO | If you checked "NO" in response to either of these questions, do not complete this form. |

| 2 | ☐Male ☐Female | REDACTED | REDACTED |
| | Gender  REDACTED | *Date of Birth | Daytime Telephone Number |
| | | ☐None | ☐None |

| 3 | *Last Name | *First Name | REDACTED  *Full Middle or Maiden Name | *Suffix (Jr., Sr., III, Etc.) |
| | *Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste  City/Town | Zip Code  REDACTED |
| | If Rural Address or Homeless, please describe where you reside | E-mail address | |

**Both**

| 1 | *Are you a citizen of the United States of America? ☒YES ☐NO | *Will you be at least 18 years of age on or before the next General Election day? ☒YES ☐NO | If you checked "NO" in response to either of these questions, do not complete this form. |

| 2 | REDACTED ☒Male ☐Female | REDACTED | |
| | *Social Security Number  REDACTED | *Gender | *Date of Birth  REDACTED | Daytime Telephone Number  REDACTED |
| | | ☐None | ☒None |

| 3 | *Last Name  REDACTED | *First Name  REDACTED | *Full Middle or Maiden Name  REDACTED | *Suffix (Jr., Sr., III, Etc.) |
| | *Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste  City/Town | Zip Code |

## ⇒ System Failure: Inviting Aliens to Stay on the Voter Rolls

In one astonishing example, a non-citizen was invited to remain on the voter rolls even after he had informed election officials he was an alien. When REDACTED registered to vote in 2007, he checked "yes" in response to the application's citizenship question. In 2010, REDACTED renewed his driver's license and on his application, he checked "no" to the citizenship question.

The inconsistencies in REDACTED 's answers alerted election officials that he might not be eligible to vote. His registration, however, was not cancelled. Instead, REDACTED was mailed an "Affirmation of Citizenship," which asked REDACTED to affirm, subject to penalty of law, that he was a U.S. citizen. REDACTED signed the form and returned it. In May 2015, REDACTED 's voter registration was cancelled after election officials determined that he was, in fact, not a U.S. citizen.[70]

REDACTED 's situation is not unique. In fact, under Virginia law, any registered voter whose citizenship status is in question must receive a Notice of Intent to Cancel. The notice informs the registrant that his registration will be canceled unless he signs a form attesting that he is a U.S. citizen. In other words, even after election officials receive mailings indicating that a registrant is not a U.S. citizen, they must give the registrant another chance to mislead them. Even after red flags are raised, no proof of citizenship is required to finally clear the air. Like the registration form, the affirmation form is nothing more than an honor system that allows aliens to remain on the rolls.





14

# Virginia's Future: Why Action Is Needed Right Now

The accidental discovery of over 5,500 non-citizens suggests thousands more could remain registered and able to vote. With no real safeguards in place, it is a certainty that new alien voters are being added to the rolls month after month. With major elections looming in 2017, swift and sweeping changes must be made to ensure that only Americans are choosing American leaders.

## Virginia's Next Governor

Governor Terry McAuliffe has been one of the biggest obstacles to election integrity in Virginia. Fortunately, he is barred by law from seeking re-election. In November, Virginians will decide who will replace him. Election integrity is not a partisan issue. No matter what party an official is from, they take an oath to uphold the laws and defend the Constitution.

Virginia's next Governor should reverse the hostility toward clean elections of Governor McAuliffe. On the heels of our previous investigation, the Virginia House of Delegates passed legislation that would require new registrants to provide proof of U.S. citizenship in order to register to vote. A bill with similar requirements could land on the desk of Virginia's next governor.

Despite clear evidence that non-citizens are registering and voting in Virginia's elections, some are choosing to remain willfully ignorant. Delegate Mark. D. Sickles, a member of the House of Delegates who represents portions of Fairfax County told the media, "I think committing a felony to vote in an election is something that no non-citizen in their right mind would do."[71] **Over 1,100 non-citizens were discovered on the voter rolls in Fairfax County. These individuals cast over 1,000 ballots before they could be removed from the rolls.** Delegate Sickles won his most recent election in 2015 with 63 percent of the vote.[72]

It makes no difference whether alien votes were cast as a result of confusion or on purpose. Each is a felony and results in the disenfranchisement of a U.S. citizen.

For those who have truly cast votes because of the mistaken belief that they are eligible to vote, we must ask: why are we content with putting non-citizens in a position to accidentally commit felonies that could result in deportation? Better safeguards during the registration process— as opposed to a checkbox—would actually protect non-citizens. Like eligible U.S. citizens, non-citizens who register to vote are mailed confirmation cards that tell them where to vote.

The legislation requiring proof of citizenship would prevent non-citizens from joining the registry in the first instance, removing the possibility that non-citizens would be provided with a ballot sometime in the future.



## House of Delegates

Republicans currently control 66 of Virginia's 100 seats in the House of Delegates.[73] While all 100 seats are up for grabs in 2017, only 55 are contested.[74] Republicans currently hold a super-majority. As of April, Democrats are running 77 candidates in 49 House districts currently occupied by Republicans, including all 17 Republican-held districts that voted for Hillary Clinton in 2016.[75]

As detailed above, lawmakers have done their part to legislatively address vulnerabilities in Virginia's registration and voting system. Whether these efforts will continue in 2017 and beyond could depend on the outcome of Virginia's House of Delegates' contests.

## United States Senate

In November 2018, Virginians will elect one of their two representatives in the United States Senate. Incumbent Senator Tim Kaine, former candidate for Vice President, is running for re-election.[76]

The federal voter registration form is in need of change. Like Virginia, the federal form uses an honor system to verify U.S. citizenship. That system has failed. An act of Congress could and should require documentary proof of citizenship that would ensure only U.S. citizens are added to the voter rolls.

## Local Elections

In 2017 and beyond, Virginians will choose mayors, school board members, and city councilors. Virginians have a right to demand that their local election officials serve their public records with vigilance to ensure that representatives of the people are duly selected.

# Recommendations and Solutions

There are several changes that states and the federal government should make to prevent non-citizens from registering and voting illegally:

- The Virginia legislature could once again pass laws that protect elections from alien registration and voting. First, pass legislation that allows election officials to use all of the data available to county governments to detect aliens on the voter rolls, especially jury excusal forms, on which the registrants say under oath they are not citizens. Second, pass legislation requiring election officials to monitor and audit voter rolls that have reached implausible rates of registration that surpass the total eligible citizen population. Third, enact some form of citizenship verification. Fourth, insist in the funding process that Commonwealth Attorneys take voter fraud seriously and prosecute election criminals. Fifth, insist that the next governor appoint a director of elections that also takes voter fraud, alien voting, and transparency obligations seriously.

- The registration process must be changed. The check-box honor system is a failure and is facilitating voter fraud. All states should require voter applicants to provide documentary proof of U.S. citizenship. In the alternative, states should fully utilize the federal SAVE database which contains the names of aliens who have had contact with the immigration system.

- Election officials should ask federal and state courts to notify local election officials when individuals summoned for jury duty from voter registration rolls are excused because they are not United States citizens.

- State legislatures or elections officials should create and enforce requirements to conduct systematic reviews of the voter histories for all registrants who were purged from the rolls due to not meeting the requirements of U.S. citizenship.

- The database, known as E-Verify, that is being used by U.S. employers to check the citizenship status of prospective employees should be made available to election officials and administrators of statewide registration databases to better identify registered voters who are not U.S. citizens.

- The U.S. Department of Homeland Security should open new information-sharing channels between agencies to include Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), Citizenship and Immigration Services (USCIS) and Homeland Security Investigations (HSI) with state and local election officials to more easily identify non-citizens coming into contact with the federal immigration system.

- Law enforcement at both the federal and state level should exercise their authority to prosecute cases of voter fraud. Voter registration and voting history records such as those contained in this report make prosecution an easy task. Armed with that information, prosecutors would simply have to verify whether or not the individual was a citizen at the time of registration or voting.

# Conclusion

Our current election systems were largely conceived in a time when the concept of non-citizens being granted voter roll entry by official actors was unheard-of. Times change, but the commitment to election integrity must remain the same.

The problem is real and the solutions are simple. What is happening in Virginia is happening in every other state. Your vote is at risk and elected officials must act. You can make a difference. Your voting rights are not limited to Election Day. You have the right to question the quality of service that election officials are providing. Please contact your local officers to ask what they are doing to ensure voter lists are accurate and free of dead, duplicate, felon, fictitious, relocated, and non-citizen voters. Simply asking a question can inspire real reform.

# Endnotes

1 | https://publicinterestlegal.org/blog/report-ineligible-aliens-registering-vote-casting-ballots/.

2 | See U.S. Dept. of Just., Federal Prosecution of Election Offenses 66 (7th ed. 2007), available at https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf.

3 | Va. Const., Art. II, Sec. 1.

4 | 18 U.S.C. § 1015(f). It is also a felony for an individual to simply "falsely and willfully represent[] himself to be a citizen of the United States." 18 U.S.C § 911.

5 | The cancellation reports for all 120 counties are available at Exhibit 1 at the link provided on page 1 of this report. The cancellation reports cover two separate time periods and were received in two separate responses from state election officials. They have been combined into one exhibit for purposes of this report.

6 | This email is reproduced in its entirety at Exhibit 2.

7 | This estimate was based on the Census Bureau's 2016 Current Population Survey (CPS). The data can be queried using the CPS Table Creator available at https://www.census.gov/cps/data/cpstablecreator.html.

8 | http://leg1.state.va.us/cgi-bin/legp504.exe?151+ful+HB1315ER+pdf.

9 | http://leg1.state.va.us/cgi-bin/legp504.exe?151+amd+HB1315AG.

10 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB1105AG.

11| https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1105.

12 | https://publicinterestlegal.org/blog/scores-of-counties-put-on-notice-about-corrupted-voter-rolls/.

13 | https://publicinterestlegal.org/blog/counties-on-notice/.

14 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+HB2343.

15 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+HB2343AG.

16 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+HB1428.

17 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB872.

18 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+HB1428AG.

19 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB872AG.

20 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1253.

21 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB1253AG.

22 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1455.

23 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB1455AG.

24 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1581.

25 | https://lis.virginia.gov/cgi-bin/legp604.exe?171+amd+SB1581AG.

26 | 52 U.S.C. § 20501 et seq.

27 | See 52 U.S.C. § 20504(a)(1) and (c)(1).

28 | 52 U.S.C. § 20504(c)(2)(C).

29 | 52 U.S.C. § 20504(c)(2)(B)(ii).

30 | 52 U.S.C. § 20507(i).

31 | Complaint, Virginia Voter's Alliance, et al. v. Leider, No. 16-cv-394 (E.D. Va., April 7, 2016).

32 | An updated cancellation report subsequently received from the Department of Elections lists the "Declared Non-Citizen Total" as 443. See Exhibit 1.

33 | See Exhibit 3.

34 | An example of this notice is provided at Exhibit 4.

35 | The email is reproduced in its entirety at Exhibit 5.

36 | The email is reproduced in its entirety at Exhibit 6.

# Endnotes

37 | This cost was later waived after we informed Commissioner Cortes that the NVRA permits election officials to charge "reasonable costs" for "photocopying" only. 52 U.S.C. § 20507(i)(1). It does not permit election officials to impose costs for time spent producing records.

38 | See Exhibit 6.

39 | 18 U.S.C. § 2722(a).

40 | The court order is available at Exhibit 7.

41 | The email is reproduced in its entirety at Exhibit 8.

42 | Press Release, Haake retires April 1, VILLAGE NEWS (March 1, 2017), http://villagenewsonline.com/2017/03/01/haake-retires-april-1/.

43 | Va. Code Ann. § 24.2-406.

44 | http://leg1.state.va.us/cgi-bin/legp504.exe?151+ful+HB1315ER+pdf.

45 | The record of **REDACTED**'s cancellation is produced in its entirety at Exhibit 9.

46 | The email is reproduced in its entirety at Exhibit 10.

47 | Id.

48 | See Exhibit 2.

49 | An excerpt from the voting history records we received is available at Exhibit 11.

50 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:12/stage:General.

51 | Vozzella and Pershing, Obenshain concedes Virginia attorney general's race to Herring, WASH. POST. (Dec. 18, 2013), https://www.washingtonpost.com/local/virginia-politics/obenshain-to-concede-virginia-attorney-generals-race-on-wednesday-in-richmond/2013/12/18/fe85a31c-67e7-11e3-8b5b-a77187b716a3_story.html?utm_term=.7eefdedfa511.

52 | http://historical.elections.virginia.gov/elections/search/year_from:2014/year_to:2014/office_id:9/district_id:27270/stage:General.

53 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:8/district_id:27389/stage:General

54 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:549/district_id:31510/stage:General.

55 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:549/district_id:32289/stage:General.

56 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:549/district_id:32310/stage:General.

57 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:549/district_id:30310/stage:General.

58 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:530/district_id:30255/stage:General.

59 | http://historical.elections.virginia.gov/elections/search/year_from:2011/year_to:2011/office_id:9/district_id:27280/stage:General.

60 | http://historical.elections.virginia.gov/elections/search/year_from:2012/year_to:2012/office_id:73/district_id:31552/stage:General.

61 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27388/stage:General.

62 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27389/stage:General.

63 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27305/stage:General.

64 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27334/stage:General.

65 | http://historical.elections.virginia.gov/elections/search/year_from:2013/year_to:2013/office_id:8/district_id:27337/stage:General.

66 | http://historical.elections.virginia.gov/elections/search/year_from:2015/year_to:2015/office_id:545/district_id:30256/stage:General.

# Endnotes

67 | http://historical.elections.virginia.gov/
elections/search/year_from:2015/year_to:2015/of
fice_id:8/district_id:27305/stage:General.

68 | http://historical.elections.virginia.gov/
elections/search/year_from:2015/year_to:2015/of
fice_id:8/district_id:27389/stage:General.

69 | The voter registration applications are
produced at Exhibit 12.

70 | Documentation of ~~REDACTED~~ 's registration is
available at Exhibit 13.

71 | Graham Moomaw, Virginia House passes bill to
require proof of citizenship to vote in state, local
elections, ROANOKE TIMES (Feb. 1, 2017),
http://www.roanoke.com/news/politics/general_as
sembly/virginia-house-passes-bill-to-require-
proof-of-citizenship-to/article_8e4177a2-cc6c-
5538-948a-f99d195815f4.html.

72 | http://historical.elections.virginia.gov/
elections/search/year_from:2015/year_to:2015/of
fice_id:8/district_id:27346/stage:General.

73 | http://virginiageneralassembly.gov/house/
members/members.php.

74 | David McGee, Field set for June primaries,
November House lineup, BRISTOL HERALD
COURIER (April 1, 2017),
http://www.heraldcourier.com/news/field-set-for-
june-primaries-november-house-
lineup/article_469d0622-7d6d-5337-8ece-
36b7f108ffbd.html.

75 | Ken Plum, Del. Ken Plum: A Sense of Impending
Changes in the Legislature, RESTON NOW (April
13, 2017),
https://www.restonnow.com/2017/04/13/del-ken-
plum-a-sense-of-impending-changes-in-the-
legislature/.

76 | Jenna Portnoy, Kaine has big lead in 2018
Senate race, early polling shows, WASH. POST.
(Feb. 17, 2017), https://www.washingtonpost.com/
local/virginia-politics/kaine-has-big-lead
-in-2018-senate-race-early-polling-shows
/2017/02/17/0ab08564-f537-11e6-a9b0-
ecee7ce475fc_story.html?utm_term=.f21368b
35e32.



"Growth Through Immigration and Diversity Builds a Strong Community"
Banner hanging outside elections office at County of Arlington

# PUBLIC INTEREST
## LEGAL FOUNDATION



For all media inquiries, please
contact us at (317) 203-5599 or
media@publicinterestlegal.org

www.publicinterestlegal.org

PUBLIC INTEREST
—— LEGAL FOUNDATION ——

32 E. Washington St.
Suite 1675
Indianapolis, IN 46204
(317) 203-5599

**Exhibit C**

<div align="center">

**COMMONWEALTH OF VIRGINIA**

**DEPARTMENT OF ELECTIONS**

**Cancellation - Declared Non-Citizen**

**153 - PRINCE WILLIAM COUNTY**

</div>

**Locality: 153**
**Precinct: ALL**
**District: ALL**

Start Date: 01/01/2011
End Date: 08/16/2016

**August 2015**

| PCT | Name<br>Address | | Registration ID | Cancel<br>Date | Cancel Type |
|-----|------|---|-----------------|----------------|-------------|
| 0201 | | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0303 | | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0402 | | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0409 | | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0504 | FREEMAN, LUCIANIA C. | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0512 | | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0601 | | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0608 | | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |

**September 2015**

| PCT | Name<br>Address | | Registration ID | Cancel<br>Date | Cancel Type |
|-----|------|---|-----------------|----------------|-------------|
| 0110 | | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |
| 0111 | | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |
| 0207 | | REDACTED | REDACTED | 9/21/2015 | Declared Non-Citizen |
| 0703 | | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |

**October 2015**

| PCT | Name<br>Address | | Registration ID | Cancel<br>Date | Cancel Type |
|-----|------|---|-----------------|----------------|-------------|
| 0201 | | REDACTED | REDACTED | 10/29/2015 | Declared Non-Citizen |
| 0302 | | REDACTED | REDACTED | 10/14/2015 | Declared Non-Citizen |

Generated on 08/16/2016 09:49:44 AM

Page 26 of 29

**1**   *Are you a citizen of the United States of America? ☑YES ☐NO    *Will you be at least 18 years of age on or before the next General Election day? ☑YES ☐NO    If you checked "NO" in response to either of these questions, do not complete this form.

**2**   ☐Male ☑Female   REDACTED   REDACTED
*Gender    *Date of Birth    Daytime Telephone Number

Freeman    Luciana    Clurice    ☐None    ☑Nor
*Last Name    *First Name    *Full Middle or Maiden Name    *Suffix (Jr., Sr., III, Etc

**3**   REDACTED
*Residence (Permanent) Home Address    Apt/Unit/Lot/Rm/Ste   City/Town    Zip Code
   REDACTED

If Rural Address or Homeless, please describe where you reside    E-mail address
   REDACTED

Mailing Address (If different)/ Virginia P.O.Box or Uniformed Service Address, if applicable (include Zip Code)    ☐City or ☑County
Name of City or County of Residence

**4**   *Have you ever been convicted of a felony? ☐YES ☑NO    State where convicted
If YES, have your voting rights been restored? ☐YES ☐NO    If YES, when restored? ☐☐,☐☐,☐☐☐☐

**5**   *Have you ever been judged mentally incapacitated? ☐YES ☑NO
If YES, has court restored you to capacity? ☐YES ☐NO    If YES, when restored? ☐☐,☐☐,☐☐☐☐

**6**   Registration Statement: I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have read the Privacy Act Notice on the front of this form.

→ *Signature (or mark if unable to sign)    *Luciana Freeman*    09, 19, 200

SEP 26 2008

If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required.) ☐ Check/describe if you have a disability that requires accommodation in order to

☐ I'm interested in being an Election Official on Election Day. Please send me information.    You may request that your home address not be released if you (a) are active or retired law enforcement, or (b) have been granted a protective court order, or (c) are in fear of your personal safety from someone who has threatened or stalked you and have filed a complaint against that person with a magistrate or law enforcement (must show copy of complaint). You must show a Virginia P.O. box under mailing address in Box 3 above. ☐ Law Enforcement ☐ Protective Order ☐ Threatened/Stalke

CANCELLED DECLARED NON CITIZEN AUG 12 2015

**Exhibit D**

# COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF ELECTIONS
## Cancellation - Declared Non-Citizen
### 059 - FAIRFAX COUNTY

**Start Date: 01/01/2011**
**End Date: 03/20/2017**

**Locality: ALL**
**Precinct: ALL**
**District: ALL**

| PCT | Name Address | | Registration ID | Cancel Date | Cancel Type |
|---|---|---|---|---|---|
| 0919 | REDACTED | | REDACTED | 3/27/2012 | Declared Non-Citizen |
| 0923 | REDACTED | | REDACTED | 3/27/2012 | Declared Non-Citizen |

**April 2012**

| PCT | Name Address | | Registration ID | Cancel Date | Cancel Type |
|---|---|---|---|---|---|
| 0105 | REDACTED | | REDACTED | 4/23/2012 | Declared Non-Citizen |
| 0237 | REDACTED | | REDACTED | 4/30/2012 | Declared Non-Citizen |

**May 2012**

| PCT | Name Address | | Registration ID | Cancel Date | Cancel Type |
|---|---|---|---|---|---|
| 0106 | REDACTED | | REDACTED | 5/8/2012 | Declared Non-Citizen |
| 0110 | REDACTED | | REDACTED | 5/8/2012 | Declared Non-Citizen |
| 0115 | REDACTED | | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0121 | REDACTED | | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0123 | REDACTED | | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0131 | REDACTED | | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0209 | REDACTED | | REDACTED | 5/8/2012 | Declared Non-Citizen |
| 0220 | REDACTED | | REDACTED | 5/8/2012 | Declared Non-Citizen |
| 0226 | REDACTED | | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0315 | REDACTED | | REDACTED | 5/3/2012 | Declared Non-Citizen |
| 0321 | BONILLA, ELIUD REDACTED | | REDACTED | 5/3/2012 | Declared Non-Citizen |

## COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF ELECTIONS
## Cancellation - Declared Non-Citizen
## 153 - PRINCE WILLIAM COUNTY

**Locality: ALL**
**Precinct: ALL**
**District: ALL**

**Start Date: 01/01/2011**
**End Date: 03/20/2017**

### August 2015

| PCT | Name<br>Address | Registration ID | Cancel<br>Date | Cancel Type |
|-----|-----------------|-----------------|----------------|-------------|
| 0201 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0303 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0402 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0409 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0504 | FREEMAN, LUCIANIA C.<br>REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0512 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0601 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |
| 0608 | REDACTED | REDACTED | 8/12/2015 | Declared Non-Citizen |

### September 2015

| PCT | Name<br>Address | Registration ID | Cancel<br>Date | Cancel Type |
|-----|-----------------|-----------------|----------------|-------------|
| 0110 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |
| 0111 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |
| 0207 | REDACTED | REDACTED | 9/21/2015 | Declared Non-Citizen |
| 0703 | REDACTED | REDACTED | 9/22/2015 | Declared Non-Citizen |

### October 2015

| PCT | Name<br>Address | Registration ID | Cancel<br>Date | Cancel Type |
|-----|-----------------|-----------------|----------------|-------------|
| 0201 | REDACTED | REDACTED | 10/29/2015 | Declared Non-Citizen |
| 0302 | REDACTED | REDACTED | 10/14/2015 | Declared Non-Citizen |

**1** | * Are you a citizen of the United States of America? ☒ YES ☐ NO | * Will you be at least 18 years of age on or before the next General Election day? ☒ YES ☐ NO | If you checked "NO" in response to either of these questions, do not complete this form.

REDACTED

Social Security Number | ☐ Male ☒ Female | * Date of Birth | Daytime Telephone Number
 | * Gender | |

ROSEN , JEANNE , ANN E | | Sanzone | ☐ None | | ☐ None
* Last Name | * First Name | * Full Middle or Maiden Name | * Suffix (Jr.,Sr.,III,Etc.)

**3**

REDACTED

* Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste | City/Town | Zip Code

If Rural Address or Homeless, please describe where you reside | E-mail address

Mailing Address *(if different)* /Virginia P.O. Box or Uniformed Service Address, if applicable *(include Zip Code)* | ☐ City or ☐ County Name of City or County of Residence

REDACTED

**4** | * Have you ever been convicted of a felony? ☐ YES ☒ NO | State where convicted |
 | If *YES*, have your voting rights been restored? ☐ YES ☐ NO | If *YES*, when restored? | M M D D Y Y Y Y

**5** | * Have you ever been judged mentally incapacitated? ☐ YES ☒ NO |
 | If *YES*, has court restored you to capacity? ☐ YES ☐ NO | If *YES*, when restored? | M M D D Y Y Y Y

**6** | Registration Statement: I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have read the Privacy Act Notice above.

* Signature (or mark if unable to sign) _Jeanne Rosen_ | REDACTED

09-18-2013   0402

If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required) | ☐ Check if you have a disability that requires someone to assist you in order to vote.

☐ ☐ ☐ Protected Voter Code if applicable. See above. | **RECEIVED** SEP 1 8 2013

☐ I'm interested in being an Election Official on Election Day. Please send me information.

**1** | \* Are you a citizen of the United States of America? ☑ YES ☐ NO | \* Will you be at least 18 years of age on or before the next General Election day? ☑ YES ☐ NO | If you checked "NO" in response to either of these questions, do not complete this form.

Male ☐ ☑ Female

| \* Social Security Number | \* Gender | \* Date of Birth | Daytime Telephone Number |
REDACTED

FOCHT ~~ABBY~~
\* Last Name | Abby
\* First Name | Sharpe
\* Full Middle or Maiden Name ☐ None | ☐ None
\* Suffix (Jr.,Sr.,III,Etc.)

**3**

REDACTED

\* Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste | City/Town | Zip Code

If Rural Address or Homeless, please describe where you reside | E-mail address

Mailing Address *(if different)* /Virginia P.O. Box or Uniformed Service Address, if applicable *(include Zip Code)* | ☐ City or ☐ County
Name of City or County of Residence | REDACTED

**4** | \* Have you ever been convicted of a felony? ☐ YES ☑ NO    State where convicted
If *YES*, have your voting rights been restored? ☐ YES ☐ NO    If *YES*, when restored? [M|M] [D|D] [Y|Y|Y|Y]

**5** | \* Have you ever been judged mentally incapacitated? ☐ YES ☑ NO
If *YES*, has court restored you to capacity? ☐ YES ☐ NO    If *YES*, when restored? [M|M] [D|D] [Y|Y|Y|Y]

**6** | Registration Statement: I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have read the Privacy Act Notice above.

➡ \* Signature (or mark if unable to sign) | [0|3] [2|4] [2|0|1|2]

If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required) | ☐ Check/describe if you have a disability that requires accommodation in order to vote.

