No. 19-2265

# In the United States Court of Appeals for the Fourth Circuit

**PUBLIC INTEREST LEGAL FOUNDATION**,

*Plaintiff-Appellant*,

v.

**NORTH CAROLINA STATE BOARD OF ELECTIONS**
and **KAREN BRINSON BELL**, in her official capacity as Executive Director of the North Carolina State Board of Elections

*Defendants-Appellees*,

On Appeal from the United States District Court for the Eastern District of North Carolina, in Case No. 5:19-cv-00248 (Hon. Terrence W. Boyle)

## APPELLANT'S OPENING BRIEF

Noel H. Johnson (WI Bar No. 1068004)
Kaylan L. Phillips (IN Bar No. 30405-84)
PUBLIC INTEREST LEGAL FOUNDATION
32 East Washington Street, Suite 1675
Indianapolis, IN 46204
Tel: 317-203-5599
Fax: 888-815-5641
njohnson@publicinterestlegal.org
kphillips@publicinterestlegal.org

*Counsel for Appellant Public Interest Legal Foundation*

## CORPORATE DISCLOSURE STATEMENT

The Public Interest Legal Foundation is a non-profit 501(c)(3) organization.

It is not a publicly held corporation and no corporation or other publicly held entity

owns more than 10% of its stock.

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .................. 2

NATURE OF THE CASE AND STATEMENT OF FACTS ....................... 3

SUMMARY OF THE ARGUMENT ............................................................ 11

ARGUMENT ................................................................................................. 15

    I.    Standard of Review ........................................................................ 15

    II.   The District Court Erred When it Held the Foundation Has
        Not Stated a Claim for Relief Under the NVRA Because the
        Requested Records are Subject to Disclosure under the Plain
        Text of the Statute ......................................................................... 15

    III.  The District Court Erred When it Inferred a Categorical
        Exemption for Records Used to Evaluate Eligibility on the
        Basis of Citizenship ...................................................................... 21

        A. Where Congress Makes Explicit Exemptions, Courts May
           not Infer Additional Ones........................................................ 22

        B. The District Court's Holding Erodes the Transparency
           Intended by Congress and Frustrates the Purposes of
           the NVRA................................................................................ 24

        C. The Narrow Exemption For Social Security Numbers
           Recognized by Project Vote Does Not Support a Categorical
           Exemption for Records Used to Evaluate the Citizenship of
           Registered Voters ................................................................... 28

           i.   Project Vote Narrowly Allowed the Redaction of Only
               Social Security Numbers Because the Record Showed
               Their Disclosure Would Cause an Intolerable Burden on
               the Right to Vote ................................................................ 28

           ii.  The Record in This Case Does Not Establish that Disclosure
               of the Requested Records Would Create an Intolerable

Burden on the Right to Vote or Undermine the Purposes
of the NVRA ....................................................... 31

iii. The Reasoning of Project Vote Does Not Apply to Noncitizens
Because They Are Ineligible to Register and Vote............. 32

iv. Disclosure of List Maintenance Records that Concern an
Evaluation of Citizenship Do Not Create an Intolerable
Burden on the Right to Vote as a Matter of Law............... 33

v. The State Board's Use of the SAVE Program Does
Not Prohibit Disclosure or Support a Categorical
Exemption ........................................................ 38

vi. The Driver's Privacy Protection Act ("DPPA")
Does Not Prohibit Disclosure or Support a Categorical
Exemption ........................................................ 41

IV.    The District Court Contravened *Project Vote* When it Upheld the
Denial of Complete Voter Registration Forms ............................. 47

V.    The District Court Abused Its Discretion and Deprived the
Foundation of a Fair Proceeding When it Allowed the State
Board to Submit Sealed and *Ex Parte* Filings................................ 47

CONCLUSION ............................................................. 52

# TABLE OF AUTHORITIES

*Cases*

*Anaya v. United States*,
  815 F.2d 1373 (10th Cir. 1987) ............................................................ 51

*Arcia v. Sec'y of Fla.*,
  772 F.3d 1335 (11th Cir. 2014) ........................................................26-35

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
  178 F.3d 350 (5th Cir. 1999) ................................................................ 45

*Bellitto v. Snipes*,
  2018 U.S. Dist. LEXIS 103617 (S.D. Fla. Mar. 30, 2018)................ 11, 24

*Davis v. Freedom of Info. Comm'n*,
  47 Conn. Supp. 309, 790 A.2d 1188 (2001).......................................... 45

*Davis v. Freedom of Info. Comm'n*,
  259 Conn. 45, 787 A.2d 530 (2002) ...................................................... 45

*Edwards v. City of Goldsboro*,
  178 F.3d 231 (4th Cir. 1999) ................................................................ 14

*Goodyear Atomic Corp. v. Miller*,
  486 U.S. 174 (1988)............................................................................... 46

*Greidinger v. Davis*,
  988 F.2d 1344 (4th Cir. 1993) ...............................................28-29, 31, 36

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982)............................................................................... 27

*In re Grand Jury Investigation*,
  630 F.2d 996 (3d Cir. 1980).............................................................50-51

*In re Grand Jury Subpoenas*,
  472 F.3d 990 (8th Cir. 2007) .............................................................48-49

*In re Grand Jury Subpoena v. Under Seal*,
  920 F.2d 235 (4th Cir. 1990) .............................................................50-51

*In re JKJ Chevrolet, Inc.*,
  26 F.3d 481 (4th Cir. 1994) .................................................................. 39

v

*In re United States*,
   398 F.3d 615 (7th Cir. 2005) ............................................................49-50

*John Doe, Inc. v. United States (In re John Doe, Inc.)*,
   13 F.3d 633 (2d Cir. 1994)................................................................ 48

*Lamie v. United States Tr.*,
   540 U.S. 526 (2004).................................................................. 12, 15, 21

*Lara-Aguilar v. Sessions*,
   889 F.3d 134 (4th Cir. 2018) ................................................................ 27

*McCaffrey v. Chapman*,
   921 F.3d 159 (4th Cir. 2019) ................................................................ 38

*Prestol Espinal v. Attorney Gen. of the United States*,
   653 F.3d 213 (3d Cir. 2011)................................................................ 23

*Project Vote/Voting for Am., Inc. v. Long*,
   752 F. Supp. 2d 697 (E.D. Va. 2010) ........................ 13-15, 17, 23, 28-32

*Project Vote/Voting for Am., Inc. v. Long*,
   813 F. Supp. 2d 738 (E.D. Va. 2011) .................................................... 28

*Project Vote/Voting for Am., Inc. v. Long*,
   682 F.3d 331 (4th Cir. 2012) ...........................................................*passim*

*Public Interest Legal Found. v. Bennett*,
   2019 U.S. Dist. LEXIS 39723 (S.D. Tex. Feb. 6, 2019) ........................ 20

*Public Interest Legal Found. v. Bennett*,
   2019 U.S. Dist. LEXIS 38686 (S.D. Tex. Mar. 11, 2019) ..................... 19

*Public Interest Legal Found. v. Boockvar*,
   2019 U.S. Dist. LEXIS 214710 (M.D. Pa. Dec. 13, 2019)20, 23, 37, 41, 44

*Public Interest Legal Found. v. Reed*,
   No. 16-cv-01375 (E.D. Va., filed Oct. 31, 2016) ...............................41-43

*Rosmer v. Pfizer, Inc.*,
   272 F.3d 243 (4th Cir. 2001) ......................................................22-23, 37

*Senate of P.R. ex rel. Judiciary Comm. v. United States DOJ*,
   823 F.2d 574 (1987)......................................................................33-34

*Spaulding v. Wells Fargo Bank, N.A.*,
  714 F.3d 769 (4th Cir. 2013) .................................................................. 15

*Stephens v. Astrue*,
  565 F.3d 131 (4th Cir. 2009) .................................................................. 15

*True the Vote v. Hosemann*,
  43 F. Supp. 3d 693 (S.D. Miss. 2014) .................................................... 24

*United States v. Appelbaum (In re United States)*,
  707 F.3d 283 (4th Cir. 2013) .................................................................. 52

*United States v. Stanford*,
  589 F.2d 285 (7th Cir. 1978) .................................................................. 50

*Williford v. Armstrong World Indus., Inc.*,
  715 F.2d 124 (4th Cir. 1983) .................................................................. 52

## Statutes and Rules

18 U.S.C. § 2721(a) ................................................................................... 44

18 U.S.C. § 2721(a)(1) ............................................................................... 43

18 U.S.C. § 2721(b)(1) ............................................................................... 45

18 U.S.C. § 2725(1) ................................................................................... 43

18 U.S.C. § 2725(3) ...............................................................................43-44

28 U.S.C. § 1291 ......................................................................................... 1

28 U.S.C. § 1331 ......................................................................................... 1

52 U.S.C. § 20501(a)(1) ............................................................................. 24

52 U.S.C. § 20501(a)(2) ............................................................................. 24

52 U.S.C. § 20501(b)(3) ............................................................................. 24

52 U.S.C. § 20501(b)(4) ............................................................................. 24

52 U.S.C § 20507(i)(1) ................................. 1, 3, 14-18, 20, 22-23, 34, 36-37

52 U.S.C. § 20507(c)(1)(A) ........................................................................ 40

52 U.S.C. § 20510(b) ............................................................... 1, 21

N.C. Gen. Stat. § 163-55(a) .............................................. 4, 16, 32

N.C. Gen. Stat. § 163-54 ................................................... 4, 16, 32

N.C. Gen. Stat. § 163-275(1) ...................................................... 34

Federal Rule of Criminal Procedure 6 .................................... 49-51

*Other Authorities*

S.Rep. No. 1183, 93d Cong., 2d Sess. ........................................ 29

Letter from State BOE Executive Director Gary Bartlett to North Carolina House Elections Committee, Attachment B, March 11, 2013, https://www.ncleg.gov/documentsites/committees/JointAppropriationsGeneralGovernment/2013%20Session/03-07-13%20Meeting/sbe_GA_response_with_attachments.pdf......... 34 n.6, 41 n.9

USPS, Inspector General, National Change of Address Program Audit Report, available at https://www.uspsoig.gov/sites/default/files/document-library-files/2015/it-ar-14-010.pdf....................................................... 40 n.8

https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2018-09-07/State_Subpoenas__%5BPublic%5D.PDF ...................................... 51 n.12

## <u>JURISDICTIONAL STATEMENT</u>

Plaintiff/Appellant Public Interest Legal Foundation (the "Foundation") brought a single-count complaint alleging a violation of Section (8)(i) of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i)(1). Joint Appendix ("J.A.") 4. The district court had jurisdiction pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States, and 52 U.S.C. § 20510(b), because the action seeks declaratory and injunctive relief under the NVRA.

