No. 19-2265

---

# In the United States Court of Appeals for the Fourth Circuit

---

**PUBLIC INTEREST LEGAL FOUNDATION**,

*Plaintiff-Appellant*,

v.

**NORTH CAROLINA STATE BOARD OF ELECTIONS** and **KAREN BRINSON BELL**, in her official capacity as Executive Director of the North Carolina State Board of Elections

*Defendants-Appellees*,

---

On Appeal from the United States District Court for the Eastern District of North Carolina, in Case No. 5:19-cv-00248 (Hon. Terrence W. Boyle)

---

### APPELLANT'S REPLY BRIEF

---

Noel H. Johnson (WI Bar No. 1068004)
Kaylan L. Phillips (IN Bar No. 30405-84)
PUBLIC INTEREST LEGAL FOUNDATION
32 East Washington Street, Suite 1675
Indianapolis, IN 46204
Tel: 317-203-5599
Fax: 888-815-5641
njohnson@publicinterestlegal.org
kphillips@publicinterestlegal.org
*Counsel for Appellant Public Interest Legal Foundation*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................. ii

ARGUMENT ................................................................................... 1

I.     The Board Has Not Produced Records Showing Results and
       Methodology for Years Other than 2016 ........................................ 3

II.    The Board's Arguments Do Not Overcome the Public
       Disclosure Provision's Plain and Unambiguous Language ........... 4

       A. The Text of the Public Disclosure Provision Requires
          Disclosure of the Requested Records........................................ 5

       B. The Goals of the NVRA Cannot Be Accomplished Without
          Disclosure of Some Personally Identifying Information ........... 8

       C. There is No Basis for the Board's Belief that
          Disclosure Will Burden Voting Rights ................................... 11

III.   Disclosure Will Not Require the Board to Violate
       Its Alleged Legal Obligations........................................................ 16

       A. Federal Privacy Laws are Not Implicated Because the
          Source of a Registrant's Citizenship Status is Not
          a Federal Database.................................................................... 17

       B. Even if Implicated, the Drivers Privacy Protection
          Act Does Not Categorically Prohibit Disclosure of
          All Requested Records ............................................................. 18

       C. Even if Implicated, the Privacy Act Does Not
          Categorically Prohibit Disclosure ........................................... 22

IV.    Interpreting the Public Disclosure Provision According
       to its Text Raises No Constitutional Concerns............................. 25

V.     Any Concerns Should be Addressed Through Redaction,
       Not Complete Secrecy ................................................................... 26

CONCLUSION ............................................................................. 27

CERTIFICATE OF COMPLIANCE............................................. 29

CERTIFICATE OF SERVICE ...................................................... 30

# <u>TABLE OF AUTHORITIES</u>

## *Cases*

*ACORN v. Edgar*,
    880 F. Supp. 1215 (N.D. Ill. 1995) .......................................... 26

*Arcia v. Sec'y of Fla.*,
    772 F.3d 1335 (11th Cir. 2014) .............................................. 14

*Almendarez-Torres v. United States*,
    523 U.S. 224 (1998) .............................................................. 26

*Brown v. Socialist Workers '74 Campaign Comm.*,
    459 U.S. 87 (1982) ............................................................ 12-13

*Condon v. Reno*,
    913 F. Supp. 946 (D.S.C. 1995) ............................................. 26

*Citizens United v. FEC*,
    558 U.S. 310 (2010) .......................................................... 12-13

*Doe v. Reed*,
    823 F. Supp. 2d 1195 (W.D. Wash. 2011) ............................. 13

*Doe v. Reed*,
    561 U.S. 186 (2010) .............................................................. 13

*Day v. Johns Hopkins Health Sys. Corp.*,
    907 F.3d 766 (4th Cir. 2018) ................................................... 4

*Greidinger v. Davis*,
    988 F.2d 1344 (4th Cir. 1993) ............................................... 12

*Lake v. Neal*,
    585 F.3d 1059 (7th Cir. 2009) .......................................... 20 n.5

*Lara-Aguilar v. Sessions*,
    889 F.3d 134 (4th Cir. 2018) ............................................. 9-10

*Maracich v. Spears*,
    570 U.S. 48 (2013) .......................................................... 5, 7-8

*NAACP v. Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) .............................................................. 12

*Project Vote/Voting for Am., Inc. v. Long*,
    752 F. Supp. 2d 697 (E.D. Va. 2010) ............................... 5-7, 15

*Project Vote/Voting for Am., Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) .........................................5-10, 14-15, 23, 26

*Protectmarriage.com v. Bowen*,
    830 F. Supp. 2d 914 (E.D. Cal. 2011) ..................................................... 13

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)................................................................................... 25

*Thomas v. United States Dep't of Energy*,
    719 F.2d 342 (10th Cir. 1983) ................................................................. 18