☐ I'm interested in being an Election Official on Election Day. Please send me information. | You may request that your home address not be released if you or member of your household are a) active or retired law enforcement, or b) have been granted a protective court order, or c) are in fear of your personal safety from someone who has threatened or stalked you and have filed a complaint against that person with a magistrate or law enforcement (must attach copy of complaint) or d) participate in the Address Confidentiality Program. You must show a Virginia P.O. box under mailing address in Box 3 above.
☐ Law Enforcement ☐ Protective Order ☐ Threatened/Stalked ☐ Address Confidentiality Program

| OFFICE USE ONLY | OFFICE USE ONLY | OFFICE USE ONLY |
|---|---|---|
| NEW LAST NAME | NEW FIRST, MIDDLE/MAIDEN NAME AND SUFFIX | DATE CHANGED |
| OTHER CHANGES | NEW PCT          AUTHORIZED BY | DATE CHANGED |

☐ DECEASED _____
☐ OUT OF STATE _____
☐ PERSONAL REQUEST _____
☐ CONVICTED OF A FELONY _____
NOTES:

☐ JUDGED INCAPACITATED _____
☐ ERROR DELETED _____
☐ NVRA PURGE _____

☐ TRANSFERRED OUT _____
☑ RE-REGISTERED 6-13-14
☐ INACTIVE STATUS w/name chg Scarhart
☐ REACTIVATED _____
Removed
6-25-14 PP

**1** * Are you a citizen of the United States of America? ☒YES ☐NO | * Will you be at least 18 years of age on or before the next General Election day? ☒YES ☐NO | If you checked "NO" in response to either of these questions, do not complete this form.

**2** | ☒Male ☐Female | | **REDACTED**
* Social Security Number | * Gender | * Date of Birth | Daytime Telephone Number
Bonilla | Eliud | | ☒None | ☒None
* Last Name | * First Name | * Full Middle or Maiden Name | * Suffix (Jr., Sr., III, Etc.)

**3** | | **REDACTED**
* Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste   City/Town | Zip Code

If Rural Address or Homeless, please describe where you reside | E-mail address
**REDACTED**

Mailing Address (If different)/ Virginia P.O. Box or Uniformed Service Address, if applicable (include Zip Code) | ☐City  or ☒County
Name of City or County of Residence

**4** * Have you ever been convicted of a felony? ☐YES ☒NO    State where convicted ___
If YES, have your voting rights been restored? ☐YES   ☐NO  If YES, when restored? [  ] / [  ] / [    ]

**5** * Have you ever been judged mentally incapacitated? ☐YES ☒NO
If YES, has court restored you to capacity? ☐YES ☐NO   If YES, when restored? [  ] / [  ] / [    ]

**6** **Registration Statement:** I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have read the Privacy Act Notice on the front of this form.

→ * Signature (or mark if unable to sign) _Eliud Bonilla_   [0]8 / [3]1 / [2][0][1][2]
09 2 4 1 2   Cancelled Declared Non-Citizen 5-3-2012

If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required). ☐ Check/describe if you have a disability that requires accommodation in order to vote.

☐ I'm Interested in being an Election Official on Election Day. Please send me information. | You may request that your home address not be released if you or member of your household (a) are active or retired law enforcement, or (b) have been granted a protective court order, (c) are in fear of your personal safety from someone who has threatened or stalked you and have filed a complaint against that person with a magistrate or law enforcement (must attach copy of complaint), or (d) participate in the Address Confidentiality Program. You must show a Virginia P.O. box under mailing address in Box 3 above.   ☐ Law Enforcement   ☐ Protective Order   ☐ Threatened/Stalked   ☐ Address Confidentiality Program

**1** | * Are you a citizen of the United States of America? ☑ YES ☐ NO | * Will you be at least 18 years of age on or before the next General Election day? ☑ YES ☐ NO | If you checked "NO" in response to either of these questions, do not complete this form.

**2** | ☐ Male ☑ Female
* Gender | REDACTED
* Date of Birth | REDACTED
Daytime Telephone Number

Freeman | Luciania | Clurice | ☐ None ☑ Nor
* Last Name | * First Name | * Full Middle or Maiden Name | Suffix (Jr., Sr., III, Et

**3** | REDACTED
* Residence (Permanent) Home Address | Apt/Unit/Lot/Rm/Ste  City/Town | Zip Code
REDACTED

If Rural Address or Homeless, please describe where you reside | E-mail address
REDACTED

Mailing Address (If different)/ Virginia P.O. Box or Uniformed Service Address, if applicable (include Zip Code) | ☐ City  or ☑ County
Name of City or County of Residence

**4** | * Have you ever been convicted of a felony? ☐ YES ☑ NO | State where convicted
If YES, have your voting rights been restored? ☐ YES ☐ NO | If YES, when restored? ☐☐ / ☐☐ / ☐☐☐☐

**5** | * Have you ever been judged mentally incapacitated? ☐ YES ☑ NO
If YES, has court restored you to capacity? ☐ YES ☐ NO | If YES, when restored? ☐☐ / ☐☐ / ☐☐☐☐

**6** | Registration Statement: I swear/affirm, under felony penalty for making willfully false material statements or entries, that the information provided on this form is true. I authorize the cancellation (entered in Box 7 below) of my current registration and I have re... the Privacy Act Notice on the front of this form.

→ * Signature (or mark if unable to sign) _____ Lucianie Freeman _____  09 , 19 , 200

SEP 26 2008

If applicant is unable to sign due to a physical disability, write the name/address of person who assisted. (Required.) ☐ Check/describe if you have a disability that requires accommodation in order to...

☐ I'm interested in being an Election Official on Election Day. Please send me information. | You may request that your home address not be released if you (a) are active or retired law enforcement, or (b) have been granted a protective court order, or (c) are in fear of your personal safety from someone who has threatened or stalked you and have filed a complaint against that person with a magistrate or law enforcement (must a... copy of complaint). You must show a Virginia P.O. box under mailing address in Box 3 above. ☐ Law Enforcement ☐ Protective Order ☐ Threatened/Stalke

CANCELLED  DECLARED  NON CITIZEN  AUG 1 2 2015

EXHIBIT 2



# NORTH CAROLINA
## STATE BOARD OF ELECTIONS

<u>VIA EMAIL</u>
Public Interest Legal Foundation
   c/o   Noel Johnson, Esq.


May 3, 2019


Re:   <u>Notice citing the National Voter Registration Act of 1993 (NVRA).</u>


Dear Ms. Johnson:

     This letter responds to the above-referenced Notice, *enclosed*, received by the N.C. State Board of Elections Office ("State Board Office") today by U.S. Mail. We are aware of communications between the Public Interest Legal Foundation (PILF) and certain staff at the State Board Office in recent months, and it appears a number of items may have been misunderstood.

     Records are maintained and freely available for list maintenance activities as to each registered voter, statewide, online: <u>ncVoter_Statewide.zip</u> (468.7 MB). It was our understanding that PILF was previously aware of that public file, which is updated weekly to reflect current registration and list maintenance activities. From the public file, PILF can identify each individual removed from the rolls, the reason for that removal, and the date of removal. Additional information is also available to you using that file. Our State has gone further and made freely available individual voter participation history for all voters, statewide, at no cost: <u>nchist_Statewide.zip</u> (264.4 MB).

     However, your Notice states that PILF's request is fundamentally for records affecting "registrations belonging to individuals who do not satisfy the citizenship requirements for voting," and your correspondence to various counties further clarifies that you seek "information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles" and this Agency.

1

The State Board Office is unable to disclose the identity of particular individuals in the manner you request, although we wish to provide you an overview of the process and the reasons why individuals cannot be identified in the manner sought.

In 2013, the State Board Office sought to enhance its ability to identify non-citizen registrants by entering an agreement with the U.S. Department of Homeland Security (DHS) and the United States Citizenship and Immigration Service (USCIS) to access their Systematic Alien Verification for Entitlements (SAVE) Program, which allows state agencies to query certain information regarding particular individuals' citizenship status. Before the State Board was granted access to the SAVE Program, however, DHS and USCIS required the State Board to enter into a memorandum of agreement that outlined and restricted the State Board's use and reliance on data from the SAVE Program. Additionally, the State Board was required to submit both the proposed agreement and other documents to the United States Department of Justice for preclearance under Section 5 of the Voting Rights Act. The State Board entered into this agreement in September 2013 (the "MOA"), *enclosed*.

Use and disclosure of information obtained through SAVE is strictly limited by the terms of our Agency's MOA with DHS and USCIS. We are required, for instance, to "use any information provided by DHS-USCIS under this MOA solely for the purpose of determining the eligibility . . . and limit use of such information accordance with this and all other provisions of this MOA," which expressly requires that the Agency "protect its confidentiality, including ensuring that it is not disclosed to any unauthorized person(s) without the prior written consent of DHS-USCIS." MOA at Sections IV(B)(1)(g) and (i), *enclosed*.

The SAVE Program is most effectively queried using alien identification numbers, which the State Board Office sought from the Department of Motor Vehicles. We understand that information is subject to nondisclosure under the Driver's Privacy Protection Act (DPPA).

In addition to the above, the State Board Office and certain county boards of elections continue to provide records sought by federal law enforcement, as described in Numbered Memos 2018-09 and 2019-01, *enclosed*. We will not presently disclose the identity of any prior or current registrant that may be subject to review by federal law enforcement.

2

Our Agency conducts list maintenance activities in a transparent manner consistent with the NVRA, and it has detailed investigatory steps regarding the use of the SAVE Program data and DMV data. *See* Post-Election Audit Report (April 21, 2017), *enclosed*. While the State Board Office cannot provide information and data otherwise restricted by agreement with federal agencies, the pendency of federal proceedings affecting that data, or other federal statutes, our Agency has provided broad access to list maintenance data for the entire state, supra.

Understanding the restrictions on the discrimination of particular data, we would ask that PILF please indicate what records it now seeks. We look forward to providing all records to which you are entitled under the NVRA.

Sincerely,

Josh Lawson
General Counsel

Encl.:     Memorandum of Agreement (2013)
           Post-Election Audit Report (2016), with copies of
           requested correspondence
           Numbered Memo 2019-01
           Numbered Memo 2018-09
           Notice Letter

## MEMORANDUM OF AGREEMENT

BETWEEN THE DEPARTMENT OF HOMELAND SECURITY,
U.S. CITIZENSHIP AND IMMIGRATION SERVICES,
AND

### NORTH CAROLINA STATE BOARD OF ELECTIONS

## I. PARTIES.

The parties to this Memorandum of Agreement (MOA) are the Department of Homeland Security, U.S. Citizenship and Immigration Services (DHS-USCIS), and the **North Carolina State Board of Elections** (User Agency). User Agency includes North Carolina county registrars responsible for maintaining voting rolls.

## II. AUTHORITY.

The authorities governing this MOA include, but are not limited to, the following:

> Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, as amended.
>
> Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
>
> Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended.
>
> Privacy Act, 5 U.S.C. § 552a, as amended.
>
> The Inter-Governmental Cooperation Act, 31 U.S.C. § 6501, et seq., as amended.
>
> The National Voter Registration Act, 42 U.S.C. § 1973gg et seq., as amended
>
> Help America Vote Act, 42 U.S.C. § 15301 et seq.as amended.
>
> Voting Rights Act, 42 U.S.C. § 1973 et seq., as amended.
>
> Civil Rights Act, 42 U.S.C. §§ 1971, 1974, as amended.
>
> N.C. Gen. Stat. §§ 163-82.4(d), 163-82.10(a), 163-82.11, 163-82.12, 163-82.14(a), 1 and 63-82.19, as amended.
>
> N.C. Gen. Stat. §§ 163-55, 163 -275 (13)-(18), as amended.

1

Rev. Ver. 08/21/2013

North Carolina Constitution, Article VI, Section 1

Pursuant to the requirements of OMB Circular A-97, which establishes the President's guidelines for implementing the Intergovernmental Cooperation Act, 31 U.S.C. Section 6501, et seq., as amended, the User Agency certifies that it cannot procure the immigration status verification services requested pursuant to this MOA reasonably and expeditiously through ordinary business channels.

## III. PURPOSE.

The purpose of this MOA is to establish the terms and conditions governing the participation of the User Agency in the DHS-USCIS Systematic Alien Verification for Entitlements (SAVE) Program for the purpose of verifying citizenship and immigration status information of non-citizen and naturalized or derived U.S. citizen **registrants** (registrants) **on the User Agency's Voter Registration Rolls (benefit)**.  The limited data will be provided to the User Agency by an:

   1) Initial response (initial verification) by SAVE to an on-line inquiry by the User Agency; and

   2) Additional verification procedures where applicable; or

   3) A response to a properly submitted Form G-845.

## IV. RESPONSIBILITIES.

## A. DHS-USCIS agrees to:

(1) Maintain and make available to the User Agency in limited part and manner determined by DHS-USCIS after consultation with the User Agency, an immigration and naturalized or derived citizenship status information verification system under the SAVE Program known as the Verification Information System (VIS).

(2) Respond through VIS to properly submitted verification requests from the User Agency by providing the limited information noted in point (1) of **PURPOSE** immediately above;

(3) Process and respond to properly submitted additional verification requests submitted by the User Agency through VIS or on Form G-845.  Response time may vary, depending on DHS-USCIS workload, resources available to process additional verification requests, and the registrant's specific circumstances;

(4) Provide to the User Agency operating instructions necessary to use VIS so that the User Agency can designate Users within the agency;

2

(5) Provide to the User Agency SAVE Program point of contact information for questions or problems regarding the User Agency's participation in SAVE;

(6) Provide access to training and information regarding the laws, policies, and procedures that govern verifying, safeguarding, using, maintaining, and disclosing certain citizenship and immigration status information;

(7) Provide the User Agency access to Form G-845, and other forms and/or supplements as appropriate, which may be reproduced and/or computer generated without prior DHS-USCIS approval;

(8) Recover no more than its actual costs. The total estimated cost of the agreement is specified on the attached USCIS Anticipated Collections from Non-Federal Sources Addendum. The User Agency certifies that it has obligated at least the amount specified on the USCIS Anticipated Collections from Non-Federal Sources Addendum to pay for its SAVE usage. DHS-USCIS shall notify the User Agency's designated Point of Contact (POC) in writing when the amount paid plus what is owed for unpaid usage equals 80 percent of the estimated total costs. DHS-USCIS will not provide services that would result in the amount paid plus the amount owed for unpaid usage exceeding the amount specified on the USCIS Anticipated Collections from Non-Federal Sources Addendum. In this instance, DHS-USCIS will be excused from further performance of the work unless and until the User Agency's authorized official increases estimated total cost of this agreement by modification pursuant to provision VIII of this MOA;

(9) Submit invoices to the User Agency's payment office at the address specified on the USCIS Anticipated Collections from Non-Federal Sources Addendum, with a copy furnished to the POC. DHS-USCIS may submit invoices when the work is completed or as otherwise authorized. The High Level Identifier, tax identification number, and associated dollar amounts will be referenced on all invoices; and

(10) Promptly initiate year-end and closeout adjustments once final costs are known.

**B.  User Agency agrees to:**

(1) <u>System Use</u>.

(a) Provide to the SAVE Program the information the SAVE Program requires to respond to User Agency requests for verification of immigration or naturalized or derived citizenship status information, including (1) information from the registrant's immigration or DHS citizenship documentation, i.e., Alien Registration, Naturalization Certificate or Certificate of Citizenship number, for initial automated verification, (2) additional information obtained from the alien's immigration or DHS citizenship documentation for automated additional verification, and (3) completed Forms G-845 and other documents and information required for manual additional verification. Institute additional verification for any registrant whose naturalized or derived citizenship status cannot be verified after conducting the automated initial verification. If SAVE is unable

3

Rev. Ver. 08/21/2013

to verify the registrant as a naturalized or derived citizen after conducting the second step additional verification, the User Agency will contact the registrant to obtain proof of citizenship in accordance with the provisions of this MOA. For manual only verification, ensure that Forms G-845 and other documents and information required for manual verification are provided;

(b) Ensure that, prior to using VIS, all Users performing verification procedures complete SAVE required training including: reading the SAVE Program Guide, taking the latest version of Web tutorial(s) and maintaining a working knowledge of requirements contained therein and in this MOA as updated;

(c) Ensure that User Agency representatives are provided with and maintain User Ids only while they have a need to perform verification procedures;

(d) Ensure all Users performing verification procedures comply with all requirements contained in the SAVE Program Guide, web-based tutorial, and this MOA, and updates to these requirements;

(e) Ensure that all Users performing verification procedures have contact information for the SAVE Program and SAVE Monitoring and Compliance;

(f) Ensure all Users perform any additional verification procedures the SAVE Program requires and/or the registrant requests after the User Agency initiates a request for verification;

(g) Use any information provided by DHS-USCIS under this MOA solely for the purpose of determining the eligibility of persons applying for the benefit issued by the User Agency and limit use of such information in accordance with this and all other provisions of this MOA;

(h) Comply with the requirements of the Federal Information Security Management Act (FISMA (PL-107-347), Title III, Section 301) and OMB guidance as applicable to electronic storage, transport of records between agencies, and the internal processing of records received by either agency under the terms of this MOA;

(i) Safeguard such information and access methods to ensure that it is not used for any other purpose than described in this MOA and protect its confidentiality, including ensuring that it is not disclosed to any unauthorized person(s) without the prior written consent of DHS-USCIS;[1]

---

[1] Each registrant seeking access to information regarding himself/herself may do so by submitting a written signed request to DHS-USCIS. Instructions for submitting such requests may be found on the Freedom of Information/Privacy Act page of www.uscis.gov.

4

Rev. Ver. 08/21/2013

(j) Comply with the Privacy Act, 5 U.S.C. Section 552a, and other applicable laws, regulations, and policies, including but not limited to all OMB and DHS privacy guidance, in conducting verification procedures pursuant to this MOA, and in safeguarding, maintaining, and disclosing any data provided or received pursuant to the MOA;

(k) Comply with federal laws prohibiting discrimination against registrants and discriminatory use of the SAVE Program based upon the national origin, color, race, gender, religion, or disability of the registrant, including but not limited to the National Voter Registration Act, 42 U.S.C. 1973gg et seq., as amended; the Help America Vote Act, 42 U.S.C. 15301 et seq., as amended; the Voting Rights Act, 42 U.S.C. 1973 et seq., as amended; and the Civil Rights Act, 42 U.S.C. 1971, 1974, as amended;

(l) Create standardized correspondence to request that a registrant provide a Naturalization Certificate or Certificate of Citizenship to complete SAVE verification and submit that correspondence to SAVE for approval prior to use with registrants;

(m) Provide all registrants who do not verify as a citizen under the terms of the MOA with adequate written notice that their citizenship could not be verified and the information necessary to contact DHS-USCIS (see attachment 1: Fact Sheet, which is subject to revision and reposting on the SAVE Website and Online Resources) so that such individuals may obtain a copy of their Naturalization Certificate or Certificate of Citizenship or correct their records in a timely manner, if necessary;

(n) Provide all registrants who are not verified as citizens based solely or in part on the SAVE response with the opportunity to use the User Agency's existing process to appeal the denial and to contact DHS-USCIS to correct their records prior to a final decision, if necessary; and

(o) Refrain from using SAVE, or assisting any person or entity, to comply with the employment eligibility verification requirements of section 274A of the Immigration and Nationality Act, 8 U.S.C. Section 1324a.

(2) <u>Monitoring and Compliance.</u>

(a) Provide the SAVE Program and SAVE Monitoring and Compliance with the current e-mail, U.S postal service address, physical address, name and telephone number of the User Agency authorized representative for any notifications, questions or problems that may arise in connection with the User Agency's participation in SAVE and with notification of changes in the benefit offered by the User Agency;

(b) Notify the SAVE Program and SAVE Monitoring and Compliance immediately whenever there is reason to believe a violation of this MOA has occurred;

(c) Notify the SAVE Program and SAVE Monitoring and Compliance immediately whenever there is reason to believe an information breach has occurred as a result of User

5

Agency action or inaction pursuant to Office of Management and Budget (OMB) Memorandum M-07-16, "Safeguarding Against and Responding to the Breach of Personally Identifiable Information";

(d) Allow SAVE Monitoring and Compliance to monitor and review all records and documents related to the use, abuse, misuse, fraudulent use or improper use of SAVE by the User Agency, including, but not limited to original registrant consent documents required by the Privacy Act, 5 U.S.C. Section 552a or other applicable authority;

(e) Allow SAVE Monitoring and Compliance to conduct desk audits and/or site visits to review User Agency's compliance with this MOA and all other SAVE-related policy, procedures, guidance and law applicable to conducting verification and safeguarding, maintaining, and disclosing any data provided or received pursuant to this MOA;

(f) Allow SAVE Monitoring and Compliance to perform audits of User Agency's User Ids use and access, SAVE Training Records, SAVE financial records, SAVE biographical information, system profiles and usage patterns and other relevant data;

(g) Allow SAVE Monitoring and Compliance to interview any and all User Agency SAVE system users and any and all contact persons or other personnel within the User Agency regarding any and all questions or problems which may arise in connection with the User Agency's participation in SAVE;

(h) Allow SAVE Monitoring and Compliance to monitor system access and usage and to assist SAVE users as necessary to ensure compliance with the terms of this MOA and the SAVE Program requirements by its authorized agents or designees; and

(i) Take corrective measures in a timely manner to address all lawful requirements and recommendations on every written finding including but not limited to those of SAVE Monitoring and Compliance regarding waste, fraud, and abuse, and discrimination or any misuse of the system, non-compliance with the terms, conditions and safeguards of this MOA, SAVE Program procedures or other applicable law, regulation or policy.

(3) Reimbursement.

(a) Pay the transaction prices provided in the attached current standard billing rates, which along with methods of payment are subject to change upon prior written notification to the User Agency. Each year, the User Agency will obligate funds sufficient to reimburse DHS-USCIS under a current appropriation upon execution of the attached USCIS Anticipated Collections from Non-Federal Sources Addendum;

(b) Pay in full within 30 days of the invoice date. The User Agency will pay any applicable sales, use, excise, and like taxes, where required by law, that are stated on each invoice. Regardless of payment type, the User Agency will clearly indicate the High Level Identifier with remittance;

6

Rev. Ver. 08/21/2013

(c) If the User Agency pre-pays for its usage, it shall submit the entire committed amount before being allowed access to VIS; and

(d) Promptly discuss and resolve issues and questions with DHS-USCIS regarding payments. Delinquent payments shall be handled in accordance with the Debt Collection and Improvement Act of 1996, 31 U.S.C. Section 3701. Interest on all unpaid balances shall be charged at the rate of the current value of funds to the United States Treasury effective on the date of the invoice. The rate is the Treasury tax and loan rate. It is published annually or quarterly by the Secretary of the Treasury in the Federal Register and the Treasury Fiscal Requirements Manual Bulletins. Handling charges will accrue at monthly rates of $5.00 for each of the first two months of delinquency and $10.00 for each month thereafter. In addition to interest and handling charges, if DHS-USCIS does not receive payment within 90 days of the invoice, 6% per annum additional interest will be assessed. Charges will be computed from the date of the invoice and will accrue monthly with the applicable interest and handling charges. In the case of any late payment, the amount received will be applied in this sequence: (1) to any accrued penalty and handling charges: (2) to any accrued interest; and (3) to outstanding principal. Failure to make timely payment may result in termination of services.

## V. POINTS OF CONTACT.

USCIS SAVE Program MS 2620, U.S. Citizenship and Immigration Services, Department of Homeland Security, Washington, DC 20529-2620, (888) 464-4218, Attn: SAVE Operations. E-mail: SAVEregistration@dhs.gov.

USCIS SAVE Monitoring and Compliance MS 2640, U.S. Citizenship and Immigration Services, Department of Homeland Security, Washington, DC 20529-2640, (888) 464-4218. E-mail: SAVE.monitoring@dhs.gov.

USER AGENCY : Don Wright, General Counsel, N.C. State Board of Elections, P.O. Box 27255, Raleigh, N.C. 27611-7255. (919) 715-5333. don.wright@ncsbe.gov. The alternative contact would be Veronica Degraffenreid, Elections Liaison, N.C. State Board of Elections, P.O. Box 27255, Raleigh, N.C. 27611-7255. (919) 715-1830, veronica.degraffenreid@ncsbe.gov .

## VI. OTHER PROVISIONS.

(A) MOA Responsibilities. Only authorized employees, agents, or designees of DHS-USCIS and the User Agency will carry out the requirements of this MOA. In carrying out these responsibilities, they will operate within the scope of applicable regulations, specifically delegated authorities, the program authorities and funding limitations and terms and conditions of this MOA.

(B) Determining Benefit Eligibility. This MOA is limited to the provision of verification services. DHS-USCIS will verify limited citizenship and immigration status information, but will not recommend to the User Agency whether to issue the benefit. The DHS-

7

Rev. Ver. 08/21/2013

USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User Agency. The User Agency has the responsibility to determine the registrant's eligibility for the benefit.

(C) <u>Criminal Penalties</u>.

(1) DHS-USCIS reserves the right to use information from the User Agency for any purpose permitted by law, including, but not limited to, the prosecution of violations of Federal administrative or criminal law.

(2) The User Agency acknowledges that the information it receives from DHS-USCIS is governed by the Privacy Act, 5 U.S.C. Section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this MOA may be subject to criminal penalties.

(D) <u>Third Party Liability</u>.

(1) Each party to this MOA shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution and/or performance of this MOA, whether civil or criminal, and retain responsibility for the payment of any corresponding liability.

(2) Nothing in this MOA is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any third party against the United States, its agencies, officers, or employees or the User Agency.

(E) <u>Disputes</u>. Disagreements on the interpretation of the provisions of this MOA that cannot be resolved between the DHS-USCIS program office and the User Agency point of contact should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement will be elevated to the next level in accordance with DHS-USCIS procedures for final resolution.

(F) <u>Conflicts</u>. This MOA, its attachments and addenda constitute the full MOA on this subject between DHS-USCIS and the User Agency. Any inconsistency or conflict between or among the provisions of this MOA, will be resolved in the following order of precedence: (1) this MOA and (2) other documents incorporated by reference in this MOA, i.e., the USCIS Anticipated Collections from Non-Federal Sources Addendum, and standard billing rates.

(G) <u>Severability</u>. Nothing in this MOA is intended to conflict with current law or regulation or the directives of DHS, DHS-USCIS, or the User Agency. If a term of this MOA is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOA shall remain in full force and effect. In the event of a conflict that prevents either party from fulfilling its obligations,

<div align="center">8</div>

Rev. Ver. 08/21/2013

this MOA may be immediately canceled without providing the 30 day notice period referenced in Section IX.