The district court entered final judgment against the Foundation on October 17, 2019. J.A. 303. A timely Notice of Appeal was filed on November 7, 2019. J.A. 304. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred when it held that list maintenance records relating to individual non-U.S. citizens are categorically exempt from the National Voter Registration Act's requirement that election officials make available for inspection "all records" concerning list maintenance programs and activities. 52 U.S.C. § 20507(i).

2.    Whether the district court's decision to permit sealed and *ex parte* communications deprived Appellant of a fair hearing.

## NATURE OF THE CASE AND STATEMENT OF FACTS

The Foundation filed this action after Appellants ("State Board") repeatedly denied the Foundation's requests to inspect and duplicate the State Board's voter list maintenance records. J.A. 9-20. The Foundation's requests were made pursuant to the National Voter Registration Act of 1993's ("NVRA") Public Disclosure Provision, 52 U.S.C § 20507(i)(1), which requires "[e]ach state" to

> make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1) (emphasis added). There is no dispute that the records at issue were requested, that the records fall within the plain language of the Public Disclosure Provision, that the State Board is maintaining the records, and that the State Board is denying the Foundation access to them.

Upon those undisputed allegations, the Foundation's Amended Complaint alleges that the State Board's refusal to permit inspection and duplication of the requested records violates the clear and unambiguous mandates of NVRA's Public Disclosure Provision.

Prior to filing this action, the Foundation patiently engaged in a nine-month-long effort to inspect public voter list maintenance records maintained by county

3

election officials and the State Board, during which the Foundation expended

substantial effort, time, and money. J.A. 11-20 ¶¶ 31-85. In September and October

2018, the Foundation asked to inspect three categories of records concerning the

programs and activities of five North Carolina counties relating to the maintenance

of their voter rolls. J.A. 11 ¶ 31. Specifically, the requested records concerned

programs and activities conducted to evaluate the eligibility of registered voters on

the basis of United States citizenship— a fundamental criterion of voter eligibility

in North Carolina, N.C. Gen. Stat. §§ 163-55(a); 163-54. The Foundation requested

the following records:

1. Documents regarding all registrants who were identified as potentially not satisfying the citizenship requirements for registration from any official information source, including information obtained from the various agencies within the U.S. Department of Homeland Security, North Carolina Department of Motor Vehicles, and from the North Carolina State Board of Elections since January 1, 2006. This request extends to all documents that provide the name of the registrant, the voting history of such registrant, the nature and content of any notice sent to the registrant, including the date of the notice, the response (if any) of the registrant, and actions taken regarding the registrant's registration (if any) and the date of the action. This request extends to electronic records capable of compilation.

2. All documents and records of communication received by your office from registered voters, legal counsel, claimed relatives, or other agents since January 1, 2006 requesting a removal or cancellation from the voter roll for any reason related to non-U.S. citizenship. Please include any official records indicating maintenance actions undertaken thereafter.

3. All documents and records of communication received by your office from jury selection officials—state and federal--since January 1, 2006 referencing individuals who claimed to be non-U.S. citizens when attempting to avoid serving a duty call. This request seeks copies of the official referrals and documents indicating where your office matched a claim of noncitizenship to

4

an existing registered voter and extends to the communications and maintenance actions taken as a result that were memorialized in any written form.

J.A. 11 ¶ 32; J.A. 59-61 (hereafter, the "Requested Records"). The requests

provided specific examples of responsive documents, including the "completed

voter application form" for each registrant and "[a]ny documents sent by your

office to the voter to require that an affirmation of citizenship or noncitizenship be

given in writing with responses included, where applicable." J.A. 12 ¶ 33; J.A. 60.

In October 2018, the State Board agreed to produce the Requested Records

on behalf of the counties. J.A. 12-14 ¶¶ 35-44; J.A. 77. Although the State Board

has produced a very small number of records, it is undisputed that the State Board

is denying the Foundation access to the records the Foundation requested. J.A. 16-

17, 19-20, 22 ¶¶ 56-57, 65, 77-78, 85, 101-102; District Court Dkt. No. 21 at 6-7,

23 ("The State Board cannot fully comply with PILF's request….").)

To date, the State Board has produced the following records:

1. A 2013 Memorandum of Agreement between the Department of Homeland Security, U.S. Citizenship and Immigration Services, and the State Board. J.A. 190-199.

2. A Post-Election Audit Report for the 2016 General Election ("2016 Audit"). J.A. 16 ¶ 59; J.A. 200-233.

3. Memoranda concerning grand jury subpoenas served by the U.S. Attorney's Office. J.A. 234-237.

4. A 2016 Memorandum of Agreement between the State Board and the North Carolina Division of Motor Vehicles.[1]

5. A Statewide list-maintenance spreadsheet purportedly reflecting "current registration and list maintenance activities." J.A. 187.

6. A Statewide voter history file. J.A. 187.

As described by the district court, the State Board has merely "disclosed to plaintiff documents which demonstrate *the manner* in which it has identified and investigated potential noncitizens who are registered to vote as well as documents which show that it has removed individuals who have been demonstrated to be noncitizens." J.A. 299 (emphasis added).

For example, the 2016 Audit describes programs and activities conducted by the State Board to evaluate the eligibility of suspected and actual noncitizen registrants following the 2016 General Election and refers to and includes sample records concerning those programs and activities. J.A. 16 ¶ 60; J.A. 202, 204-205, 208-209, 221-222, 228-230. The 2016 Audit further explains that if records "indicate a voter is a non-citizen, NCSBE opens a case file and attempts to contact the voter to determine citizenship status through mailings and interviews." J.A. 209. The mailing process asks suspected noncitizens to complete and return an "Admission or Denial of Non-U.S. Citizen Return Form" and attach documentation proving citizenship. J.A. 228-230. Through this process, the 2016

---

[1] This document is not in the record.

6

Audit identified 41 registrants who "acknowledged they were not U.S. citizens" and "identified an additional 34 voters who provided documents showing they *are* U.S. citizens." J.A. 202 (emphasis in original). When the 2016 Audit was released, investigators were "continu[ing] to review 61 additional records" of registrants flagged for potential citizenship defects. *Id.*

The Foundation plausibly alleged that the State Board engaged in similar audits to identify and remove noncitizen registrants in other years, including, specifically, 2013 and 2014. J.A. 9-10 ¶¶ 24 n.1, 26, 28. The State Board has not produced *any* records pertaining to those audits, even those that merely describe the methodology and results of the audit, without identifying any particular registrant. Thus even under the district court's interpretation of the NVRA, explained *infra*, the Foundation has stated a claim for relief.

The district court notes that "records of individuals who have been removed from the voter rolls, including the reason for removal, are publicly available." J.A. 299. It is true that the State Board makes some lists available on its website that show individual registrants who have been removed from the rolls and the reason for their removal. However, the Foundation was unable to find any individual who was removed for citizenship reasons in those lists and was further unable to determine the time period for which the lists pertained.

7

It is undisputed that the State Board has not produced the records that were requested. Those records include, but are not limited to, the following records:

1.  Records that describe the methodology and results of audits performed in any year between 2006 and the present (excluding 2016).

2.  Records used to evaluate the eligibility of individual registered voters on the basis of citizenship with respect to the 2016 Audit, such as correspondence, documentation used to confirm eligibility, and records of interviews with registered voters. J.A. 204-205, 228-230.

3.  Records used to evaluate the eligibility of individual registered voters on the basis of citizenship with respect to any other year between 2006 and the present. J.A. 59-60 (requesting records dating to January 1, 2006).

4.  Records of communications received from registered voters and others requesting removal or cancellation for reasons related to non-U.S. citizenship. J.A. 59 (Request #2).

5.  Records of communications from jury selection officials concerning individuals who claimed to lack citizenship to avoid jury duty. J.A. 59-60 (Request #3).

6.  Completed voter registrant forms for each registrant. J.A. 60.

7.  Compilations or lists reflecting noncitizen registrants removed from the voter rolls or the number of noncitizen registrants removed from the rolls in years other than 2016. *See e.g.*, J.A. 220-222.