## Statutes and Rules

5 U.S.C. § 552a(b) ....................................................................................... 18

18 U.S.C. § 2721(a) ..................................................................................... 18

18 U.S.C. § 2722(a) ..................................................................................... 21

18 U.S.C. § 2725(1) ..................................................................................... 19

52 U.S.C. § 20504(a)(1)................................................................................ 19

52 U.S.C. § 20507(c)(1)(A) .......................................................................... 24

52 U.S.C. § 20507(d)(2) ................................................................................. 9

52 U.S.C. § 20507(i)(1) ....................................................... 5, 7, 10, 23, 26

52 U.S.C. § 20507(i)(2) .............................................................6, 9-10, 24

N.C. Gen. Stat. § 163-82.19(a) ........................................ 19, 20 n.5

N.C. Gen. Stat. § 163-82.19(c) ........................................ 20, 20 n.5

## Other Authorities

139 Cong. Rec. E2747-01 ............................................................................ 21

139 Cong. Rec. S15745-01 ........................................................................... 21

https://dl.ncsbe.gov/index.html?prefix=data/ .......................................... 10 n.2

https://dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf .. 18 n.3

https://www.ncdot.gov/dmv/license-id/driver-licenses/new-drivers/Pages/other-registrations.aspx........................................................................................ 19 n.4

**ARGUMENT**

Imagine this scenario: county election officials receive information that motor vehicle department records call into question the citizenship of a registered voter. The county checks its records and confirms that the suspected alien is on the county voter roll. The county wants to be sure, so pursuant to state law it mails the registrant a letter explaining the concern and asking for affirmation of citizenship. The letter warns that she has just thirty days to do so or else her voter registration may be canceled. For reasons unknown, the letter is never returned, and the woman—who is and always was a U.S. citizen—is removed from the voter rolls.

Fast forward. A public interest group researching foreign participation in American elections asks to inspect records of individuals the county has removed from the voter rolls due to citizenship defects. Next to each person's name— including our canceled U.S. citizen—the county has stamped the label "Declared Non-Citizen." *See* J.A. 177. The public interest group issues a report critiquing election officials and highlighting the failures of current citizenship verification methods, including failures in existing federal law. The cancelation lists are published along with the report. As a result of the group's public reporting, our suspected alien learns of her improper cancelation as a "Declared Non-Citizen." Other U.S. citizens soon discover they too were labeled by the county as "noncitizens." The public interest group brings these errors to the attention of state

1

election officials and encourages them to take immediate action to halt the improper removal of eligible U.S. citizens.

This scenario is not a fiction. It is essentially the story of Appellant Public Interest Legal Foundation's (the "Foundation") efforts to catalog failures in the registration system and efforts to petition the government for remedies, and four U.S.-born Virginians who were declared "noncitizens" by elections officials and removed from the voter rolls. The Foundation shone a light on these errors *only* because Virginia officials complied with the National Voter Registration Act ("NVRA") and publicly produced records showing the names of people removed from the voter rolls for citizenship defects.

The discoveries of failures made in Virginia cannot be made in North Carolina because Appellees (the "Board") are hiding records that will allow the public to evaluate governmental decisions to remove suspected aliens from the voter rolls. Without the requested records, only the government will know whether eligible citizens are being denied their voting rights. Such an absurd result is contrary to NVRA's text, this Circuit's precedent, and the transparency and accountability intended by Congress when it passed the NVRA.

The Boards concedes the Foundation's premise, that the Board's methods are "hopelessly inaccurate," Doc. 19 at 6, and "often unreliable" and "outdated," Doc. 19 at 8. It is vital that this Court interpret the NVRA in a way that shines a

2

much-needed light on the Board's work. Congress did not make the Public Disclosure Provision a "take our word for it" statute. Congress mandated a level of transparency that allows the purposes of the statute to be realized. The district court's ruling does not do that and if allowed to stand, the decision below will prevent discovery of disenfranchising errors, like those revealed by the Foundation in Virginia.

The following reasons, and those made in the Foundation's Opening Brief, the decision of the district court should be reversed.

## I.    The Board Has Not Produced Records Showing Results and Methodology for Years Other than 2016.

The State Board production is not complete even under the district court's limiting interpretation of the law. The district court exempted—albeit, erroneously—*only* "records of individual voters," J.A. 299, from the NVRA's broad reach. The Board must therefore disclose, at a minimum, all other records for all years in which the Board conducted any activities to identify, evaluate, and remove ineligible aliens. It is undisputed that the Board has not done so.

The Board concedes that its production of records is limited to 2016. *See* Doc. 9 at 16. The Foundation's request was *not* limited to 2016, but sought records dating back to 2006. J.A. 59-60. The Foundation plausibly alleges in its Amended Complaint that the Board engaged in audits (or other similar activities) to identify and remove noncitizen registrants in years *other than 2016*. The Amended

3

Complaint makes specific and well-pleaded allegations concerning activities conducted in 2013 and 2014. J.A. 9-10 ¶¶ 24 n.1, 26, 28. The Board does not refute those allegations or even address why its production thus far failed to include records from years other than 2016. The district court did not either. Those allegations are presumed true for purposes of this appeal, *Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 770 (4th Cir. 2018), and reversal is thus warranted on this point alone.