(H) Assignment. The User Agency may not assign this MOA, nor may it assign any of its rights or obligations under this MOA. To the extent allowable by law, this MOA shall inure to the benefit of, and be binding upon, any successors to DHS-USCIS and the User Agency without restriction.

(I) Waiver. No waiver by either party of any breach of any provision of this MOA shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOA shall not be construed to be a waiver thereof.

(J) Compliance with Other Laws. Nothing in this MOA is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 42 U.S.C. 1973gg et seq., as amended; the Help America Vote Act, 42 U.S.C. 15301 et seq., as amended; the Voting Rights Act, 42 U.S.C. 1973 et seq., as amended; and the Civil Rights Act, 42 U.S.C. 1971, 1974, as amended.

## VII. EFFECTIVE DATE.

This MOA shall be effective when the DHS-USCIS authorized official and User Agency authorized official have both signed the MOA. This MOA shall continue in effect unless modified or terminated in accordance with the provisions of this MOA.

## VIII. MODIFICATION.

(A) This MOA is subject to periodic review by DHS-USCIS, its authorized agents or designees, and, if necessary, periodic modification and/or renewal to assure compliance with current law, policy, and standard operating procedure(s). This MOA and the attached USCIS Anticipated Collections from Non-Federal Sources Addendum constitute the complete MOA between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of both parties evidenced in writing and signed by both parties and appended to this agreement; and

(B) The User Agency may accomplish a unilateral administrative modification to add funds to the MOA, and either party may accomplish a unilateral administrative modification to change POC information. A written bilateral modification (i.e., agreed to and signed by authorized officials of both parties) is required to change any other term of this MOA.

## IX. TERMINATION.

Either party may terminate this MOA at any time by providing 30 days written notice of intent. DHS-USCIS, when feasible, will consult with the User Agency and attempt to

9

reconcile issues before terminating this MOA. Notwithstanding any other provision in the MOA, DHS-USCIS may suspend or terminate this MOA without prior notice if deemed necessary because of a requirement of law or policy, upon a determination by DHS-USCIS that there has been a breach of system integrity or security by the User Agency or a failure by the User Agency to comply with established procedures or legal requirements, including but not limited to failure to pay.

Written notices shall be sent to the addresses of the POCs listed herein and shall be effective upon receipt. Either party may change its POC by written notice to the other party.

The foregoing, in conjunction with the referenced and incorporated attachments, constitutes the full agreement on this subject between DHS-USCIS and the User Agency. This MOA supersedes all previous agreements governing the provision of verification services. Those agreements are explicitly acknowledged to be null and void.

The undersigned represent that they are authorized to enter into this MOA on behalf of DHS-USCIS and the User Agency, respectively.


**Alissar K. Rahi**
**Chief, SAVE Program**
**U.S. Citizenship and Immigration Services**
**Department of Homeland Security**

**Kim Strach**
**Executive Director**
**N.C. State Board of Elections**

9/10/13
**Date**

9/9/13
**Date**

10

Rev. Ver. 08/21/2013

# Post-Election Audit Report

April 21, 2017

## General Election 2016



NORTH CAROLINA
State Board *of* Elections

## BACKGROUND

The N.C. State Board of Elections (NCSBE) is an independent and bipartisan agency charged with oversight of elections in North Carolina. Advances in database technology and data quality and the formation of an in-house investigative team now allow the agency to develop audits that flag irregularities for review by investigators. These "post-election integrity audits" compare voter and election records with various government databases to identify potentially ineligible voters and irregularities, ranging from unintentional violations to intentional voter fraud and elections tampering. **[Appendix 1: Audit Descriptions]**

Conducting integrity audits requires NCSBE to walk an extremely tight line: Preserving processes that ensure broad access to the polls while preventing unlawful participation. Data cannot tell the whole story and audit results must be analyzed carefully by those who know the limitations of individual data sources. Data analysts work alongside trained investigators with prior experience in state and federal law enforcement to review cases before drawing conclusions or involving prosecutors.

State law requires our agency to investigate "frauds and irregularities in elections" and to report violations to the attorney general or district attorneys. **[Appendix 2: G.S. § 163-22(d)]**

NCSBE takes seriously its uniquely independent position to address allegations of fraud in the state through responsible, data-driven investigations. In 2015, this agency created a formal Investigations Division — one of a few of its kind in the nation — to review allegations related to elections and refer them to prosecutors when warranted by evidence.

State and federal elected officials, journalists and everyday citizens have requested information regarding cases of fraud or investigations following the 2016 elections. **[Appendix 3: Congressional Letter]**

Rather than providing information on a one-off basis, NCSBE staff prepared this report, which is intended to provide an overview of audits, findings and investigations related to the 2016 general election in North Carolina, while offering context necessary to avoid misinterpretation. Where possible, this report also provides numbers of voters who investigators are reviewing or who investigators have concluded were not eligible to participate.

Irregularities occur in small percentages in nearly every election, and North Carolina is not immune to this. Administrative error and misunderstanding should be distinguished from systemic manipulation or intentional fraud. However, NCSBE understands that whether an irregularity is administrative, unintentional or intentional, the end result is an ineligible vote that dilutes votes lawfully cast by eligible voters. ***Even assuming all ineligible ballots identified in this report were cast for the prevailing candidate, no races -- statewide or local -- would have had a different outcome than the one already certified by the state.***

**SUMMARY**

Nearly 4.8 million N.C. voters participated in the 2016 general election, the largest number in state history. It is important to recognize that suspected cases of ineligible voters casting ballots and/or committing fraud represent a tiny fraction of that number.

The following data points summarize the results of post-election audits from the 2016 general election:

- **441 open cases of voting by suspected active felons.** The State Constitution disqualifies current felons from voting until their sentence is completed, including probation or parole. Investigators were able to rule out more than 100 voters initially flagged as ineligible through the audit, further supporting the need for investigative review of data audits. These new processes are being implemented to ensure those serving felony sentences do not remain on the voter rolls and that all registrants are checked against the current felons' database at the time of registration. New processes fill gaps in the list maintenance process outlined in G.S. § 163-82.14(c).
- **41 non-citizens with legal status (green card, etc.) cast ballots.** The State Constitution only permits U.S. citizens to register and to vote. The audit pairing state and federal databases identified an additional 34 voters who provided documents showing they *are* U.S. citizens. Investigators continue to review 61 additional records.
- **24 substantiated cases of double-voting initiated through tips and data audits.** An initial audit identified a few dozen additional voter records that remain under review, though administrative errors by poll workers can lead to voter history being assigned to the wrong people; this may lead to false positives in audits that can only be detected by more detailed review.
- **Two cases of voter impersonation referred to prosecutors.** NCSBE is conducting additional review using death data and double-voting audits to identify whether additional cases should be investigated. Of the two cases referred, one involves voting by mail, and the other involves voting in person. Both involve family members voting in the place of a recently deceased loved one, forgery of the deceased voter's signature, and subsequent admissions to investigators. **[Appendix 4: Admission Letters]**
- **Irregularities affecting absentee by-mail voting in Bladen County.** The State Board voted unanimously late last year to refer an investigation into suspected criminal activity to federal prosecutors.
- **No evidence of ballot stuffing or equipment tampering.** NCSBE was among the first states to partner with the U.S. Department of Homeland Security in an effort last year to prevent cyber hacking. A separate audit of voting systems logs presented no evidence of administrative fraud, including in Durham County (where an investigation in the March primary was referred to local prosecutors).

**[Appendix 5: Breakdown of Voting Irregularities by Type, Party Affiliation of Voters]**

All numbers above are subject to change based on ultimate investigative findings.

**A provisional ballot audit resulted in 428 ballots of eligible voters being counted that would not otherwise have counted.** The audit was performed to ensure uniformity and compliance with election laws among the 100 county boards of election. **[Appendix 1: Audit Descriptions]**

## FELONS

Under G.S. § 163-275(5), it is a Class I felony "for any person convicted of a crime which excludes the person from the right of suffrage, to vote . . . without having been restored to the right of citizenship."

NCSBE initiates investigations into possible cases of felons voting through a system of data audits followed by investigator review, referrals from county boards of elections and tips from the public.

In late January 2017, NCSBE sent letters to suspected felon voters identified through data audits, notifying recipients that they may have illegally voted and that their registrations would be canceled in 30 days unless they objected in writing and presented evidence that they are not active felons. *See* G.S. §§ 163-82.14(c)(3) and 163-82.14(c) **[Appendix 6: Sample Letter to Suspected Felon Voters]**

Some suspected felons provided information showing they were not active felons (they had completed their sentences, been convicted of a misdemeanor or received a deferred prosecution, for example), and were eligible to vote. Others told investigators that they did not know they had lost their voting rights upon conviction.

Currently, 441 files of suspected felon voters remain open after an initial screening and contacts or attempted contacts with the voters.

Investigators have begun referring investigation reports regarding felons to local prosecutors. To date, 16 substantiated cases from the 2016 general election have been referred to district attorneys. The remaining 425 are expected to be referred when investigations are complete. Under state law, felon voting is a strict liability offense, and thus a felon may be convicted of a crime even if he or she does not know that voting while serving an active sentence is wrongful.

Updated voter lists help prevent individuals from unintentional violations. An individual may, for instance, legally register to vote before becoming a felon and then appear at the polls while on probation. Such a person may not understand they are ineligible. NCSBE has reexamined its registration and list maintenance processes and is taking significant steps to discourage unlawful participation by current felons. NCSBE's efforts include:

- **Working with public safety officials and the court system to ensure that convicted felons are expressly notified that they lose their voting rights upon conviction**, and regain them only after completing their sentence, including probation and parole. Certain suspects claimed they were never informed of the restriction. An initial review of associated plea agreements and contact with probation personnel indicate there is room to improve education around voting rights. **[Appendix 7: Letter to DPS/AOC on Felons]**
- **Increasing data-sharing between local election officials to ensure a felon removed in one county does not re-register in another county, unless his or her sentence is complete.** Though the past system followed the requirements of G.S. § 163-82.14(c), a gap in the legacy voting data system may have allowed some active felons to register or to re-register without being detected. **Additional felons who did not vote in the general election were recently removed from the voter rolls, closing that gap.** These removals followed the notice sent to felons by mail and waiting period required under state law. Fixing the gap and educating affected voters will reduce the opportunity for unintentional violations. It also will improve the likelihood of successful prosecutions against willful offenders.
- **Updating elections software to check felon status at the time of registration.** The improved system is being coded and will roll out statewide this summer, substantially improving the maintenance efforts through current technologies and new data-sharing relationships.
- **Adding checkboxes to voter forms to ensure participants are aware of voter qualifications**, including the restriction on current felons. **[Appendix 8: New Voter Forms]**
- **Educating the public about voting requirements** through NCSBE website, outreach events, news releases, social media and other means.

---

## NON-CITIZENS

The N.C. Constitution allows only U.S.-born and naturalized citizens to register and vote. It is unlawful for a non-citizen to register or vote in a state or federal election.

A separate post-election audit and post-audit investigation using state and federal databases identified non-U.S. citizens suspected of casting ballots in the general election. Upon receipt of a letter from NCSBE, 41 of these individuals acknowledged they were not U.S. citizens. **[Appendix 9: Sample Letter to Possible Non-U.S. Citizen Voters].** The investigation into these cases, including interviewing voters, is ongoing.

All cases involve documented non-citizens who were admitted into the country lawfully. All individuals subject to this audit were matched to the Department of Homeland Security's database using information obtained from the N.C. Division of Motor Vehicles (DMV).

NCSBE research shows the 41 non-citizen voters originally came from 28 different countries. **[Appendix 10: Breakdown of Non-U.S. Citizen Voters by Country of Origin]**

This audit, detailed in Appendix 1, identified 61 additional voters who did not respond to the letter, and investigations into those cases continue as well. And 34 voters, tagged by the same audit, subsequently provided proof of citizenship, highlighting the fact that data matches alone are not sufficient to verify citizenship or to take action against the voters without follow-up investigations.

Information obtained from those who are not citizens illustrates the complexity of this work. A number of non-citizens said they were not aware that they were prohibited from voting. Interviews and evidence show that some non-citizens were misinformed about the law by individuals conducting voter registration drives or, in at least one documented case, by a local precinct official. One registrant in her 70s has lived in the United States for more than 50 years and believed that she was a citizen because she had been married to a U.S. citizen.

Investigations on non-citizen cases also have revealed the complexities of immigration law and citizenship status. For instance, some individuals achieve citizenship as a matter of law through "derived citizenship" as the child of a naturalized citizen, though paperwork showing that changed status is only available if requested and official databases may not reflect the correct status. An Application for Certificate of Citizenship costs $1,170. Individual contact with affected registrants has also illustrated the limitations of the data. Even where data from the Division of Motor Vehicles, the U.S. Department of Homeland Security and the voter rolls matched exactly, a high proportion of flagged individuals were citizens. **[Appendix 1: Audit Descriptions].** For this reason, it is important to take a case-by-case approach to these matters.

As with felons, education and understanding of state law appear to be the primary problem. Consequently, warnings on voter registration forms and voting documents are being reviewed to improve their effectiveness. **[Appendix 8: Revised Voter Forms]**. NCSBE is working with the Division of Motor Vehicles to more clearly indicate that registrants must be U.S. citizens. Additionally, NCSBE is developing additional poll worker training to address the nuances with terms like "permanent resident" and "green card" so that poll workers are better equipped to assist voters who are uncertain about their eligibility.

## DOUBLE VOTERS & IMPERSONATION

So-called double voters violate state and federal law by voting more than one time in a single election. A suspect may do so by voting multiple times within the same jurisdiction or in different jurisdictions. NCSBE is currently investigating 24 substantiated cases of double-voting from the 2016 general election.

North Carolina maintains a strong system that checks for this behavior throughout voting, whether through the mail, at early voting locations, or in the precinct on Election Day. However, variations in voter information or human error can allow a double voter to go undetected until more nuanced investigation is performed. Some violators appear to be "testers" trying to find holes in the system. Others claim their property ownership in multiple jurisdictions should allow them to vote in each, and others brush past the law to support their candidate by any means necessary. Additionally, a case that initially appears to be a double voter — an individual who votes twice — may actually be a case of voter impersonation — an individual who casts a ballot using the identity of another person.

Detecting double voting and voter impersonation is a time-intensive process. Database matching is not enough, as administrative errors can lead to voter history being assigned to the wrong person — such as when a poll worker checks off the wrong name on the poll book. Instead, data is only the starting point for cases that ultimately involve live interviews and signature analyses. NCSBE has begun that process on possible in-state double voting cases in 2016. This initial review of NC voter registration records indicates that there are a few dozen possible additional cases of double voting; however, this process is still in its preliminary stages and staff have not yet completed review of voter documents to determine whether the match was due to administrative error rather than illegal voting.

NCSBE rarely encounters verified cases of voter impersonation, though two cases are being referred to prosecutors from the election last fall. In one instance, a widow voted by mail after allegedly forging her husband's signature in the presence of relatives. In the second instance, a daughter allegedly presented in person to vote in the name of her deceased mother. The suspects in each case indicated that they were motivated out of a desire to carry out their loved one's voting wishes. **[Appendix 4: Admission Letters]**. NCSBE is conducting additional audits using state and federal death databases and screening algorithms to review 19 cases in which records indicate a date of death earlier than the date on which records indicate that person voted. An initial review of the voter registration documents indicates that a number of these are likely cases of mistaken identity rather than voter fraud where, for example, the death record was for a "John Smith Sr." and the voter record was for a "John Smith Jr."

While no audit exists to catch all possible cases of voter impersonation, double voter and deceased voter audits may detect such cases. State law puts additional deterrents in place. They include requiring identification documents from (1) voters whose information cannot be verified or who wish to register and vote on the same day during the early voting period, (2) requiring voters to state their name and address, and (3) requiring

two witness signatures or a notarial certificate on absentee return envelopes.[1]

Also, since 2014, NCSBE has used data from the Interstate Crosscheck Program as a tool to help identify voters who vote in more than one state in the same election. Administered by the Kansas Secretary of State's office, the program identifies possible duplicate registrations among states and provides evidence of possible double voting. NCSBE recently received the program's data for 2016 and will examine it in the coming months.

---

## NEXT STEPS

NCSBE continues to investigate voting irregularities from the 2016 general election and will refer cases to prosecutors where appropriate. Findings from post-election audits and subsequent investigations allow NCSBE to pinpoint which policies are best suited to improving electoral integrity in the state. For example, because this agency knows that many irregularities occurred because of a lack of information and education, we know to direct our efforts to better educating registrants and those who help citizens register to vote. This agency stands ready to help policymakers, advocacy organizations, media representatives, and the general public understand the topic of voting irregularities and provide information that will help them draw accurate and appropriate conclusions.

This agency strongly cautions readers not to refer to each of these cases as "voter fraud." As stated earlier, "ineligible voters casting ballots" may be the result of unintentional or intentional conduct. Fraud, in most cases, is an intent crime that requires prosecutors to show that the voter knowingly committed a crime.

***The evidence suggests that participation by ineligible voters is neither rampant nor non-existent in North Carolina. Our audits suggest that in the 2016 general election, approximately 0.01% of ballots were cast by ineligible voters. Most incidents are isolated and uncoordinated, and detecting technical violations does not always prove purposefully unlawful conduct. Our work indicates that ineligible voters are not isolated to one political party or any geographical region of the state.***

When people do vote unlawfully, either out of ignorance or to perpetrate a fraud, NCSBE now has procedures in place to detect and investigate those incidents and refer potential criminal cases to prosecutors where warranted. North Carolina has made tremendous advances in data analysis and investigation tactics, and NCSBE remains committed to improving elections administration responsibly by integrating new data streams into its processes, where appropriate. The report reflects our agency's commitment to public transparency, the rule of law, and our mission to promote access to the polls and the vigilance necessary to preserve the credibility of electoral outcomes.

---

[1] A federal court enjoined additional identification and registration requirements under S.L. 2013-381 on July 29, 2016.



# APPENDIX 1

## Audit Descriptions

### Overview

The following audits are designed to ensure election integrity by maintaining accurate voter rolls and proper oversight of election processes. Audits take various forms and are crafted to identify data anomalies that could indicate potential issues or problems, while supporting the N.C. State Board of Elections' goal of uniformity and compliance across 100 counties.

The audits have detected instances in which ineligible voters are suspected of casting ballots in the 2016 general election. NCSBE has developed a thorough process to investigate these cases and, when warranted, refer them to prosecutors across the state to consider criminal charges. NCSBE understands that some of these cases will be prosecuted and others will not, based on the unique circumstances of each case.

It is important to note that data used to identify suspected ineligible voters, like all data, is not perfect and matches require further analysis and investigation. This agency has taken great care to ensure that no one is publicly accused of any crime or referred to prosecutors without evidence that a crime was committed and that referral for prosecution is warranted.

### Felon Audit

Under state law, it is a Class I felony "for any person convicted of a crime which excludes the person from the right of suffrage, to vote . . . without having been restored to the right of citizenship."

After an election, the N.C. State Board of Elections checks the state's voter registration database against a list of current felons from the N.C. Department of Public Safety. This analysis cross-checks dates of birth and driver's license numbers between the two databases. When a match occurs, NCSBE reviews voting history to determine whether the individual may have cast a vote while serving a felony sentence.

If an active felon appears to have voted, NCSBE investigators then refer to an additional criminal records database, the Criminal Justice Law Enforcement Automated Data Services (CJLEADS), for further verification. The resulting matches from this second check may then be followed up with interviews, mailings and other traditional investigative methods.

If a current felon appears to be improperly registered, county boards of elections may proceed to remove the registration following notice and hearing, if requested, as required by state law.

### Non-U.S. Citizen Audit

The N.C. Constitution allows only U.S.-born and naturalized citizens to register and vote, and it is unlawful for a non-citizen to vote in a state or federal election. To identify non-U.S. citizens who may have cast ballots, NCSBE first checks voter records against N.C. Division of Motor Vehicles (DMV) data, which indicates whether a customer's driver's license contains a restriction code related to their non-citizen status. Other DMV tables are then cross referenced to determine if evidence of citizenship was provided in a subsequent visit to the DMV.



The resulting matches are run through the U.S. Department of Homeland Security's Systematic Alien Verification for Entitlements Program (SAVE) database, an information service for agencies to verify an individual's immigration status.

NCSBE has determined based on past experience that a match with the SAVE database is not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE.

Also, due to timing issues and the fact that DMV data is generally updated only when licenses are issued, DMV data alone is not reliable for this purpose either.  **In fact, voters who appear to be non-citizens based on DMV data were confirmed to be U.S. citizens in the SAVE database 97.6 percent of the time.**

If SAVE indicates a voter is a non-citizen, NCSBE opens a case file and attempts to contact the voter to determine citizenship status through mailings and interviews.  Because of the unreliability of citizenship data, voters who appear to be non-citizens — where both data sources indicate non-citizenship status — are not removed from the rolls, absent independent confirmation that they are not citizens.  In fact, approximately three-quarters of those who subsequently provide proof of U.S. citizenship continued to appear as non-citizens in the SAVE database.

**Manual Entry Audit**

County election officials occasionally must enter election results by hand directly into the vote tabulation software. This may occur, for example, due to a media card failure.  This audit can catch inadvertent mistakes in transcribing numbers, as well as purposeful manipulation of data. After the 2016 election, the NCSBE identified all manual entries that occurred in November across the state. Data analysts then reached out to the counties to identify the reasons for the manual entries. NCSBE determined all manually entries were done for valid purposes.  In the future, manual entry audits will include an automated process able to detect transcription errors in real time as results are entered by hand. This change, still under development, will help ensure the accuracy of manual entries made in future elections.

**Voter History Audit**

When voters check in at polling places, they fill out authorization to vote (ATV) forms or one-stop applications during early voting. This results in a voter history record for each individual. When ballots are run through tabulators, tabulation software provides election return data that identifies the number of ballots cast. This audit compares the number of ATV forms and one-stop applications with the number of physical ballots cast. Those two numbers should generally match, but may be *slightly* off for valid reasons, such as if a voter checks in and then decides not to vote.

This audit is designed to identify certain problems or fraud, such as ballot stuffing, fraudulent manual entries, tampering with media cards or certain ballot coding issues.

**Provisional Ballot Audit**

Voters cast provisional ballots when questions arise about their qualifications or eligibility to vote in certain contests. Those ballots are held aside pending research by county boards of elections as to whether they should be counted.



This audit is aimed at ensuring all 100 counties make uniform decisions that comply with election laws when counting provisional ballots. It compares provisional voter data to several data sources, including the DMV database, an incomplete queue that catalogs registration attempts that were deemed incomplete and the current registration database as of Election Day. Data analysts execute matching algorithms to determine whether provisional voters were eligible vote in the counties where they presented to vote. Additionally, two web services are used to geocode the voters' addresses to confirm that they resided in the county at the time they voted. Audit results are sent to county boards of elections, which analyze them and, where appropriate, amend their canvasses to reflect any changes.

For the 2016 general election, this audit resulted in 428 voters statewide whose provisional ballots were counted in accordance with current election law. Those ballots wouldn't have been counted otherwise.



# APPENDIX 2

## G.S. § 163-22(d)

**G.S. § 163-22.  Powers and duties of State Board of Elections.**

. . . .

 (d) The State Board of Elections shall investigate when necessary or advisable, the administration of election laws, frauds and irregularities in elections in any county and municipality and special district, and shall report violations of the election laws to the Attorney General or district attorney or prosecutor of the district for further investigation and prosecution.


Post-Election Audit Report
NORTH CAROLINA
State Board *of* Elections

# APPENDIX 3

## Congressional Letter

### Congress of the United States
#### Washington, DC 20515

January 25, 2017

The Honorable Kim Westbrook Strach
Executive Director
State Board of Elections
P.O. Box 27255
Raleigh, NC 27611

The Honorable Josh Stein
North Carolina Attorney General
Attorney General's Office
9001 Mail Service Center
Raleigh, NC 27699-9001

Dear Executive Director Strach and Attorney General Stein:

Thank you for your service in the critical work of helping ensure that elections across the country are free, fair, and administered in a way that upholds the fundamental tenets of the United States Constitution. We are writing given recent claims of voter fraud and its potential impact on our nation's elections. To investigate these claims, we are seeking information regarding confirmed incidents of voter fraud.

To assist in our inquiry, we request that you provide a list of all specific cases in which either of your offices has determined that an individual who cast a vote in the federal elections held in November 2016 was legally prohibited from doing so. For each specific case, please include the following information:

1) the identity of the individual who cast the prohibited vote;
2) the date on which the prohibited vote took place;
3) the polling place where the prohibited vote occurred;
4) the specific legal reason the individual's vote was prohibited; and
5) the result of the individual's prosecution, if any.

Please include in this list all cases in which the state has determined that a prohibited vote was cast, regardless of whether a prosecution was initiated or concluded. Please feel free to provide joint or separate responses.

We request this information by February 22, 2017. Please contact Karen Kudelko of Ranking Member Cummings' staff at (202) 225-5051, Khalil Abboud with Ranking Member Brady's staff at (202) 225-2061, or Amy Miller Pfeiffer with Assistant Democratic Leader Clyburn's staff at (202) 226-3210 with any questions.

PRINTED ON RECYCLED PAPER



The Honorable Kim Westbrook Strach
The Honorable Josh Stein
Page 2

Sincerely,

Elijah E. Cummings
Ranking Member
Committee on Oversight and
Government Reform

Robert A. Brady
Ranking Member
Committee on House
Administration

James E. Clyburn
Assistant Democratic
Leader

cc:    The Honorable Jason Chaffetz
Chairman, House Committee on Oversight and Government Reform

The Honorable Gregg Harper
Chairman, Committee on House Administration



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

# APPENDIX 4.1

## Admission Letter (Case 1)

**From:**
**Sent:** Friday, February 03, 2017 10:11 AM
**To:**
**Subject:**

I, ▇▇▇▇▇▇ personally completed both ballots.

**From:** ▇▇▇▇▇▇▇▇▇▇▇@ncsbe.gov>
**To:**
**Sent:** Friday, February 3, 2017 10:02 AM
**Subject:** RE: ▇▇▇▇

Both Ballots

**From:**
**Sent:** Friday, February 03, 2017 10:01 AM
**To:** ▇▇▇▇▇▇▇▇▇@ncsbe.gov>
**Subject:** Re: ▇▇▇▇

I, ▇▇▇▇▇▇ wife of ▇▇▇▇▇▇, marked the ballot.