With no other recourse left, the Foundation filed this action on June 17, 2019, seeking an order compelling the State Board to permit inspection and duplication, as required by the Public Disclosure Provision. *See* J.A. 1.

On August 5, 2019, the State Board moved to dismiss the Complaint. *See* J.A. 1. Shortly thereafter, the State Board filed a sealed, *ex parte* motion to stay the case, which the State Board then moved, *ex parte*, to seal. J.A. 2. The State Board

8

also asked that the motion to seal itself be sealed. J.A. 98. The Foundation received

no notice of these filings through the court's electronic filing system and was given

no chance to respond to any of the facts or legal argument presented in them.[2] On

July 31, 2019, the district court entered a sealed *ex parte* order, the nature of which

remains unknown to the Foundation. J.A. 2.

Prior to the deadline to oppose the motion to dismiss, the Foundation timely

filed the Amended Complaint, which added Appellee Karen Brinson Bell as a

defendant. J.A. 4-24. The State Board then moved to dismiss the Amended

Complaint, arguing that Defendant North Carolina State Board of Elections is

immune from suit under the Eleventh Amendment to the Constitution of the United

States, and that the Foundation failed to state a claim for relief against Defendant

Bell. J.A. 296-297. The State Board did not contest the Foundation's standing or its

compliance with the NVRA's pre-litigation notice requirements. J.A. 299 n.2.

The district court issued a written opinion on October 17, 2019. J.A. 294-

302. Like the State Board, the district court did not contest the Foundation's

standing or its compliance with the NVRA's pre-litigation notice requirements.

J.A. 299 n.2. The court held that Defendant North Carolina State Board of

Elections is immune from suit under the Eleventh Amendment to the Constitution

---

[2] The only reason the Foundation is aware that the State Board's first *ex parte*
motion requested a stay of the proceedings is because the motion to seal the motion
to stay was entered on the docket sometime after it was filed *ex parte*. J.A. 2.

of the United States.[3] J.A. 297-298. The district court did not contest the

Foundation's allegation that the requested records are within the scope of the plain

language of the Public Disclosure Provision. J.A. 20 ¶ 86. The district court

nevertheless held that the Foundation failed to state a claim against Defendant Bell

because, in the district court's view, "the information plaintiff requests concerning

individuals on the voter rolls is uniquely sensitive and vulnerable to abuse, and

thus that the NCSBOE is not required to disclose it by the NVRA." J.A. 299-300.

The district court explained that its decision was "guided" by the following things:

1. "[B]eing identified as an individual who is registered to vote but who may not be a United States citizen raises the specter of immigration violations and criminal activity." J.A. 300.

2. Certain responsive records like copies of birth certificates—which registrants may have submitted to prove their citizenship—"may be utilized, like social security numbers, in identity theft." J.A. 300.

3. The NVRA's two "express exemptions" for certain records not implicated here "demonstrate . . . that while Congress was concerned with transparency when enacting the NVRA, it was unwilling [to] completely override individual privacy in areas which may result in either stigma or harassment." J.A. 300.

4. "Other federal statutes, such as the Privacy Act, 5 U.S.C. § 552a(b), and the Drivers Privacy Protection Act, 18 U.S.C. § 272l(c), protect from disclosure by the NCSBOE the records sought by plaintiff which would have been used to identify a potential noncitizen voter." J.A. 301.

On the same day it issued its written opinion, the district court issued a

sealed *ex parte* order, the nature of which remains unknown to the Foundation. J.A.

---

[3] The Foundation does not appeal this portion of the district court's order.

3. The district court entered judgment on October 17, 2019, which dismissed the Amended Complaint in its entirety. J.A. 303.

To date, the State Board has not made the Requested Records available to the Foundation.

## SUMMARY OF THE ARGUMENT

The Public Disclosure Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334-35 (4th Cir. 2012) ("*Project Vote*"). To that end, Congress designed the Public Disclosure Provision to shed light on *all* activities that determine who belongs and who does not belong on the voter rolls. As one federal district court put it recently, the Public Disclosure Provision "convey[s] Congress's intention that the public should be monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs. Accordingly, election officials must provide full public access to all records related to their list maintenance activities, including their voter rolls." *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *12-13 (S.D. Fla. Mar. 30, 2018).

The district court's decision erodes the transparency Congress intended and undermines the purposes of the Public Disclosure Provision. Documents showing

the general "manner," J.A. 299, in which the State Board identifies and evaluates potential noncitizens on the voter rolls may be informative—but they do not permit the public—or the affected voters—to monitor the adequacy of the State Board's decision to wipe the names of registered voters from its rolls. When voting rights are at stake, Congress demands that election officials show their work. Without such transparency, it is impossible to determine whether rights are being upheld or are being "sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote*, 682 F.3d at 334-35.

The plain language of the NVRA's Public Disclosure Provision requires that the State Board make *all* records concerning its noncitizen audit processes publicly available for inspection and copying because they are records concerning the process through which the State Board keeps its voter rolls current and accurate. Neither the State Board nor the district court disputes this. Yet rather than "enforce it according to its terms," *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004), the district court judicially amended the Public Disclosure Provision to categorically exempt any record used to evaluate the eligibility of registered voters on the basis of citizenship.

The district court's holding is not only contrary to the text and intent of the Public Disclosure Provision, it is contrary to controlling authority in this circuit, which found citizenship verification to be an indispensable part of the eligibility

12

and list maintenance process. *Project Vote*, 682 F.3d at 335-336. *Project Vote* holds that the Public Disclosure Provision should be interpreted with "great breadth" to require public disclosure of *all* records election officials use to determine eligibility to register and vote—even when disclosure "may conceivably inhibit voter registration in some instances." *Id*. at 336, 339. This Court was clear: "It is not the province of this court … to strike the proper balance between transparency and voter privacy." *Project Vote*, 682 F.3d at 339. The district court erred when it substituted its judgment for that of Congress and failed to enforce the statute as written.

The district court also erred when it construed *Project Vote* as establishing an exemption for information that is "uniquely sensitive and vulnerable to abuse." *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711-12 (E.D. Va. 2010). *Project Vote* did not exempt Social Security Numbers from disclosure based on their sensitive nature. Rather, it exempted them because it found, after consulting precedent and Congressional findings, that their disclosure would create a "substantial burden on the voter, to the degree that the voter would forego registering to vote." *Project Vote*, 752 F. Supp. 2d at 710 n.20; *Project Vote*, 682 F.3d at 389. The strong showing that justified that limited exemption cannot be made here because noncitizens have no right to vote.

13

It makes no difference for disclosure purposes whether some registrants flagged for citizenship evaluation ultimately proved themselves eligible because the Public Disclosure Provision applies equally to cancellation records and records confirming eligibility. *Project Vote*, 682 F.3d at 335. It would, prior to discovery, be an "act of conjecture [to] conclud[e] that the public disclosure … would necessarily upset the purposes of the statute." *Project Vote*, 752 F. Supp. 2d at 710. The full scope of the records, what information they each contain, and whether any record could be disclosed with redactions are factual questions that are not appropriately resolved on a motion to dismiss. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). By resolving those questions, the district court erred.

Congress did not carve out certain categories of eligibility for disclosure; it very clearly required disclosure of "all records," 52 U.S.C. § 20507(i)(1), so that the process would be transparent and the right to vote secure. "State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339.

For these and the reasons that follow, this Court should reverse the judgment of the district court and remand this action for further proceedings.

## **ARGUMENT**

### I.    **Standard of Review**

This Court "review[s] a district court's grant of a motion to dismiss *de novo*, focusing only on the legal sufficiency of the complaint." *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 776 (4th Cir. 2013) (citations omitted). When an appeal raises a question of statutory interpretation, it is "a quintessential question of law, which [the court] review[s] *de novo*." *Stephens v. Astrue*, 565 F.3d 131, 137 (4th Cir. 2009). "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie*, 540 U.S. at 534.

### II.    **The District Court Erred When it Held the Foundation Has Not Stated a Claim for Relief Under the NVRA Because the Requested Records are Subject to Disclosure under the Plain Text of the Statute.**

In an action to enforce the NVRA's Public Disclosure Provision, a complaint states a claim upon which relief may be granted if the requested records are subject to disclosure under the plain and ordinary meaning of the terms of the NVRA. *Project Vote*, 752 F. Supp. 2d at 705 (quoting 52 U.S.C. § 20507(i)(1)). This Court awarded *summary judgment* under the same standard. *Project Vote*, 682 F.3d at 335-337.

"The starting point for any issue of statutory interpretation is of course the language of the statute itself." *Id.* at 335. "[W]hen the words of a statute are

15

unambiguous … this first canon is also the last [and] judicial inquiry is complete." *Id*. The NVRA requires the State Board to "make available for public inspection… all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). This Court instructs that this language is to be interpreted broadly, explaining that "the use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." *Project Vote*, 682 F.3d at 336 (quotations and citations omitted).

Neither the State Board nor the district court disputed that the Requested Records fall within the scope of the Public Disclosure Provision's plain language. The Requested Records concern registrants whose eligibility was evaluated on the basis of citizenship, a requirement for eligibility under North Carolina law. N.C. Gen. Stat. §§ 163-55(a); 163-54. Those evaluations resulted in each registrant either remaining on the voter roll (if citizenship was confirmed) or being removed from the voter roll (if citizenship was not confirmed). The Requested Records thus concern implementation of the State Board's process for reviewing and maintaining an accurate and current voter list.