In 2013, the Board entered into an agreement to use the Systematic Alien Verification for Entitlements ("SAVE") Program database to identify alien registrants. *See* J.A. 199. This establishes that the Board has engaged in list maintenance activities concerning noncitizens since at least 2013. Yet the Board has produced records for just one of those years. The Board may not withhold records concerning other years even under the district court's erroneous view.

## II.    The Board's Arguments Do Not Overcome the Public Disclosure Provision's Plain and Unambiguous Language.

The Board claims the Foundation cannot show that the Requested Records are subject to disclosure for three reasons. Doc. 19 at 26. Yet none of those arguments overcomes the plain and unambiguous language of the Public Disclosure Provision or this Court's reasoning and decision in *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) ("*Project Vote*").

4

### A. The Text of the Public Disclosure Provision Requires Disclosure of the Requested Records.

The Board's arguments start from an erroneous premise—that the Foundation "must show that Congress gave 'clear and explicit' instructions to invade individual privacy rights." Doc. 19 at 22 (quoting *Maracich v. Spears*, 570 U.S. 48, 64 (2013)). Not so. Rather, the Foundation must show that the Requested Records fall within the scope of the Public Disclosure Provision's plain language. *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697 (E.D. Va. 2010); *Project Vote*, 682 F.3d at 335-337 (awarding summary judgment under same standard). The Requested Records are clearly "records" concerning a "program" or "activity" conducted for the purpose of "ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i)(1). Doc. 13 at 15-21. The Board's brief does not refute this. Instead, the Board appeals to rules of construction and contextual arguments to attempt to change the meaning, contrary to controlling Circuit precedent.

The Board argues that the word "all" must have limits. Doc. 19 at 27. Congress provided those limits and they do not apply here. The Public Disclosure Provision limits disclosure to records that "concern[] the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The Board does not explain why any of the records it is withholding fall outside that language.

5

In fact, the records fall within it. Adhering to the limits Congress created will not result in the "unlimited disclosure of voters' personal information." Doc. 19 at 26. This Court rejected that position in *Project Vote* and should do so again.

Nothing about Congress's use of the word "implementation" suggests additional limitations that place the Requested Records outside the scope of the law's unambiguous text.

> "The term 'implementation' means the act of 'carry[ing] out' or 'accomplish[ing]' or 'giv[ing] practical effect to and ensur[ing] … actual fulfillment by concrete measures." *Id*. at 1134-35. Accordingly, records which relate to carrying out voter registration procedures are subject to the Public Disclosure Provision's requirements.

*Project Vote*, 752 F. Supp. 2d at 707. The Requested Records—including things like correspondence sent to potential aliens—"relate to carrying out" the Board's list maintenance programs and are thus records subject to disclosure.

The Board concedes that the Public Disclosure Provision requires disclosure of the "lists of the names and addresses" of registrants who were sent address-verification notices under another section of the NVRA, 52 U.S.C. § 20507(i)(2). Doc. 19 at 28. Yet the Board argues, "By specifically mentioning disclosure of only address-verification records, Congress has conveyed that *other* kinds of records on individual voters may not be subject to the disclosure requirement." Doc. 19 at 29. This argument is foreclosed by *Project Vote*, which squarely addressed and rejected the argument that the records mentioned in Section 8(i)(2)

6

should be considered an exhaustive list of records subject to disclosure. *Project Vote*, 682 F.3d at 337. What *is* an exhaustive list is the list of disclosure exemptions found in 52 U.S.C. § 20507(i)(1). That provision "identifies the information which Congress specifically wished to keep confidential." *Project Vote*, 752 F. Supp. 2d at 710. It is not a basis to extrapolate and infer additional exemptions as the Board claims. Doc. 19 at 29.

*Maracich v. Spears* does not change anything this Court said in *Project Vote*. For starters, *Maracich* involved a statute that was designed to *limit* the disclosure of information. 570 U.S. at 57-58. The Public Disclosure Provision is designed to expand disclosure.[1] The law interpreted in *Maracich*, however, had exceptions that allowed for disclosure in certain circumstances. *Id*. at 58. *Maracich* does not mean Congress cannot command broad disclosure or that language of great breadth, like "all records," should not be given its plain and ordinary meaning. On the contrary, the Supreme Court instructed that the laws passed by Congress *should* be interpreted literally and broadly if "commanded by the text." *Id*. at 60. Where not so clearly commanded, broad and far reaching language should *still* be given its intended operation unless "that result would contravene the

---

[1] *Maricich* involved "the most sensitive kind of information, including medical and disability history and Social Security numbers." 570 U.S. at 64. The Foundation has asked to inspect documents like voter registration forms (with Social Security numbers redacted) and form letters sent to registrants.

7

statutory design." *Id*. *Maracich* does not require courts to reflexively apply limitations to all statutes, like the Public Disclosure Provision, that use broad language, like "all records." *Project Vote*, 682 F.3d at 336. ("[T]he use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth.").