**From:** ▇▇▇▇▇▇▇▇@ncsbe.gov>
**To:**
**Sent:** Friday, February 3, 2017 9:48 AM
**Subject:** RE: ▇▇▇▇

▇▇▇▇,

On the first ballot that was done at the hospital who marked the ballot?
On the second ballot that was retrieve from the trash who marked that ballot?

▇▇▇▇

**From:**
**Sent:** Thursday, February 02, 2017 9:10 PM
**To:** ▇▇▇▇▇▇▇▇@ncsbe.gov>
**Subject:** Re:

Entered your email address incorrectly!

**From:**
**To:** ▇▇▇▇@nbsbe.gov" ▇▇▇▇@nbsbe.gov>
**Sent:** Thursday, February 2, 2017 12:15 PM
**Subject:**

1

Thank you for this opportunity to clarify the absentee ballot of my late husband, ███████████ I apologize for my misunderstanding of the process.

My husband was hospitalized Sept 11, 2015. Because of the seriousness of his condition, my brother, ████████████████████████████████ suggested we apply for absentee ballots, just in case he wasn't home in time to vote. We had always voted in person and were not even aware this was a possibility. Since I was basically living in ███ hospital room at ████ I asked ████ to request the absentee ballots for us. By the time the ballots arrived, my husband's condition had further deteriorated, but his desire to vote had not diminished. With family at his bedside, we witnessed his nod to vote (Republican) and signed to that effect. It was my misunderstanding of the written directions that left his signature line blank. I did not make a copy of our ballots, so I cannot look back to see what I misunderstood, but we left it unsigned on purpose, thinking our witness of his will and intent was sufficient. I took our ballots to the post office to be sure the proper postage was affixed, and the ballots were mailed.

After my husband died, another ballot arrived at our home, which I thought strange, but just a mistake, since our ballots had already been mailed. I discarded the ballot to the recycling bin. Then I received several reminders to be sure to complete and return the ballot. When I mentioned this to my brother, he advised me to call the Board of Elections in ████████ County. I was told that my ballot had been received, but that my husband's ballot was unsigned and another had been sent for his signature. Using a flashlight, my brother and I retrieved the discarded ballot out of the recycling bin on the curb. The next day, I completed the ballot on my husband's behalf, according to his wishes, and signed his name. I thought that was what I was supposed to do. I was not trying to be deceitful or fraudulent, as I thought I had authority to sign his signature as his wife, and as executor of his estate. I even drove to the Board of Elections and delivered it in person, explaining that it was to clarify the first ballot.

I am glad to know that voter fraud is being diligently investigated. I am very distressed that my ignorance, but good intentions, have caused such a problem. Maybe in less stressful circumstances I would not have made this mistake. I respectfully request that you consider these facts, and our history as reputable, law-abiding citizens.

████████████

2



Post-Election Audit Report
NORTH CAROLINA
State Board *of* Elections

**From:**
**Sent:**     Wednesday, February 08, 2017 11:00 AM
**To:**
**Subject:**

Hi Mr. ████, good morning. Thank you for your call and condolences today regarding my blood sister ████ and her late husband (my brother-in-law) ████. When ████ was first hospitalized at ██ and ████ was staying with him full-time, I suggested they apply for absentee ballots. Several times in the past while my children were off at college I had requested absentee ballots to be sent to my two sons and daughter to be sure they had the opportunity to vote. ████ called and asked me to request both ballots for them because she was at the hospital ████ and did not have her computer nor a convenient way to request the ballots. Both expected to be back home in time to vote on election day but to be sure they wanted to get their absentee ballot submitted in case they were unable to be home. I spoke (by phone and visits) numerous times with ████ about politics and he was very excited about the upcoming election. Unfortunately, while be treated and making progress in his recovery, he suddenly suffered some critical setbacks and unexpectedly passed away. With best regards, ████

1



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

# APPENDIX 4.2

## Admission Letter (Case 2)

**From:**
**Sent:** Friday, February 03, 2017 3:26 PM
**To:**
**Subject:** Re: NCSBE Case #

My phone number is

Sent from my iPhone

On Feb 3, 2017, at 1:47 PM, @ncsbe.gov> wrote:

I am very sorry for your loss.
Thank you for your cooperation in this matter.
Please forward a telephone number if we have to contact you.
If you have any additional question please feel free to contact me.
Thank you

/Investigator
North Carolina State Board of Elections
441 N. Harrington Street
Post Office Box 27255
Raleigh, NC 27611
office | 919.715.0135 fax
www.ncsbe.gov

<image002.png>

**From:**
**Sent:** Friday, February 03, 2017 11:16 AM
**To:** @ncsbe.gov>
**Subject:** NCSBE Case #

My mother          at 89 was a tremendous Donald Trump fan. She donated to his campaign, watched all his debates and news involving his campaign on Fox news. She was so excited about voting for him and at every opportunity told everyone else to vote for him to save our country.

1



My mother had AFIB which would cause her heart rate and blood pressure to rise to dangerous levels with the risk of stroke. I had printed out a State Absentee Ballot Request Form on Saturday, October 22, 2016 and told her to fill it out and mail it in so that she could vote in the event she was unable to go and cast her vote. She said, "ok and if anything happens you have my power of attorney and you be sure to vote for Donald Trump for me". The following day she had a massive stroke and passed away on October 26. 2016.

This was devastating to me because my dad, brother and sister were deceased and I was the only one left in my family. As election day approached, all I could hear were her words "if anything happens you have my power of attorney and you be sure to vote for Donald Trump for me"! On November 3rd I took a copy of the power of attorney, which no one asked for, and honored her request and voted on her behalf. It was the last thing I could do for her and I felt excited to do that for her.

My mother was alive during the absentee period and if she had received the ballot in time she would have been able to vote. Please understand that my actions were in no way intended to be fraudulent but were done during my grief and an effort to honor my mothers last request and I knew that one vote from this 89 year old lady would not affect the outcome of the election anyway.

2



**RECEIVED**

MAR 27 2017

STATE BOARD OF ELECTIONS

DAVID LEARNER
DISTRICT ATTORNEY

*State of North Carolina*
*General Court of Justice*
*Twenty-Fifth Prosecutorial District*

CATAWBA COUNTY JUSTICE CENTER
P.O. BOX 566
NEWTON, NC 28658
(828) 695-6110
(828-695-6111 FAX

Investigator ▮▮▮▮▮▮▮
NC State Board of Elections
PO Box 27255
Raleigh, NC 27611-7255

Re:    NCSBE Case number: 2016-165

Dear Investigator ▮▮▮▮,

The 25ᵗʰ Prosecutorial District will decline to prosecute the above referenced case, taking all facts and evidence into consideration along with the lack of criminal history for Ms. ▮▮▮▮.

Ms. ▮▮▮▮ voted for her mother believing that her power of attorney and honoring her mother's dying wish was not a fraudulent act. Her mother was alive during the absentee period and if she had received the ballot in time she would have been able to legitimately cast her vote. Ms. ▮▮▮▮ actions were done during a time of grief and mourning and in an effort to honor her mother's dying wish.

The 25ᵗʰ Prosecutorial District believes it to be in the best interest of justice to decline prosecution of NCSBE Case Number 2016-165. If you have any questions or need additional information, please don't hesitate to contact me.

Sincerely,

Stacey London, MPA
Administrative Assistant
25ᵗʰ Prosecutorial District
828-695-6196



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

# APPENDIX 5

## Breakdown of Voting Irregularities by Type, Party Affiliation of Voter

| Party Affiliation | Double Voter | % | Felons | % | NonCitizens | % | Voter Impersonation | % | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Democrat | 14 | 58% | 292 | 66% | 20 | 49% | | 0% | 326 | 54% |
| Libertarian | | 0% | 4 | 1% | | 0% | | 0% | 4 | 1% |
| Republican | 5 | 21% | 73 | 17% | 11 | 27% | 2 | 100% | 91 | 15% |
| Unafiliated | 5 | 21% | 72 | 16% | 10 | 24% | | 0% | 87 | 14% |
| **Total** | **24** | **100%** | **441** | **100%** | **41** | **100%** | **2** | **100%** | **508** | **100%** |

\*      The above reflects affiliation as of Election Day 2016
\*\*   On Election Day 2016, statewide registration by party as follows:
     Democrat (39.5%), Republican (30.2%), Libertarian (0.4%), and Unaffiliated (29.9%)



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

| County | Double Voter* | Felons | Non-Citizens | Voter Imperson-ation | Total |
|---|---|---|---|---|---|
| ALAMANCE | 2 | 13 | | | 15 |
| ALLEGHANY | | | 1 | | 1 |
| ANSON | | 2 | | | 2 |
| ASHE | | 1 | | | 1 |
| BEAUFORT | | 7 | 1 | | 8 |
| BERTIE | | 1 | | | 1 |
| BLADEN | | 1 | | | 1 |
| BRUNSWICK | | 3 | | | 3 |
| BUNCOMBE | | 7 | 1 | | 8 |
| CABARRUS | | 6 | 2 | | 8 |
| CALDWELL | 1 | 6 | | | 7 |
| CARTERET | | 5 | | 1 | 6 |
| CASWELL | | 2 | | | 2 |
| CATAWBA | 1 | 4 | | 1 | 6 |
| CHATHAM | | 2 | | | 2 |
| CHEROKEE | | 1 | | | 1 |
| CLAY | 2 | 1 | | | 3 |
| CLEVELAND | | 5 | | | 5 |
| COLUMBUS | | 2 | 1 | | 3 |
| CRAVEN | 1 | 10 | 1 | | 12 |
| CUMBERLAND | 1 | 20 | 3 | | 24 |
| CURRITUCK | 1 | 1 | | | 2 |
| DAVIDSON | | 4 | 1 | | 5 |
| DAVIE | | 1 | | | 1 |
| DUPLIN | | 3 | | | 3 |
| DURHAM | 1 | 30 | 3 | | 34 |
| EDGECOMBE | | 8 | | | 8 |
| FORSYTH | | 20 | 2 | | 22 |
| FRANKLIN | | 2 | | | 2 |
| GASTON | | 11 | 1 | | 12 |
| GATES | | 1 | | | 1 |
| GRANVILLE | | 2 | | | 2 |
| GREENE | | 1 | | | 1 |
| GUILFORD | 6 | 49 | 8 | | 63 |
| HALIFAX | | 9 | | | 9 |
| HARNETT | | 4 | | | 4 |
| HAYWOOD | | 2 | | | 2 |
| HENDERSON | 1 | | | | 1 |
| HERTFORD | | 3 | | | 3 |
| HOKE | | 5 | 2 | | 7 |
| JOHNSTON | | 8 | 1 | | 9 |
| JONES | | 3 | | | 3 |
| LENOIR | | 2 | | | 2 |
| LINCOLN | | 1 | | | 1 |



Post-Election Audit Report
NORTH CAROLINA
State Board *of* Elections

| | | | | | |
|---|---|---|---|---|---|
| MCDOWELL | | 1 | | | 1 |
| MECKLENBURG | | 14 | 1 | | 15 |
| MONTGOMERY | | 3 | | | 3 |
| MOORE | 1 | 5 | | | 6 |
| NASH | | 4 | 1 | | 5 |
| NEW HANOVER | | 16 | 1 | | 17 |
| ONSLOW | | 1 | | | 1 |
| ORANGE | 1 | 1 | | | 2 |
| PAMLICO | | 5 | | | 5 |
| PASQUOTANK | | 2 | | | 2 |
| PENDER | | 6 | 1 | | 7 |
| PERSON | | 3 | | | 3 |
| PITT | | 13 | | | 13 |
| POLK | | 1 | | | 1 |
| RANDOLPH | | 6 | 1 | | 7 |
| RICHMOND | 1 | | | | 1 |
| ROBESON | | 5 | | | 5 |
| ROCKINGHAM | | 6 | | | 6 |
| ROWAN | | 3 | | | 3 |
| RUTHERFORD | | 2 | | | 2 |
| SAMPSON | | 3 | | | 3 |
| SCOTLAND | | 5 | | | 5 |
| STANLY | | 2 | | | 2 |
| STOKES | | 2 | | | 2 |
| SURRY | | 3 | 1 | | 4 |
| UNION | | 7 | 2 | | 9 |
| VANCE | | 2 | | | 2 |
| WAKE | 1 | 32 | 3 | | 36 |
| WARREN | 1 | 3 | | | 4 |
| WAYNE | 3 | 12 | | | 15 |
| WILKES | 1 | | | | 1 |
| WILSON | | 4 | 2 | | 6 |
| **Grand Total** | **26 records (24 voters)** | **441** | **41** | **2** | **510 records (508 voters)** |

\* Two suspected double voters are assigned to two different registration records, each from a different county.



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

# APPENDIX 6

## Letter to Suspected Felon Voters



*Mailing Address:*
P.O. Box 27255
Raleigh, NC 27611-7255

Phone: (919) 733-7173
Fax: (919) 715-0135

**KIM WESTBROOK STRACH**
*Executive Director*

[Date]

**TO:**    [Voter Name]
[Mailing Address]
[Mailing City, State, ZIP]

**RE:**    NOTICE OF REMOVAL DUE TO FELONY CONVICTION;

This office has received felony conviction records indicating that you are currently an active felon and that as such, you may have illegally voted in [County] in the November 8, 2016 General Election.

Persons who are currently serving a sentence for a felony conviction are not qualified to vote in North Carolina. Active felons include persons serving prison time or those on probation or parole for a felony conviction and who have not completed all aspects of their sentence, including completion of any period of parole or probation. It is a felony to vote if you are not qualified to do so. By this letter, please be notified that: **If not already cancelled, as a convicted felon, your current voter registration in [County] will be cancelled in 30 days.**

If you disagree with the finding that you are an active felon and you object to the removal of your name from the list of registered voters, you must **object in writing within 30 days of this notice**. If you object, the chairman of the County Board of Elections will enter a challenge to your voter registration. You will then be notified to appear at a challenge hearing. The above referenced notice and other relevant records received by our office of your felony conviction will be introduced as evidence at the hearing.

If you are in a *deferred prosecution* status for a felony, please contact our office immediately and provide us with these details, including the name and telephone number of your current probation officer and the attorney who represented you. Persons who are on *deferred prosecution* may not be subject to removal and may avoid removal from the voter registration rolls.

As a convicted felon, your rights of citizenship are restored automatically under the provisions of North Carolina General Statute § 13-1 only upon discharge from your felony sentence, including periods of probation or parole, or a full pardon. At that time, provided that you are under no other active felony convictions, you will be qualified to vote. Upon completion of your sentence, you must submit a **new voter registration form** to the County Board of Elections office where you reside.

Again, if you believe that the information contained in this letter concerning your voter eligibility and/or voting activity is incorrect, you must object in writing to this office **within 30 days of this notice**. Please mail your written objection and any documentation to the attention of NCSBE Investigator Matthew Martucci at P.O. Box 27255, Raleigh, NC 27611-7255. It is also recommended that you contact Investigator Martucci at (919) 715-1827.

Thank you for your prompt attention to this matter.

*6400 Mail Service Center ▪ Raleigh, NC 27699-6400*
*441 N. Harrington Street ▪ Raleigh, NC 27611-7255*



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

# APPENDIX 7

## Letter to DPS/AOC on Felons



*Mailing Address*:
P.O. Box 27255
Raleigh, NC 27611-7255

Phone: (919) 733-7173
Fax: (919) 715-0135

March 3, 2017

*VIA E-MAIL*

The Honorable Erik A. Hooks
Secretary, Department of Public Safety
erik.hooks@nccrimecontrol.org

The Honorable Marion R. Warren
Director, Administrative Office of the Courts
marion.r.warren@nccourts.org

Re:  <u>Uniform notice to felons regarding voting rights in North Carolina.</u>

Dear Secretary Hooks and Judge Warren:

As you are each aware, the State Board of Elections maintains a statewide voter registration system used by election officials across North Carolina. In recent years, data-sharing relationships among states and with federal agencies have enhanced our efforts to ensure the integrity of the voter rolls, including the removal of voters who have become ineligible due to felony conviction. We are presently engaged in a comprehensive audit of the agency's list maintenance process surrounding felons on the rolls, and I am encouraged by the plan set in motion two weeks ago by technical staff from our three agencies and the Government Data Analytics Center. Thank you for sharing in our mission to ensure the integrity of elections.

Beyond the promising future in our data-sharing relationship, I want to make you aware that the State Board's in-house investigations staff have become aware that the information provided to felons serving active sentences does not appear to be standard and often excludes references to the loss of voting rights. This issue arises at the referral phase of our investigations, when some district attorneys express understandable concern that a felon who has voted may not have been aware of the unlawfulness of his actions. Although individuals are required to affirm that they are not serving an active felony sentence both when registering and presenting to vote, we have received feedback that not all voters read this language prior to signing. Establishing that the subject of an investigation may have knowingly and willfully violated N.C. election laws prohibiting felons from voting will support successful prosecutions.

We are in the process of finalizing an investigation into a number of felons suspected of voting unlawfully in the 2016 general election, and it is my hope that we can take proactive steps to ensure notice is provided to felons that they are not eligible to vote in North Carolina until they have completed their sentences, including probation. Educating active felons about the law could help reduce the volume of infractions, while making prosecution of willful offenders easier for our state's dedicated district attorneys. It would also align with G.S. § 163-82.20A, which requires

*441 N. Harrington Street ▪ Raleigh, NC 27601-7255*


that our agencies create programs and procedures to inform felons about the restoration of their voting rights.  Among other suggestions, we are seeking improvements and additions to passive methods of informing felons of their voting ineligibility, such as the use of informational pamphlets and verbal warnings, to more active written warnings that are presented to felons orally and in writing and which are then signed by the felon acknowledging their understanding.

If you are willing, I would like to arrange a conference call between appropriate personnel at our agencies for the week of March 20th.  Thank you for your consideration, and I look forward to our continued coordination on behalf of the voters of this State.


Sincerely,

Kim Westbrook Strach
Executive Director, State Board of Elections



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

# APPENDIX 8

## Revised Voter Forms

---

**AUTHORIZATION TO VOTE FORM**
North Carolina

ATV # _____

VR PARTY _____    PRIMARY PARTY _____

**FRAUDULENTLY OR FALSELY COMPLETING THIS FORM IS A CLASS I FELONY UNDER CHAPTER 163 OF THE NC GENERAL STATUTES.**

**A**   **Voter's Certification of Voting Qualifications**

If ID required, check the type of current ID shown:

AGE _____

VEN: _____

- ☐ Photo ID     ☐ Government Check
- ☐ Bank Statement     ☐ Paycheck
- ☐ Utility Bill     ☐ Other Government Doc

Registration Date: _____

ELECTION: _____
PCT: _____
VTD: _____

I, **[INSERT VOTER NAME]**, certify that:

- ☐ I am a registered voter in this county and I shall have resided at the address noted above for **30 days** immediately prior to this election.
- ☐ I am a United States Citizen.
- ☐ I am at least 18 years of age, or will be by the date of the general election.
- ☐ *For partisan primary elections ONLY:* I am registered **[PARTY NAME]** and I will receive a **[PRIMARY PARTY]** ballot.
- ☐ I understand that it is a felony to vote more than one time in an election.
- ☐ I have not been convicted of a felony, or if I have been convicted of a felony, I have completed my sentence, including any probation or parole.

**X** _____      _____
SIGNATURE OF VOTER          OFFICIAL'S INITIALS

**B**   **Election Day Transfer** (Use this section to send a voter from their old polling place to their new polling place after moving.)

This person is hereby authorized to vote in his/her precinct after executing this form.

Old Precinct # _____     Name of New Polling Place: _____

New Precinct # _____     Address of New Polling Place _____

Party Affiliation On Record _____     **X** _____
SIGNATURE OF PRECINCT OFFICIAL

**C**   **Curbside Affidavit** (Affidavit of person voting outside voting place or enclosure.)

STATE OF NORTH CAROLINA, COUNTY OF _____

I do solemnly swear (or affirm) that I am a registered voter in _____ precinct. That because of age or physical disability, I am unable to enter the voting place to vote in person without physical assistance. That I desire to vote outside the voting place or enclosure. **I understand that a false statement as to my condition will be in violation of North Carolina law.**

_____      _____
DATE          VOTER ADDRESS

**X** _____    **X** _____
SIGNATURE OF VOTER          SIGNATURE OF PRECINCT OFFICIAL

| OFFICIAL USE ONLY | Station | | Voting Method | | Voting Date/Time | | V2017.04 |
|---|---|---|---|---|---|---|---|
| | Site | | Transaction | | Operator Name | | |



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

## ONE STOP APPLICATION
NORTH CAROLINA
COUNTY OF

_____

_____

FRAUDULENTLY OR FALSELY COMPLETING THIS FORM IS A CLASS I FELONY UNDER CHAPTER 163 OF THE NC GENERAL STATUTES.

**A** | Voter's Certification of Voting Qualifications

VRN:

REG:                           PRIMARY
PARTY:                         BALLOT:
REG DATE:                      AGE:

PCT:                           VTD:

*Mailing Address*

I, **[INSERT VOTER NAME]**, certify that:

☐ I am a registered voter in this county and I shall have resided at the address noted above for **30 days** immediately prior to this election.

☐ I am a United States Citizen.

☐ I am at least 18 years of age, or will be by the date of the general election.

☐ *For partisan primary elections ONLY:* I am registered **[PARTY NAME]** and I will receive a **[PRIMARY PARTY]** ballot.

☐ I understand that it is a felony to vote more than one time in an election.

☐ I have not been convicted of a felony, or if I have been convicted of a felony, I have completed my sentence, including any probation or parole.

X_____        _____
SIGNATURE OF VOTER                     OFFICIAL'S INITIALS

**B** | Change or Verification of Name and Address (Use this section to verify or change a voter's name or address in the registration records.)

New Name: _____        Former Name: _____

New Address: _____        Former Address: _____

New Mailing Address: _____        Former Mailing Address: _____

Have you lived here for 30 days or more? ☐ Yes ☐ No        I certify that I moved at least 30 days before this election to the new address.

If no, date moved? _____ / _____ / _____
DAYTIME PHONE NO.          X_____
                           SIGNATURE OF PRECINCT OFFICIAL

**C** | Curbside Affidavit (Affidavit of person voting outside voting place or enclosure.)

STATE OF NORTH CAROLINA, COUNTY OF _____

I do solemnly swear (or affirm) that I am a registered voter in _____ precinct. That because of age or physical disability, I am unable to enter the voting place to vote in person without physical assistance. That I desire to vote outside the voting place or enclosure. **I understand that a false statement as to my condition will be in violation of North Carolina law.**

_____        _____
DATE                 VOTER ADDRESS

X_____        X_____
SIGNATURE OF VOTER                     SIGNATURE OF PRECINCT OFFICIAL

| OFFICIAL USE ONLY | Board Approval Date: | Board Signature: | | V2017.04 |
| | Station | Voting Method | Voting Date/Time | |
| | Site | Transaction | Operator Name | |



# APPENDIX 9

## Sample Letter to Possible Non-U.S. Citizen Voters



**NORTH CAROLINA**
**State Board** *of* **Elections**

*Mailing Address:*
P.O. Box 27255
Raleigh, NC 27611-7255

Phone: (919) 733-7173
Fax: (919) 715-0135

February 16, 2017



RE:     Your voter registration in North Carolina.

Dear Mr./Ms. _____:

The State Board of Elections conducts routine audits following an election. During one of these audits, N.C. Division of Motor Vehicles (DMV) data indicated that you were not a citizen of the United States when you applied for or renewed your driver's license or state identification card. Information from the U.S. Department of Homeland Security (DHS) also indicated that you may not be a citizen of the United States. We understand these databases may not be current, and you may be a citizen of the United States.

In North Carolina only citizens of the United States may register to vote or to vote.[1] It is a crime for a non-citizen to vote in a state or federal election.[2]

**Please complete and return the enclosed *Admission or Denial of Non-U.S. Citizen Return Form* within (30) days of receiving this letter.** If you are a citizen of the United States, include a copy of an official document confirming your citizenship status. If your name has changed, be sure to provide documentation of that name change. You may mail, fax, e-mail or deliver the *Admission or Denial of Non-U.S. Citizen Return Form*.

Documents that may prove your citizenship within the United States include the following:

- **U.S. Birth Certificate.** If you cannot find your birth certificate, please contact the vital statistics office in the state or U.S. territory that originally issued your certificate.

- **U.S. Passport (booklet or card).** If you cannot find your U.S. Passport, please contact the U.S. Department of State at 1-877-487-2778 (TTY 1-888-874-7793) or visit the website at: http://travel.state.gov/passport/lost/lost_848.html

---

[1] *See* North Carolina General Statute § 163-55 and Article VI, Section 1 of the North Carolina Constitution.
[2] North Carolina General Statue § 163-275 and United States Code Title 18, Section 611.

*441 N. Harrington Street • Raleigh, NC 27611-7255*



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

- **Consular Report of Birth Abroad.** If you cannot find your U.S. Consular Certificate of Birth, please contact the U.S. Department of State at 1-877-487-2778 (TTY 1-888-874-7793) or visit the website at: https://travel.state.gov/content/passports/en/abroad/events-and-records/birth/replace-or-amend-consular-report-of-birth-abroad.html

- **Certificate of Naturalization or Certificate of Citizenship.** If you cannot find your Certificate of Naturalization or Certificate of Citizenship, or believe that there is some problem with your records that needs to be corrected by the United States Citizenship and Immigration Services (USCIS), please refer to the enclosed *Information for Registrants: Verification of Citizenship Status and How to Obtain Your Document or Correct Your Record with USCIS.* You can make a copy of your naturalization or citizenship certificate and send it to this agency.

If you return the *Admission or Denial of Non-U.S. Citizen Return Form* stating that you are <u>not</u> a citizen of the United States, you will be removed from the voter registration rolls.

If you believe an error has occurred regarding your identity or citizenship status, you have the right to ask for a hearing. The citizenship requirements, however, cannot be waived or ignored by those at a hearing. Remember, it is a crime for a non-citizen to vote in an election in North Carolina.