*Project Vote* confirms that the Requested Records are subject to disclosure. In *Project Vote*, this Court held that "completed voter registration applications are *clearly* 'records concerning the implementation of programs and activities

16

conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'" *Project Vote*, 682 F.3d at 335 (quoting 52 U.S.C. § 20507(i)(1)) (emphasis added). This Court observed that election officials must examine applications to determine whether the applicants "possess the necessary qualifications." *Id*. This "process of review is a 'program' because it is carried out in the service of a specified end—maintenance of voter rolls—and it is an 'activity' because it is a particular task and deed of Virginia election employees." *Id*. The process of reviewing applications and evaluating the applicant's qualification was "plainly" done for the purposes of ensuring the accuracy and currency of official lists of eligible voters. *Id*. *Any* process by which eligible applicants are registered and ineligible applicants are rejected has such a purpose. *See id*.

The requested applications, this Court continued, "concern[] the implementation" of Virginia's voter registration program "because they are 'the means by which an individual provides the information necessary for the Commonwealth to determine his eligibility to vote.'" *Id*. at 336 (quoting *Project Vote*, 752 F. Supp. 2d at 707). This Court found citizenship verification to be an indispensable part of the eligibility and list maintenance process. *Id*.

> Without verification of an applicant's *citizenship*, age, and other necessary information provided by registration applications, state officials would be unable to determine whether that applicant meets the statutory requirements for inclusion in official voting lists. Thus, completed applications not only "concern[] the implementation of" the voter registration process, but are also integral to its execution.

17

*Id*.

Under *Project Vote*, there is no credible argument that the Requested Records are not "records" concerning a "program" or "activity" conducted for the purpose of "ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The State Board's process of reviewing records and determining a registrant's eligibility based on citizenship—*i.e.*, keeping eligible registrants registered and removing ineligible registrants—is a "program and activity" within the meaning of the NVRA's plain terms. *Project Vote*, 682 F.3d at 335. That program is conducted for the purpose of ensuring that North Carolina's voter roll is accurate and current, and the Requested Records "concern" that program. *Id*.

The 2016 Audit is illustrative. The State Board explained below that it (1) reviews "voter records"; (2) checks them against records maintained by the DMV to generate a list of "resulting matches"; (3) checks that list against the Systematic Alien Verification for Entitles Program (SAVE) database to produce a second list of "individuals flagged" for investigation; (4) mails each of those potential noncitizens and asks them to "complete and return an 'Admission or Denial of Non-U.S. Citizen Return Form' and attach documentation proving citizenship." District Court Dkt. No. 21 at 3-4. All of those records "concern" the State Board's

"program" because they are "means by which" the State Board determines whether the registrant is eligible. *Project Vote*, 682 F.3d at 336.

The same is true of records concerning registrants who requested cancellation of their registration for reasons of noncitizenship, the second category of the Requested Records. J.A. 59. The cancellation request is "the means by which" the State Board determines eligibility to vote, or in this instance, ineligibility. *Project Vote*, 682 F.3d at 336.

Indeed, records that explain the reason why and the method by which the State Board evaluates registrants on the basis of citizenship are precisely the type of records that the NVRA was intended to reach. Whether a registrant's eligibility is confirmed or denied, the Requested Records are essential for allowing the public to evaluate whether the State Board is properly performing its duties. As this Court prudently observed, "State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible." 682 F.3d at 339. "Without such transparency, public confidence in the essential workings of democracy will suffer." *Id.*

The district court's decision is presently the outlier on this issue. The Southern District of Texas relied on *Project Vote* in its recent decision denying a substantially similar motion to dismiss. *Public Interest Legal Found. v. Bennett*,

19

No. 4:18-CV-00981, 2019 U.S. Dist. LEXIS 38686 (S.D. Tex. Mar. 11, 2019), *adopting recommendation of Public Interest Legal Found. v. Bennett*, No. H-18-0981, 2019 U.S. Dist. LEXIS 39723, at *10 (S.D. Tex. Feb. 6, 2019). *Bennett* concerned the very same kind of list maintenance records relating to potential noncitizens. The court denied the motion to dismiss, explaining, "PILF has alleged a plausible claim under the public disclosure provisions of § 20507(i)." *Bennett*, 2019 U.S. Dist. LEXIS 39723 at *10.

In December 2019, the Middle District of Pennsylvania likewise denied a motion to dismiss an action filed to compel disclosure of noncitizen list maintenance records. *Public Interest Legal Found. v. Boockvar*, No. 1:19-CV-622, 2019 U.S. Dist. LEXIS 214710 (M.D. Pa. Dec. 13, 2019). The court declined to limit the reach of the Public Disclosure Provision, finding that "the Commonwealth's effort to identify noncitizen registrants is a 'program' or 'activity' designed to identify noncitizens and ensure an accurate and current list of eligible voters. Records concerning this effort are therefore accessible to the public under the Disclosure Provision." *Id*. at *17.

The State Board concedes it is not allowing inspection of "all records" that were requested, as the NVRA requires. 52 U.S.C. § 20507(i)(1). The State Board violated the NVRA within 30 days of an election for federal office. J.A. 15 ¶¶ 50-51. Although not required, the Foundation provided written notice of the violation

20

to Appellee Bell, the State's Chief Election Official. J.A. 11-13 ¶¶ 45-54. The State Board failed to cure the violation. The Foundation rightfully pursued this action under the NVRA's private-right-of-action provision. 52 U.S.C. § 20510(b).

Drawing all reasonable inferences in the Foundation's favor—as this Court must—the Amended Complaint easily contains enough factual matter to demonstrate that the Requested Records fall within the plain language of the NVRA. "Where, as here, 'the statute's language is plain, the sole function of the courts … is to enforce it according to its terms.'" *Project Vote*, 682 F.3d at 340 (quoting *Lamie*, 540 U.S. at 534). The district court erred when it held otherwise.

## III. The District Court Erred When it Inferred a Categorical Exemption for Records Used to Evaluate Eligibility on the Basis of Citizenship.

Notwithstanding the plain language of the statute, the district court inferred an additional, categorical exemption for list maintenance "records of individual voters who the NCSBOE, for one reason or another, has identified as *potential* noncitizens." J.A. 300 (emphasis in original). In the court's view, such records— *all* of them—are "uniquely sensitive and vulnerable to abuse, and thus that the NCSBOE is not required to disclose it by the NVRA." J.A. 299-300. The court explained that its decision was "guided" by four separate findings, each of which is addressed below. J.A. 300.

The consequences of the court's decision are significant. Records that explain the reason why individual registrants were flagged as noncitizens and

21

records that explain why individual registrants were removed (or not removed) from the voter rolls are now concealed from public view. Such an absurd result is contrary to the transparency and accountability intended by Congress. The district court's reasoning and conclusions are also contrary to or foreclosed by Circuit precedent and accordingly, should be rejected.

### A.    Where Congress Makes Explicit Exemptions, Courts May not Infer Additional Ones.

The district court's decision should be reversed for the fundamental reason that it violates established principles of statutory construction. Congress explicitly exempted only two types of records from the NVRA's public right of access: (1) "records relate[d] to a declination to register to vote" and (2) "the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). The Requested Records do not fall within either of these two exemptions.

Where Congress specifically exempts certain categories from otherwise applicable language, courts may not infer additional exemptions. *Rosmer v. Pfizer, Inc.*, 272 F.3d 243, 247 (4th Cir. 2001) (stating that inferring additional exceptions into a list of statutory exceptions drafted by Congress runs afoul of the doctrine of *expressio unius est exlusio alterius* and would amount to the court performing a "legislative trick"). Yet that is precisely what the district court did when it inferred an exemption for an entire category of list maintenance records.

22

The *Project Vote* court prudently observed that "[t]he records which Congress did not want to be encompassed by the term 'all' were specifically identified in the exceptions to the Public Disclosure Provision[.]" *Project Vote*, 752 F. Supp. 2d at 708. Therefore, the court declined to "undermine the purposeful usage of a broad term by Congress, in order to limit the scope of the statute." *Id*. This Court should likewise reject the invitation to "craft or infer additional exceptions." *Id*. (citing *Rosmer*, 272 F.3d at 247).

Like the *Project Vote* court, the Middle District of Pennsylvania likewise refused to carve out an exemption for list maintenance records concerning noncitizens because the Public Disclosure Provision's text does not permit it.

> [T]he Disclosure Provision requires production of "all" records, with two exceptions. The word "all" is expansive. *Long*, 682 F.3d at 336. The Disclosure Provision's two exceptions are narrow and specific. 52 U.S.C. § 20507(i)(1). The contrast between the broad mandate to disclose "all" records and the tailored protection of two types of records implies that Congress crafted this provision carefully. We will not (and indeed, must not) read unexpressed limitations into an unambiguous statute's terms. *See Prestol Espinal v. Attorney Gen. of the United States*, 653 F.3d 213, 222 (3d Cir. 2011).

*Boockvar*, 2019 U.S. Dist. LEXIS 214710, at *14

As in *Project Vote*, so here: "[b]ecause the requested [records] do not fall within either of the[] two exceptions—and because they are covered by Section 8(i)(1)'s general mandate—they must be made 'available for public inspection and … photocopying.'" 682 F.3d at 336 (quoting 52 U.S.C. § 20507(i)(1)).