Regardless, the controlling authority in *Project Vote* is consistent with *Maracich*. *Project Vote* construed the Public Disclosure Provision "consistent with the statutory framework and design." *Maracich*, 570 U.S. at 60. Congress designed the NVRA to "increase the number of eligible citizens who register to vote" while "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1), (4). This Court declined to limit disclosure beyond Social Security numbers because "[p]ublic disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections." *Project Vote*, 682 F.3d at 339-40.

**B. The Goals of the NVRA Cannot Be Accomplished Without Disclosure of Some Personally Identifying Information.**

It is true that the Public Disclosure Provision was designed primarily so that the public could monitor the activities of election officials. "State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of

8

democracy will suffer." *Project Vote*, 682 F.3d at 339. That Congress intended to make list maintenance activities transparent does not mean it intended to shield all personally identifying information. Disclosure of some personally identifying information is necessary to effectuate the transparency and accountability that Congress intended, such as names and addresses and birth dates, so that one registrant can be distinguished from another.

First, the Public Disclosure Provision expressly requires disclosure of personally identifying information. Section 8(d)(2) describes the address-confirmation notice that must be sent to any registrant prior to cancelation. 52 U.S.C. § 20507(d)(2). Section 8(i)(2) requires each state to maintain and make public the "lists of the names and addresses of all persons to who notices described in subsection (d)(2) are sent." 52 U.S.C. § 20507(i)(2). Congress mandated that disclosure of personally identifying information was necessary to monitor list maintenance activities that could result in the removal of a registrant. Congress believed such information is also helpful for monitoring eligibility evaluations for other reasons, including death, felony conviction, or citizenship status. In fact, the NVRA's express language and this Court's controlling authority make it unreasonable to conclude that Congress intended to keep the names of registrants a secret because that would produce the absurd result of eliminating the transparency and accountability mandated by the NVRA. *Lara-Aguilar v. Sessions*, 889 F.3d

9

134, 144 (4th Cir. 2018) (Courts must "avoid 'interpretations of a statute which would produce absurd results … if alternative interpretations consistent with the legislative purpose are available.'").

Second, controlling authority has already held that it is "self-evident" that disclosure of "personal information" will "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote*, 682 F.3d at 339. Indeed, personally identifying information was vital to the discovery that Virginia was improperly removing eligible citizens as "Declared Non-Citizens."

Third, the Board already publishes personally identifying information and voting history of all active and removed registrants on its website, including each registrant's full name, home address, mailing address, full phone number, and party affiliation.[2] Yet they offer not a single instance where the publication has resulted in harm or created a burden on the right to vote.

Fourth, the Public Disclosure Provision's text unambiguously requires disclosure of "all records" related to voter list maintenance. 52 U.S.C. § 20507(i)(1). If Congress wanted to categorically exempt personally identifying information from this broad command, it would have done so in clear terms. It did not. Instead, Congress specifically identified the only two pieces of information it wished to be confidential. 52 U.S.C. § 20507(i)(2), neither of which apply here.

---

[2] https://dl.ncsbe.gov/index.html?prefix=data/ (last accessed March 15, 2020).

The Board asks this Court to interpret the NVRA so that only the government knows the identity of the people it has labeled noncitizens and removed from the rolls. Congress unambiguously mandated that records of such decisions are public.

### C. There is No Basis for the Board's Belief that Disclosure Will Burden Voting Rights.

Last, the Board claims that disclosure of the Requested Records would "have a chilling effect on the willingness of many Americans to register to vote at all." Doc. 19 at 35. The Court should reject this claim for at least three reasons.

First, the claim is based on this false premise: "If these requests were granted, the affected voters—the majority of whom are eligible citizens—would be publicly branded as possible felons." Doc. 19 at 35. This is no basis for that belief. The Board's audits are not criminal investigations. They are list maintenance activities. The Board investigates the eligibility of scores of registrants for all sorts of reasons, including reasons that might subject the registrant to penalties.  List maintenance records are not criminal investigation records. Doc. 13 at 34-35. Nor does the simple fact of disclosure "*publicly brand*" anyone as a "possible felon." Records showing that registrants affirmed their citizenship would be public and resolve the Board's concerns.

Second, there is nothing in the record to support the Board's claim. When this Court narrowly exempted Social Security numbers from disclosure in

*Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993), it did not do so based on speculation and hypotheticals. Rather, it rested its decision on a body of evidence, including the findings of Congress. *Greidinger*, 988 F.2d at 1353 (quoting S.Rep. No. 1183, 93d Cong., 2d Sess.). Here, the Board does not offer a single instance where the evaluation of citizenship status caused an otherwise eligible registrant to forego registration or point to Congressional findings to support its position. The Board offers no limiting principle to this blanket exemption from disclosure, certainly not one consistent with the controlling authority of this Court.