If you do not respond to this letter and return the *Admission or Denial of Non-U.S. Citizen Return Form* within thirty (30) days of receipt, your case may be referred to your local county board of elections, which may enter a challenge to your voter registration. If the challenge is successful, your voter registration will be cancelled.

For information regarding this matter or to submit your completed *Admission or Denial of Non-U.S. Citizen Return Form,* you may contact our agency at the following:

| | | |
|---|---|---|
| **Mailing Address:** | **Street Address:** | **Phone:** (919) 733-7173* |
| N.C. State Board of Elections | 441 N. Harrington St. | **Fax:** (919) 715-0135 |
| Attn: Joan Flemming | Raleigh, NC 27603 | **E-mail:** joan.fleming@ncsbe.gov |
| P.O. Box 27555 | | |
| Raleigh, NC 27611-7255 | | *Please ask for the undersigned |

Thank you for your cooperation in this matter.

Sincerely,


Joan Fleming
Chief Investigator, North Carolina State Board of Elections

Enclosures: *Admission or Denial of Non-U.S. Citizen Form* & self-addressed return envelope
*Information for Registrants: Verification of Citizenship Status and How to Obtain Your Document or Correct Your Record with USCIS*



## ADMISSION OR DENIAL OF
## NON-U.S. CITIZEN RETURN FORM

*Please complete and return this form no later than thirty (30) days of receiving the notice of potential ineligibility. If you do not respond within that timeframe, we may refer your case to the local county board of elections, which may enter a challenge against your voter registration.*

Under penalties of perjury, I swear or affirm that (check applicable statements):

☐ I am the person referred to in the letter I received from you and that I am **not** a U.S. citizen.

☐ I am the person referred to in the letter I received from you but I **am** a U.S. citizen.  Check one:

_____ I am enclosing a *copy* of proof of U.S. citizenship; or

_____ I am currently seeking a records review or correction, or replacement copy of the documentation or record in support of my U.S. citizenship from_____.
<span style="font-size:smaller">[Insert the name of the government agency]</span>

☐ I am not the person referred to in the letter I received from you and am enclosing a *copy* of proof of my identity and/or U.S. citizenship.

| | |
|---|---|
| **Voter's Name** | |
| | Last Name            First            Middle |
| **Date of Birth** | |
| | Month   (MM)          Day (DD)          Year (YYYY) |
| **North Carolina Driver's License Number OR North Carolina ID Card Number OR Last 4 of Social Security Number** | |
| | |
| **Contact Information** ( mailing address, phone number, or e-mail) | |

**SIGNATURE OF VOTER:**_____ **DATE:** _____

*(WARNING: If you sign this form and know it to be false, you can be convicted of a Class I felony)*

**RETURN FORM TO:**
North Carolina State Board of Elections
Attn: Joan Fleming (Investigations)
P.O. Box 27555
Raleigh, N.C.  27611-7255

*North Carolina driver's license number/North Carolina identification card number, Social Security numbers and date of birth are exempt from public disclosure under Public Records Law. The signature can be viewed but not copied.*

[REFERENCE:  ]



**U.S. Department of Homeland Security**
*U.S. Citizenship and Immigration Services*
*Verification Division*
*Washington, DC 20024*



**U.S. Citizenship and Immigration Services**

# Fact Sheet

**Information for Registrants: Verification of Citizenship Status and**

**How to Obtain Your Document or Correct Your Record with USCIS**

Many federal, state and local agencies verify the immigration or citizenship status of benefit applicants to ensure that only qualified aliens or naturalized and derived citizens receive benefits. These agencies verify immigration or citizenship status by using the Systematic Alien Verification for Entitlements (SAVE) Program of the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS).

The voter registration agency in your state has submitted information to the SAVE Program for verification of your citizenship. Because the SAVE Program cannot confirm your citizenship status based upon information provided by the agency, you must be given an opportunity by the voter registration agency to provide the correct documentation or correct your records with USCIS and/or appeal the denial of your voter registration. Please note that there are a number of reasons why the SAVE Program may not be able to verify your citizenship, e.g., the SAVE Program can only verify naturalized or derived citizens, to the extent that a derived citizen received an official determination on citizenship by USCIS. The inability of the SAVE Program to verify your citizenship does not necessarily mean that you are not a citizen of the United States and are ineligible to vote.

If you need a replacement of your Naturalization Certificate or Certificate of Citizenship or believe that the SAVE Program response to the voter registration agency did not provide accurate information about your citizenship status and you need to make corrections to your citizenship record, please contact USCIS by using one of the following methods:

1. **File a Form N-565 to obtain a replacement of your Naturalization Certificate or Certificate of Citizenship.** The Form N-565 and instructions for filing can be found at: http://www.uscis.gov/files/form/n-565.pdf and http://www.uscis.gov/files/form/n-565instr.pdf

2. **Schedule an appointment for an in-person interview at a local USCIS office to correct your record.** You may schedule an appointment at a local USCIS office at the InfoPass website, http://infopass.uscis.gov, or by calling the National Customer Service Center, 1-800-375-5283. Scheduling an appointment is the fastest way to correct your records. We recommend that you bring to your appointment this Fact Sheet, documentation evidencing your citizenship status, and any information provided by the voter registration agency concerning why your citizenship status could not be verified.

3. **Submit a request in writing to correct your record.** If you know the information that needs

Rev. Ver. August 14, 2012


Post-Election Audit Report

to be corrected in your record, you may submit a request to <u>correct</u> your records to the Freedom of Information Act/Privacy Act (FOIA/PA) Office at the following address:

Privacy Act Amendment
U.S. Citizenship and Immigration Services National Records Center
FOIA/PA Office
P.O. Box 648010
Lee's Summit, MO 64064-8010

**We recommend that you include the following information in your submission, if available:**

- State that you are being denied voter benefits    • Copies of your immigration or DHS citizenship documents
- Information that is inaccurate    • Reason it is inaccurate
- Proposed change(s) to the record    • A-File number and/or the full name
- Date and place of birth    • Notarized signature of the registrant
- A return address    • Other information to assist locating the record

If you do not know the information you need to correct, you may submit a written request to <u>obtain</u> your records by submitting Form G-639, *FOIA/PA Request*. This form is available from the nearest USCIS office or online at <u>http://www.uscis.gov/files/form/g-639.pdf</u>. You should use the address specified above, but mark the envelope *"Privacy Act Request"* rather than *"Privacy Act Amendment."*

Rev. Ver. August 14, 2012



Post-Election Audit Report
NORTH CAROLINA
State Board of Elections

# APPENDIX 10

## Breakdown of Non-U.S. Citizen Voters by Country of Origin

| Country of Origin | Count |
|---|---|
| Canada | 2 |
| China, Peoples Republic | 1 |
| Costa Rica | 2 |
| Dominican Republic | 1 |
| El Salvador | 1 |
| Germany | 2 |
| Guyana | 1 |
| Haiti | 2 |
| Honduras | 1 |
| Israel | 1 |
| Italy | 2 |
| Jamaica | 1 |
| Korea | 1 |
| Liberia | 2 |
| Malaysia | 1 |
| Mexico | 4 |
| Netherlands | 1 |
| Nicaragua | 2 |
| Nigeria | 2 |
| Panama | 1 |
| Philippines | 1 |
| Poland | 1 |
| Australia | 1 |
| Senegal | 1 |
| Sierra Leone | 1 |
| United Kingdom | 1 |
| Ukraine | 1 |
| Vietnam | 1 |
| UNKNOWN | 2 |
| **Grand Total** | **41** |

# NORTH CAROLINA
## State Board of Elections & Ethics Enforcement

*Mailing Address*:
P.O. Box 27255
Raleigh, NC 27611-7255

Phone: (919) 814-0700
Fax: (919) 715-0135

## NUMBERED MEMO 2018-09

| | |
|---|---|
| **TO:** | County Boards of Elections |
| **FROM:** | Kim Strach, Executive Director |
| **RE:** | **Preservation of Documents from 2016 General Election and Ballot Secrecy** |
| **DATE:** | September 7, 2018 |

### Retention of 2016 General Election Records

In light of recent subpoenas issued by the U.S Attorney's Office for the Eastern District of North Carolina, county boards of elections are instructed to preserve documents described below. A number of key terms in the below descriptions are exceedingly vague. Out of an abundance of caution, when in doubt, do not delete, alter, or destroy any document that may reasonably fall within any descriptions below:

Any and all voter registration applications and/or other documents, as identified below, that were submitted to, filed by, received by, or maintained by the North Carolina State Board of Elections from January 1, 2010, through August 30, 2018, within any of the counties in North Carolina. To include, but not limited to:

1. Standard Voter Registration Application forms
2. Federal Post Card Applications (FPCA)
3. Federal Write-In-Absentee Ballots (FWAB)
4. One-Stop (Early Voting) application forms
5. Provisional Voting forms
6. N.C. Absentee Ballot Request forms
7. Any and all "Admission or Denial of Non-Citizen Return Form" that were generated by the North Carolina State Board of Elections, or were caused to be generated by the North Carolina Board of Elections, and/or the Ethics Enforcement Office.
8. Any and all Voter Registration Cancellation or Voter Revocation forms that have been generated by the North Carolina State Board of Elections, and/or the Ethics Enforcement Office.

> Any and all poll books, e-poll books, voting records, and/or voter authorization documents, and executed official ballots (including absentee official ballots), that were submitted to, filed by, received by, and/or maintained by the ▮ County Board of Elections from August 30, 2013 through August 30, 2018.

> Furthermore, we wish to clarify, especially for the County Boards, that the request for voting records and voting authorization documents would include, without limitation, all Absentee Applications and Certificates (including envelopes) for the time period specified in the subpoenas.

This retention request expands the scope of Numbered Memo 2018-04.  Due to the broad scope of the subpoena issued to the State Board, all 100 county boards of elections are instructed to preserve the above documents.

## Secrecy of Voted Ballots

State law protects the right of voters to a secret ballot.  County boards of elections are reminded that G.S. § 163A-1105(e) prohibits the disclosure of voted ballots or paper or electronic records of individual voted ballots absent a court order.  It is a Class 1 misdemeanor for you or anyone with access to voted ballots or records to knowingly disclose these documents without a court order.

## State Board Order

The State Board's Order regarding representation by the Attorney General's office is enclosed. No additional action by the county boards or county attorneys is required at this time.

STATE OF NORTH CAROLINA
WAKE COUNTY

BEFORE THE STATE BOARD OF ELECTIONS & ETHICS ENFORCEMENT

IN THE MATTER OF: SUBPOENAS  )
ISSUED BY THE U.S. ATTORNEY'S  )          **ORDER**
OFFICE   FOR   THE   EASTERN  )
DISTRICT OF NORTH CAROLINA    )

THE STATE BOARD  OF ELECTIONS & ETHICS ENFORCEMENT ("State Board")
held a public meeting on September 7, 2018, after considering certain grand jury subpoenas
issued on or about August 31, 2018 to the State Board and forty-four county boards of
elections (the "Subpoenas") within the jurisdiction of the U.S. Attorney's Office for the
Eastern District of North Carolina.

Upon the unanimous vote of its members, and pursuant to its supervisory authority over
elections administration under G.S. §§ 163A-741(a) and 163A-745, the State Board hereby
**ORDERS**:

> The Attorney General of North Carolina is authorized to take steps necessary
> to quash the Subpoenas and any associated subpoenas on behalf of the State
> Board and all affected county boards of elections.

This the seventh day of September, 2018.

J. Anthony Penry, Chair
STATE BOARD OF ELECTIONS
& ETHICS ENFORCEMENT



*Mailing Address:*
P.O. Box 27255,
Raleigh, NC 27611

(919) 814-0700 or
(866) 522-4723

*Fax:* (919) 715-0135

**NUMBERED MEMO 2019-01**

**TO:**      All County Boards of Elections

**FROM:**   Kim Westbrook Strach, Executive Director

**RE:**      Response to Subpoenas Issued by the U.S. Attorney's Office for the Eastern District of North Carolina

**DATE:**    February 6, 2019

## Production of Records

On August 31, 2018, the U.S. Attorney's Office for the Eastern District of North Carolina issued identical grand jury subpoenas to each of the county boards of elections within its jurisdiction seeking millions of documents including all voting records over a period of years, including ballots that would have to be redacted.  The Office also issued a grand jury subpoena to the State Board of Elections & Ethics Enforcement ("State Board") for some of the same records and additional information for all North Carolina's voters maintained within our central system in Raleigh.

On September 7, 2018, I issued Numbered Memo 2018-09 requiring every county board to preserve the documents described in the subpoenas.  The Numbered Memo also informed you that, the State Board's members had unanimously exercised their supervisory authority over elections administration under N.C. Gen. Stat. §§ 163A-741(a) and 163A-745 to request that the Attorney General of North Carolina take the steps necessary to quash the subpoenas to the counties and to the State Board (collectively, the "Subpoenas").

The U.S. Attorney's Office agreed to extend the compliance date for responding to the Subpoenas until January 14, 2019. Now, the Attorney General's office has directed the State Board to acquire the records associated with 289 individuals who were previously registered in counties within the Eastern District. These records will be transmitted to the U.S. Attorney's Office in response to the Subpoenas. It is our understanding that this limited production is all that is required at this time.

Accordingly, the State Board Office will be reaching out, individually, to each of the counties in the Eastern District, identifying the records your county may need to retrieve and review so our agency can produce the responsive records on your behalf. Initial indications suggest that more than two-thirds of the prior registrants were already inactive in 2017; that for twenty-two of the affected counties, there were five or fewer registrations; and that no registrants were immediately identified in Bertie, Columbus, Dare, Granville, Hyde, Jones, Northampton, Pamlico, Tyrrell, or Warren counties.

In response to the Subpoenas, the State Board of Elections is also providing registration records on approximately 500 individuals statewide who resided outside the Eastern District of North Carolina.

## Preservation of Records

Out of an abundance of caution, Numbered Memo 2018-09 remains in effect for **all county boards of elections in the State**, and all records identified therein must be retained and preserved. No additional action by the county boards or county attorneys is required at this time.

# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

April 30, 2019

RECEIVED

MAY 0 3 2019

STATE BOARD OF ELECTIONS

Kim Westbrook Strach
Executive Director
North Carolina State Board of Elections
P.O. Box 27255
Raleigh, NC 27611-7255
Email: Kim.Strach@ncsbe.gov, Elections.SBOE@ncsbe.gov

**RE: Notice of NVRA Violation**

Dear Ms. Strach:

It has been nearly seven months since the North Carolina State Board of Elections (NCSBE) promised to produce voter list maintenance records originally requested from certain North Carolina county boards of elections pursuant to the records inspection provision of the National Voter Registration Act of 1993 ("NVRA"). 52 U.S.C. 20507(i). The requested records concern the actions county election officials have taken to identify and cancel registrations belonging to individuals who do not satisfy the citizenship requirements for voting.

To date, **we not have not received any responsive records from the NCSBE**, despite repeated assurances that production of records was imminently forthcoming.

This letter serves to notify that the **NCSBE is in violation of the NVRA for failure to permit inspection and photocopying of public records as required by 52 U.S.C. § 20507(i)**. Because these violations are ongoing and occurring within 30 days of an election for federal office,[1] the NVRA authorizes us to pursue immediate federal litigation to enforce the inspection requirements of the law. *See* 52 U.S.C. § 20510(b)(3). However, we are providing this letter with the hope that you will immediately remedy these violations and make litigation unnecessary.

## Background

On September 10, 2018, we requested the opportunity to inspect or receive certain voter list maintenance records from the county boards of elections in Guilford, Forsyth, and Durham pursuant to the records inspection provision of the NVRA, 52 U.S.C. § 20507(i). In part, the request sought "[d]ocuments regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration" and "actions taken regarding the registrant's registration." A copy of the letter served on the Durham County Board of Elections is attached this request, for reference.

---

[1] The primary election for North Carolina's 9th Congressional District is scheduled to occur on May 14, 2019.

32 E. Washington Street, Suite 1675, Indianapolis, Indiana 46204
Telephone: 317.203.5599  Fax: 888.815.5641  PublicInterestLegal.org

When we received no response to our requests, we notified each county board on October 1, 2018 that it was in violation of the NVRA, copying the NCSBE on the correspondence. That same day, the NCSBE wrote to us via email, explaining that it would "help facilitate a response to [the] recent records request[s]" made to Guilford, Forsyth, and Durham because "our agency likely houses some of the data responsive to your request." On October 9, 2018, we asked the NCSBE to provide the same records for the counties of Mecklenburg and Buncombe as well.

When asked for an update on the progress of the request 20 days later, the NCSBE stated, "We are still working on them and would hope to have a response to you some time in November." The NCSBE did not produce any records in November.

Cognizant that the NCSBE was facing uncertainty regarding the legality of its composition, we remained patient, and agreed to travel to NCSBE offices to conduct an in-person inspection of the requested records on January 11, 2019.

On or around January 9, 2019, the NCSBE contacted us via telephone to indicate that the scheduled in-person visit was not necessary because the NCSBE would begin production of records by the end of January. On January 9, 2019, the phone call was memorialized in an email, in which the NCSBE stated, "Working on the citizenship request now, per our discussion. I will send records for your additional request on a rolling basis as they are reviewed and redacted." The NCSBE did not produce any records by the end of January.

More than two months later, on April 10, 2019, we again wrote to the NCSBE to request an update on the progress of the requests. Later than day, the NCSBE responded via email, stating, "I will give you a full update and hopefully start providing responsive documents tomorrow or Friday." The NCSBE did not produce any records—let alone an "update"—by Friday, April 12, as promised.

As of the date of this letter, the NCSBE has not provided a substantive update on its progress or produced any records responsive to the request. It has now been **232 days** since we first requested access to public voter list maintenance records in the possession of North Carolina election officials.

**Violation of the National Voter Registration Act**

As explained in the September 10, 2018 requests (attached), the NVRA requires election officials to make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). The requested records fall within the scope of this requirement.

Failure to permit public inspection or otherwise provide copies of these records is a violation of federal law for which the NVRA provides a private-right-of-action. 52 U.S.C. § 20510(b).

2

Filed: 12/23/2019     Doc: 12     Pg: 243 of 309

USCA4 Appeal: 19-2265

A primary election for federal office in North Carolina is scheduled for May 14, 2019.[2] For NVRA violations occurring within 30 days of an election for federal office, there is no curative period. 52 U.S.C. § 20510(b)(3). **If the NVRA violation described herein is not corrected immediately, the Foundation will pursue federal litigation to enforce its rights.** For any lawsuits initiated by a private party, an award of attorney's fees, expenses, and costs incurred are available under 52 U.S.C. § 20510(c).

As the state's chief election official for purposes of the NVRA, N.C. Gen. Stat. § 163A-6, the Executive Director of the NCSBE is copied on this correspondence. *See Voter Integrity Project NC, Inc. v. Wake Cty. Bd. of Elections*, 301 F. Supp. 3d 612, 617 n.4 (E.D.N.C. 2017).

Please direct all future correspondence to njohnson@publicinterestlegal.org.

Thank you for your service on this matter.

Sincerely,


Noel Johnson
Litigation Counsel
Public Interest Legal Foundation

CC:

Mr. Robert Cordle
Chairman
North Carolina State Board of Elections
P.O. Box 27255
Raleigh, NC 27611-7255

---

[2] https://s3.amazonaws.com/dl.ncsbe.gov/Elections/2019/District9Candidates.pdf.

# PUBLIC INTEREST
## —— LEGAL FOUNDATION ——

VIA EMAIL

September 10, 2018

Derek L. Bowens
Director
Durham County Board of Elections
PO Box 868
Durham, NC 27702
Email: elections@dconc.gov

**RE: NVRA public disclosure request**

Dear Disclosure Officer(s):

I am writing to request inspection or copies of records related to your office's voter list maintenance obligations under the National Voter Registration Act of 1993 (NVRA).

The National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq.*, requires your office to make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i).

Pursuant to Section 20507(i) of NVRA, I request that your office reproduce or provide the opportunity to inspect the following:

1. Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles, and from the North Carolina State Board of Elections since January 1, 2006. This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.

2. All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection officials—state and federal--since January 1, 2006 referencing individuals who claimed

32 E. Washington Street, Suite 1675, Indianapolis, Indiana 46204
Telephone: 317.203.5599  Fax: 888.815.5641  PublicInterestLegal.org

JA-241  Case 5:19-cv-00248-BO  Document 20-2  Filed 08/05/19  Page 55 of 58

Filed: 12/23/2019  Pg: 244 of 309  Doc: 12  USCA4 Appeal: 19-2265

to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

Understanding that federal file retention laws may impact some disclosures, an optimal grouping of documents presented per registered voter disclosed would contain the following:

- The completed voter application form (redacted where necessary to prevent disclosures of claimed Social Security number and signature);

- Referral documents/transmissions for new or updated voter registration applications provided by state agencies charged with National Voter Registration Act (Motor Voter) duties;

- Records indicating the "voter profile" or "voter view" or similar feature provided within the North Carolina State Elections Information Management System (SEIMS) which details all information kept per voter, to include but is not limited to:
  - Full name on file (including previous names)
  - Date of birth
  - Voter ID number
  - Voter registration date (including previous dates of registration)
  - Date of last maintenance/update action
  - Reason code(s) for previous maintenance action(s)
  - County of registration
  - Detailed address information history (residential and mailing)
  - Political party designation history (if claimed/recorded)
  - Registration method history (e.g. self, NVRA agency transaction, third-party, etc.)
  - Assigned voting districts history
  - Election participation history in full
  - All internal memoranda stored within each "profile"

- All letters, postcards, and other mailings sent from your office to the voter in question with notations for types of postage or method of delivery indicated where possible;

- All letters, emails, logged phone calls, documents, and other communications from the voter in question to your office—including those communications from legal counsel or claimed relatives on their behalf—that is either affirmatively sent by the voter or in response to a mailing received by your office or other official entity;

- All documents your office may receive from federal entities to include but are not limited to the U.S. Department of Homeland Security/USCIS detailing inquiries regarding registered voters in your county and your responses given;

- All documents your office may generate upon request to the voter or federal agency concerned with immigration matters for the purpose of detailing a registration status

history and voting history;

- All documents and communications between your office and the registered voter in question with respect to pending immigration matters; and

- Any documents sent by your office to the voter to require that an affirmation of citizenship or noncitizenship be given in writing with responses included, where applicable.

If you wish to dispense with a public inspection and provide copies of these records instead, please send them to following address:

> 32 E. Washington Street
> Suite 1675
> Indianapolis, IN 46204

Should you need to contact me regarding this request, please contact me via email at lchurchwell@publicinterestlegal.org.

Thank you for your service on this matter.


Sincerely,

Logan Churchwell
Communications & Research Director
Public Interest Legal Foundation
lchurchwell@publicinterestlegal.org

Pg: 246 of 309    Filed: 12/23/2019    Doc: 12    USCA4 Appeal: 19-2265

# PUBLIC INTEREST
## — LEGAL FOUNDATION —

E. Washington Street, Suite 1675
Indianapolis, IN 46204





INDIANAPOLIS IN 46
28 APR 2019 PM 6 L

Kim Westbrook Strach
Executive Director
North Carolina State Board of Elections
P.O. Box 27255
Raleigh, NC 27611-7255

27611-725555

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS – RICHMOND REGION COUNCIL 4614, ET AL., | ) ) ) ) | |
| *Plaintiffs,* | ) ) | Civil No. 1:18-cv-00423 |
| v. | ) ) | Hon. Liam O'Grady |
| PUBLIC INTEREST LEGAL FOUNDATION, ET AL., | ) ) ) | |
| *Defendants & Third-Party Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| VIRGINIA DEPARTMENT OF ELECTIONS, | ) ) ) | |
| *Third-Party Defendant.* | ) ) ) | |

<u>**MEMORANDUM OPINION & ORDER**</u>

This matter comes before the court on Third-Party Defendant's Motion to Dismiss Third-Party Complaint (Dkt. 70) and Motion to Dismiss the Amended Third-Party Complaint (Dkt. 77). The motions were fully briefed, and the Court dispensed with oral argument. For the reasons stated below, and for good cause shown, the Court hereby **GRANTS** Third-Party Defendant's Motion to Dismiss the Amended Third-Party Complaint (Dkt. 77) and **DENIES** Third-Party Defendant's Motion to Dismiss Third-Party Complaint (Dkt. 70) as moot.

**I. BACKGROUND**

This suit arises out of the publication of *Alien Invasion* and *Alien Invasion II* by Third-Party Plaintiffs, the Public Interest Legal Foundation ("PILF") and J. Christian Adams. Am. Third-Party Compl. at ¶ 2. The *Alien Invasion* publications attached previously unpublished

1

records obtained from the Virginia Department of Elections ("the Department") identifying by name, address, and telephone numbers, various individuals whom Third-Party Plaintiffs argued were likely illegally voting. *Id.* at ¶ 37–40; Pls.' Resp. at 3. Several of the individuals identified in the *Alien Invasion* publications and the League of United Latin American Citizens – Richmond Region Council 4614, sued Third-Party Plaintiffs for defamation and violations of 42 U.S.C. § 1985(3) (the "Ku Klux Klan Act") and Section 11(b) of the Voting Rights Act. Third-Party Plaintiffs then filed a Third-Party Complaint against the Department, arguing that the Department was liable for all or part of the claims asserted against PILF and Mr. Adams. Dkt. 66.

The Department filed a Motion to Dismiss the Third-Party Complaint. Dkt. 70. In response, Third-Party Plaintiffs filed an Amended Third-Party Complaint. Dkt. 73. While the Department disagrees with Third-Party Plaintiffs that the filing of the Amended Third-Party Complaint mooted the Motion to Dismiss, the Department "agree[d] that the only motion on which a ruling is needed is the Department's . . . motion to dismiss the Amended Third-Party Complaint." Dkt. 76 at 1.

In the Third-Party Amended Complaint, Third-Party Plaintiffs state that they attempted to verify the information in the Department records and were told by the former Commissioner of the Department that "the government created records referenced in the Reports in fact show what they purport to show." Am. Third-Party Compl. at ¶ 3. Third-Party Plaintiffs allege that they "had every right to rely upon the accuracy of [the] government-created records," *id.* at ¶ 2, and therefore, "[i]f Plaintiffs are successful against Third-Party Plaintiffs, it will be because Third-Party Plaintiffs relied upon the representations of the Department, which unlawfully removed citizens from the voter rolls and failed to accurately maintain and produce records in violation of

2

the" National Voter Registration Act of 1993 (the "NVRA"), *id.* at ¶ 53. Stated another way,

Third-Party Plaintiffs allege that "any liability that PILF and Mr. Adams may have for Plaintiff's

claims is due, in whole or in part, to actions taken by and conduct of the Department." Dkt. 80 at

8.