**B.      The District Court's Holding Erodes the Transparency Intended by Congress and Frustrates the Purposes of the NVRA.**

The NVRA reflects the view that "the right of *citizens* of the United States to vote is a fundamental right," and "it is the duty of the Federal, State, and local governments to promote the exercise of that right." 52 U.S.C. § 20501(a)(1)-(2) (emphasis added). The NVRA was passed with four stated purposes, among them, "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4).

To further these goals, Congress made "all" voter list maintenance records subject to public inspection. In the words of this Court,

> It is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls. State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer.

*Project Vote*, 682 F.3d at 339; *id*. at 339-340 ("Public disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections."). Other federal courts concur. *Bellitto*, 2018 U.S. Dist. LEXIS 103617, at *12-13 (explaining that the Public Disclosure Provision "convey[s] Congress's intention that the public should be monitoring the state of the voter rolls and the adequacy of election officials' list maintenance programs."); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 721

24

(S.D. Miss. 2014) ("The NVRA Public Disclosure Provision is one means of ensuring compliance with the NVRA's stated goals. By opening up voter registration records for inspection, the Public Disclosure Provision shines a light on States' voter registration activities and practices.").

It is also "self-evident," *Project Vote*, 682 F.3d at 339, that concealing all records that could validate (or call into question) the removal of a registered voter accused of being an ineligible noncitizen erodes the transparency Congress intended and frustrates the purposes of the NVRA. However, for the sake of clarity, the Foundation will use the 2016 Audit to illustrate how.

The State Board claims that its 2016 Audit flagged 136 registered voters as potential noncitizens. J.A. 204-205. It further claims that "41 of these individuals acknowledged they were not U.S. citizens" after receiving a letter from the State Board. *Id*. The State Board further claims that "34 voters, tagged by the same audit, subsequently provided proof of citizenship" and were allowed to remain registered. J.A. 205.[4]

How do we know whether those 136 registered voters were appropriately flagged as noncitizens in the first instance, such that the State Board was justified

---

[4] The 2016 Audit explains that an additional 61 registrants flagged for potential citizenship issues did not respond to mailed correspondence from the State Board. The State Board has not produced any records that explain the disposition in those cases, even in a general way that does not identify the registrant.

25

in asking them to produce documentary proof of citizenship in order to keep their right to vote? How do we know whether 41 individuals actually confessed their noncitizen status? What if English is not the registrant's first language and they simply misunderstood the instructions? How do we know whether those registrations were actually cancelled, or cancelled in a timely manner? How do we know whether the State Board received valid proof of citizenship from 34 suspected noncitizens? And how did these noncitizens obtain voter registration in the first instance? Did they answer the citizenship checkbox on the registration form "yes" or "no?" Was the registration the result of "error [or] fraud[?]" *Project Vote*, 682 F.3d 339. Did any noncitizen removed from the rolls re-register at a later date?

The Public Disclosure Provision is not a "take our word for it" statute. It requires full transparency. The questions posed above cannot be answered and election officials cannot be held accountable unless all records are made public. "Without such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339.

Concealing the Requested Records from public view also poses very real risks to the franchise because it could prevent individuals or organizations from uncovering ineffective or unlawful list maintenance. These risks are illustrated by *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1339-40 (11th Cir. 2014), in which the

26

Florida Secretary of State was sued to stop programs designed to identify and remove noncitizens on the voter rolls. Like North Carolina's audits, the program unintentionally flagged eligible citizens for removal in some instances. *Id*. at 1339. Affected individuals and organizations sued the Secretary and obtained relief, preventing the unjustified removal of additional United States citizens. Under the district court's interpretation, those individuals and organizations would not have been able to inspect the records used by the Secretary to assess the eligibility of individual registrants. The State Board concedes that the information it uses to initially flag registrants for evaluation is "not reliable." District Court Doc. No. 21 at 5. It is thus paramount that the entire process be transparent.

Courts must "avoid 'interpretations of a statute which would produce absurd results … if alternative interpretations consistent with the legislative purpose are available.'" *Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). That is why this Court in *Project Vote* interpreted the Public Disclosure provision in a way that gives effect to Congress's use of the word "all." *Project Vote*, 682 F.3d at 336. The district court's interpretation, on the other hand, produces a result squarely at odds with intent of the law because it shields from public view *all* records that might validate (or call into question) the removal of a registered voter. A result so absurd must be rejected.

**C.**    **The Narrow Exemption For Social Security Numbers Recognized by *Project Vote* Does Not Support a Categorical Exemption for Records Used to Evaluate the Citizenship of Registered Voters.**

    **i.**    ***Project Vote* Narrowly Allowed the Redaction of Only Social Security Numbers Because the Record Showed Their Disclosure Would Cause an Intolerable Burden on the Right to Vote.**

In *Project Vote*, the lower court permitted a limited exemption for Social Security Numbers ("SSNs") from the NVRA's broad command to make "all" list maintenance records public. *Project Vote*, 752 F. Supp. 2d at 712; *Project Vote/Voting for Am., Inc. v. Long*, 813 F. Supp. 2d 738, 743 (E.D. Va. 2011). The district court, however, read this isolated and narrow exemption to mean that "nothing in the NVRA requires that information contained in voter application records which is 'uniquely sensitive and vulnerable to abuse' must be disclosed." J.A. 299 (quoting *Project Vote*, 752 F. Supp. 2d at 712). *Project Vote* did not establish such a simple and expansive rule.

In fact, *Project Vote* did not establish anything at all. Instead, *Project Vote* followed Circuit precedent—*Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993)—which had already established that conditioning voter registration on public disclosure of one's SSN "creates an intolerable burden on [the] fundamental right to vote." *Greidinger*, 988 F.2d at 1355.

*Greidinger* supported its conclusion with a body of evidence, including the findings of Congress, which recognized that the "widespread use of SSNs as

universal identifiers in the public and private sectors is 'one of the most serious manifestations of privacy concerns in the Nation.'" *Greidinger*, 988 F.2d at 1353 (quoting S.Rep. No. 1183, 93d Cong., 2d Sess.). The Fourth Circuit found that "armed with one's SSN, an unscrupulous individual could obtain a person's welfare benefits or Social Security benefits, order new checks at a new address on that person's checking account, obtain credit cards, or even obtain the person's paycheck." *Id.* In short, "the harm that can be inflicted from the disclosure of a SSN … is alarming and potentially *financially ruinous*." *Id.* at 1354 (emphasis added). Such a burden, this Court held, was too much for the right to vote to tolerate. *Id.* at 1354-55.

> *Project Vote* simply applied *Greidinger*'s holding to the NVRA:

> While *Greidinger* did not directly involve the NVRA, the court finds the Fourth Circuit's rationale regarding disclosure of a voter's SSN applicable to this case, and concludes that it would likely undermine the purposes of the statute for the NVRA to require that voters disclose their SSNs to the public.

*Project Vote*, 752 F. Supp. 2d at 711.

On appeal in *Project Vote*, this Court did not overrule the lower court's decision to narrowly permit redaction of SSNs. 682 F.3d at 339. However, when asked to extend *Greidinger*'s reach beyond disclosure of SSNs, this Court declined. *Id.* ("*Greidinger* is inapposite here, however, because the district court did not require public disclosure of Social Security numbers."). *Project Vote*, 682

29

F.3d at 339. Appellants argued that like SSNs, disclosure of other personal information—like criminal history, mental incompetency determinations, home addresses, and telephone numbers—would "suppress registration contrary to congressional intent." *Id*. The court disagreed, explaining that the need for transparency outweighs privacy concerns.

> We do not think appellants' privacy concerns unfounded. By requiring public disclosure of personal information, Section 8(i)(1) may conceivably inhibit voter registration in some instances. However, this potential shortcoming must be balanced against the many benefits of public disclosure. It is selfevident [sic] that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls. State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer.

*Id.*

Furthermore, this Court held that Congress, not the courts, decides which list maintenance records are subject to disclosure. *Id*. ("It is not the province of this court … to strike the proper balance between transparency and voter privacy."). The extent of disclosure is a "policy question" that "Congress has already answered [] by enacting NVRA Section 8(i)(1)." *Id*.

The district court misconstrued *Project Vote*. In that case, neither the lower court, nor this Court, forbid the disclosure of records solely because they are "'uniquely sensitive and vulnerable to abuse.'" J.A. 299 (citing *Project Vote*, 752

30

F. Supp. 2d at 712). When the lower court used that language it was paraphrasing the views of this Court with respect to *only* SSNs, as expressed in *Greidinger*. *Project Vote*, 752 F. Supp. 2d at 711-712 ("As the Fourth Circuit recognized, SSNs are uniquely sensitive and vulnerable to abuse….").

Aside from SSNs, both the lower court, and this Court, plainly endorsed disclosure of information, "which to some persons may be considered sensitive," *id*. at 710, even information that "may conceivably inhibit voter registration in some instances," *Project Vote*, 682 F.3d at 339.

*Project Vote* permits the *redaction* of SSNs, while *requiring* disclosure of other personal information. The district court erred when it construed *Project Vote* more broadly than intended.

### ii.  The Record in This Case Does Not Establish that Disclosure of the Requested Records Would Create an Intolerable Burden on the Right to Vote or Undermine the Purposes of the NVRA.