In rare contexts, the Supreme Court has required groups seeking an exemption from facially valid disclosure requirements to demonstrate a "reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed." *Citizens United v. FEC*, 558 U.S. 310, 370 (2010) (discussing disclosure of First-Amendment protected campaign contributions). Those seeking an exemption bear a heavy burden. Such exemptions have been granted in only a few cases. For example, in *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958), petitioners "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." In *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 99 (1982), the challengers

"introduced proof of specific incidents of private and government hostility" including "threatening phone calls and hate mail, the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office." In contrast, exemptions have been denied where a plaintiff presented "anecdotal evidence … that offers merely a speculative possibility of threats, harassment, or reprisals." *Doe v. Reed*, 823 F. Supp. 2d 1195, 1204 (W.D. Wash. 2011); *see also Protectmarriage.com v. Bowen*, 830 F. Supp. 2d 914, 933 (E.D. Cal. 2011) (requiring "evidence of thousands of acts of reprisals, threats or harassment" to obtain disclosure exemption). Where a group "has offered no evidence" of threats or harassment, as is the case here, no exemption is warranted. *Citizens United*, 558 U.S. at 370.

"There are laws against threats and intimidation; and harsh criticism, short of unlawful action, is a price our people have traditionally been willing to pay for self-governance. Requiring people to stand up in public for their political acts fosters civic courage, without which democracy is doomed." *Doe v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J., concurring). The same is true here. The Public Disclosure Provision is facially valid. The Supreme Court requires real evidence that disclosure will harm constitutional rights before granting exemptions. This Court should do the same.

The Board further claims that "if Americans knew that registering to vote could result in the bulk disclosure of their personal information, they would be discouraged from exercising their fundamental right to vote." Doc. 19 at 35. If that were true, we would expect to see large-scale evidence of it in North Carolina because the Board already publishes the personal information and voting history of all active and canceled registrants on its website, including each registrant's full name, home address, mailing address, full phone number, and party affiliation. They have not proffered a single example where publication led to abuse, harassment, or otherwise discouraged someone from voting.

Congress intended for citizenship to be evaluated when it passed the NVRA. *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1344 (11th Cir. 2014) ("The [NVRA] is premised on the assumption that citizenship is one of the requirements for eligibility to vote.") This Court has similarly observed that citizenship verification is an indispensable part of voter list maintenance. *Project Vote*, 682 F.3d at 336. It is illogical that Congress mandated citizenship attestations but list maintenance documents concerning citizenship are so sensitive as to be exempt from the Public Disclosure Provision.

Third, the Foundation has asked to inspect records concerning individuals who affirmed their citizenship *and* individuals who acknowledged they were not U.S. citizens. Because noncitizens cannot lawfully vote, the concern that disclosure

14

will burden their voting rights is nonsensical. The Board brushes aside this gaping hole in its briefing by touting that "the vast majority of voters who are investigated as possible noncitizens turn out to be citizens who are eligible to vote." Doc. 19 at 36. So show the public, don't tell the public. Regardless, it does nothing to change the fact that *some* registrants acknowledged they are not U.S. citizens. *See* J.A-204 ("Upon receipt of a letter from NCSBE, 41 of these individuals acknowledged they were not U.S. citizens."). With respect to those individuals, the Board cannot "show[] that disclosure … would create a substantial burden on the voter, to the degree that the voter would forego registering to vote." *Project Vote*, 752 F. Supp. 2d at 710 n.20. This Court must address this fatal flaw in the district court's reasoning.

The Board flips the Public Disclosure Provision on its head when it argues the Foundation must "identify [a] reason to believe that the Board has not properly discharged its duty" before the Board must disclose records. Doc. 19 at 36. In other words, the Board believes transparency comes only *after* mistakes have been made. And only the Board gets to decide if they made a mistake. Such a position is not only contrary to the law's text, it risks causing the very same disenfranchising errors that occurred in Virginia. "Public disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections." *Project Vote*, 682 F.3d at 339-40.

15

### III. Disclosure Will Not Require the Board to Violate Its Alleged Legal Obligations.

The Board argues this Court must interpret the Public Disclosure Provision in a way that harmonizes it with other federal laws—namely, the Driver's Privacy Protect Act ("DPPA") and the Privacy Act. Doc. 19 at 39-40. Yet the Board advances a position that would obliterate the transparency Congress intended when it passed the NVRA.

Moreover, a true understanding of the methodology of the Board's process for removing aliens from the voter rolls demonstrates that the ultimate determination of citizenship status—and therefore the cause of any list maintenance actions—is *not* information maintained in other databases. Rather, it is information *supplied by the registrants themselves*. Doc. 19 at 10-11. Responses to list maintenance inquiries by the registrants are list maintenance documents. The Board seeks to rely on federal privacy laws to hide information that did not derive from relevant databases. The remaining registrant data—including the registrant's name—was already in the possession of the Board throughout the process and well past any contact with relevant non-election databases. That the Board chose to look at discrete and isolated data in other databases to help verify citizenship status does not transmogrify all of that data into data that is confidential under *other* federal laws—particularly information that was provided by registrant. For the reasons explained in the Foundation's Opening Brief and those that follow, it is simply

16

false that the State "Board cannot turn over any of these records without violating federal privacy laws." Doc. 19 at 39. In the event the Court has concerns about other statutes, the proper solution is not complete secrecy. Rather, this Court should reverse the lower court and permit factual discovery about the author and custodian of the Requested Records. Granting a motion to dismiss without such an inquiry is plain error.