Third-Party Plaintiffs further allege that if the Department records were accurate, they

cannot be held liable for publishing them, and if they were inaccurate, "the Department is

responsible for their contents—with the result that Plaintiffs cannot prove essential elements of

their claims against PILF and Mr. Adams." Am. Third-Party Compl. at ¶ 5. Indeed, Third-Party

Plaintiffs allege that *they* were also harmed by the Department's allegedly inaccurate

recordkeeping because the inaccuracies are "having a chilling effect" on the exercise of their

First Amendment rights, *id.* at ¶ 5, and part of PILF's objectives are to ensure voter registration

rolls are accurate, *id.* at ¶ 11. Plaintiffs respond that their Complaint alleges not that the reports

are false, but rather that Third-Party Plaintiffs ignored warnings and drew false conclusions from

the reports, then published the records with a defamatory gloss. Pls.' Resp. at 3.

The Amended Third-Party Complaint brings two claims against the Department: (I)

unlawful removal of voters in violation of the NVRA, and (II) improper maintenance of voter

registration rolls in violation of the NVRA. Third-Party Plaintiffs seek declaratory and injunctive

relief to compel the Department's compliance with the NVRA. *Id.* at ¶ 1. Third-Party Plaintiffs

do not seek monetary contribution from the Department, though they do seek attorney's fees and

expenses for litigation of the Third-Party Complaint. *See id.*; Dkt. 80 at 13.

The Department has moved to dismiss the Third-Party Amended Complaint with

prejudice because (a) any claim for contribution is barred by sovereign immunity, (b) any claim

that the Department violated NVRA is a derivative suit not properly joined to the Plaintiffs' case,

3

(c) the Amended Complaint fails to state a plausible claim that the Department is responsible for the statements and reports by Third-Party Plaintiffs underlying Plaintiffs' claims, and (4) Third-Party Plaintiffs lack standing because they assert only an individualized grievance. Plaintiffs support granting the Motion to Dismiss. *See* Pls.' Resp.

### III. ANALYSIS

Under Federal Rule of Civil Procedure 14(a)(1),"[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." A third-party complaint is appropriate under Rule 14(a) "only where the third party defendant would be secondarily or derivatively liable to the defendant in the event the defendant is held liable to the plaintiff" and the outcome of the third-party claim is not "independent of the outcome of the main claim." *Watergate Landmark Condo. Unit Owners' Ass'n v. Wiss, Janey, Elstner Assocs., Inc.*, 117 F.R.D. 576, 577 (E.D. Va. 1987) (Ellis, J.). Third-party complaints are not appropriate where, for example, (a) the third-party claim "is not part of the main claim" of the plaintiffs against the third-party plaintiffs; (b) the third-party plaintiffs make, in effect, an "it was him, not me" argument that the third-party defendant may be liable to the *plaintiff*; or (c) the third-party plaintiffs do not seek reimbursement or contribution from the third-party defendant for all or part of any sum the third-party plaintiff must pay the plaintiff. *Id.* at 577–78. The Amended Third-Party Complaint at issue in this case is improper for all three of these reasons.

First, the Amended Third-Party Complaint's claim that the Department violated the NVRA is not part of the Plaintiffs' main claim. Plaintiffs do not claim that the Department violated the NVRA or even that the records were false. Instead, the Plaintiffs argue that the Third-Party Plaintiffs defamed them and violated voter protection acts by drawing false

4

conclusions from the reports despite warnings about the limited and potentially misleading or inaccurate nature of the Department reports. While Third-Party Plaintiffs' claims "arise[] out of the same general set of facts as the main claim[s]," they constitute a "separate and independent action" from Plaintiffs' causes of action against the Third-Party Plaintiffs and are thus not permitted under Rule 14(a). *Laughlin v. Dell Fin. Servs., L.P.*, 465 F. Supp. 2d 563 (D.S.C. 2006); *Watergate*, 117 F.R.D. at 577.

Second, the Third-Party Plaintiffs' primary argument that the Amended Third-Party Complaint is proper under Rule 14(a) is that the harm caused to the Plaintiffs was in part caused by the actions of the Department, and therefore any liability Third-Party Plaintiffs owe Plaintiffs is partially the result of the Department's inaccurate records. Essentially, Third-Party Plaintiffs argue that the Department is also liable to the Plaintiff, not that the Department is derivatively liable to Third-Party Plaintiffs for Plaintiffs' harms. While it is proper for the Third-Party Plaintiffs to raise such arguments in their defense, "it was him, not me" arguments are not a proper basis for impleader. *Id.* at 578.

Finally, the Amended Third-Party Complaint is improper because it brings independent claims that the Department violated the NVRA and seeks declaratory and injunctive relief, not contribution or indemnification. As such, the Amended Third-Party Complaint fails to state permissible claims under Rule 14(a). *Id.* (finding that third-party complaints are appropriate only where the third-party plaintiff seeks reimbursement for all or part of anything it must pay to the plaintiffs); *deHaas v. Empire Petrol. Co.*, 286 F. Supp. 809 (D. Colo. 1968) (finding that claims for affirmative or injunctive relief are not permitted under Rule 14).

5

## IV. CONCLUSION

For the reasons stated above, and for good cause shown, Third-Party Defendant's Motion to Dismiss the Amended Third-Party Complaint (Dkt. 77) is hereby **GRANTED** and Third-Party Defendant's Motion to Dismiss Third-Party Complaint (Dkt. 70) is hereby **DENIED** as moot.

November 26, 2018
Alexandria, Virginia

Liam O'Grady
United States District Judge

6

EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS - RICHMOND REGION COUNCIL 4614, ELIUD BONILLA, LUCIANIA FREEMAN, and ABBY JO GEARHART,** | |
| **Plaintiffs,** | **Civil Action No. 1:18-cv-00423 (LO/IDD)** |
| **v.** | |
| **PUBLIC INTEREST LEGAL FOUNDATION and J. CHRISTIAN ADAMS,** | |
| **Defendants.** | |

### STIPULATION AND ORDER OF DISMISSAL WITH PREJUDICE

Pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure and the

agreement among the undersigned parties, the undersigned parties hereby stipulate to the

dismissal of the above-captioned action with prejudice. The Court will retain jurisdiction over

the Action for the purpose of enforcing compliance with the terms of the parties' agreement.

Dated: July 22, 2019                    Respectfully submitted.

By _/s/ Christopher S. Herlihy_         By _/s/ Michael J. Lockerby_
   Christopher S. Herlihy (VSB No. 93558)    Michael J. Lockerby (Va. Bar No. 24003)
   Anisa A. Somani (VSB No. 86103)          Eli L. Evans (Va. Bar No. 90700)
   Nicole M. Cleminshaw (VSB No. 92161)     FOLEY & LARDNER LLP
   Geoffrey M. Wyatt (*pro hac vice*)       Washington Harbour
   Sean M. Tepe (*pro hac vice*)            3000 K Street, N.W., Suite 600
   Andrew Hanson (*pro hac vice*)           Washington, D.C. 20007-5109
   Zachary W. Martin (*pro hac vice*)       Telephone: 202-945-6079
   John R. Thornburgh II (*pro hac vice*)   Facsimile: 202-672-5399
   1440 New York Avenue, N.W.               mlockerby@foley.com
   Washington, D.C. 20005                   eevans@foley.com

USCA4 Appeal: 19-2265    Doc: 12    Filed: 12/23/2019    Pg: 255 of 309
Case 1:18-cv-00423-LO-IDD    Document 219    Filed 07/23/19    Page 2 of 3 PageID# 16823

EXHIBIT 4

Telephone: (202) 371-7293
Facsimile: (202) 661-8293
Christopher.Herlihy@probonolaw.com
Anisa.Somani@probonolaw.com
Nicole.Cleminshaw@probonolaw.com
Geoffrey.Wyatt@probonolaw.com
Sean.Tepe@probonolaw.com
Andrew.Hanson@probonolaw.com
Zachary.Martin@probonolaw.com
John.Thornburgh@probonolaw.com

Allison Riggs, Esq. (*pro hac vice*)
Jaclyn Maffetore, Esq. (*pro hac vice*)
Jeffrey Loperfido, Esq. (*pro hac vice*)
SOUTHERN COALITION
FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, North Carolina 27707
Telephone: (919) 323-3380
Facsimile: (919) 323-3942
AllisonRiggs@sourtherncoalition.org
JaclynMaffetore@southerncoalition.org
JeffLoperfido@scsj.org

Cameron Kistler, Esq. (*pro hac vice*)
Genevieve Nadeau, Esq. (*pro hac vice*)
Jamila Benkato, Esq. (*pro hac vice*)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue, N.W. # 163
Washington, D.C. 20006
Telephone: (202) 599-0466
Facsimile: (929) 777-9428
cameron.kistler@protectdemocracy.org
genevieve.nadeau@protectdemocracy.org
jamila.benkato@protectdemocracy.org

Larry Schwartztol, Esq. (*pro hac vice*)
PROTECT DEMOCRACY PROJECT
125 Walnut St., Suite 202
Watertown, MA 02472
Telephone: (202) 599-0466
Facsimile: (929) 777-9428
larry.schwartztol@protectdemocracy.org

Andrew G. Celli, Jr., Esq. (*pro hac vice*)
Alanna Kaufman, Esq. (*pro hac vice*)

William E. Davis (admitted *pro hac vice*)
Ana Romes (admitted *pro hac vice*)
FOLEY & LARDNER LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: 305-482-8404
Facsimile: 305-482-8600
wdavis@foley.com
aromes@foley.com

*Counsel for Defendants Public Interest Legal
Foundation and J. Christian Adams*

Matthew E. Kelley (Va. Bar No. 84045)
Seth D. Berlin (*pro hac vice*)
Steven D. Zansberg (*pro hac vice*)
Alia L. Smith (*pro hac vice*)
Alexander I. Ziccardi (*pro hac vice*)
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Telephone: 202-661-2200
Facsimile: 202-661-2299
kelleym@ballardspahr.com
berlins@ballardspahr.com
zansbergs@ballardspahr.com
smithalia@ballardspahr.com
ziccardia@ballardspahr.com

*Counsel for Defendant J. Christian Adams*

2

EXHIBIT 4

David Lebowitz, Esq. (*pro hac vice*)
EMERY CELLI BRINCKERHOFF & ABADY
LLP
600 Fifth Avenue at Rockefeller Center
10th Floor
New York, New York 10020
Telephone: (212) 763-5000
Facsimile: (212) 763-5001
acelli@ecbalaw.com
akaufman@ecbalaw.com
dlebowitz@ecbalaw.com

*Counsel for Plaintiffs*

**SO ORDERED:**

United States District Court Judge
/s/
Liam O'Grady
United States District Judge

Date: 07/23/2019.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| THE PUBLIC INTEREST LEGAL FOUNDATION, INC. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:16-cv-01375 |
| SUSAN REED, in her official capacity as General Registrar for the City of Manassas, | ) ) ) ) | |
| Defendant. | ) | |

### ORDER

THIS MATTER comes before the Court on Defendant Susan Reed's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 8.) Plaintiff, The Public Interest Legal Foundation, Inc., brought this suit under Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507, seeking declaratory and injunctive relief to order Defendant, in her official capacity as General Registrar for the City of Manassas, to allow Plaintiff to inspect voter records.

Defendant has moved to dismiss the Complaint on the grounds that the privacy provision of the Driver Privacy Protection Act of 1994 ("DPPA"), 18 U.S.C. §§ 2721-2725, overrides the public disclosure provision of the NVRA under the circumstances of this

case. The Court finds that the DPPA does not apply to the disclosure of the voter information requested by Plaintiff. Because Plaintiff has stated a plausible claim for declaratory and injunctive relief, it is hereby

ORDERED that Defendant Susan Reed's Motion to Dismiss is DENIED.

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
January 27, 2016

2

No. 5:19-cv-248-BO - Exhibit A



June 2, 2016

VIA CERTIFIED MAIL

J. Brian Ratledge, Chair
W. Ellis Boyle, Secretary
Mark Ezzell, Member
Wake County Board of Elections
P.O. Box 695
Raleigh, NC  27606

Dear Board Members:

I am writing on behalf of the Voter Integrity Project – NC to notify you that your county is in apparent violation of Section 8 of the National Voter Registration Act based on our research.

The Voter Integrity Project – NC is a non-partisan, volunteer, organization with a mission to restore trust in the democratic process through analysis, detection and prevention of fraud.

Voter rolls across America contain substantial numbers of ineligible voters, resulting in the possible disenfranchisement of legally eligible voters via ballot dilution that threatens to taint the integrity of the electoral process.

Based on our comparison of publicly available information published by the U.S. Census Bureau and the federal Election Assistance Commission, your county is failing to comply with Section 8 of the National Voter Registration Act (NVRA). Federal law requires election officials to conduct a reasonable effort to maintain voter registration lists free of dead voters, ineligible voters and voters who have moved away; 52 U.S.C. §§ 20503 and 20507.

In short, your county has significantly more voters on the registration rolls than it has eligible living citizen voters.

The Attorney General of the United States may enforce the list maintenance requirements of Section 8 of NVRA to ensure that ineligible voters are not participating in the political process, but she has failed to do so. Voter Integrity Project – NC has therefore taken on the task of notifying you of your county's violation.

This letter serves as the statutory notice to your county, required by 52 U.S.C. § 20510(b) prior to the commencement of any lawsuit in order to enforce provisions of Section 8 of the NVRA, 52 U.S.C. § 20507.

It is our hope that your county will work quickly towards full compliance with 52 U.S.C. § 20507. If not, according to the federal statute, a lawsuit under the NVRA may be filed twenty (20) days after the receipt of this notice by a private party since the NVRA contains a private



right of action to enforce the provisions of the statute. For any lawsuits initiated by a private party, an award of attorney's fees, expenses and costs incurred are available under 52 U.S.C. §20510(c).

If you believe the information reported by the Election Assistance Commission for 2014 ("2014 EAC Report") or to the Secretary of State currently is inaccurate, please state the basis for that belief. In particular, if the publicly available information cited above is no longer accurate, it would be helpful if you could provide:

(a) updated registration data since the publication of the 2014 EAC report;

(b) records your office obtained or received from North Carolina court clerks, United States District Court clerks or other sources regarding individuals who were ineligible to serve on juries because of a lack of American citizenship, death or relocation out of the jurisdiction, including but not limited to records concerning juror qualification questionnaires—whether completed via the Internet or returned through the mail—on which the individual that completed the questionnaire indicated that he or she is not a United States citizen, please include subsequent list maintenance records produced pursuant to inquiries based on this information;

(c) the number of ineligible voters purged by category (e.g., dead, duplicate, ineligible) and by date;

(d) the source agency that provided the identifying information of the purged deceased and when the data was provided;

(e) the number of notices sent to inactive voters since the publication of the 2014 EAC Report including the date, scope and contents of any countywide mailing to all registered voters;

(f) the names of the staff in your office responsible for conducting list maintenance obligations who may appear on list maintenance records or who alter list maintenance records in furtherance of the duties of the office;

(g) the number of ineligible voters removed for criminal conviction, if applicable, and the date of the most recent dataset containing criminal convictions against which you compared voter lists, including communications with other agencies regarding criminal convictions;

(h) the total number of voters registered in your county as of the date of your response;

(i) any records indicating the use of citizenship or immigration status for list maintenance activities, including but not limited to the Systematic Alien Verification for Entitlements (SAVE) Program database. Any other records produced in reliance on other sources of citizenship verification data;



(j) all list maintenance records including federal voter registration forms containing citizenship eligibility questionnaires for the last 22 months;

Section 8 also requires your county office to make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i); *See also, Project Vote v. Long*, 682 F.3d 331, 334-335 (4th Cir. Va. 2012) (The NVRA requires local election officials to provide voter registration data to the public).

We would like to discuss with your office how to implement a remedial plan which could cure what appears to be a violation of Section 8 of the NVRA. We also request the opportunity to inspect the list maintenance documents outlined above.

Since steps necessary to ensure that only eligible voters are on the rolls will not involve significant effort or cost, we believe it is reasonable to expect your county's voter roll violations to be resolved before voting begins in the November 2016 elections.

Thank you for your time and attention to this matter. Please feel free to call to arrange a convenient time to discuss and arrange an inspection by contacting me at the below address or email.

Sincerely,

Jay DeLancy, Director
Voter Integrity Project – NC
4441 Six Forks Rd., Box 106-233
Raleigh, NC   27609

CC: Kim Westbrook Strach, Executive Director
North Carolina State Board of Elections
PO Box 27255
Raleigh, NC 27611-7255

```
========================
        NORTH HILLS
350 E SIX FORKS RD STE 150
        RALEIGH
          NC
        27609-7879
       3663560175
06/03/2016   (800)275-8/77   9:26 AM
========================
========================
Product              Sale    Final
Description           Qty     Price

First-Class            1     $0.47
Ma
Letter
   (Domestic)
   (RALEIGH, NC 27602)
   (Weight:0 Lb 0.80 Oz)
   (Expected Delivery Day)
   (Monc   06/06/2016)
Certified              1     $3.30
   (USPS Certified Mail #)
   (70160340000061663935)
Return                 1     $2.70
Receipt
   (USPS Return Receipt #)
   (9590940306765126196259)
First-Class            1     $0.47
Mail
Letter
   (Domestic)
   (RALEIGH, NC 27602)
   (Weight:0 Lb 0.80 Oz)
   (Expected Delivery Day,
   (Monday 06/06/2016)
Certified              1     $3.30
   (USPS Certified Mail #)
   (70160340000061663942)
Return                 1     $2.70
Receipt
   (USPS Return Receipt #)
   (9590940306765196401932)
First-Class            1     $0.47
Mail
Letter
   (Domestic)
   (RALEIGH, NC 27602)
   (Weight:0 Lb 0.80 Oz)
   (Expected Delivery Day)
   (Monday 06/06/2016)
Certified              1     $3.30
   (USPS Certified Mail #)
   (70160340000061663959)
Return                 1     $2.70
Receipt
   (USPS Return Receipt #)
   (9590940306765196496266)

Total                        $19.41
```



No. 5:19-cv-248-BO - Exhibit B

Exhibit A

Case 5:16-cv-00683-BR   Document 1-2   Filed 07/18/16   Page 5 of 5

Exhibit A
Page 5 of 5

No. 5:19-cv-248-BO - Exhibit B

JA-260   Case 5:19-cv-00248-BO   Document 26-2   Filed 08/26/19   Page 5 of 5

---

**First card:**

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

MARK EZZELL
WAKE BOE
Box 695
RAL   NC 27606

9590 9403 0676 5196 4962 66

2. Article Number (Transfer from service label)
7016 0340 0000 6166 3959

PS Form 3811, April 2015 PSN 7530-02-000-9053

COMPLETE THIS SECTION ON DELIVERY

A. Signature
x [signature]   □ Agent   □ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Crystal Sherman

D. Is delivery address different from item 1?   □ Yes
If YES, enter delivery address below:   □ No

JUN 04 2016

CENTURY STATION
RALEIGH - 27602

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
   Restricted Delivery

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Return Receipt for Merchandise
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

Domestic Return Receipt

---

**Second card:**

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BRIAN RATCLIFFE
WAKE BOE
Box 695
RAL   NC 27606

9590 9403 0676 5196 4019 32

2. Article Number (Transfer from service label)
7016 0340 0000 6166 3942

PS Form 3811, April 2015 PSN 7530-02-000-9053

COMPLETE THIS SECTION ON DELIVERY

A. Signature
□ Agent
□ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   □ Yes
If YES, enter delivery address below:   □ No

JUN 04 2016

CENTURY STATION
RALEIGH - 27602

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
   (over $500)   Restricted Delivery

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Return Receipt for Merchandise
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

Domestic Return Receipt

---

**Third card:**

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

ELLIS BOYCE
WAKE BOE
Box 695
RAL   NC 27606

9590 9403 0676 5196 4962 59

2. Article Number (Transfer from service label)
7016 0340 0000 6166 3935

COMPLETE THIS SECTION ON DELIVERY

A. Signature
x [signature]   □ Agent   □ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Crystal Sherman

D. Is delivery address different from item 1?   □ Yes
If YES, enter delivery address below:   □ No

JUN 04 2016

CENTURY STATION
RALEIGH - 27602

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
   (over $500)   Restricted Delivery

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Return Receipt for Merchandise
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

Domestic Return Receipt

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| League of United Latin American Citizens – Richmond Region Council 4614, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PUBLIC INTEREST LEGAL FOUNDATION, an Indiana Corporation, and J. CHRISTIAN ADAMS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:18-cv-00423-LO-IDD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF NICOLE M. CLEMINSHAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY ON**
**PLAINTIFFS' DEFAMATION CLAIMS AND DEFENDANTS' AFFIRMATIVE**
**DEFENSES UNDER THE FIRST AMENDMENT AND VIRGINIA'S IMMUNITY**
**PROVISION**

I, Nicole M. Cleminshaw, state and declare as follows:

1.      I am over 18 years of age.  I am counsel for Plaintiffs League of United Latin

American Citizens – Richmond Region Council 4614, Eliud Bonilla, Luciania

Freeman, and Abby Jo Gearhart (collectively, "Plaintiffs") in this matter and have

personal knowledge of the facts stated herein.  I make this declaration for the

purposes of transmitting certain documents to the Court in support of Plaintiffs'

Motion for Partial Summary Judgment as to Liability on Plaintiffs' Defamation

Claims and Defendants' Affirmative Defenses Under the First Amendment and

Virginia's Immunity Provision.

2.      Attached as Exhibit A is a true and correct copy of the Parties' Joint Written Stipulation of Undisputed Facts, which was filed on May 17, 2019 (ECF No. 155).

3.      Attached as Exhibit B is a true and correct copy of *Alien Invasion in Virginia: The Discovery and Coverup of Noncitizen Registration and Voting* and its exhibits.

4.      Attached as Exhibit C is a true and correct copy of the transcript of the Deposition of Noel Johnson ("Johnson Deposition"), with the cited portions highlighted.

5.      Attached as Exhibit D is a true and correct copy of the transcript of the Deposition of Public Interest Legal Foundation 30(b)(6) designee J. Christian Adams ("PILF Deposition"), with the cited portions highlighted.

6.      Attached as Exhibit E is a true and correct copy, redacted for personal identifiers, of *Alien Invasion II:  The Sequel to the Discovery and Cover-up of Noncitizen Registration and Voting in Virginia* and its exhibits.

7.      Attached as Exhibit F is a true and correct copy of Exhibit 29 to the Johnson Deposition, which are communications from November 2017 between Adams and certain PILF employees.

8.      Attached as Exhibit G is a true and correct copy of an email dated May 31, 2017 containing a PILF newsletter, which was produced by Defendants (bates-stamped PILF-ADAMS-0037281).

9.      Attached as Exhibit H is a true and correct copy of Exhibit 5 to the PILF Deposition, a letter dated January 14, 2016 from PILF to the Alexandria City Registrar.

2

10.  Attached as Exhibit I is a true and correct copy of the Deposition of J. Christian Adams ("Adams Deposition"), with the cited portions highlighted.

11.  Attached as Exhibit J is a true and correct copy of Exhibit 47 to the Deposition of Steven Albertson ("Albertson Deposition"), a PILF newsletter dated May 29, 2017.

12.  Attached as Exhibit K is a true and correct copy of a PILF newsletter dated May 2, 2019 from its website.

13.  Attached as Exhibit L is a true and correct copy of the transcript of the Deposition of Eliud Bonilla, redacted for personal identifiers and with the cited portions highlighted.

14.  Attached as Exhibit M is a true and correct copy of the transcript of the Deposition of Abby Jo Gearhart, redacted for personal identifiers with the cited portions highlighted.

15.  Attached as Exhibit N is a true and correct copy of the transcript of the Deposition of Luciania Freeman, redacted for personal identifiers and with the cited portions highlighted.

16.  Attached as Exhibit O is a true and correct copy of Exhibit 4 to the Johnson Deposition, which contains communications from the Bedford County Registrar dated August 18, 2016.

17.  Attached as Exhibit P is a true and correct copy of the Deposition of Virginia Voters Alliance 30(b)(6) designee Reagan George.

Pg: 266 of 309     Filed: 12/23/2019     Doc: 12     USCA4 Appeal: 19-2265

Pg: 267 of 309        Filed: 12/23/2019        Doc: 12        USCA4 Appeal: 19-2265

18.     Attached as Exhibit Q is a true and correct copy of Exhibit 6 to the PILF Deposition, which contains September 2016 communications between PILF and the attorney for the Alexandria City Registrar.

19.     Attached as Exhibit R is a true and correct copy of Exhibit 7 to the PILF Deposition, which is an email dated August 5, 2016 from Adams to certain PILF employees.

20.     Attached as Exhibit S is a true and correct copy of Exhibit 2 to the Johnson Deposition, which is an email to PILF dated August 16, 2016 containing information from Prince William County.

21.     Attached as Exhibit T is a true and correct copy of Exhibit 8 to the PILF Deposition, which are PILF communications containing letters to Virginia Registrars.

22.     Attached as Exhibit U is a true and correct copy of Exhibit 8 to the Deposition of Clarabelle Wheeler, which is an email dated September 13, 2016 from Clarabelle Wheeler to Adams.

23.     Attached as Exhibit V is a true and correct copy of the transcript of the Deposition of Edgardo Cortes ("Cortes Deposition"), redacted for personal identifiers and with the cited portions highlighted.

24.     Attached as Exhibit W is a true and correct copy of the transcript of the Deposition of Virginia Department of Elections 30(b)(6) designee Christopher Piper, with the cited portions highlighted.

4

25.   Attached as Exhibit X is a true and correct copy of Exhibit 42 to the Albertson
Deposition, with personal identifiers redacted, which contains communications
dated  October 4, 2016 between Steven Albertson and Jordan Labiosa.

26.   Attached as Exhibit Y is a true and correct copy of portions of the transcript of the
Steven Albertson Deposition.

27.   Attached as Exhibit Z is a true and correct copy of Exhibit 15 to the Johnson
Deposition, which contains communications with the York County Registrar
dated November 22, 2016.