If this Court chooses to apply the reasoning of *Project Vote* and *Greidinger* to the Requested Records, it must do so under the correct standard, rather than the one applied by the district court. It is not enough to avoid transparency that the information be, in the court's view, "sensitive" or "vulnerable to abuse." Rather, the record must demonstrate that disclosure of the information is so sensitive and so vulnerable to abuse that "it creates an intolerable burden on [the] fundamental right to vote," *Greidinger*, 988 F.2d at 1355, such that disclosure "would likely

31

undermine the purposes of the statute," *Project Vote*, 752 F. Supp. 2d at 711. In other words, there must be a "showing that disclosure of such information would create a substantial burden on the voter, to the degree that the voter would forego registering to vote." *Id*. at 710 n.20. No such showing has been made.

### iii. The Reasoning of *Project Vote* Does Not Apply to Noncitizens Because They Are Ineligible to Register and Vote.

The Requested Records include records concerning registered voters who were removed from the voter roll after the State Board determined they were *not* U.S. citizens. J.A. 59 (records of self-requested cancellations and cancellations as a result of jury recusal); J.A. 204 (explaining that after the 2016 election, the State Board received correspondence from 41 registered voters who "acknowledged they were not U.S. citizens."). *Project Vote*'s rationale for exempting SSNs cannot apply to those records or any records concerning other noncitizens because noncitizens are ineligible to register and vote. N.C. Gen. Stat. §§ 163-55(a); 163-54. In other words, the State Board cannot "show[] that disclosure of such information would create a substantial burden on the voter, to the degree that the voter would forego registering to vote." *Project Vote*, 752 F. Supp. 2d at 710 n.20. The district court did not address this fatal flaw in its reasoning.

### iv. Disclosure of List Maintenance Records that Concern an Evaluation of Citizenship Do Not Create an Intolerable Burden on the Right to Vote as a Matter of Law.

The Requested Records also include records concerning registered voters who were initially flagged as noncitizens, but later affirmed their citizenship. *See* J.A. 59; J.A. 205 (34 registrants verified their citizenship through the 2016 audit process).[5] The district court held that *all* such records are "uniquely sensitive and vulnerable to abuse" and supported that conclusion with several additional findings. J.A. 300-301. Yet none of those findings withstand scrutiny under the standards of this Court.

The district court first claimed that "being identified as an individual who is registered to vote but who may not be a United States citizen raises the specter of immigration violations and criminal activity." J.A. 300. In support, the court cites only *Senate of P.R. ex rel. Judiciary Comm. v. United States DOJ*, 823 F.2d 574, 588 (1987) ("*Senate of P.R.*"), which explains, "There is little question that disclosing the identity of targets of law-enforcement investigations can subject

---

[5] The Foundation phrased its request in terms of "potential" noncitizens to capture records concerning registrants initially flagged as noncitizens, *i.e.*, *potential* noncitizens, but later confirmed as citizens after further investigation. The NVRA applies equally to cancellation records and to records concerning instances where eligibility was confirmed. *Project Vote*, 682 F.3d at 335. The Foundation's use of "potential" thus changes nothing about whether the records are covered by the Public Disclosure Provision.

those identified to embarrassment and potentially more serious reputational harm." *Senate of P.R.* is inapposite for several reasons.

First, *Senate of P.R.* is a Freedom of Information Act ("FOIA") case. 823 F.2d at 577. Congress did not include in the NVRA the exemptions it included in FOIA. Rather, it exempted just two categories of records. 52 U.S.C. § 20507(i)(1). That choice must be given effect.

Second, *Senate of P.R.* involved a FOIA request for records of a criminal investigation, specifically, records concerning a possible state-sponsored murder of two political activists. 823 F.2d at 577. That is not the case here. Instead, the Foundation seeks records used to keep the voter rolls current and accurate.[6] *See* Bartlett Letter (describing North Carolina's noncitizen audit process and proclaiming, "We are committed to keeping our voter rolls clean and accurate").

It is a criminal offense in North Carolina for a person to fraudulently register in a precinct where he cannot lawfully vote. N.C. Gen. Stat. § 163-275(1). But that does not transform all records concerning changes in residency into records of

---

[6] Letter from State BOE Executive Director Gary Bartlett to North Carolina House Elections Committee, Attachment B at 6, March 11, 2013, https://www.ncleg.gov/documentsites/committees/JointAppropriationsGeneralGovernment/2013%20Session/03-07-13%20Meeting/sbe_GA_response_with_attachments.pdf (accessed Dec. 20, 2019) (hereafter, "Bartlett Letter").

criminal investigation. In the same way, the fact that voting as a noncitizen is a criminal offense, does not make the Requested Records criminal in nature.

Regardless, nothing in the record even suggests that any registered voter who affirmed her citizenship was referred to law enforcement for further investigation. There would be no reason to because each such registrant *affirmed* her citizenship with the State Board and remained registered to vote. For that reason, the State Board's records do not "raise[] the specter of immigration violations and criminal activity," as the district court claimed. J.A. 300. In reality, the records negate any specter that might exist because they prove the registrant is a citizen and is eligible to vote.

The fact that an individual was simply *evaluated* for eligibility on the basis of citizenship does not create an intolerable burden on the right to vote. Indeed, Congress intended for citizenship to be evaluated when it passed the NVRA. *Arcia*, 772 F.3d at 1344 ("The National Voter Registration Act (NVRA) is premised on the assumption that citizenship is one of the requirements for eligibility to vote.") This Court has similarly observed that citizenship verification is an indispensable part of voter list maintenance. *Project Vote*, 682 F.3d at 336. It thus strains credulity to think that Congress would consider a citizenship evaluation to be so sensitive as to undermine the purpose of the NVRA.

The district court also claimed that documents used by registered voters to affirm their citizenship—*e.g.*, copies of birth certificates and passports—can be "utilized, like social security numbers, in identify theft." J.A. 300 (citing *Greidinger*, 988 F.2d at 1354). The district court did not explain how those documents can be used to commit identity theft, like the *Greidinger* court did. *Greidinger*, 988 F.2d at 1354. Even if the court is correct, the remedy is redaction, not wholesale exemption,[7] because any "potential shortcoming must be balanced against the many benefits of public disclosure," including detecting "both error and fraud." *Project Vote*, 682 F.3d at 339. Wholesale exemption for proof-of-citizenship records would prevent the oversight intended by Congress.

The district court further believed that the nature of the two explicit exemptions found in the NVRA's text means that Congress implicitly exempted records that implicate the same concerns. J.A. 300. This reasoning defies the careful language Congress used when it drafted the Public Disclosure Provision. The statute's two exemptions describe records that disclose two very specific pieces of information—where the registrant applied for registration and whether the individual declined to register. 52 U.S.C. § 20507(i)(1). "The contrast between the broad mandate to disclose "all" records and the tailored protection of two types

---

[7] The State Board has never offered to produce any records with information redacted. It has, instead, maintained that entire records—regardless of their contents—are exempt.

of records implies that Congress crafted this provision carefully." *Boockvar*, No. 1:19-CV-622, 2019 U.S. Dist. LEXIS 214710, at *14. As explained supra, Section III.A, where Congress specifically exempts certain categories from otherwise applicable language, courts may not infer additional exceptions. *Rosmer*, 272 F.3d at 247. The district court erred when it did precisely that.

Judicially amending the NVRA to exempt eligibility determinations involving citizenship would also contravene *Project Vote* because it would require this Court to substitute its judgment for that of Congress. This Court was clear the first time around: "It is not the province of this court … to strike the proper balance between transparency and voter privacy." *Project Vote*, 682 F.3d at 339. Congress has already spoken. *Id*. "All" list maintenance must be disclosed. 52 U.S.C. § 20507(i)(1).

Even without the binding instructions of *Project Vote*, there is no logical reason to classify such records as "uniquely sensitive" or "vulnerable to abuse," such that disclosure would create an intolerable burden on the right to vote. The 2016 Audit is again illustrative. The State Board explains that it (1) reviews "voter records"; (2) checks them against DMV records to generate a list of "resulting matches"; (3) checks that list against the SAVE Program database to produce a second list of "individuals flagged" for investigation; (4) mails each of those individuals and requests they "complete and return an 'Admission or Denial of

37

Non-U.S. Citizen Return Form' and attach documentation proving citizenship."
(District Court Dkt. No. 21 at 4.) Those records, lists, and correspondence likely
contain names, addresses, telephone numbers, birthdates and other similar
information commonly maintained with respect to registered voters. This Court has
held that all of that information is subject to disclosure under the NVRA. *Project
Vote*, 682 F.3d at 339. If any records do contain SSNs or voter signatures, that
information may, of course, be redacted because the Foundation has not requested
that information.

This case does not involve a discrete piece of data, with documented
vulnerabilities, like SSNs. Instead, it involves many different types of common list
maintenance records, some of which remain unknown. To defeat the Foundation's
well-pleaded allegations, the State Board must show that there are no set of facts
upon which the Foundation may prevail. *McCaffrey v. Chapman*, 921 F.3d 159,
164 (4th Cir. 2019). Put differently, it must be conclusively shown that every
conceivable responsive record that exists is exempt from disclosure *as a matter of
law*. Neither the State Board nor the district court made such a showing. The
judgment should therefore be reversed.