### A. Federal Privacy Laws are Not Implicated Because the Source of a Registrant's Citizenship Status is Not a Federal Database.

The Board explains that the final step in its program to remove aliens is "the Board's own investigation." Doc. 19 at 11. During that step, the registrant is asked to "return a form that admits or denies that they are noncitizens" and to include "a copy of an official document" that proves their citizenship. Doc. 19 at 11 (quoting J.A. 53). During the 2016 audit, 41 individuals who received the form, returned it "acknowledge[ing] they were not U.S. citizens." J.A. 29. These individuals were removed from the voter rolls. An additional 34 individuals returned the form and "provided proof of citizenship." J.A. 30. These individuals were not removed from the voter rolls.

As this process reveals, the ultimate and sole determination of citizenship status—and therefore any list maintenance action taken—is information provided *by the registrants*, not information maintained in state or federal databases. The DPPA does not protect that information because it was not "obtained … in

connection with a motor vehicle record." 18 U.S.C. § 2721(a). The Privacy Act does not protect that information because it is not a "record" derived from a "system of records." 5 U.S.C. § 552a(b). It makes no difference that the same information might be housed in the SAVE Program database because "[t]he disclosure of information derived solely from independent sources is not prohibited by the statute even though identical information may be contained in an agency system of records." *Thomas v. United States Dep't of Energy*, 719 F.2d 342, 346 (10th Cir. 1983).

Because the source of a registrant's citizenship status is *not* a confidential database, but is the registrant herself, the DPPA and Privacy Act are not implicated and cannot be used to completely thwart the transparency Congress intended.

### B. Even if Implicated, the Drivers Privacy Protection Act Does Not Categorically Prohibit Disclosure of All Requested Records.

Even if the DPPA is implicated, it does not categorically prohibit disclosure and does not support dismissal. A plaintiff is entitled to discovery to test the assertions of a litigant and to explore the true author of these documents. The North Carolina Voter Registration Application requires the registrant to provide her citizenship status when registering to vote.[3] The Board's explains that it uses certain DMV records—namely, citizenship status "codes" and "alien identification

---

[3] *Available at* https://dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf (last accessed March 16, 2020).

numbers"—to later verify the citizenship status of the registrant. Doc. 19 at 40. All other registrant data used in the verification process—including the registrant's name—originates with the Board. The Board's position is this: if election officials use any piece of information contained in a DMV record—even if for verification purposes only—*all* records and information that are remotely connected to that use are thereafter confidential under the DPPA. If that view of the DPPA is adopted, it would gut the Public Disclosure Provision.

If adopted, the Board's position would shield from public view countless list maintenance records beyond those at issue here. The NVRA is also known as "Motor Voter" because it requires that an application for a driver's license—which is a "motor vehicle record" under the DPPA, 18 U.S.C. § 2725(1)—to "serve as an application for voter registration." 52 U.S.C. § 20504(a)(1). Accordingly, residents of North Carolina can "register to vote or change their registration" when "obtaining or renewing a North Carolina license or ID."[4] *See also* N.C. Gen. Stat. § 163-82.19(a). Information supplied in connection with a driver's license—and by operation a voter registration application—includes the registrant's name, address, and birthday, among other personal information.[5] That personal information is

---

[4] https://www.ncdot.gov/dmv/license-id/driver-licenses/new-drivers/Pages/other-registrations.aspx (last accessed March 16, 2020).

[5] Other federal appellate court found that "a voter registration form filled out pursuant to the NVRA does not 'pertain' to any of the listed DMV documents" protected by the DPPA because "[t]he voter registration form, which is filled out

transmitted to election officials and used to create the most basic voter registration records. That personal information travels with the registrant during his entire tenure as a registered voter. North Carolina's compliance with core provisions of the NVRA would be shielded in secrecy if the extreme position of the Board were adopted. There is no way to know whether government officials are complying with the law except for the Public Disclosure provision. It is also used to evaluate eligibility for a host of reasons, including death, felony conviction, and relocation. Under the Board's view, record of those activities could not be made public.

That secrecy could attach to far more than those individuals who registered to vote at the DMV. North Carolina law provides,

> The Department of Transportation jointly with the Board of Elections shall develop and operate a computerized interface to match information in the database of the statewide voter registration system with the drivers license information in the Division of Motor Vehicles to the extent required to enable the Board of Elections and the Department of Transportation to *verify the accuracy* of the information provided on applications for voter registration, *whether the applications were received at drivers license offices or elsewhere.*

N.C. Gen. Stat. § 163-82.19(c) (emphasis added). The Board thus uses motor vehicle records to verify *other* registrant data in very much the same way it verifies

---

*separately* and at the applicant's option, is not a part, member, accessory, or product of a motor vehicle operator's permit." *Lake v. Neal*, 585 F.3d 1059, 1061 (7th Cir. 2009) (emphasis added). North Carolina, however, must provide for voter registration "on a part of the form" used to issue a driver's license. N.C. Gen. Stat. § 163-82.19(a). Moreover, North Carolina additionally verifies *all* registration data using driver's license data. N.C. Gen. Stat. § 163-82.19(c).

citizenship status. If that verification process transforms the Board's voter registration data into a motor vehicle record shielded by the DPPA, there is little useful list maintenance data that could ever be made public.