28.   Attached as Exhibit AA is a true and correct copy of Exhibit 17 to the PILF
Deposition, which contains communications with the York County Registrar from
January and February 2017.

29.   Attached as Exhibit BB is a true and correct copy of Exhibit 19 to the PILF
Deposition, which contains February 2017 communications between Johnson and
the County of Fauquier Registrar.

30.   Attached as Exhibit CC is a true and correct copy of Exhibit 15 to the PILF
Deposition, which contains emails dated February 15, 2017 between Johnson and
the James City County Registrar.

31.   Attached as Exhibit DD is a true and correct copy of Exhibit 16 to the PILF
Deposition, which contains February 2017 emails between Johnson and the James
City County Registrar.

32.   Attached as Exhibit EE is a true and correct copy of Exhibit 20 to the PILF
Deposition, which is a communication dated February 9, 2017 to PILF from the
Rappahannock County Registrar.

Pg: 268 of 309     Filed: 12/23/2019     Doc: 12     USCA4 Appeal: 19-2265

33.   Attached as Exhibit FF is a true and correct copy of Exhibit 21 to the PILF Deposition, which is an email from Adams to Johnson dated February 1, 2017.

34.   Attached as Exhibit GG is a true and correct copy of Exhibit 22 to the PILF Deposition, which contains communications between Adams, Johnson, and Hans von Spakovsky dated February 1, 2017.

35.   Attached as Exhibit HH is a true and correct copy of Exhibit 13 to the Deposition of Hans von Spakovsky, which contains March 2017 communications between Hans von Spakovsky, Reagan George, Adams, and others.

36.   Attached as Exhibit II is a true and correct copy of Exhibit 27 to the Johnson Deposition, which contains communications dated March 28, 2017 between Adams and certain PILF employees.

37.   Attached as Exhibit JJ is a true and correct copy of Exhibit 24 to the PILF Deposition, redacted for personal identifiers, which contains communications dated May 25, 2017 between Adams, Reagan George, and others.

38.   Attached as Exhibit KK is a true and correct copy of Exhibit 36 to the Johnson Deposition, which is a draft of a PILF report about sanctuary cities dated August 14, 2018.

39.   Attached as Exhibit LL is a true and correct copy of an email dated September 24, 2016 from Adams to several PILF employees, which was produced by Defendants (bates-stamped PILF-ADAMS-0014090).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on June 14, 2019, in Washington, D.C.

6

Nicole M. Cleminshaw (VSB No. 92161)

7

Pg: 270 of 309

Filed: 12/23/2019

Doc: 12

USCA4 Appeal: 19-2265

Pg: 271 of 309

Filed: 12/23/2019

Doc: 12

USCA4 Appeal: 19-2265

## CERTIFICATE OF SERVICE

I, Nicole M. Cleminshaw, hereby certify that on June 14, 2019, I electronically filed the

foregoing Declaration of Nicole M. Cleminshaw in Support of Plaintiffs' Motion for Partial

Summary Judgment using the CM/ECF system, which shall send notification of such filing

(NEF) to the following counsel of record:

Michael J. Lockerby, Esq.
Foley & Lardner LLP
3000 K Street, N.W. | Suite 600
Washington, DC 20007
mlockerby@foley.com

*Counsel for Defendants*

Matthew E. Kelley, Esq.
Ballard Spahr LLP
1909 K Street, NW | 12th Floor
Washington, DC 20006
kelleym@ballardspahr.com

*Counsel for Defendant J. Christian Adams*

<div style="text-align:right">

_____ /s/
NICOLE M. CLEMINSHAW (VSB No. 92161)
1440 New York Ave. NW
Washington, DC 20005
Telephone:   (202) 371-7509
Facsimile:    (202) 661-8209
Nicole.Cleminshaw@probonolaw.com

*Counsel for Plaintiffs League of United Latin
American Citizens – Richmond Region Council
4614, Eliud Bonilla, Luciana Freeman, Abby Jo
Gearhart*

</div>

8

# EXHIBIT CC

| | |
|---|---|
| **From:** | Dianna Moorman [Dianna.Moorman@jamescitycountyva.gov] |
| **Sent:** | 2/15/2017 2:27:26 PM |
| **To:** | Noel Johnson [njohnson@PublicInterestLegal.org]; Nate Green [ngreen@wjcc-ca.hrcoxmail.com] |
| **CC:** | Shawna Powell [spowell@PublicInterestLegal.org] |
| **Subject:** | RE: NVRA Request and Litigation Notice |
| **Attachments:** | Cancellation_Declared_Non_Citizen 2011-2017.pdf |

Good afternoon-

My sincerest apologies for not responding sooner. I have attached the requested report of non-citizens in James City County from January 1, 2011-February 15, 2017. Please note that many of these simply were because they failed to check the "Are you a US citizen" box on the voter registration application, not because they are actually a non-citizen, and have since reregistered with an acceptable completed application.

Please let me know if there is anything else I can do for you.

Best regards-

-Dianna Moorman


*Please note: our office has moved and all contact info has changed.*

**Dianna S. Moorman, VREO**
**General Registrar and Director of Elections**



**Voter Registration and Elections**
**5300 Palmer Lane**
**Williamsburg, VA 23188**
**P: 757-259-4940**
**F: 757-259-4945**
**TDD: 711**
**jamescitycountyva.gov/vote**

**From:** Noel Johnson [mailto:njohnson@PublicInterestLegal.org]
**Sent:** Wednesday, February 15, 2017 1:37 PM
**To:** Dianna Moorman ; Nate Green
**Cc:** Shawna Powell
**Subject:** NVRA Request and Litigation Notice

Ms. Moorman,

On August 8, 2016, we sent you a letter seeking inspection of election records pursuant to the National Voter Registration Act. To date, we have not received any of the requested records, including a VERIS report showing cancellations of registrants who were determined to not meet the requirement of U.S. citizenship.

We have attempted several times to discuss this matter with you and to inspect the requested documents, including an in-office visit on September 23, 2016. Most recently, we contacted you on January 31, 2017, informing you that your basis for withholding the noncitizen cancellation report has been rejected by a federal court in the Eastern District of Virginia.

**This is our last attempt to resolve this matter prior to litigation.** If you do not provide access to the documents requested in our August 8, 2016 letter, we will commence litigation next week by filing the attached Complaint and Exhibits.

Please note: our request is not limited to the noncitizen cancellation report, but includes other documents such as the voter registration applications of all cancelled noncitizens and any records showing the voting history of those noncitizens. Additionally, our request asks for all communications with law enforcement officials regarding those noncitizens. Please refer to the attached Exhibit 1 for the entire scope of our request.

The attorney for James City, as listed on the Commonwealth's Attorney's website, is copied here.

Please follow up immediately with any questions or concerns.

**Noel Johnson**
Litigation Counsel
PUBLIC INTEREST LEGAL FOUNDATION
njohnson@publicinterestlegal.org
32 E. Washington Street, Suite 1675
Indianapolis, IN 46204
Telephone (317) 203-5599
Facsimile (888) 815-5641
www.publicinterestlegal.org

# EXHIBIT EE

## DO NOT FORWARD. NOT FOR PUBLICATION OR ATTRIBUTION.

Dear Ms. Powell,

I am responding to the most recent request by your organization, the Public Interest Legal Foundation, for the non-citizen cancellation report for the dates 1/1/11 to present. To clarify charges you make in your letter dated January 31, 2017, we did not deny your request. Your representatives appeared in my office on the first day of absentee voting. Our office is a two person office that was in the midst of serving our registered voters by conducting the election with professionalism and integrity. Your purported concerns about the integrity of elections should have taken into consideration that significant deadline to serve registered voters and made *them* a priority. Upon requesting contact information from your representatives so I could respond to them, they refused to even provide their names or contact information. All of these events render your accusation that we denied your request invalid.

I would also like to remind your organization that the Department of Elections provided the report you are requesting including clarifications, in September of 2016 (see <u>Attachment A</u>). Your article in <u>the Daily Signal</u> titled "Hundreds of Noncitizens on Voting Rolls in Swing State of Virginia"(<u>Attachment B</u>) dated September 28, 2016 grossly misrepresented the facts and further eroded voter confidence in the processes election administrators are required to follow in accordance with legislation.

Attached (<u>Attachment C</u>) you will find the report you have requested. As you were informed by the Department of Elections, this report is not all inclusive and there are false positives. Each voter on this report was a different circumstance. I have researched each one of them since I wasn't appointed to this position or employed in this office until late 2012. In many instances, voters miss checking the tiny box indicating they are citizens. In this instance, we are required to deny their registrations or cancel them if they are registered and submitting an application to change their address or name etc. without completing that part of the application. We send a letter notifying them of the cancellation and the reason and in the majority of instances, they provide valid photo id/proof of citizenship and their registration is reactivated. In one instance I found that my predecessor erroneously cancelled the voter, noting that the voter had failed to check the citizen box when in fact the voter had. This report only shows the cancellations and insinuates that hundreds or thousands of non-citizens have voted when you don't have the whole history of the voters you are referencing statewide.

There are many more serious concerns in the administration of elections nationwide. I remain concerned about your potential misinterpretation of the reports and your propensity to misrepresent those results to our voters.

Please note, I do not give you permission in any way to quote me, reproduce, forward, or attribute anything I have written in this letter. Rappahannock County has now complied with your request and a copy of all correspondence regarding this matter is now in the custody of our Commonwealth Attorney and County Attorney.

Respectfully,

Kim McKiernan, VREO
Director of Elections, Rappahannock County, VA

2/9/17

DEPOSITION
EXHIBIT
20
PILF
PENGAD 800-631-6989

**ATTACHMENT A**

In an email dated 2/8/17:

The Department of Elections is aware of the request made by the Public Interest Legal Foundation (PILF) related to the non-citizen cancellation report produced in VERIS. Because the requests sent to localities contains threatened litigation, you should consult with your local legal counsel regarding how to properly respond to this request as ELECT is unable to provide legal advice to localities. Please note that the Department provided PILF a custom statewide report on September 30, 2016 that contains all the information presented in the VERIS non-citizen cancellation report plus additional information related to false positives, including individuals who received a non-citizen letter and subsequently affirmed their U.S. citizenship.

Edgardo Cortés
Commissioner
Virginia Department of Elections
edgardo.cortes@elections.virginia.gov
804-864-8903 direct

PILF-ADAMS-0019101

## ATTACHMENT B

**Hundreds of Noncitizens on Voting Rolls in Swing State of Virginia**

**September 28, 2016**

Fred Lucas | The Daily Signal

The 2012 presidential race in Virginia was decided by just 3 percentage points, as was the next year's race for governor. In both 2005 and 2013, fewer than 1,000 votes decided contests for Virginia attorney general.

Against this backdrop, watchdog groups have pushed local election officials in seven Virginia jurisdictions to reveal hundreds of noncitizens who are registered to vote. So far, they have found more than 550.

However, leaders of the group say the Virginia State Board of Elections has resisted release of information on ineligible voters.

The Public Interest Legal Foundation represents the Virginia Voters Alliance in a lawsuit filed earlier this year against the city of Alexandria. The city prompted its suspicion after the alliance determined that more people were registered to vote in the city than eligible voters who lived there, said Noel Johnson, litigation counsel for the legal foundation.

"These records that we are trying to get should all be available through the National Voter Registration Act," Johnson told The Daily Signal in a phone interview. "Every ineligible voter on the rolls could end up being an eligible vote that cancels out the vote of other, eligible voters. So these are high stakes."

In most cases, Johnson said, counties respond by saying the Virginia State Board of Elections informed them not to provide information about noncitizens that are registered to vote.

Alexandria General Registrar Anna Leider, who is in charge of elections and voter registration there, said the city's reading of Census Bureau information showed the number of voting-age adults surpassed the number of registered voters. So, city officials disagreed with the Virginia Voters Alliance on that point, she said.

"We provided them with all of the information they have requested," Leider told The Daily Signal in a phone interview, referring to the alliance.

In Alexandria, election officials have removed 70 noncitizens from the voter rolls since January 2012, Leider said.

Separate from the Alexandria lawsuit, the legal foundation obtained voter information from seven of the 20 counties it is investigating.

Of the data available, the largest number of noncitizens registered to vote was in Prince William County, about 400 since 2011, before **officials removed them from the rolls**, Johnson said.

Other jurisdictions providing information to the Public Interest Legal Foundation were the city of Fairfax and the counties of Bedford, Hanover, Roanoke, and Stafford, which combined had about 150 noncitizens registered to vote.

Virginia has moved from being a reliably Republican state in presidential elections to twice voting for President Barack Obama. This shift has prompted Democrats and Republicans to contest it as a swing state.

In June, U.S. District Judge Leonie M. Brinkema of the Eastern District of Virginia, who was appointed by resident Bill Clinton, dismissed the Virginia Voters Alliance lawsuit against Alexandria.

The lawsuit argued that Leider, the registrar, violated the National Voter Registration Act by not releasing records about city procedures for maintaining voter rolls, which the group said should be available for public inspection under the federal voter registration law. The alliance also asked that the rolls be cleaned up, in compliance with that law.

Martin Mash, spokesman for the Virginia Department of Elections, the agency supervised by the Board of Elections, at first told The Daily Signal that the department wouldn't comment on pending litigation.

When The Daily Signal noted that the lawsuit had been dismissed, Mash again declined to comment. He referred questions on the matter to the office of Virginia Attorney General Mark Herring, which did not respond to phone and email inquiries. Herring is a Democrat.

The Public Interest Legal Foundation also has sought to know if these noncitizens voted in past elections, but said local governments haven't provided the information.

"That is not done for any canceled voter registration, not for deceased [voters], not for people who have moved out of the state," Leider said. "Past activity is not something we routinely check."

It is a federal crime and a violation of Virginia law for noncitizens to vote.

The federal penalty for an ineligible voter found to have cast a vote could be a fine or imprisonment for no more than one year. Under Virginia law, it is a Class 6 felony for an ineligible voter to vote, punishable by not less than one year of imprisonment and not more than five years

"We have had conversations with the [Alexandria] commonwealth's attorney, but those conversations are between us and the commonwealth's attorney," Leider said.

In Virginia, a commonwealth's attorney is equivalent to a district attorney or local prosecutor.

The federal voter registration law requires state and local election officials to "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."

Hans von Spakovsky, a senior legal fellow with The Heritage Foundation, is a former member of both the election board in Fairfax County, Virginia, and the Federal Election Commission.

"Not a single one of those noncitizens, who committed a felony under federal law, has been prosecuted," von Spakovsky said at a forum on voter fraud at The Heritage Foundation, referring to the findings of the legal foundation. "In fact, there is no indication that any of this information was ever turned over to law enforcement officials for investigation or prosecution."

Von Spakovsky recently wrote that the Virginia State Board of Elections was engaged in a "cover-up":

Numerous other Virginia counties have refused to provide this information to the Public Interest Legal Foundation, apparently based on instructions from the State Board of Elections and individuals working for the state Department of Elections, which the board supervises. This is what a cover-up directed by state election officials looks like. They are trying to hide hundreds, if not thousands, of instances of voter fraud that occurred on their watch.

If thousands of aliens are registered or actually voting, it would obviously undermine the national narrative that voter fraud is a myth. This would be particularly disturbing in a state like Virginia, in which statewide elections for attorney general have been decided by fewer than 1,000 votes in the last decade.

@FredLucasWH

Fred Lucas Fred Lucas is the White House correspondent for The Daily Signal. Send an email to Fred.

**ATTACHMENT C**

DO NOT FORWARD.  NOT FOR PUBLICATION OR ATTRIBUTION.

Additional Comments:

**I would encourage you to conduct some additional research.

http://www.elections.virginia.gov/board/greb-duties-workgroup/index.html

Specifically, read the GREB Final Report dated December 16, 2015

All of this is available on the Department of Elections website, including, the Voter Registration List Maintenance report for 2016.

http://www.elections.virginia.gov/resultsreports/maintenance-reports/index.html

PILF-ADAMS-0019105

# EXHIBIT HH

**From:** Reagan George
**Sent:** Thursday, March 30, 2017 10:54 PM
**To:** 'Hunt, Stephen M'
**Subject:** RE: [GRLIST] Declared Non-Citizen Hopper


Steve;

Has anyone audited this new system?  Talk about foxes guarding the hen house.  We even have foxes guarding the chickens in the hen house.

I would not be trusting Cortez at all.

Reagan
-----Original Message-----
From: Hunt, Stephen M [mailto:Stephen.Hunt@fairfaxcounty.gov]
Sent: Thursday, March 30, 2017 6:48 PM
To: Reagan George; von Spakovsky Hans; clarabelle.wheeler@elections.virginia.gov
Subject: Re: [GRLIST] Declared Non-Citizen Hopper

Just talked to Cameron.


We received another 197 non-citizen notices from the DMV.  These are from the September & October time frame. These seem to have started when the new system with the DMV was instituted in June of 2016.  These folks all had transactions with the DMV.  ELECT also set it up that every DMV transaction generates an on-line voter registration (original request or update).  Consequently, if you go in to renew your driver's license, a new voter registration form was generated.


It is my guess that somehow either the person ignored the "Are you a citizen" block since they were renewing their driver's license so "who cared" or the system is capturing the wrong input.  If the voter had actually checked that they are not citizens, then the new voter registration should never had been generated.  This is a significant problem and the system should be shut down until it is investigated, identified and fixed.


This does not address the question regarding why these are just showing up now.


Steve


_____
From: Hunt, Stephen M
Sent: Thursday, March 30, 2017 5:25:36 PM
To: Reagan George; von Spakovsky Hans
Subject: Re: [GRLIST] Declared Non-Citizen Hopper


Reagan


A couple updates.  Cameron, with the boards support, has initiated the required process for contacting the people who were designated as a non-citizen by the DMV to give them the opportunity to confirm their citizenship. Anyone who does not respond will be removed from the roles and if they have voted, their name is going to be sent to the commonwealth attorney.

EXHIBIT  13
WIT: Von Spakovsky
DATE: 5/9/19
REPORTER: J. HARMONSON

VVA-001239

Many of the people who were identified as a non-citizen have verified their citizenship. A good number responded very rapidly because they have security clearances that could be at risk if there was some indication that they were not citizens. This causes me to believe that there are two issues. The first is what in the DMV system is causing miss identification of US citizens as non-citizens. The second is why did we not receive the information until now. The board has sent a letter to the State Board of Elections requesting an investigation into both of these issues.

I would be a little cautious in using the numbers as the number of non-citizens who have voted. In fact the 190 de-duped down to 102. I will try to remember to let you know how many names we send to the commonwealth attorney.

Steve

_____

From: Reagan George <rgeorge137@cox.net>
Sent: Thursday, March 30, 2017 4:24:12 PM
To: Hunt, Stephen M; von Spakovsky Hans
Subject: FW: [GRLIST] Declared Non-Citizen Hopper

Sorry; I missed sending this to the two of you.

Hope all is well.

Reagan

From: Reagan George [mailto:rgeorge137@cox.net]
Sent: Tuesday, March 28, 2017 12:18 PM
To: Adams J. Christian (a@electionlawcenter.com); 'Keith G. Damon (kgdamon@pheasridge.com)'; Clara Belle Wheeler MD (cbwhandsur@aol.com)
Cc: Ed Gillespie (ed@edgillespiestrategies.com); Jill H. Vogel (jh@hvjt.law); John Adams (john@johnadamsforva.com); 'Mark Cole'; John Whitbeck <chairman@vagop10.org> (chairman@vagop10.org)
Subject: FW: [GRLIST] Declared Non-Citizen Hopper

All;

Here is a great example of the Department of Elections hiding the ball prior to the last election. This is also an example of ELECT hiding evidence of fraudulent voting in the last election.

Non-citizens registered and voting in our elections are both a Federal and State felony crime. Is anyone going to be prosecuted? How many other non-citizens are registered and voting? Note at the bottom the Fairfax Registrar said there were 190 in his hopper and most of them voted. Republicans must get serious about this issue. This is a huge impact on the non-citizens list that the Public Interest Legal Foundation (PILF) is trying to compile statewide.

VVA has been trying to purchase the Social Security Admin.'s Death Master File. The Obama Admin has made it extremely hard to obtain the file. They raised the prices and now require a $500 Certification process. They knew that we can use it to identify fraudulent SSNs that the left uses to register non-citizens to vote as well as dead voters that are not being removed from the voter rolls. I would not be surprised if only dead Republicans are being removed from VERIS because they won't get push back from fellow Democrats.

Regards;

Reagan George
President, Virginia Voters Alliance

713.545.1047 cell
703.803.8482 office
rgeorge137@cox.net<mailto:rgeorge137@cox.net>

From: Friendly Registrar
Sent: Tuesday, March 28, 2017 10:33 AM
To: Reagan George
Subject: Fw: [GRLIST] Declared Non-Citizen Hopper


Reagan:

I'm not sure if you have seen the e-mail below from the Department explaining why we are now getting in March
2017 DMV Non-citizen Declaration data from as far back as July 2016!

Friendly Registrar

From: The official communication list for the General Registrars of the Commonwealth
[mailto:GRLIST@LISTLVA.LIB.VA.US] On Behalf Of Cortes, Edgardo (ELECT)
Sent: Tuesday, March 28, 2017 10:12 AM
To: GRLIST@LISTLVA.LIB.VA.US<mailto:GRLIST@LISTLVA.LIB.VA.US>
Subject: Re: [GRLIST] Declared Non-Citizen Hopper

Good morning,

Several weeks ago we began a post-election review and internal audit of our processes to ensure that incoming data
was appropriately processed.  The review covers from April 2016 to present.  We identified that the non-citizen files
for July and August were not fully processed before the election and that data was loaded earlier in March.  Those
were the only files received prior to the November election that were not fully processed.

The records loaded into your hoppers last night reflect transactions that occurred at DMV in September and
October.  The process for compiling, reviewing, and sending that data from DMV to ELECT takes approximately
45-60 days.  While the transaction may have taken place prior to the election, we do not receive the data until mid-
November at the earliest.  As part of this review, we are working with DMV to expedite transfer of this data and
fully leverage the electronic motor voter process.

Determinations regarding whether or not a match has occurred or should be processed is a complex process and has
not been automated.  There are varied circumstances that could occur and this decision, under state law, is left to the
General Registrar to determine if an individual has met the legal requirements to remain registered.  You should
follow your routine procedures for processing this data.

Edgardo Cortés
Commissioner
Virginia Department of Elections
edgardo.cortes@elections.virginia.gov<mailto:edgardo.cortes@elections.virginia.gov>
804-864-8903 direct

From: The official communication list for the General Registrars of the Commonwealth
[mailto:GRLIST@LISTLVA.LIB.VA.US] On Behalf Of Anna Cloeter
Sent: Tuesday, March 28, 2017 9:41 AM
To: GRLIST@LISTLVA.LIB.VA.US<mailto:GRLIST@LISTLVA.LIB.VA.US>
Subject: Re: [GRLIST] Declared Non-Citizen Hopper

We received 13 with September/October declaration dates overnight. At least that's down from the 19 we got at the
beginning of the month that had declaration dates in July/August?

As with last time, it seems that a few have been re-registered subsequent to the date of their alleged non-citizen declaration and many participated in the last election.

Anna Cloeter
General Registrar & Director of Elections County of Roanoke, Virginia
T: (540) 772-7500 | F: (540) 772-2115
acloeter@roanokecountyva.gov<mailto:acloeter@roanokecountyva.gov>

>>> "Ables, Alex"
>>> <alex.ables@FAUQUIERCOUNTY.GOV<mailto:alex.ables@FAUQUIERCOUNTY.GOV>
>>> 3/28/2017 9:26 AM >>>
My records indicate that the last time Non-Citizens were population into my Hopper was September 2016 and no other data was loaded until March 2017, that's a long time without any data being provided.

Alexander A. Ables
General Registrar
County of Fauquier, Virginia
528 Waterloo Road, Suite 200
Warrenton, VA 20186-3011
Tel. 540-422-8290
Fax 540-422-8291
http://vote.fauquiercounty.gov<http://vote.fauquiercounty.gov/>

From: The official communication list for the General Registrars of the Commonwealth
[mailto:GRLIST@LISTLVA.LIB.VA.US] On Behalf Of Sasnett, Cameron G
Sent: Tuesday, March 28, 2017 8:55 AM
To: GRLIST@LISTLVA.LIB.VA.US<mailto:GRLIST@LISTLVA.LIB.VA.US>
Subject: [GRLIST] Declared Non-Citizen Hopper

Did anyone else get their Declared Non-Citizen Hopper populated overnight with records from September and October? We received 190 records, most of whom voted in November. This is second time this month we've received a similar batch of voters who should have been canceled prior to November. I'm just curious if anyone else had received these types of records and are as similarly concerned as I am.

Regards,

Cameron Glenn Sasnett
Director of the Office of Elections & General Registrar Fairfax County Office of Elections 703.324.4715[o]
571.992.3837[m]

---

To unsubscribe from the GRLIST list, e-mail
verishelp@elections.virginia.gov<mailto:verishelp@elections.virginia.gov>.

---

To unsubscribe from the GRLIST list, e-mail
verishelp@elections.virginia.gov<mailto:verishelp@elections.virginia.gov>.

---

To unsubscribe from the GRLIST list, e-mail
verishelp@elections.virginia.gov<mailto:verishelp@elections.virginia.gov>.

---

To unsubscribe from the GRLIST list, e-mail
verishelp@elections.virginia.gov<mailto:verishelp@elections.virginia.gov>.

EXHIBIT 2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| THE PUBLIC INTEREST LEGAL FOUNDATION, INC. | ) ) ) | |
| Plaintiff, | ) ) | Civ. No. 1:16-CV-1375 |
| v. | ) ) | |
| SUSAN REED, in her official capacity as General Registrar for the City of Manassas, | ) ) ) | |
| Defendant. | ) ) ) ) ) | |

### SUSAN REED'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND MEMORANDUM OF POINTS AND AUTHORITIES

Susan Reed ("Defendant"), in her official capacity as General Registrar for the City of Manassas, by counsel, respectfully submits this Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6)). In connection therewith, Defendant respectfully states as follows:

### Procedural Background

1.  The Public Interest Legal Foundation, Inc. (collectively as "Plaintiff") commenced this adversary proceeding by filing a Complaint on November 3, 2016 seeking declaratory and injunctive relief to compel Defendant's compliance with Section 8 of the National Voter Registration Act of 1993 ("NVRA").