### v.  The State Board's Use of the SAVE Program Does Not Prohibit Disclosure or Support a Categorical Exemption.

As part of its list maintenance program, the State Board has contracted with
the Department of Homeland Security ("DHS") and the U.S. Citizenship and

Immigration Services ("USCIS") to use the Systematic Alien Verification for

Entitlements ("SAVE") Program, which contains information about a legal

immigrant's citizenship status. J.A. 2; District Court Dkt. No. 21 at 22. The State

Board's use of the SAVE Program is governed by a Memorandum of Agreement,

J.A. 190-199 ("MOA"), which the State Board argued below prohibits disclosure

of *all* of the Requested Records, District Court Dkt. No. 21 at 22-25. The district

court cited the alleged confidentiality of the SAVE database as an additional factor

supporting its decision. J.A. 301.

In *Project Vote*, this Court confronted a similar argument—namely, that the

federal Help America Vote Act ("HAVA") and the Military Overseas Voter

Empowerment ("MOVE") Act prohibited disclosure of the contested records. 682

F.3d at 334. This Court held that consideration of other laws is not necessary when

the statutory language is clear:

> Where "the language is plain and 'the statutory scheme is coherent and
> consistent,' there is no need to inquire further." *In re JKJ Chevrolet,
> Inc.*, 26 F.3d 481, 483 (4th Cir. 1994). Accordingly, we need not
> consider the impact of HAVA and the MOVE Act on the language of
> Section 8(i)(1)[.]

*Id*.

Even if considered, it should not affect the result, because the MOA

explicitly disavows conflict with the NVRA: "Nothing in this MOA is intended or

should be construed to limit or affect the duties, responsibilities, and rights of the

User Agency under the National Voter Registration Act[.]" J.A. 198 (MOA § VI(J)). Compliance with the Public Disclosure Provision is a duty and a responsibility of the State Board under the NVRA. The district court made no reference to this provision of the agreement.

Congress intended that election officials would use federal databases to perform list maintenance. The NVRA's text envisions use of "change-of-address information supplied by the Postal Service through its licensees," (also known as the National Change of Address ("NCOA") Program) to perform list maintenance based on changes in residency. 52 U.S.C. § 20507(c)(1)(A). The Postal Service, like DHS, "requires licensees and their customers to complete a Processing Acknowledgment Form (acknowledgement form) to comply with the Privacy Act of 1974 and document the companies' intended use of the data."[8] Under the district court's reasoning, *all* records of list maintenance programs that utilize NCOA Program data would be concealed from public view. Such a result would be absurd. Congress did not intend for use of the NCOA Program to obliterate the transparency of the Public Disclosure Provision. Likewise, this Court should not interpret the MOA, or the Privacy Act, in a way that undoes the will of Congress.

---

[8] USPS, Inspector General, National Change of Address Program Audit Report at 1, available at https://www.uspsoig.gov/sites/default/files/document-library-files/2015/it-ar-14-010.pdf.

Further, the MOA cannot be used to justify denial of *all* the Request Records because it did not even take effect until September 2013. J.A. 199. The Foundation has requested records dating back to 2006. J.A. 59-60. Before the State Board contracted to use the SAVE Program, its noncitizen audits were conducted using only DMV data.[9, 10]

### vi. The Driver's Privacy Protection Act ("DPPA") Does Not Prohibit Disclosure or Support a Categorical Exemption.

Last, the district court claimed that the DPPA, a federal law governing the privacy of *motor vehicle records*, prohibits disclosure of voter list maintenance records. J.A. 301. The DPPA has nothing to do with voter list maintenance or this case. Indeed, the only known cases to address the issue head-on have found the DPPA does not prohibit disclosure of noncitizen list maintenance records, *Public Interest Legal Found. v. Reed*, No. 16-cv-01375 (E.D. Va., filed Oct. 31, 2016); J.A. 253-254, or prohibits only information that is obtained by a motor vehicle agency in connection with a motor vehicle record, such as driver's license numbers. *Boockvar*, 2019 U.S. Dist. LEXIS 214710, at *22.

---

[9] *See* Bartlett Letter, *supra* note 6.

[10] Even the State Board's *current* programs do not rely exclusively on SAVE Program data. The State Board uses DMV data to generate the initial list of potential noncitizens, which is a discrete list maintenance record. (District Court Dkt. No. 21 at 3-4.)

The Foundation has not asked to inspect motor vehicle records covered by the DPPA. The Foundation requested records concerning suspected noncitizen registrants identified, in part, through information *obtained from* the North Carolina DMV. J.A. 59. For example, the State Board compares "voter records" to DMV records to generate a list of "resulting matches." District Court Dkt. No. 21 at 3-4. Those "voter records" and the list of "resulting matches" are list maintenance records—not motor vehicle records—and are subject to disclosure under the NVRA.

The alleged conflict between the DPPA and the NVRA was raised and rejected in *Public Interest Legal Found. v. Reed*, No. 16-cv-01375 (E.D. Va., filed Oct. 31, 2016), J.A. 254-255. There, the Foundation made an NVRA request for records concerning the cancellation of noncitizen registrants, including a cancellation list and copies of each canceled registrant's application for registration. *Id*., Complaint (Doc. 1). The defendant argued that the DPPA prohibited the disclosure of the requested list maintenance records because they contained information that was derived from records maintained by the department of motor vehicles. In a two-page order, the court rejected this argument:

> Defendant has moved to dismiss the Complaint on the grounds that the privacy provision of the [DPPA] … overrides the public disclosure provision of the NVRA under the circumstances of this case. The Court finds that the DPPA does not apply to the disclosure of the voter information requested by Plaintiff. Because Plaintiff has stated a plausible claim for declaratory and injunctive relief, it is hereby

42

ORDERED that Defendant Susan Reed's Motion to Dismiss is
DENIED.

J.A. 254-255.

The decision in *Reed* is correct for several reasons. The DPPA provides, in

relevant part,

> (a) A State department of motor vehicles, and any officer, employee,
> or contractor thereof, shall not knowingly disclose or otherwise make
> available to any person or entity:
>
> > (1) personal information, as defined in 18 U.S.C. 2725(3), about
> > any individual obtained by the department in connection with a
> > motor vehicle record, except as provided in subsection (b) of this
> > section.

18 U.S.C.S. § 2721(a)(1). "Motor vehicle record" is defined as "any record that

pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle

registration, or identification card issued by a department of motor vehicles." 18

U.S.C.S. § 2725(1).

The Requested Records do not "pertain[] to a motor vehicle record." *Id*.

Instead, they pertain to the State Board's list maintenance activities. Indeed, the

correspondence and other records associated with the State Board's seemingly

annual noncitizen audits are pure records of list maintenance. The only possible

exception could be the noncitizen designation or identifier that is apparently

present in the motor vehicle records of legal permanent residents. J.A. 204.

43

However, the DPPA prohibits the disclosure of only "personal information," which the statute defines as

> information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

18 U.S.C.S. § 2725(3). Citizenship status—which is all the noncitizen designation reflects—does not "identif[y] an individual." *Id*. Nor is it included in the DPPA's definition of "personal information." It is therefore not information protected by the DPPA.

Even if the noncitizen designation could be used to identify an individual—a dubious prospect and a factual question—it would not justify concealment of *all* list maintenance records used to evaluate eligibility. Rather, it would, if present in a particular record, justify a limited exemption for the noncitizen designation. Such was the reasoning of the Middle District of Pennsylvania, which reasoned that voter list maintenance records are protected by the DPPA only "to the extent they include personal information obtained by the DMV in connection with a motor vehicle record." *Boockvar*, 2019 U.S. Dist. LEXIS 214710, at *20.

Second, the DPPA does not limit state *election* officials. Instead, the DPPA limits disclosure by a "State department of motor vehicles, and any officer, employee, or contractor thereof." 18 U.S.C. § 2721(a). The State Board is not any

44

of those things and therefore the express terms of the DPPA do not apply. *See*

*Davis v. Freedom of Info. Comm'n*, 47 Conn. Supp. 309, 315-16, 790 A.2d 1188,

1192 (2001) ("Neither the FDPPA nor § 14-10(d) ... apply by their express terms to

the office of the tax assessor or to the motor vehicle grand list books. They apply

only to the commissioner of motor vehicles and motor vehicle records.").

Third, the DPPA expressly *permits* disclosure of motor vehicle information

"[f]or use by any government agency ... in carrying out its functions, or any private

person or entity acting on behalf of a Federal, State, or local agency in carrying out

its functions." 18 U.S.C. § 2721(b)(1). In *Davis*, the court relied on this

permissible-use exception to hold that the DPPA does not apply to other

government agencies that disclose personal information received from a motor

vehicle agency in the course of their normal government functions. *Davis v.*

*Freedom of Info. Comm'n*, 259 Conn. 45, 787 A.2d 530 (2002), *affirming Davis*,

47 Conn. Supp. 309. Information disclosed to the State Board can be used to carry

out its functions, including the obligation to comply with the NVRA.

Furthermore, the permissible-use exception extends to "any private person

or entity acting on behalf of" a government agency. 18 U.S.C. § 2721(b)(1).

Congress has cast NVRA plaintiffs in the role of "private attorneys general"

through the NVRA's private-right-of-action provision. *Ass'n of Cmty. Orgs. for*

*Reform Now v. Fowler*, 178 F.3d 350, 364 (5th Cir. 1999). DPPA's permissible-

45

use exception should therefore apply with equal force to private entities pursuing an action to enforce the NVRA, like the Foundation.