Legislative history further supports the conclusion that Congress did not intend for the DPPA to impose liability for the disclosure of derivative list maintenance records created and maintained by election officials. Congress declined to draft the DPPA to make it unlawful to get or use information in public records, as opposed to protected records of a state DMV. In defining "[a]dditional unlawful acts" under Section 2722(a), both the Senate and House rejected a theory of derivative liability. The Senate bill came to conference broadly barring use of personal information "… obtained from a motor vehicle department of any State, or any officer or employee thereof, *or other person . . .*", regardless of the source. 139 Cong. Rec. S15745-01, 1993 WL 470986 (Proposed Sec. 2720(b)(1) (emphasis added)). The related House bill had a similarly broad conception of liability, providing that "[i]t shall be unlawful for any person knowingly to obtain or use personal information, *derived from a motor vehicle record*, for any purpose not described in section 2721(b) of this title." 139 Cong. Rec. E2747-01, 1993 WL 448643 (Proposed Sec. 2722(a) (emphasis added)).

That is, the initial drafts purported to impose liability for a person who got "personal information" that started out in a "motor vehicle record," even if she did

not actually obtain it from a "motor vehicle record." However, the House bill that came to conference and the text ultimately enacted removed the term "derived" from the statute and did not include the Senate's broad bar on using personal information obtained from some "other person." That language, rejecting derivative liability, remains the law today. 18 U.S.C. § 2722(a).

The records the Foundation seeks are voter list maintenance records created and maintained by the Board. If this Court feels the DPPA is relevant here, it should construe both statutes only so far as is necessary to accomplish the purposes of both laws. It should not, for the reasons stated, turn the Board's reliance on one discrete "code" into an impenetrable barrier of secrecy. Most of all, this Court should be cognizant that walling off motor vehicle records from the reach of the NVRA will shield from scrutiny whether a state is in compliance with other provisions of the NVRA, such as the obligation to move intra-state relocations automatically to the new address for voting purposes.

### C. Even if Implicated, the Privacy Act Does Not Categorically Prohibit Disclosure.

Like its arguments concerning the DPPA, the Board's Privacy Act arguments depend on something that is not accurate—that the Foundation seeks information maintained in a confidential federal database. To the contrary, the Foundation seeks derivative list maintenance records created and maintained entirely by the Board. Those records are public records under the plain language of

22

the Public Disclosure Provision. Again, if nothing else, granting a motion to dismiss was error here. The Foundation had no opportunity to explore the true author or origins of various documents in discovery. Instead of the complaint's allegations being taken as true, the lower court took the Board's characterization of facts as true, with some characterizations made under seal.

The Board ignores that when this Court was asked to consider the effect of other laws on the Public Disclosure Provision, it declined, explaining consideration of other laws is not necessary when the statutory language is clear:

> Where "the language is plain and 'the statutory scheme is coherent and consistent,' there is no need to inquire further." *In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 483 (4th Cir. 1994). Accordingly, we need not consider the impact of HAVA and the MOVE Act on the language of Section 8(i)(1)[.]

*Project Vote*, 682 F.3d at 334. Consideration of the Privacy Act is likewise not necessary.

Even if considered, the Privacy Act does not categorically prohibit disclosure of the Requested Records. The Memorandum of Agreement, J.A. 190-199 ("MOA") governing the Board's use of the SAVE Program database explicitly disavows conflict with the NVRA: "Nothing in this MOA is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the [NVRA.]" J.A. 198 (MOA § VI(J)). The Board says that disclaimer does not apply because it is "generic provision." Doc. 19 at 48.

23

However "generic" it may seem, it cannot be brushed aside so easily because compliance with the Public Disclosure Provision is a "duty" and a "responsibility" of the Board under the NVRA and because adopting the Board's position would make secret a process that relies on data that the Board says is "often unreliable or outdated." Doc. 19 at 8.

The NVRA itself also provides strong evidence that Congress does not believe the Privacy Act is a barrier to disclosure of derivative list maintenance records. Congress encourages state election officials to use of "change-of-address information *supplied by the Postal Service* through its licensees," (also known as the National Change of Address ("NCOA") Program) to perform list maintenance based on changes in residency. 52 U.S.C. § 20507(c)(1)(A) (emphasis added). That change-of-address information is thus derived from a federal database. Yet Congress requires disclosure of the "names and addresses" of all registrants flagged by elections officials using information in that database. 52 U.S.C. § 20507(i)(2). This disclosure provision would make no sense if the use of federal NCOA data made list maintenance records confidential under the Privacy Act.