### Statement of Facts

2.  Plaintiff is a public interest organization headquartered in Plainfield, Indiana, that works to promote the integrity of elections nationwide. Plaintiff asserts that it has dedicated significant time and resources to ensure that voter rolls in the Commonwealth of Virginia are

free from ineligible registrants, non-citizens, and individuals who are no longer registered. (Compl. ¶ 4.)

3.      Defendant is the General Registrar for the City of Manassas.  (Compl. ¶ 5.)

4.      On August 8, 2016, Plaintiff sent a statutory notice letter ("notice letter") to Defendant.   In the notice letter, Plaintiff requested that Defendant provide Plaintiff an opportunity to inspect the following information:

> 1. *Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any information source*, including information obtained from the Virginia Department of Motor Vehicles or from the Virginia State Board of Elections since 2011.  This request extends to all documents that provide the name of the registrant, the voting history of such registrant, *the nature and content of any notice sent to the registrant*, including the date of the notice, the response (if any) of the registrant, and *actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.*
>
> 2.  All communications regarding your list maintenance activities relating to #1 above to the Commonwealth Attorney, Virginia Attorney General, Virginia State Police, any other state law enforcement agencies, the United States Attorney's office, or the Federal Bureau of Investigation.
>
> 3.  The total voting-age population in your jurisdiction as of the date of your response; and
>
> 4.  The total number of voters registered in your jurisdiction as of the date of your response.

(See attached as Exhibit 1 a true and accurate copy of the notice letter) (Compl. ¶ 8.)

5.      On September 13, 2016, Plaintiff contacted Defendant by telephone to discuss the notice letter and repeated its requests.  Specifically, Plaintiff requested an opportunity to inspect and duplicate records showing individuals whose voter registrations had been cancelled by

2

Defendant because they were determined not to be United States citizens ("non-citizen cancellation report").  (Compl. ¶ 10.)

6.      On September 23, 2016, a representative of Plaintiff visited Defendant's office to inspect the non-citizen cancellation reports.  Defendant did not disclose the requested non-citizenship cancellation reports to Plaintiff.  (Compl. ¶ 11-12.)

7.      In response, Plaintiff filed a Complaint in the Eastern District of Virginia, Richmond Division, on November 3, 2016 (the "Complaint").

8.      Paragraph 21 of the Complaint, alleges that "[t]he requested non-citizen cancellation report is a record 'concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . . . 52 U.S.C. § 20507(i)(1)."  (Compl. ¶ 21.)

9.      Paragraph 22 asserts that "[u]nder the NVRA, the Defendant is obligated to make the requested non-citizen cancellation report available for public inspection."  (Compl. ¶ 22.)

10.     Relying on these allegations and conclusory statements, Plaintiff asserts one claim against Defendant:

> The Defendant has failed to respond to Plaintiff's written request for data and failed to provide records [the non-citizen cancellation report] to Plaintiff concerning Defendant's implementation of programs and activities for ensuring the accuracy and currency of official lists of eligible voters for Chesterfield County, in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(i).  *See Project Vote v. Long*, 682 F.3d 331, 334-335 (4th Cir. 2012) (The NVRA requires local election officials to provide such data to the public).

> (Comp. ¶ 31).

11.     Accordingly, Plaintiff asks this Court to declare Defendant in violation of Section 8 of the NVRA.  Additionally, Plaintiff demands judgment (1) declaring that Defendant is in violation of the NVRA; (2) ordering the Defendant to provide to the Plaintiff the records

3

concerning his implementation of programs and activities to ensure the accuracy and currency of

City of Manassas's voter registration list; and (3) ordering the Defendant to pay Plaintiff's

reasonable attorney's fees, including litigation expenses and costs, pursuant to 52 U.S. §

20510(c).  (Compl. ¶ 1, 3-4[sic].)

<div align="center">**Argument**</div>

<div align="center">### I.    Standard of Review.</div>

12.    When considering a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), the court "should accept as true all well-pleaded allegations" and should

construe those allegations in the light most favorable to the plaintiff.  *Mylan Labs., Inc. v.

Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  As the Supreme Court notes, a complaint need not

assert detailed factual allegations, but must contain "more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007).  "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

13.    Furthermore, even assuming the factual allegations in the complaint are true, they

"must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at

555.  The court "need not accept the legal conclusions drawn from the facts," and "need not

accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore

Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *see also Wahi v.

Charleston Area Med. Ctr., Inc*., 562 F.3d 599, 615 n.26 (4th Cir. 2009).  Moreover, "elements

of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute

well-pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com,* 591

F.3d 250, 255 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).  "[W]hen the allegations in a

<div align="center">4</div>

complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558.

14.     Thus, the Court should grant a motion to dismiss unless the factual allegations in the complaint raise a reasonable inference that Plaintiffs will be able to make a case. *Twombly*, 550 U.S. at 556.  Plaintiffs "must sufficiently allege facts to allow the Court to infer that all elements of each of his causes of action exist." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 344-45 (4th Cir. 2006).  Moreover, a complaint must allege sufficient facts to establish plausible grounds upon which the claim rests and must contain more than a claimant's bare averment that he wants relief and is entitled to it. *See Twombly*, 550 U.S. at 556.

15.     The Supreme Court has stated that the plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Twombly*, 550 U.S. at 556.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of "entitlement to relief." *Id.* at 557; *Iqbal,* 556 U.S. at 678.

**II.     18 U.S.C. § 2721 Prohibits Disclosure of the Information**

16.     Plaintiff's Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  Under Count I, Plaintiff essentially asserts that Defendant failed to disclose the non-citizenship cancellation report.  A fair reading of the Complaint indicates that Plaintiff requests the following data: 1) "Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any information source, including information obtained from the Virginia Department of Motor Vehicles" and 2) "All communications regarding your list maintenance

activities relating to #1 above to the Commonwealth's Attorney, Virginia Attorney General, Virginia State Policy, any other state law enforcement agencies, the United States Attorney's office, or the Federal Bureau of Investigation." (Compl. ¶ 8.)

17.    Plaintiff admits that the non-citizenship cancellation report is derived directly from personal information from the Virginia Department of Motor Vehicles. (Compl. ¶ 8.)

18.    Under 18 U.S.C. § 2721(a), "A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: (1) personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record." Section 2725(3) defines "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." Additionally, "person" is defined as "an individual, organization or entity, but does not include a State or agency thereof." 18 U.S.C. § 2725(2).

19.    When read together, Plaintiff is a "person" as defined under § 2725(2). Consequently, the Department of Motor Vehicles must not "knowingly disclose or otherwise make available" the requested personal information. In making repeated requests for disclosure of the non-citizenship cancellation reports, Plaintiff ignores federal law prohibiting such disclosure. The non-citizenship cancellation report is replete with personal information derived from the Department of Motor Vehicles' records and, therefore, is expressly protected under Section 2721(a). While Section 2721(b) does permit disclosure of information "[f]or use by any governmental agency . . . in carrying out its functions", the exception solely allows the General

6

Registrar, as an official within the Virginia Department of Elections, to review the personal information or carry out list maintenance purposes.

20.    Plaintiff has requested specific personal information derived from the Virginia Department of Motor Vehicles that may have provided assistance in Defendant's list maintenance program. There is no authority under the National Voter Registration Act that overrides Section 2721's express prohibition of disclosing personal information from the Department of Motor Vehicles. Accordingly, the non-citizenship cancellation reports requested by Plaintiff are protected under the Section 2721 and must not be disclosed.

21.    Plaintiff also requests "[a]ll communications regarding your list maintenance activities relating to #1 [non-citizen cancellation reports] above to the Commonwealth's Attorney, Virginia Attorney General, Virginia State Policy, any other state law enforcement agencies, the United States Attorney's office, or the Federal Bureau of Investigation." Plaintiff's request is both vague and not a list maintenance document under the NVRA. The NVRA permits disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy of official lists of eligible voters . . . ." 52 U.S.C. §20507(i). The information sought by Plaintiff is "communications" relating to the non-citizenship cancellation reports. As previously established, the non-citizenship cancellation reports cannot be disclosed under Section 2721 and do not relate to list maintenance. Accordingly, any communications relating to such information also does not relate to list maintenance and are not under the purview of the NVRA disclosure requirements.

`    22.    Plaintiff relies on *Project Vote v. Long*, 682 F.3d 331 (4th Cir. 2012) to support its argument that the non-citizenship cancellation reports must be disclosed. The information requested by the plaintiffs in *Project Vote* is factually distinguishably from the requested

information in the current matter.  In *Project Vote*, the plaintiffs requested that the Registrar "'make available for inspection and copying the completed voter registration applications of any individual who timely submitted an application at any time from January 1, 2008, through October 31, 2008, who was not registered to vote in time for the November 4, 2008 election" as well as 'documents identifying the reasons the applications were rejected.'"  *Id.* at 333.  In contrast, Plaintiff demands disclosure of "[d]ocuments regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any information source, *including information obtained from the Virginia Department of Motor Vehicles . . . .*" (emphasis added).

23.     The requests by the plaintiffs in *Project Vote* did not derive from any information from the Department of Motor Vehicles but dealt with information directly related to voter registration applications.  As such, *Project Vote* is factually distinguishable and inapplicable to the current matter.  Consequently, Plaintiff's complaint does not establish a plausible ground for relief under the National Voter Registration Act and should be dismissed.

## Conclusion

24.     A complaint must allege sufficient facts to establish plausible grounds upon which the claim rests and must contain more than a claimant's bare averment that he wants relief and is entitled to it.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  This Court should grant Defendant's Motion to Dismiss unless the factual allegations in the Complaint raise a reasonable inference that Plaintiffs will be able to make their case.  *Id.*  Section 2721 expressly prohibits disclosure of the information requested by Plaintiff and, therefore, there is no plausible ground upon which Plaintiff's claim rests.  Accordingly, this Court should grant Defendant's

8

Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and dismiss the Complaint with prejudice.

WHEREFORE, Susan Reed, in her official capacity as General Registrar for the City of Manassas, respectfully requests that the Court: (i) dismiss the Complaint filed by the Public Interest Legal Foundation, Inc. with prejudice for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6); and (ii) grant Defendant such other and further relief as may be just and proper.

Respectfully submitted,

SUSAN REED, in her official capacity
General Registrar for the City of Manassas


By:   ___/s/ William W. Tunner_____
                    Counsel



William W. Tunner, Esquire (VSB #38358)
David N. Gustin, Esquire (VSB #86350)
*Thompson*McMullan, P.C.
100 Shockoe Slip
Richmond, Virginia 23219
Telephone: (804) 698-6205
Facsimile: (804) 780-1813
Email: wtunner@t-mlaw.com
Email: dgustin@t-mlaw.com

*Counsel for Susan Reed*

9

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of November, 2016, a true and accurate copy of the foregoing Motion was served via the Electronic Case Filing (ECF) system, as appropriate and as indicated, on the following parties:

J. Christian Adams (VSB#42543)
Noel H. Johnson
Public Interest Legal Foundation
209 W. Main Street
Plainfield, IN 46168
Phone: (317) 203-5599
Fax: (888) 815-5641
E-mail: adams@publicinterestlegal.org
E-mail: njohnson@publicinterestlegal.org

        /s/ William W. Tunner
        William W. Tunner

10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CV-248-BO

PUBLIC INTEREST LEGAL )
FOUNDATION, INC., )
            Plaintiff, )
v. )     O R D E R
 )
KAREN BRINSON BELL, in her official )
capacity as Executive Director of the North )
Carolina State Board of Elections, and )
NORTH CAROLINA STATE BOARD )
OF ELECTIONS, )
            Defendants. )

 

This cause comes before the Court on defendants' motions to dismiss[1] the amended complaint in its entirety. Plaintiff has responded, defendants have replied, and the matter is ripe for ruling. For the reasons that follow, the motions to dismiss are granted.

## BACKGROUND

Plaintiff filed this action against the North Carolina State Board of Elections (NCSBOE) seeking disclosure of public voting records pursuant to Section 8 of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(i). NCSBOE moved to dismiss the complaint. Plaintiff thereafter filed an amended complaint, adding Bell as a defendant. Defendants Bell and NCSBOE filed the instant motions to dismiss the amended complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

---

[1] The State Board of Elections filed a motion to dismiss, which defendant Bell joined. [DE 20 & 22].

The amended complaint alleges as follows. Plaintiff is a non-partisan, public interest organization that seeks to promote the integrity of elections nationwide through research, education, remedial programs, and litigation. Plaintiff regularly utilizes the NVRA's public disclosure provision as well as state and federal open records laws to gain access to records and data which plaintiff compiles and disseminates in accordance with its organizational mission.

Plaintiff alleges that more than nine months ago it requested access to public records maintained by the NCSBOE and that the NCSBOE has denied its request. Specifically, plaintiff requested records following the NCSBOE's issuance of a post-election audit report in April 2017 which stated that in the 2016 general election:

> 41 non-citizens with legal status (green card, etc.) cast ballots. The State Constitution only permits U.S. citizens to register and vote. The audit pairing state and federal databases identified an additional 34 voters who provided documents showing they are U.S. citizens. Investigators continue to review 61 additional records.

[DE 8 ¶ 29] (emphasis in original removed).

On September 10, 2018, Plaintiff sent letters to the county boards of elections for the counties of Durham, Guilford, and Forsyth seeking to inspect three broad categories of records: (1) documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including the United States Department of Homeland Security and the North Carolina Department of Motor vehicles; (2) all documents and records of communication received by the boards of elections from registered voters, legal counsel, claimed relatives or other agents since January 1, 2006, requesting removal or cancellation from the voter role for any reason related to non-United States Citizenship; and (3) all documents and records of communication received by the boards of elections since January 1, 2006, from state and federal jury selection officials referencing individuals who claimed

2

to be non-U.S. citizens when responding to a jury summons. Plaintiff's request for records was later amended to include the same records from Buncombe and Mecklenberg counties.

The relevant county boards of elections were not responsive to plaintiff's requests, and thus plaintiff contacted the NCSBOE. After several months of communication between plaintiff and the NCSBOE, on May 3, 2019, plaintiff received a letter from then-counsel for the NCSBOE describing programs and activities conducted by the NCSBOE to perform registration list maintenance in regard to actual or suspected noncitizen registrants; the letter further explained that the NCSBOE would not allow plaintiff to inspect those records related to the programs and activities described in the letter. Despite continued efforts, plaintiff has not been permitted to inspect the records which it has sought to inspect. This suit followed.

## DISCUSSION

Defendants have moved to dismiss the first amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of civil Procedure.

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a claim for lack of subject matter jurisdiction. When subject matter jurisdiction is challenged, the plaintiff has the burden of proving jurisdiction to survive the motion. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647-50 (4th Cir. 1999). "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). To this end, "the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id.* (citing *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1558-59 (9th Cir. 1987)).

3

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). When acting on a motion to dismiss under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and mere recitals of the elements of a cause of action supported by conclusory statements do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

I.    The NCSBOE is immune from suit.

"The Eleventh Amendment bars suit against non-consenting states by private individuals in federal court." *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). This guarantee applies not only to suits against the state itself but also to suits where "one of [the state's] agencies or departments is named as the defendant." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The Court concludes that the NCSBOE is within the purview of Eleventh Amendment immunity. *See, e.g.*, *Cooper v. N. Carolina State Bd. of Elections*, No. 5:08-CV-423-D, 2009 WL 9081691, at *9 (E.D.N.C. June 12, 2009). The Eleventh Amendment bars suit in federal court regardless of the nature of the relief that is sought, *Pennhurst*, 465 U.S. at 100, unless one of the limited exceptions, such as waiver or abrogation, applies. *See Edelman v. Jordan*, 415 U.S. 651, 673 (1974); *Seminole Tribe v. Florida*, 517 U.S. 44 (1996).

Plaintiff's argument that Congress abrogated state immunity for suits under the NVRA is unpersuasive. Two questions must be answered in the affirmative in order for Congress to have properly abrogated state sovereign immunity: (1) Congress must have unequivocally expressed its

4

intent to abrogate sovereign immunity, and (2) and in so doing Congress must have acted "pursuant to a valid exercise of power." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Plaintiff has failed to demonstrate that Congress, in enacting the NVRA, has unequivocally expressed its intent to abrogate sovereign immunity. Indeed, the general authorization to bring suit in federal court provided in 52 U.S.C. § 20510(b)(2) "is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Seminole Tribe*, 517 U.S. at 56 (internal quotation and citation omitted). Accordingly, the Court concludes that the NCSBOE is immune from suit. *See also Krieger v. Loudon Cty.*, No. 5:13CV073, 2014 WL 4923904, at *3 (W.D. Va. Sept. 30, 2014), aff'd sub nom. *Krieger v. Virginia*, 599 F. App'x 112 (4th Cir. 2015).

II.      Plaintiff has failed to state a claim against Bell.

> The NVRA reflects the view of Congress that the right to vote "is a fundamental right," that government has a duty to "promote the exercise of that right," and that discriminatory and unfair registration laws can have a "damaging effect on voter participation" and "disproportionately harm voter participation by various groups, including racial minorities." Congress enacted the NVRA in order to "increase the number of eligible citizens who register to vote" in federal elections, "enhance[] the participation of eligible citizens as voters," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained."

*Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334 (4th Cir. 2012) (citing 42 U.S.C. §§ 1973gg(a) & (b), as amended 52 U.S.C. §§ 20507(i)(1)(a) & (b)). In furtherance of these goals, the NVRA requires states to establish methods of voter registration and a system for removal of improperly registered voters. 52 U.S.C. §§ 20503-20507.

To ensure compliance, the NVRA includes a public disclosure provision, which requires that election administration officials must "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i)(1). Expressly exempted from the NVRA's public disclosure provision are "records relate[d] to a declination to

5

register to vote or the identity of a voter registration agency through which any particular voter is registered." *Id.* At bottom, the NVRA puts in place a uniform code for the registration of voters and the removal of voters from registered voter lists. *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 722 (S.D. Miss. 2014). Finally, the NVRA establishes a private right of action, subject to certain prerequisites. *Id.* § 20510(b).[2]

Voter registration applications are within the scope of the NVRA's public disclosure provisions. *Long*, 682 F.3d at 335-36 ("[T]he process of reviewing voter registration applications is a 'program' and 'activity.'"). However, as the district court in *Long* recognized, nothing in the NVRA requires that information contained in voter application records which is "uniquely sensitive and vulnerable to abuse" must be disclosed. *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 712 (E.D. Va. 2010). On this ground, the Eastern District of Virginia court required that applicant social security numbers be redacted, and this limitation on public disclosure was upheld. Other courts have upheld similar redactions of sensitive information subject to abuse, such as telephone numbers, birth dates, and email addresses. *See generally Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016).

In response to plaintiff's request, the NCSBOE has disclosed to plaintiff documents which demonstrate the manner in which it has identified and investigated potential noncitizens who are registered to vote as well as documents which show that it has removed individuals who have been demonstrated to be noncitizens. *See* [DE 17-8] Amd. Compl. Ex. G. Indeed, records of individuals who have been removed from the voter roll, including the reason for removal, are publicly available. *Id.* But the documents at issue here are records of individual voters who the NCSBOE, for one reason or another, has identified as *potential* noncitizens. The Court concludes that the

---

[2] Defendants have not challenged plaintiff's compliance with the prerequisites to bringing this suit.

6

information plaintiff requests concerning individuals on the voter rolls is uniquely sensitive and vulnerable to abuse, and thus that the NCSBOE is not required to disclose it by the NVRA.

In so holding, the Court is guided by the following. First, and importantly, being identified as an individual who is registered to vote but who may not be a United States citizen raises the specter of immigration violations and criminal activity. *See, e.g.,* 18 U.S.C. § 611. This is plainly the type of information that is both sensitive and vulnerable to abuse. *See, e.g., Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 588 (D.C. Cir. 1987) ("There is little question that disclosing the identity of targets of law-enforcement investigations can subject those identified to embarrassment and potentially more serious reputational harm."). Moreover, plaintiff's broad request seeks not only individual voter registration records, but also documents relating to immigration or citizen status. Such documents would include copies of birth certificates or passports, both of which may be utilized, like social security numbers, in identity theft. *See Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

Second, the NVRA expressly prevents the disclosure of a potential voter's declination to register to vote and the identity of a voter's voter registration agency, which may be a public assistance office. 52 U.S.C. §§ 20507(i)(1); 20506(a)(2). These express exemptions demonstrate that while Congress was concerned with transparency when enacting the NVRA, it was unwilling completely override individual privacy in areas which may result in either stigma or harassment. *See* S. Rep. No. 103-6, 35 (1993); *Kemp*, 208 F. Supp. 3d 1320, 1339-40 (N.D. Ga. 2016). Further, the NCSBOE contends that it has identified potential noncitizen registered voters from two primary sources: North Carolina driver's license records, which include a noncitizen designation

7

on the driver's identification card,[3] and a confidential Department of Homeland Security database. Other federal statutes, such as the Privacy Act, 5 U.S.C. § 552a(b), and the Drivers Privacy Protection Act, 18 U.S.C. § 2721(c), protect from disclosure by the NCSBOE the records sought by plaintiff which would have been used to identify a potential noncitizen voter.

Contrary to plaintiff's argument, the Fourth Circuit in *Long* did not address the issue presented here when it decided the narrow question of whether the NVRA requires disclosure of completed voter registration applications. *Long*, 682 F.3d at 340. The request to the board of elections in *Long* was for "completed voter registration applications of any individual who timely submitted an application at any time from January 1, 2008, through October 31, 2008, who was not registered to vote in time for the November 4, 2008 general election [and] documents identifying the reasons the applications were rejected." *Id.* at 333. Unlike the plaintiff in *Long*, plaintiff here has not requested voter registration applications made during a period of time and the documents which identify the reasons applications were rejected. Instead, plaintiff has requested a broad array of documents concerning all registrants who were identified as *potentially* not satisfying the citizenship requirement for registration. Plaintiff's request for documents well-exceeds the scope of what was requested in *Long*, especially as it seeks, as its starting point, voter registrant information that is uniquely sensitive and vulnerable to abuse.

The Court concludes that the NVRA does not require public disclosure of the voter registration information sought by plaintiff. Plaintiff has therefore failed to state a claim, and the claims against defendant Bell are dismissed.

---

[3] Information pertaining to a driver's identification card is a motor vehicle record subject to protection by the Drivers Privacy Protection Act. *Lake v. Neal*, 585 F.3d 1059, 1060-61 (7th Cir. 2009).

8

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss [DE 20 & 22] are GRANTED.

The pending motion to dismiss the original complaint [DE 11] is DENIED AS MOOT. The clerk

is DIRECTED to close the case.


SO ORDERED, this _16_ day of October, 2019.


TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE

9

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| PUBLIC INTEREST LEGAL FOUNDATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **JUDGMENT** 5:19-CV-248-BO |
| NORTH CAROLINA STATE BOARD OF ELECTIONS and KAREN BRINSON BELL, | ) ) ) | |
| Defendants. | ) ) ) | |

**Decision by Court.**
This cause comes before the Court on defendants' motions to dismiss the amended complaint in its entirety.

**IT IS ORDERED, ADJUDGED AND DECREED** that defendants' motions to dismiss [DE 20 & 22] are GRANTED.  The pending motion to dismiss the original complaint [DE 11] is DENIED AS MOOT.

This case is closed.

<u>**This judgment filed and entered on October 17, 2019, and served on:**</u>
Noel Johnson (via CM/ECF Notice of Electronic Filing)
Kaylan Phillips (via CM/ECF Notice of Electronic Filing)
Benton Sawrey (via CM/ECF Notice of Electronic Filing)
Paul Cox (via CM/ECF Notice of Electronic Filing)

PETER A. MOORE, JR., CLERK

October 17, 2019

*Lindsay Stouch*
By: Deputy Clerk

**United States District Court**
**Eastern District of North Carolina**
**Western Division**
**No. 5:19-cv-248-BO**

| | |
|---|---|
| **PUBLIC INTEREST LEGAL FOUNDATION,** | |
| *Plaintiff,* | |
| *v.* | |
| **KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections, and NORTH CAROLINA STATE BOARD OF ELECTIONS,** | |
| *Defendants.* | |

## PLAINTIFF PUBLIC INTEREST LEGAL FOUNDATION'S NOTICE OF APPEAL

Notice is hereby given under Federal Rules of Appellate Procedure 3 that the Public Interest Legal Foundation, Plaintiff in the above named case, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the order and judgment of the United States District Court for the Eastern District of North Carolina entered October 17, 2019 (Docs. 29 and 31), dismissing Plaintiff's Amended Complaint.

Plaintiff also hereby appeals to the United States Court of Appeals for the Fourth Circuit from the sealed *ex parte* orders entered July 31, 2019 and October 17, 2019 (Docs. 15 and 30), the nature of which is unknown to Plaintiff.

1

Dated: November 7, 2019.

Respectfully submitted,

For the Plaintiff Public Interest Legal Foundation:

   /s/ Benton G. Sawrey
Benton G. Sawrey (N.C. Bar #46379)
Narron Wenzel, P.A.
102 S. Third Street
PO Box 1567
Smithfield, N.C. 27577
T: (919) 934-0049
F: (919) 934-6280
bsawrey@narronwenzel.com
Local Civil Rule 83.1(d) Counsel

J. Christian Adams* (Virginia Bar #42543)
Public Interest Legal Foundation, Inc.
1555 King St., Ste. 200
Alexandria, VA 22314
Tel: (317) 203-5599
Fax: (888) 815-5641
adams@PublicInterestLegal.org

   /s/ Noel H. Johnson
Noel H. Johnson** (Wisconsin Bar #1068004)
Kaylan L. Phillips** (Indiana Bar #30405-82)
Public Interest Legal Foundation, Inc.
32 E. Washington St., Ste. 1675
Indianapolis, IN 46204
Tel: (317) 203-5599
Fax: (888) 815-5641
njohnson@PublicInterestLegal.org
*Special Appearance to be filed*
**Special Appearance filed*

Attorneys for Plaintiff Public Interest Legal Foundation

2

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2019, I electronically filed the foregoing using the

Court's ECF system, which will serve notice on all registered parties.


                                        /s/ Noel H. Johnson

                                        Noel H. Johnson

                                        njohnson@publicinterestlegal.org

                                        Counsel for Plaintiff

3