Last, even if motor vehicle records provided to state election officials cannot be disclosed, records of derivative list maintenance activities certainly must be disclosed, particularly those related to the identification or cancellation of registrants, such as the lists described by the State Board, District Court Dkt. No. 21 at 3-4, or correspondence sent to and received from registrants, *id*. The Foundation sought a broad array of records that go well beyond the discrete noncitizen designations used to initially identify potential noncitizens on the voter rolls. The State Board cannot hide behind one piece of data to withhold the entirety of the Requested Records.

The NVRA became law in 1993. The DPPA became law in 1994. Courts "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988). To accept the district court's holding that the DPPA *requires* concealment of scores of list maintenance records is to find that the same Congress intended to obliterate the NVRA's Public Disclosure Provision just one year after it created it. Such a result is absurd and should be avoided.

**IV.    The District Court Contravened *Project Vote* When it Upheld the Denial of Complete Voter Registration Forms.**

The district court erroneously claimed that the Foundation did not request completed voter registration forms. J.A. 301. In its written request, however, the Foundation asked to inspect "[t]he completed voter application form (redacted where necessary to prevent disclosures of claimed Social Security number and signature)" for all registrants whose records were captured by its three requests. J.A. 60. Completed voter registration applications (with SSNs redacted) are categorically subject to disclosure under this Court's holding in *Project Vote*, 682 F.3d at 335. Reversal is required because the district court upheld the State Board's denial of those applications, in direct contravention of *Project Vote*.

**V.    The District Court Abused Its Discretion and Deprived the Foundation of a Fair Proceeding When it Allowed the State Board to Submit Sealed and *Ex Parte* Filings.**

Shortly after it moved to dismiss the Complaint, the State Board filed a sealed, *ex parte* motion to stay the case, which the State Board then moved, *ex parte*, to seal. J.A. 2. (Docket Sheet at 2). The State Board asked contemporaneously that the motion to seal also be sealed. J.A. 98.

The Foundation received no notice of these filings through the court's electronic filing system. The Foundation became aware of these filings only by happenstance when its counsel accessed the case docket after noticing that the docket number for the Amended Complaint was higher than expected. By then, the

47

district court had already entered a sealed *ex parte* order, the nature of which remains unknown to the Foundation. J.A. 2.

By allowing the State Board to file the motion to stay *ex parte*, the district court deprived the Foundation of an opportunity to both oppose the requested relief and counter any factual and legal statements about the Requested Records, the State Board's list maintenance processes, and any attacks on the Foundation's character, like those riddled throughout the State Board's motion to dismiss.[11] A one-sided presentation—especially one that cannot be seen—is contrary to the adversarial process and works to unfairly advantage one party. If this case is remanded, the State Board may again move *ex parte* to stay the case or obtain other forms of relief. For the following reasons, the Foundation respectfully asks this Court to examine the sealed filings and orders, and if their method of presentation is found unjustified, order that they be unsealed and any other relief deemed appropriate.

"*[I]n camera* submission deprives one party to a proceeding of a full opportunity to be heard on an issue, and its use is justified only by a compelling interest." *John Doe, Inc. v. United States (In re John Doe, Inc.)*, 13 F.3d 633, 636 (2d Cir. 1994) (citations and quotations omitted); *see also In re Grand Jury*

---

[11] The State Board supported its motion to dismiss by suggesting that the Foundation would use the Requested Records to defame and harass registered voters. (*See, e.g.*, District Court Dkt. No. 21 at 28).

48

*Subpoenas*, 472 F.3d 990, 995 (8th Cir. 2007) ("*ex parte* motions do prevent a party from arguing on its own behalf"). In its Motion to Seal, the State Board claimed that it was justified in seeking a stay *ex parte* because the "motion and memorandum of law discuss matters that are before this Court in sealed proceedings relating to sealed criminal investigations and grand jury subpoenas issued pursuant to these investigations." J.A. 98. This Court should question whether such a justification under these circumstances is "compelling" for at least three reasons.

**First**, the State Board's use of grand jury proceedings to favor its own interests justifies giving the Foundation the opportunity to respond. Federal Rule of Criminal Procedure 6 governs the secrecy of grand jury proceedings. Rule 6(e)(3)(F) permits the United States to petition the court *ex parte* for disclosure of otherwise confidential grand-jury matter. Upon filing, "the judge must decide whether to order an interested private party to be notified." *In re United States*, 398 F.3d 615, 619 (7th Cir. 2005).

Ordinarily, "when a grand jury investigation is ongoing, district courts have broad discretion in taking action to protect the secrecy of that investigation." *In re Grand Jury Subpoenas*, 472 F.3d 990, 995 (8th Cir. 2007). However, that discretion is not unlimited. The Seventh Circuit explains,

> It is not hard to imagine circumstances in which lack of notice would abuse the district judge's discretion: for example, when the United

49

> States seeks to favor its own interests by authorizing itself to use grand jury material in a civil suit, the judge would be well advised to let the civil defendant have an opportunity to oppose the motion.

*In re United States*, 398 F.3d 615, 619 (7th Cir. 2005). Although the State Board's motion does not arise under Rule 6, the Seventh Circuit's reasoning applies just the same. The State Board used grand jury matters to favor its interest while relying on the secrecy of those same matters to proceed *ex parte*. Grand jury proceedings are not a shield and a sword. Under these circumstances, the Foundation should have be given an opportunity to oppose the motion.

**Second**, it is unlikely that the State Board's motion or memorandum discussed confidential grand jury matters, or enough of such matters to justify proceeding *ex parte*, as opposed to proceeding with redactions.

Rule 6's "policy of secrecy is not absolute." *In re Grand Jury Investigation*, 630 F.2d 996, 1000 (3d Cir. 1980) (citing *United States v. Stanford*, 589 F.2d 285, 291 (7th Cir. 1978)). Instead, Rule 6(e) "shields solely 'matters occurring before the grand jury.'" *Id*. Accordingly, this Court explains that "Rule 6(e)(2) protects from disclosure 'only the essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process." *In re Grand Jury Subpoena v. Under Seal*, 920 F.2d 235, 241 (4th Cir. 1990) (citations and quotations omitted). The concern is "whether the information … [will] actually

subvert[] the secrecy veiling what took place before the grand jury." *Anaya v.*

*United States*, 815 F.2d 1373, 1378 (10th Cir. 1987). With respect to documents,

> The Rule is not intended "to foreclose from all future revelation to proper authorities the same information or documents which were presented to the grand jury." *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960). The mere fact that a particular document is reviewed by a grand jury does not convert it into a "matter occurring before the grand jury" within the meaning of 6(e).

*In re Grand Jury Investigation*, 630 F.2d 996, 1000 (3d Cir. 1980).

In all likelihood, the State Board believes that the records sought by the

Foundation overlap with records responsive to the grand jury subpoena served on

the State Board by the United States Attorney's Office.[12] Even if that is true, it

does not make those records "matters occurring before the grand jury," such that

they are confidential and justify proceeding *ex parte*. *In re Grand Jury Subpoena v.*

*Under Seal*, 920 F.2d at 241; *In re Grand Jury Investigation*, 630 F.2d at 1000.

Whether certain records exist and the nature of those records forms an

essential part of the relief requested by the Foundation. To permit discussion of

those topics in an *ex parte* fashion deprived the Foundation of information that is

useful to its case. Unless the material discussed is confidential under Rule 6, its

submission *ex parte* and *in camera* was unjustified.

---

[12] *Available at*
https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2018-09-07/State_Subpoenas__%5BPublic%5D.PDF (last accessed Dec. 19, 2019).

**Third**, even if some material discussed in the State Board's motion and memorandum qualifies as "matters occurring before the grand jury," it is unlikely that material was essential to the request, such that proceeding *ex parte* was justified. "The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983). To make that showing, it is unlikely that the State Board needed to discuss the "essence of what takes place in the grand jury room," especially when the grand jury subpoena—and the records it seeks—are already in the public sphere.

To argue that the stay was not granted misses the point. The common law and First Amendment presume a right of access to judicial records, *United States v. Appelbaum (In re United States)*, 707 F.3d 283, 290 (4th Cir. 2013), while the adversarial process demands bilateral participation. That did not occur here. The State Board was lent extra time with the court's ear. This Court should satisfy itself that such time was justified.

## CONCLUSION

The Requested Records are subject to disclosure under the plain language of the Public Disclosure Provision. The district court erred when it inferred an expansive exemption that was not intended by Congress and contrary to purposes

52

of the NVRA. This Court should therefore reverse the judgment of the district

court and remand the action for further proceedings.

## **STATEMENT REGARDING ORAL ARGUMENT**

Because this appeal presents issues concerning the right to vote, Appellant

Public Interest Legal Foundation respectfully requests oral argument.

Dated: December 23, 2019.

　　　　　　　　　　　　　　 /s/ Noel H. Johnson
　　　　　　　　　　　　　　Noel H. Johnson
　　　　　　　　　　　　　　*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limits of Rule 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 12,260 words.

This brief also complies with the typeface requirements because this brief has been prepared in a proportionally space type face using Microsoft Word in 14 point Times New Roman.

Dated: December 23, 2019.

  /s/ Noel H. Johnson   

Noel H. Johnson

*Counsel for Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2018, I electronically filed the

foregoing Appellant's Opening Brief using the Court's ECF system, which will

serve notice on all parties.

Dated December 23, 2019.

    /s/ Noel H. Johnson
Noel H. Johnson
Counsel for Appellant