The same logic applies to other federal databases that election officials are encouraged to use—like the SAVE Program database. Congress would not have intended for the general and broad disclosure requirements of Section 8(i) to be categorically undone when election officials rely on information in those databases

24

to make voter rolls more current and accurate. Where two laws are "capable of co-existence," courts have a "duty ... to regard each as effective." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984). The NVRA and the Privacy Act can be harmonized here by reading the latter to protect the discrete alien identification numbers accessed by the Board and reading the former as authorizing disclosure of derivative list maintenance records, such original voter registration forms.

## IV. Interpreting the Public Disclosure Provision According to its Text Raises No Constitutional Concerns.

The Board asks this Court to establish—in this public records case—a *Constitutional right* to keep private the fact that one's eligibility to vote was examined by election officials. Congress already resolved this issue by enacting the Public Disclosure Provision. If the Board is making a Constitutional challenge, it should plainly do so, and do so properly. In any event, granting a motion to dismiss that relies any such assertion is error. The Board advances this hardly developed argument on imaginary assertions about the Foundation's intended use of the Requested Records. *See* Doc. 19 at 68 ("PILF seeks to burden voting rights by imposing an onerous condition on the right to vote—the burden of being publicly branded as a potential felon."); Doc. 19 at 69 ("PILF's requests seek to burden voting rights selectively, in a way that harms a protected class."). There is no basis to entertain these scurrilous accusations and baseless arguments.

This Court assumes that Congress "legislates in light of constitutional limitations." *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998) (citations omitted). The doctrine of constitutional avoidance applies only where there are "grave doubts," *id*. at 237, or a "serious likelihood that the statute will be held unconstitutional," *id*. at 238. No such circumstances are present. The NVRA's constitutionality is established. *Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1995); *ACORN v. Edgar*, 880 F. Supp. 1215 (N.D. Ill. 1995). Furthermore, this Court has already balanced privacy concerns against "the many benefits of public disclosure" and found that "[w]ithout such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339.

> It is not the province of this court, however, to strike the proper balance between transparency and voter privacy. That is a policy question properly decided by the legislature, not the courts, and Congress has already answered the question by enacting NVRA Section 8(i)(1) … .

*Id*. at 339-40. There is no reason to revisit what this Court decided in *Project Vote*.

## V.     Any Concerns Should be Addressed Through Discovery and Redaction, Not Complete Secrecy.

If any concerns remain, it was error to grant the motion to dismiss before any discovery could be conducted about the authorship and contents of the Requested Records. Redaction of discrete information was one way the Federal Rules would allow a case to proceed instead of the erroneous grant of complete secrecy. Such a solution would allow for at least some transparency and

26

accountability. For example, the Board claims that after the 2016 election, 41 registrants acknowledged in writing that they were not U.S. citizens. J.A. 204. Requiring disclosure of those writings—with names and addresses partially redacted—would allow the public to verify that 41 such concessions were actually made. Requiring disclosure of those 41 individuals' original voter registration applications—with names and addresses redacted—would allow the public to see whether each canceled alien answered "yes" or "no" to the question "Are you a United States citizen?" Instances where applicants checked "no," but were registered to vote anyway, should not be swept under the rug. Bringing these instances to light will allow election officials to make appropriate corrections in the registration process and avoid similar errors in the future.

None of the cases the Board cites support exemption of an entire category of records. *See* J.A. 35. Rather, each permitted redactions of limited information, such as telephone numbers. Those cases also do not control—*Project Vote* does. The minimal document production authorized by the district court is woefully inadequate to accomplish Congress's goals. This Court should not endorse relief that renders federal law effectively meaningless.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order and remand this case for further proceedings.

Dated: March 18, 2020.

Respectfully submitted,

  /s/ Noel H. Johnson
Noel H. Johnson (WI Bar No. 1068004)
Kaylan L. Phillips (IN Bar No. 30405-84)
PUBLIC INTEREST LEGAL FOUNDATION
32 East Washington Street, Suite 1675
Indianapolis, IN 46204
Tel: 317-203-5599
Fax: 888-815-5641
njohnson@publicinterestlegal.org
kphillips@publicinterestlegal.org
*Counsel for Appellant Public Interest Legal Foundation*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limits of Rule 32(a)(7)(B)(ii) because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 6,498 words.

This brief also complies with the typeface requirements because this brief has been prepared in a proportionally space type face using Microsoft Word in 14-point Times New Roman.

Dated: March 18, 2020.

  /s/ Noel H. Johnson
Noel H. Johnson
*Counsel for Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2020, I electronically filed the foregoing

Appellant's Reply Brief using the Court's ECF system, which will serve notice on

all parties.

Dated: March 18, 2020

　　　　　　　　　　　　　　 /s/ Noel H. Johnson　　　　　　
　　　　　　　　　　　　　　Noel H. Johnson
　　　　　　　　　　　　　　*Counsel for Appellant*